IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENDO PHARMACEUTICALS INC. and PENWEST PHARMACEUTICALS CO., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-731 |
| IMPAX LABORATORIES, INC., | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
MOTION FOR EXPEDITED DECLARATORY JUDGMENT RELIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Mary B. Graham (#2256)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mgraham@mnat.com
jheaney@mnat.com
  *Attorneys for Plaintiffs*
  *Endo Pharmaceuticals Inc. and Penwest
  Pharmaceuticals Co.*

*Of Counsel*:

Martin J. Black
George G. Gordon
Ann M. Caviani Pease
Robert D. Rhoad
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
(215) 994-4000

Robert J. Gunther, Jr.
Lisa J. Pirozzolo
James P. Barabas
WILMER CUTLER PICKERING HALE AND
DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

November 20, 2007

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDING ................................................................. 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

    A.    OVERVIEW OF THE ANDA LITIGATION PROCESS.................................... 3

    B.    IMPAX'S IMPROPER ATTEMPT TO TRIGGER THE ANDA
          LITIGATION PROCESS ................................................................... 6

ARGUMENT .......................................................................................................... 8

I.     RULE 57 PROVIDES FOR EXPEDITING DECLARATORY RELIEF WHERE,
      AS HERE, THE CLAIM INVOLVES AN ISSUE OF LAW THAT TURNS ON
      UNDISPUTED FACTS ................................................................................ 8

II.    THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED
      DECLARATORY RELIEF BECAUSE IMPAX'S PARAGRAPH IV
      CERTIFICATIONS ARE NULL AND VOID.................................................. 11

    A.    Absent An ANDA That Has Been Accepted By The FDA, A Generic
          Manufacturer Has No Legitimate Basis To Trigger The ANDA  Litigation
          Process ................................................................................ 11

    B.    The Undisputed Facts Demonstrate That Impax Had No Basis To Trigger
          The ANDA Litigation Process And That Plaintiffs Are Entitled As A
          Matter Of Law To The Declaratory Relief They Seek ........................ 12

CONCLUSION...................................................................................................... 14

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE**

*Eli Lilly and Co. v. Medtronic, Inc.,*
    496 U.S. 661 (1990) .................................................................10

*Medimmune, Inc. v. Genentech, Inc.,*
    -- U.S. --, 127 S.Ct. 764 (2007) ........................................8-9

*Merck & Co., Inc. v. Apotex, Inc.,*
    488 F. Supp. 2d 418 (D. Del. 2007)...................................10

*Minnesota Mining and Manuf. Co. v. Barr Labs, Inc.,*
    289 F.3d 775 (Fed Cir. 2002)..............................................14

*Pence v. Lexington Ins. Co.,*
    2006 WL 133475 (S.D. Tex. Jan. 17, 2006) .........................9

*Rechler P'Ship v. Resolution Trust Corp.,*
    1990 WL 711357 (D.N.J. Sept. 7, 1990) .............................9

**STATUTES, RULES & REGULATIONS**

21 U.S.C. § 355...................................................................*passim*

28 U.S.C. § 2201(a) ....................................................................8

35 U.S.C. § 156 ...........................................................................1

35 U.S.C. § 271.............................................................1, 10, 14

35 U.S.C. § 282 ...........................................................................1

Fed. R. Civ. P. 57.....................................................................1, 9

21 C.F.R. § 314.94(a)..................................................................4

21 C.F.R. § 314.95(b) ..........................................................*passim*

21 C.F.R. § 314.107(b)(3).............................................................5

**OTHER AUTHORITIES**

54 Fed. Reg. 28872, 28887 (July 10, 1989).........................1-2, 12

59 Fed. Reg. 50338, 50350 (Oct. 3, 1994)..............................12

H.R. Rep. 98-857(I), reprinted in 1984 U.S.C.C.A.N. 2647 ........11

Pub. L. No. 98-417........................................................................1

## NATURE AND STAGE OF PROCEEDING

Plaintiffs Endo Pharmaceuticals Inc. ("Endo") and Penwest Pharmaceuticals Co. ("Penwest") (collectively, "Plaintiffs") filed this action against defendant Impax Laboratories, Inc. ("Impax") on November 15, 2007. Pursuant to Fed. R. Civ. P. 57, Plaintiffs now move for expedited declaratory judgment relief, declaring that Impax's attempt to trigger the process for resolving patent disputes relating to Abbreviated New Drug Applications ("ANDAs") was premature, improper and contrary to law. Resolving Plaintiffs' request for declaratory judgment relief requires no discovery. Nor does it require an evidentiary hearing. Rather, it raises a pure legal issue that turns on a simple and undisputed fact: as Impax has admitted, the FDA has rescinded acceptance of its ANDA for a generic version of OPANA® ER. Because Impax has no ANDA which has been accepted for substantive review, Impax's attempt to trigger the ANDA patent dispute resolution process is null and void as a matter of law.

## SUMMARY OF ARGUMENT

In the so-called "Hatch-Waxman Act," Pub. L. No. 98-417, *codified at* 21 U.S.C. §§ 355, 360cc, and 35 U.S.C. §§ 156, 271, 282, Congress crafted a process for resolving patent disputes that may arise when a drug company files an ANDA seeking approval to market a generic version of an innovator drug product. Generic applicants may only trigger that process by properly serving a so-called "Paragraph IV Notice" on the innovator drug company. The law, however, is clear: generic manufacturers like Impax cannot trigger the ANDA litigation process by serving Paragraph IV Notices unless and until they have submitted an ANDA that the U.S. Food and Drug Administration ("FDA") has formally accepted as being sufficiently complete to permit substantive review. *See* 21 C.F.R. § 314.95(b). As the FDA has explained, "the [Federal Food, Drug, & Cosmetic Act ("the Act")] and legislative history . . . demonstrate that Congress

did not intend incomplete application submissions to trigger legal action . . . ."  54 Fed. Reg. 28872, 28887 (July 10, 1989).

This makes perfect sense.  Allowing anything less than an ANDA that has been accepted as ready for substantive review to trigger the litigation process would wreak havoc with that process by allowing generic manufacturers to file incomplete, sham ANDAs which would nevertheless force the innovator company to litigate claims that are not – and may never become – ripe.  Simply put, if an ANDA is so deficient and incomplete that the FDA is not even willing to accept it for review, there is no reason to force the courts and parties to invest the time and money required to pursue potentially unnecessary patent litigation.

In this case, it is ***undisputed*** that Impax does not have an ANDA on file that the FDA has accepted for review.  Indeed, Impax itself issued a press release announcing that the FDA rescinded acceptance of its ANDA for OPANA® ER.

Impax is trying, nevertheless, to do exactly what Congress sought to prevent— to game the system and gain an unfair and unlawful advantage against Endo, Penwest and other generic manufacturers by prematurely triggering the ANDA litigation process under the Hatch-Waxman Act.  Despite the fact that it has no ANDA accepted for review by the FDA, Impax inundated Endo and Penwest with no fewer than six separate Paragraph IV Notices.

Plaintiffs have asked Impax to withdraw its Paragraph IV Notices, but Impax has refused to do so.  Endo and Penwest, therefore, had no practical choice but to bring this litigation to preserve their rights under the ANDA patent litigation process.  Impax's actions have created a definite and concrete controversy over whether the parties must pursue this litigation now, when the patent infringement claims are premature because Impax does not have – and may never have – an ANDA accepted for review by the FDA.

The Court should put an immediate end to Impax's gamesmanship. The material facts are undisputed. Moreover, the requested declaratory relief is based on a pure question of law and goes directly to the ripeness of, and the Court's subject matter jurisdiction over, the patent infringement claims. Consequently, Endo and Penwest respectfully request that the Court issue an order declaring that:

- Impax's Paragraph IV Notices are null, void and without legal effect and it was not entitled to trigger the ANDA patent litigation process with respect to the relevant patents;

- This Court has no subject matter jurisdiction over patent infringement litigation involving the relevant patents because the Paragraph IV Notices served by Impax are null, void and of no legal effect;

- The Paragraph IV Notices served by Impax did not commence the 45-day period for filing a patent infringement action pursuant to 21 U.S.C. § 355(j)(5)(B)(iii);

- If and when the FDA accepts Impax's ANDA, Impax must submit and serve on Endo and Penwest new patent certifications at that time pursuant to 21 U.S.C. § 355(j)(2)(A)(vii).

Plaintiffs also respectfully request that the Court decide their declaratory judgment claim up-front, on an expedited basis, before the Court and the parties are put to the unnecessary expense and burden of a full-scale patent infringement case involving claims that may never need to be decided.

## STATEMENT OF FACTS

### A.    OVERVIEW OF THE ANDA LITIGATION PROCESS

The Act provides that a company seeking to market a new pharmaceutical drug in the United States must first obtain approval from the FDA, typically through the filing of a New Drug Application ("NDA"). *See* 21 U.S.C. § 355(a). The sponsor of the NDA is required to submit information on all patents claiming the drug that is the subject of the NDA, or a method

of using that drug, and the FDA then lists such patent information in its publication, the *Approved Drug Products with Therapeutic Equivalence Evaluations*, which is commonly referred to as the "Orange Book." *See* 21 U.S.C. § 355(b)(1) and (c)(2).

On the other hand, a company seeking to market a generic version of an innovator drug is not required to submit a full NDA. Instead, it may file an Abbreviated New Drug Application ("ANDA"). *See* 21 U.S.C. § 355(j). The generic drug approval process is considered "abbreviated" because the generic manufacturer may piggyback on the innovator company's data and the FDA's prior finding of safety and efficacy by demonstrating, among other things, that the generic product is bioequivalent to the previously approved drug (the "listed drug" or "innovator drug").

As part of the generic approval process, the Act provides that an ANDA filer must provide certifications addressing each of the patents listed in the Orange Book for the innovator drug at issue. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12). An ANDA filer may certify, for instance, that it believes a patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4). This is known as a so-called "Paragraph IV Certification."

The sponsor of an ANDA with a Paragraph IV Certification must also provide notice to both the owner of the listed patent and the sponsor of the NDA for the listed drug. This "Paragraph IV Notice" must state that the "FDA has received an abbreviated new drug application submitted by the applicant containing any required bioavailability or bioequivalence data or information" and must also include a detailed statement of the factual and legal bases for

the applicant's belief that the challenged patent in invalid or not infringed by the proposed generic product. 21 C.F.R. § 314.95(c); *see also* 21 U.S.C. § 355(j)(2)(B).

If the patentee or NDA holder files a patent infringement action within 45 days of receiving a Paragraph IV Notice, final approval of the ANDA is generally subject to a 30-month stay. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(b)(3). The Act also provides that the first ANDA applicant to submit and lawfully maintain a Paragraph IV Certification with respect to an approved drug may be entitled to 180 days of marketing exclusivity, during which time no other ANDA filer may come to market with a competing generic product. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

Timing is crucial when it comes to applying the 30-month stay and determining eligibility for the 180-day exclusivity period. The 30-month stay, for example, applies if the innovator company files an infringement action within 45 days of receiving a Paragraph IV Notice, but only if the relevant patent was submitted for listing in the Orange Book before the ANDA applicant had submitted a substantially complete ANDA. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Likewise, a generic manufacturer is entitled to the 180-day market exclusivity period only if it is deemed to be a "first applicant," as determined based on the date that it has submitted "a substantially complete application that contains and lawfully maintains a [Paragraph IV Certification] for the drug." *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb).

Generic applicants thus have powerful incentives to obtain the earliest filing date possible for their ANDAs, even if it requires filing a "sham" or incomplete ANDA. Congress and the FDA recognized this risk. As a result, generic applicants may not trigger the ANDA litigation process until they have an ANDA on file that has been accepted by the FDA for substantive review. *See* 21 C.F.R. § 314.95(b) ("The applicant shall send the [Paragraph IV]

notice . . . when it receives from FDA an acknowledgment letter stating that its abbreviated new drug application is sufficiently complete to permit substantive review").

### B.    IMPAX'S IMPROPER ATTEMPT TO TRIGGER THE ANDA LITIGATION PROCESS

The basic facts relevant to Plaintiffs' declaratory judgment claim are not in dispute:

On June 1, 2006, the FDA approved Endo's new drug application No. 21-610 for OPANA® ER tablets, which contain oxymorphone hydrochloride, under § 505(b) of the Act, 21 U.S.C. § 355(b), for the relief of moderate-to-severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. *See* http://www.fda.gov/cder/rxotcdpl/pdpl_200606.htm.[1]

Thereafter, in July 2007, the U.S. Patent & Trademark Office ("PTO") issued a Notice of Allowance for a patent application which covers the formulation of OPANA® ER. On July 23, 2007, Penwest issued a press release disclosing the Notice of Allowance. That press release described the patent "as an important component in the intellectual property estate protecting OPANA ER" and stated that "Endo will list this patent at the earliest opportunity in the Orange Book . . . ." *See* Ex. 1.

The possible listing of a new patent in the Orange Book had several important implications for Impax and any other generic manufacturer contemplating filing an ANDA with respect to OPANA® ER. First, Impax knew that once this new patent issued, Endo would be required to submit information about the patent to the FDA for listing in the Orange Book.

---

[1]    Pursuant to 21 U.S.C. § 355(j)(5)(F)(iii), OPANA® ER has been granted a period of regulatory exclusivity through June 22, 2009, meaning that a generic version of OPANA® ER cannot be approved for marketing before that date, even absent any patent protection.

Second, Impax also knew that if it could get an ANDA on file before that patent was submitted to the FDA, it might be able to avoid the 30-month stay on approval that typically applies to ANDAs subject to patent infringement litigation. *See* 21 U.S.C. § 355(j)(5)(B)(iii). Finally, Impax was also aware that if it was the first generic applicant to file an ANDA with a Paragraph IV Notice challenging the patent, it might be entitled to 180 days of exclusivity. In short, learning that the PTO was about to issue a new patent on OPANA® ER provided Impax with a significant incentive to rush to file an ANDA with the FDA as quickly as possible.

On October 2, 2007, the PTO issued United States Patent No. 7,276,250 ("the '250 patent"), entitled "Sustained Release Formulations Of Oxymorphone," to Penwest as assignee. *See* Ex. 2. That same day, Endo submitted information regarding the '250 patent to the FDA for listing in the Orange Book with respect to OPANA® ER tablets. *See* Ex. 3. Also on that same day, Impax sent Endo and Penwest a Paragraph IV Notice stating that it had submitted ANDA No. 79-087 seeking approval to manufacture, use, or sell a generic version of OPANA® ER prior to the expiration of the '250 patent. *See* Ex. 4.

Just two days later, however, on October 4, 2007, Impax issued a press release in which it admitted that the FDA ***"has rescinded its initial acceptance"*** of Impax's ANDA and that Impax was "working with the FDA to correct any deficiencies of the ANDA." *See* Ex. 5 (emphasis added). Despite Impax's public acknowledgement that it had no ANDA accepted for filing by the FDA, Impax continued to inundate Endo and Penwest with additional Paragraph IV Notices. On October 3, 4, 5 and 9, Impax sent to Endo and Penwest, four additional, but substantively identical notices, with respect to the '250 patent. *See* Ex. 6.

Endo and Penwest demanded that Impax withdraw its Paragraph IV Notices, but Impax has refused to do so. *See* Ex. 7. To the contrary, Impax has continued to act as if it actually had an ANDA accepted by the FDA for substantive review.

On October 19, 2007, for example, Endo submitted information regarding two additional patents – United States Patent Nos. 5,662,933 ("the '933 patent") and 5,958,456 ("the '456 patent") – to the FDA for listing in the Orange Book with respect to OPANA® ER tablets. Again, despite Impax's public acknowledgement that the FDA had rescinded acceptance of its ANDA, Impax served yet another Paragraph IV Notice on Endo and Penwest, this time with respect to the '933 and '456 patents. *See* Ex. 8.

It has now been more than six weeks since Impax publicly announced that the FDA had rescinded its ANDA, and Impax's CEO confirmed as recently as yesterday that the FDA still has not accepted for substantive review any ANDA from Impax with respect to OPANA® ER. See Ex. 9. Indeed, the FDA maintains on its website a list of all of the substantially complete ANDAs that it has on file that contain Paragraph IV Certifications, and as of the date of this brief, there is no ANDA listed on the FDA website for OPANA®ER. *See* http://www.fda.gov/cder/ogd/ppiv.htm; Ex. 10.

## ARGUMENT

### I.    RULE 57 PROVIDES FOR EXPEDITING DECLARATORY RELIEF WHERE, AS HERE, THE CLAIM INVOLVES AN ISSUE OF LAW THAT TURNS ON UNDISPUTED FACTS

The Declaratory Judgment Act provides that "[i]n a case or actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). To satisfy the case-or-controversy requirement, the dispute must be "definite and concrete, touching the legal relations of parties having adverse

interests" and "admit of specific relief through a decree of a conclusive character." *Medimmune, Inc. v. Genentech, Inc.*, -- U.S. --, 127 S.Ct. 764, 771 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 771 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil, Co.*, 312 U.S. 270, 273 (1941)).

Rule 57 of the Federal Rules of Civil Procedure specifically provides for expediting declaratory judgment relief. *See* Fed. R. Civ. P. 57 ("The Court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."). Indeed, Rule 57 is "specifically designed to 'afford a speedy and inexpensive method of adjudicating legal disputes to settle legal rights and remove uncertainty and insecurity from legal relationships. . . .'" *Rechler P'Ship v. Resolution Trust Corp.*, 1990 WL 711357, at *7 (D.N.J. Sept. 7, 1990) (quoting *Beacon Constr. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975)). Courts have recognized that expedited relief is appropriate where – as here – the claim involves "an issue of law on undisputed or relatively undisputed facts." *Rechler*, 1990 WL 711357, at *7 (quoting Advisory Committee Notes to Rule 57) (granting expedited relief where "essential fact" was "undisputed" and issue was "purely legal"); *see also Pence v. Lexington Ins. Co.*, 2006 WL 133475, at *2 (S.D. Tex. Jan. 17, 2006) ("a declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts and it operates frequently as a summary proceeding") (quoting Advisory Committee Notes).

Expedited relief is particularly appropriate here because resolution of the controversy between Plaintiffs and Impax turns on a pure legal issue:  Whether Impax has

properly triggered the Hatch-Waxman ANDA litigation process. That legal issue can be resolved based upon a single *undisputed* fact—that Impax does not have an ANDA for OPANA® ER that the FDA has accepted for substantive review. It requires neither discovery, nor an evidentiary hearing.

It also makes sense to resolve this dispute quickly, at the start of the case, because it goes directly to the threshold question of whether the Court has subject matter jurisdiction to hear Endo and Penwest's patent infringement claims. Under 35 U.S.C. § 271, it is an act of infringement to submit an ANDA for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of a drug claimed in a patent before the expiration of such patent. *See* 35 U.S.C. § 271(e)(2). The Supreme Court has explained that Congress created this "artificial" act of infringement in § 271(e)(2) solely to "enable the judicial adjudication upon which the ANDA . . . scheme[] depend[s]." *Eli Lilly and Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990). That scheme, however, cannot begin until the FDA has accepted an ANDA for substantive review. Accordingly, without an accepted ANDA, it follows that there is no act of infringement under 35 U.S.C. § 271(e). Here, it undisputed that Impax does not have an accepted ANDA on file with the FDA, and thus the Court has no jurisdiction over any latent patent claims. Thus, Plaintiffs' requested declaratory judgment relief is incident to the Court's inherent power to "guard its jurisdiction jealously." *Merck & Co., Inc. v. Apotex, Inc.*, 488 F. Supp. 2d 418, 424 (D. Del. 2007).

## II. THE COURT SHOULD GRANT PLAINTIFFS' REQUESTED DECLARATORY RELIEF BECAUSE IMPAX'S PARAGRAPH IV CERTIFICATIONS ARE NULL AND VOID

### A. Absent An ANDA That Has Been Accepted By The FDA, A Generic Manufacturer Has No Legitimate Basis To Trigger The ANDA Litigation Process

FDA regulations clearly provide that absent an ANDA that has been accepted by the FDA for substantive review, generic manufacturers have no legitimate basis to initiate the ANDA litigation process. *See* 21 C.F.R. 314.95(b). This safeguard makes sense, given the incentives for generic applicants to jump the gun by filing incomplete ANDAs in order to obtain the earliest possible filing date. A generic applicant that is able to file its ANDA before the listing of a patent in the Orange Book may be able to avoid application of a 30-month stay of approval. Likewise, a generic applicant deemed to be a "first filer" gets the advantage of 180 days of marketing exclusivity.

Congress was well aware of, and sought to minimize, this potential for abuse. The legislative history of the Act, for instance, leaves no doubt that Congress considered the FDA's acceptance for substantive review of a valid, substantially complete ANDA to be a prerequisite for starting the ANDA litigation process. A House Report discussing the Paragraph IV Notice requirement specifically states that "the committee does not intend that applicants be permitted to circumvent this notice requirement by filing sham ANDA's or ANDA's which are substantially incomplete." H.R. Rep. 98-857(I), at 24, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2657 (Ex. 11). In the context of discussing a failure to include bioequivalence tests, the legislative history further explains that an incomplete ANDA "will void the effectiveness of any notice" and that "notice must then be given again" if a complete ANDA is later submitted. *Id.* at 25, 2658.

Moreover, the FDA has confirmed that it adopted 21 C.F.R. § 314.95(b) to give effect to Congress's intent that a generic manufacturer such as Impax be permitted to trigger the litigation process only if it has submitted an ANDA that the FDA has accepted for substantive review. As the FDA explained at the time it proposed that regulation, "the statute and legislative history . . . demonstrate that *Congress did not intend incomplete application submissions to trigger legal action* by a patent owner or approved application holder." 54 Fed. Reg. 28872, 28887 (July 10, 1989) (emphasis added). Following a lengthy comment period, the FDA approved the regulation without making any changes to subsection (b). In the adopting release, the FDA echoed its earlier rationale for the regulation:

> To permit an ANDA applicant to provide notice before FDA has determined whether the ANDA is sufficiently complete would be contrary to the legislative history because it would only encourage ANDA applicants to file incomplete or "sham" ANDA's and to supplement them later to secure a place in the review queue in an attempt to secure the first ANDA approval.

59 Fed. Reg. 50338, 50350 (Oct. 3, 1994).

**B.    The Undisputed Facts Demonstrate That Impax Had No Basis To Trigger The ANDA Litigation Process And That Plaintiffs Are Entitled As A Matter Of Law To The Declaratory Relief They Seek**

Here, the undisputed facts demonstrate beyond question that Impax is playing games with the carefully constructed statutory and regulatory framework. Indeed, a single undisputed fact – that Impax did not have and still does not have an accepted ANDA on file with FDA – justifies the declaratory relief the Plaintiffs seek.

Despite admitting that the FDA rescinded acceptance of its ANDA, Impax has persisted in its efforts to push the ANDA litigation process forward. It has refused to withdraw its original Paragraph IV Notice, which was served the very day the '250 patent issued (*i.e.*,

before FDA even had time to include that patent in the electronic Orange Book listing), and it continued thereafter to serve several such notices on a daily basis.

By racing to file an incomplete ANDA, Impax hoped to preempt application of the 30-month stay (by filing before the listing of the '250 patent) and to co-opt for itself the 180-day market exclusivity afforded the first ANDA applicant to successfully challenge a listed patent. The problem is that in its race to game the system, Impax was unable to compile and submit a substantially complete ANDA.

As a result, Impax has no legitimate basis to trigger the ANDA patent infringement litigation process. Each of the Paragraph IV Notices Impax sent to Endo and Penwest beginning on October 2, 2007 was improper, null, void, and without legal effect. This Court should put an end to Impax's flagrant abuse of the ANDA litigation process, and grant Plaintiffs' the declaratory judgment they seek.

The appropriate path forward is clear. Plaintiffs respectfully request that the Court declare that Impax's efforts to trigger the ANDA patent litigation process were premature and that Impax's Paragraph IV Notices are null, void and of no legal effect. Upon doing so, the Court can dismiss the Plaintiffs' patent infringement claims as moot. *If* the FDA were, at some point, to accept Impax's ANDA for filing, that would be the appropriate time for Impax to trigger the Paragraph IV litigation process, assuming it had a good faith basis to do so.

Moreover, the Court should grant Plaintiffs' requested declaratory relief immediately. The propriety of Impax's misguided attempts to trigger the ANDA litigation process goes to the very heart of this Court's subject matter jurisdiction over the patent infringement claims that Impax, by its actions, forced Plaintiffs to include in their complaint to

preserve their rights under the Act.[2]  Without a valid ANDA accepted and on file with the FDA,

there is no act of infringement under 35 U.S.C. § 271(e), and thus, the Court has no jurisdiction

over those latent patent claims.  Indeed, if Impax is unable to fix the deficiencies that caused the

FDA to rescind acceptance of its ANDA, those claims may never need to be litigated.

Accordingly, the Court should grant the declaratory relief Plaintiffs seek, and dismiss those

patent claims as moot before it and Plaintiffs are forced to incur any more time and expense on

this matter.

## CONCLUSION

For all of the above reasons, Endo and Penwest respectfully request that the Court

grant their motion and enter the proposed order submitted herewith.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_Jack B. Blumenfeld (#1014)_
Mary B. Graham (#2256)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  1999
(302) 658-9200
jblumenfeld@mnat.com
mgraham@mnat.com
jheaney@mnat.com
   *Attorneys for Plaintiffs*
      *Endo Pharmaceuticals Inc. and*
      *Penwest Pharmaceuticals Co.*

---

[2]     For these reasons, this case is far different than *Minnesota Mining and Manuf. Co. v. Barr Labs, Inc.*, 289 F.3d 775 (Fed Cir. 2002), in which the Federal Circuit declined to review the sufficiency of a Paragraph IV Notice.  That case involved a challenge to the sufficiency of the content of a Paragraph IV Notice for purposes of determining infringement.  Here, by contrast, the issue is not the content of Impax's Paragraph IV Notice, but rather whether or not the necessary predicate condition for triggering the ANDA litigation process – and this Court's subject matter jurisdiction – exists in the first place.

*Of Counsel*:

Martin J. Black
George G. Gordon
Ann M. Caviani Pease
Robert D. Rhoad
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Robert J. Gunther, Jr.
Lisa J. Pirozzolo
James P. Barabas
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

November 20, 2007

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on November 20, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

I further certify that true and correct copies of the foregoing were caused to be served on November 20, 2007 upon the following individuals in the manner indicated:

**VIA HAND DELIVERY**

Impax Laboratories, Inc.
c/o The Prentice-Hall Corp. Systems, Inc.
2711 Centerville Road
Suite 400
Wilmington, DE 19808

**VIA ELECTRONIC MAIL**

Daralyn Durie, Esquire
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 97111-1704

Jack B. Blumenfeld (#1014)
jblumenfeld@mnat.com

EXHIBIT 1

PRINT                                                                                                    <<Back

**Penwest Announces Allowance for Oxymorphone Patent Application Related to OPANA ER**

DANBURY, Conn., Jul 23, 2007 (PrimeNewswire via COMTEX News Network) -- Penwest Pharmaceuticals Co. (Nasdaq:PPCO) today reported that the U.S. Patent and Trademark Office (PTO) has indicated on its website that a Penwest patent application claiming the sustained-release formulation of oxymorphone related to OPANA(r) ER (oxymorphone HCl) extended-release tablets CII has been allowed.

Penwest previously announced that it received a final rejection from the PTO for this application on March 15, 2007. In response to the rejection, the Company amended the claims and the PTO examiner found these amended claims allowable.

OPANA ER uses Penwest's TIMERx(r) technology and is indicated for the treatment of moderate-to-severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. OPANA ER is not intended to be used on an as-needed basis. It is marketed by Endo Pharmaceuticals Inc.

"We are very pleased that this patent application related to OPANA ER has been allowed by the U.S. Patent and Trademark Office," said Jennifer L. Good, President and Chief Executive Officer of Penwest. "We believe that this patent is an important component in the intellectual property estate protecting OPANA ER."

Upon payment of the issue fee, the PTO will prepare the allowed patent application for printing and publication. The patent, once issued, will be scheduled to expire in 2022. Penwest expects that Endo will list this patent at the earliest opportunity in the Orange Book published by the U.S. Food and Drug Administration (FDA).

Penwest Pharmaceuticals

Penwest is a specialty pharmaceutical company dedicated to bringing to the marketplace innovative products that help improve the lives of patients. The Company's goal is to identify, develop and commercialize prescription products that address unmet medical needs, primarily for diseases of the nervous system. The launch by Endo Pharmaceuticals in mid-2006 of OPANA(r) ER (oxymorphone hydrochloride extended-release tablets) formulated with the Company's TIMERx(r) extended release delivery technology demonstrates the execution of this strategy and the value of the Company's TIMERx(r) technology. The Company is currently applying its expertise to a pipeline of potential products that are in various stages of development. The Company intends to commercialize these products independently or through third party alliances.

Penwest Forward-Looking Statement

The matters discussed herein contain forward-looking statements that involve risks and uncertainties, which may cause Penwest's actual results in future periods to be materially different from any future performance suggested herein. For this purpose, any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. Without limiting the foregoing, the words "believes," "anticipates," "plans," "expects," "intends," "potential," and similar expressions are intended to identify forward-looking statements. Important factors that could cause results to differ materially include: risks relating to the commercial success of OPANA ER and our reliance on Endo for the commercial success of OPANA ER; regulatory risks relating to drugs in development, including the timing and outcome of regulatory action; uncertainty of success of collaborations including the collaboration with Edison Pharmaceuticals; the timing of clinical trials, including the impact of enrollment rates; whether the results of clinical trials will warrant further clinical trials or warrant submission of an application for regulatory approval of, or the regulatory approval of, the product that is the subject of the trial; actual and potential competition; the need for capital; and other risks as set forth under the caption Risk Factors in Penwest's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on May 10, 2007, which risk factors are incorporated herein by reference.

The forward-looking statements contained in this press release speak only as of the date of the statement made. Penwest disclaims any intention or obligation to update any forward-looking statements. TIMERx is a registered trademark of Penwest. All other trademarks referenced herein are the property of their respective owners.

This news release was distributed by PrimeNewswire, www.primenewswire.com

SOURCE: Penwest Pharmaceuticals Co.

```
Penwest Pharmaceuticals Co.
        Investors:
        Ben Palleiko
        (203) 796-3750
        (877) 736-9378

        Kekst and Company
        Media:
        Laura Walters
        (212) 521-4800
```

EXHIBIT 2

US007276250B2

(12) **United States Patent**
Baichwal et al.

(10) Patent No.: **US 7,276,250 B2**
(45) Date of Patent: **Oct. 2, 2007**

(54) **SUSTAINED RELEASE FORMULATIONS OF OXYMORPHONE**

(75) Inventors: **Anand R. Baichwal**, Wappingers Falls, NY (US); **Huai-Hung Kao**, Syosset, NY (US); **Troy W. McCall**, Germantown, TN (US)

(73) Assignee: **Penwest Pharmaceuticals Company**, Danbury, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 216 days.

(21) Appl. No.: **10/189,932**

(22) Filed: **Jul. 3, 2002**

(65) **Prior Publication Data**

US 2003/0129230 A1    Jul. 10, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/329,352, filed on Oct. 15, 2001, provisional application No. 60/329,426, filed on Oct. 15, 2001, provisional application No. 60/303,357, filed on Jul. 6, 2001.

(51) **Int. Cl.**
*A61K 9/22* (2006.01)
*A61K 9/26* (2006.01)
*A61K 9/36* (2006.01)

(52) **U.S. Cl.** ...................... **424/468**; 424/470; 424/464; 424/479; 424/480; 424/481; 424/482

(58) **Field of Classification Search** ................ 424/468, 424/474, 490, 475, 476, 477, 479, 480, 482, 424/491, 494, 495, 497, 498
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,806,033 A | 9/1957 | Lewenstein et al. | |
| 3,393,197 A | 7/1968 | Pachter et al. | |
| 3,845,770 A | 11/1974 | Theeuwes et al. | |
| 3,879,555 A | 4/1975 | Pachter et al. | |
| 3,966,940 A | 6/1976 | Pachter et al. | |
| 3,980,766 A | 9/1976 | Shaw et al. | |
| 4,070,494 A | 1/1978 | Hoffmeister et al. | |
| 4,366,159 A | 12/1982 | Magruder | |
| 4,457,933 A | 7/1984 | Gordon et al. | |
| 4,464,376 A | 8/1984 | Sunshine et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| AU | 0016639 | 12/1999 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Staniforth, et al., "Synergistically Interacting Heterodisperse Polysaccharides—Function in Achieving Controllable Drug Delivery," *American Chemical Society*, pp. 327-350 (1993).

(Continued)

*Primary Examiner*—Lakshmi S. Channavajjala
(74) *Attorney, Agent, or Firm*—Wilmer Cutler Pickering Hale & Dorr, LLP

(57) **ABSTRACT**

Sustained release formulations of oxymorphone or pharmaceutically acceptable salts thereof; methods for making the sustained release formulations of oxymorphone or pharmaceutically acceptable salts thereof; and methods for using the sustained release formulations of oxymorphone or pharmaceutically acceptable salts thereof to treat patients suffering from pain are provided.

**16 Claims, 1 Drawing Sheet**



**US 7,276,250 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,479,956 A | 10/1984 | Sunshine et al. | |
| 4,486,436 A | 12/1984 | Sunshine et al. | |
| 4,558,051 A | 12/1985 | Sunshine et al. | |
| 4,567,183 A | 1/1986 | Sunshine et al. | |
| 4,569,937 A * | 2/1986 | Baker et al. | 514/282 |
| 4,582,835 A | 4/1986 | Lewis et al. | |
| 4,587,249 A | 5/1986 | Sunshine et al. | |
| 4,599,114 A | 7/1986 | Atkinson | |
| 4,656,177 A | 4/1987 | Sunshine et al. | |
| 4,661,492 A | 4/1987 | Lewis et al. | |
| 4,711,782 A * | 12/1987 | Okada et al. | 424/455 |
| 4,777,174 A | 10/1988 | Sunshine et al. | |
| 4,844,909 A | 7/1989 | Goldie et al. | 424/480 |
| 4,861,598 A | 8/1989 | Oshlack | |
| 4,935,428 A | 6/1990 | Lewis et al. | |
| 4,994,276 A | 2/1991 | Baichwal et al. | 424/440 |
| 5,128,143 A | 7/1992 | Baichwal et al. | |
| 5,135,757 A | 8/1992 | Baichwal et al. | |
| 5,236,714 A | 8/1993 | Lee et al. | |
| 5,399,358 A | 3/1995 | Baichwal et al. | |
| 5,431,922 A | 7/1995 | Nicklasson | |
| 5,455,046 A | 10/1995 | Baichwal | |
| 5,470,584 A | 11/1995 | Hendrickson et al. | |
| 5,478,577 A * | 12/1995 | Sackler et al. | 424/489 |
| 5,512,297 A | 4/1996 | Baichwal | |
| 5,512,578 A | 4/1996 | Crain et al. | |
| 5,543,434 A | 8/1996 | Weg | |
| 5,554,387 A | 9/1996 | Baichwal | |
| 5,556,837 A | 9/1996 | Nestler et al. | |
| 5,567,754 A | 10/1996 | Stramel | |
| 5,580,578 A | 12/1996 | Oshlack et al. | 424/468 |
| 5,612,053 A | 3/1997 | Baichwal et al. | |
| 5,633,000 A | 5/1997 | Grossman et al. | |
| 5,639,476 A | 6/1997 | Oshlack et al. | 424/468 |
| 5,662,933 A | 9/1997 | Baichwal et al. | 424/457 |
| 5,672,360 A | 9/1997 | Sackler et al. | 424/490 |
| 5,738,865 A | 4/1998 | Baichwal et al. | |
| 5,858,388 A | 1/1999 | Grossman et al. | |
| 5,891,474 A | 4/1999 | Busetti et al. | 424/490 |
| 5,914,131 A | 6/1999 | Merrill et al. | |
| 5,948,438 A | 9/1999 | Staniforth et al. | 424/464 |
| 5,958,452 A | 9/1999 | Oshlack et al. | 424/457 |
| 5,958,458 A * | 9/1999 | Norling et al. | 424/490 |
| 5,958,459 A | 9/1999 | Chasin et al. | 424/490 |
| 5,965,161 A | 10/1999 | Oshlack et al. | 424/457 |
| 5,965,163 A | 10/1999 | Miller et al. | 424/468 |
| 5,968,551 A | 10/1999 | Oshlack et al. | 424/456 |
| RE36,547 E | 2/2000 | Crain et al. | |
| 6,093,420 A * | 7/2000 | Baichwal | 424/468 |
| 6,103,258 A | 8/2000 | Simon | |
| 6,103,261 A | 8/2000 | Chasin et al. | 424/459 |
| 6,129,933 A | 10/2000 | Oshlack et al. | 424/495 |
| 6,143,322 A | 11/2000 | Sackler et al. | 424/459 |
| 6,143,325 A | 11/2000 | Dennis et al. | |
| 6,143,353 A | 11/2000 | Oshlack et al. | 427/2.21 |
| 6,221,393 B1 | 4/2001 | Collnaeri et al. | 424/469 |
| 6,228,863 B1 | 5/2001 | Palermo et al. | |
| 6,245,357 B1 | 6/2001 | Edgren et al. | 424/473 |
| 6,248,789 B1 | 6/2001 | Weg | |
| 6,261,599 B1 | 7/2001 | Oshlack et al. | |
| 6,277,384 B1 | 8/2001 | Kaiko et al. | |
| 6,294,195 B1 * | 9/2001 | Oshlack et al. | 424/457 |
| 6,296,842 B1 | 10/2001 | Jaworowicz et al. | 424/78.02 |
| 6,306,425 B1 | 10/2001 | Tice et al. | |
| 6,309,668 B1 * | 10/2001 | Bastin et al. | 424/472 |
| 6,316,031 B1 | 11/2001 | Oshlack et al. | 424/495 |
| 6,340,475 B2 | 1/2002 | Shell et al. | 424/469 |
| 6,375,957 B1 | 4/2002 | Kaiko et al. | |
| 6,387,394 B1 | 5/2002 | Baichwal et al. | |
| 6,391,336 B1 | 5/2002 | Royer | 424/468 |
| 6,413,494 B1 | 7/2002 | Lee et al. | 424/9.1 |

| | | | |
|---|---|---|---|
| 6,432,438 B1 | 8/2002 | Shukla | 424/426 |
| 6,475,494 B2 | 11/2002 | Kaiko et al. | |
| 6,495,155 B1 | 12/2002 | Tice et al. | |
| 6,506,730 B1 | 1/2003 | Lee et al. | |
| 6,514,531 B1 | 2/2003 | Alaux et al. | |
| 6,555,127 B2 | 4/2003 | Steiner | |
| 6,627,635 B2 | 9/2003 | Palermo et al. | |
| 2002/0010127 A1 | 1/2002 | Oshlack et al. | |
| 2002/0058673 A1 | 5/2002 | Kaiko et al. | |
| 2002/0081333 A1 | 6/2002 | Oshlack et al. | 424/468 |
| 2002/0090345 A1 | 7/2002 | Baichwal et al. | |
| 2002/0164373 A1 | 11/2002 | Maloney | 424/469 |
| 2002/0165248 A1 | 11/2002 | Wimmer et al. | 514/282 |
| 2002/0187192 A1 | 12/2002 | Joshi et al. | |
| 2003/0004177 A1 | 1/2003 | Kao et al. | |
| 2003/0031712 A1 | 2/2003 | Kaiko et al. | |
| 2003/0044458 A1 | 3/2003 | Wright et al. | |
| 2003/0049272 A1 | 3/2003 | Joshi et al. | |
| 2003/0059397 A1 | 3/2003 | Hughes | |
| 2003/0064099 A1 | 4/2003 | Oshlack et al. | |
| 2003/0064122 A1 | 4/2003 | Goldberg et al. | |
| 2003/0065002 A1 | 4/2003 | Caruso et al. | |
| 2003/0068276 A1 | 4/2003 | Hughes et al. | |
| 2003/0068370 A1 | 4/2003 | Sackler | |
| 2003/0068371 A1 | 4/2003 | Oshlack et al. | |
| 2003/0068375 A1 | 4/2003 | Wright et al. | |
| 2003/0068392 A1 | 4/2003 | Sackler | |
| 2003/0069263 A1 | 4/2003 | Breder et al. | |
| 2003/0073714 A1 | 4/2003 | Breder et al. | |
| 2003/0091635 A1 * | 5/2003 | Baichwal et al. | 424/468 |
| 2003/0124061 A1 | 7/2003 | Roberts | |
| 2003/0124185 A1 | 7/2003 | Oshlack et al. | |
| 2003/0125347 A1 | 7/2003 | Anderson et al. | |
| 2003/0129230 A1 | 7/2003 | Baichwal et al. | |
| 2003/0129234 A1 | 7/2003 | Baichwal et al. | 424/470 |
| 2003/0143269 A1 | 7/2003 | Oshlack et al. | |
| 2003/0147975 A1 | 8/2003 | Joshi et al. | |
| 2003/0152638 A1 | 8/2003 | Tice et al. | |
| 2003/0157167 A1 | 8/2003 | Kao et al. | 424/468 |
| 2003/0157168 A1 | 8/2003 | Breder et al. | |
| 2003/0158264 A1 | 8/2003 | Radhakrishnan et al. | |
| 2003/0163099 A1 | 8/2003 | Wermeling et al. | |
| 2003/0170181 A1 | 9/2003 | Midha | |
| 2003/0190362 A1 | 10/2003 | Sackler et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2314896 | 12/1998 |
| CA | 2369302 | 10/2000 |
| EP | 319243 | 11/1980 |
| EP | 360562 A2 * | 3/1990 |
| EP | 441833 | 9/1993 |
| EP | 0 636 366 | 2/1995 |
| EP | 742711 | 3/1999 |
| EP | 751766 | 10/2001 |
| EP | 1293195 | 3/2003 |
| EP | 1293209 A1 | 3/2003 |
| JP | 2003113074 | 4/2003 |
| NZ | 0505192 | 7/1999 |
| WO | WO 80/00841 | 5/1980 |
| WO | WO-80/00841 | 5/1980 |
| WO | WO-84/00488 | 2/1984 |
| WO | WO-84/00490 | 2/1984 |
| WO | WO-85/02540 | 6/1985 |
| WO | WO-85/02542 | 6/1985 |
| WO | WO-91/07950 | 6/1991 |
| WO | WO-95/20947 | 8/1995 |
| WO | WO-95/22965 | 8/1995 |
| WO | WO-96/00047 | 1/1996 |
| WO | WO-96/02251 | 2/1996 |
| WO | WO-96/04007 | 2/1996 |
| WO | WO-96/20927 | 7/1996 |
| WO | WO-97/07750 | 3/1997 |

# US 7,276,250 B2

Page 3

| | | |
|---|---|---|
| WO | WO-97/16172 A1 | 5/1997 |
| WO | WO-99/32119 | 7/1999 |
| WO | WO-99/32120 | 7/1999 |
| WO | WO-00/01377 | 1/2000 |
| WO | WO 00 21520 | 4/2000 |
| WO | WO-00/33835 | 6/2000 |
| WO | WO-00/38649 | 7/2000 |
| WO | WO-00/61147 | 10/2000 |
| WO | WO-01/00181 | 1/2001 |
| WO | WO 01 08661 | 2/2001 |
| WO | WO-01/12230 | 2/2001 |
| WO | WO-01/15699 | 3/2001 |
| WO | WO-01/52813 | 7/2001 |
| WO | WO-01/58447 | 8/2001 |
| WO | WO-01/58451 | 8/2001 |
| WO | WO-02/05647 | 1/2002 |
| WO | WO-02/13886 | 2/2002 |
| WO | WO-02/087558 | 11/2002 |
| WO | WO-02/092059 | 11/2002 |
| WO | WO-02/092060 | 11/2002 |
| WO | WO-02/094172 | 11/2002 |
| WO | WO-02/094254 | 11/2002 |
| WO | WO-03/007802 | 1/2003 |
| WO | WO-03/013433 | 2/2003 |
| WO | WO-03/013476 | 2/2003 |
| WO | WO-03/013479 | 2/2003 |

| | | |
|---|---|---|
| WO | WO-03/013525 | 2/2003 |
| WO | WO-03/013538 | 2/2003 |
| WO | WO-03/015531 | 2/2003 |
| WO | WO-03/026743 | 4/2003 |
| WO | WO-03/039561 | 5/2003 |
| WO | WO-03/072106 | 9/2003 |

## OTHER PUBLICATIONS

United States Patent and Trademark Office, Before the Board of Appeals and Interferences, "Decision on Appeal. Appeal No. 2005-0416, U.S. Appl. No. 09/970,020", Apr. 28, 2005, pp. 1-8.

Chiao, et al., Sustained-Release Drug Delivery Systems, Chapter 94.

Weiss, Derivatives of Morphine, I. 14-Hydroxydihydromorphinone, Nov. 20, 1995, vol. 77, pp. 5891-5892.

Chiao et al., "Sustained-Release Drug Delivery Systems", Remington's Pharmaceutical Sciences, Chapter 94, pp. 1660-1675, (1993).

McConville, J. T. et al., "Use of a Novel Modified TSI for the Evaluation of Controlled-Release Aerosol Formulations. I", *Drug Dev Ind Pharmacy*, vol. 26, No. 11, pp. 1191-1198, 2000.

Dhopeshwarkar et al., Evaluation of Xanthan Gum in the Preparation of Sustained Release Matrix Tablets, Drug Development and Industrial Pharmacy, 19(9), 999-1017 (1993).

* cited by examiner



MEAN PLASMA OXYMORPHONE CONCENTRATIONS VERSUS TIME – LINEAR SCALE

- □ 1 × 20 mg oxymorphone sustained release tablet of the invention, fasted
- ○ 1 × 20 mg oxymorphone sustained release tablet of the invention, fed
- ● 10 mg/6.7 mL oxymorphone HCl oral solution, fasted
- ▲ 10 mg/6.7 mL oxymorphone HCl oral solution, fed

US 7,276,250 B2

<table>
<tr><td>

1

**SUSTAINED RELEASE FORMULATIONS OF OXYMORPHONE**

</td><td>

2

SUMMARY OF THE INVENTION

</td></tr>
</table>

RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/329,426 filed Oct. 15, 2001, U.S. Provisional Application No. 60/329,352 filed Oct. 15, 2001, and to U.S. Provisional Application No. 60/303,357 filed Jul. 6, 2001, the disclosures of which are incorporated by reference herein in their entirety.

FIELD OF THE INVENTION

The invention provides sustained release formulations of oxymorphone and pharmaceutically acceptable salts thereof; methods for making the sustained release formulations of oxymorphone and pharmaceutically acceptable salts thereof; and methods for using the sustained release formulations of oxymorphone and pharmaceutically acceptable salts thereof to treat patients suffering from pain.

BACKGROUND OF THE INVENTION

Pain is the most frequently reported symptom and it is a common clinical problem which confronts the clinician. Many millions of people in the United States suffer from severe pain that is chronically undertreated or inappropriately managed. The clinical usefulness of the analgesic properties of opioids has been recognized for centuries, and morphine and its derivatives have been widely used for analgesia for decades in a variety of clinical pain states.

Oxymorphone HCl (14-hydroxydihydromorphinone hydrochloride) is a semi-synthetic phenanthrene-derivative opioid agonist, used in the treatment of acute and chronic pain, with analgesic efficacy comparable to other opioid analgesics. Oxymorphone is currently marketed as an injection (1 mg/ml in 1 ml ampules; 1.5 mg/ml in 1 ml ampules; 1.5 mg/ml in 10 ml multiple dose vials) for intramuscular, subcutaneous, and intravenous administration, and as 5 mg rectal suppositories. At one time, a 10 mg oral immediate release tablet formation of oxymorphone HCl was marketed. Oxymorphone HCl is metabolized principally in the liver and undergoes conjugation with glucuronic acid and reduction to 6 alpha and beta hydroxy epimers.

An important goal of analgesic therapy is to achieve continuous relief of chronic pain. Regular administration of an analgesic is generally required to ensure that the next dose is given before the effects of the previous dose have worn off. Compliance with opioids increases as the required dosing frequency decreases. Non-compliance results in suboptimal pain control and poor quality of life outcomes. Scheduled rather than "as needed" administration of opioids is currently recommended in guidelines for their use in treating chronic non-malignant pain. Unfortunately, evidence from prior clinical trials and clinical experience suggests that the short duration of action of immediate release oxymorphone would necessitate 4-hourly administrations in order to maintain optimal levels of analgesia in patients with chronic pain. Moreover, immediate release oxymorphone exhibits low oral bioavailability, because oxymorphone is extensively metabolized in the liver.

There is a need in the art for new formulations of oxymorphone that require less frequent dosing. The invention is directed to these, as well as other, important ends.

The invention provides compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, where the sustained release delivery system comprises at least one hydrophilic compound, at least one cross-linking agent (which may be cationic) and at least one pharmaceutical diluent. The sustained release delivery system may further comprise one or more additional hydrophobic polymers or cross-linking compounds. The compositions may optionally comprise an outer coating comprising at least one water insoluble compound, and optionally one or more plasticizers and/or water soluble compounds.

The invention provides compositions comprising an inner core and an outer sustained release coating, where the inner core comprises oxymorphone or a pharmaceutically acceptable salt thereof and the outer sustained release coating comprises at least one water insoluble compound. The outer sustained release coating may optionally further comprise one or more plasticizers and/or water soluble compounds.

The invention provides methods for treating pain in patients by administering an effective amount of any of the compositions of the invention. The pain may be moderate to severe, and may be acute or chronic.

The invention also provides methods for making such compositions.

These and other aspects of the invention are described in detail herein.

BRIEF DESCRIPTION OF THE FIGURE

FIG. 1 is a linear scale graph, without standard deviations, showing the mean oxymorphone plasma concentration versus time for patients treated with the sustained release oxymorphone tablets of the invention after fasting (A), for patients treated with sustained release oxymorphone tablets of the invention after a high fat meal (B), for patients treated with an oxymorphone solution after fasting (C), and for patients treated with an oxymorphone solution after a high fat meal (D).

DETAILED DESCRIPTION OF THE INVENTION

To overcome the difficulties associated with the very low bioavailability of the oral immediate release formulation of oxymorphone and with a 4 hourly dosing frequency of oxymorphone, the invention provides an oral sustained release formulation of oxymorphone comprising an analgesically effective amount of oxymorphone or a pharmaceutically acceptable salt thereof. The bioavailability of the oral sustained release formulations of the invention is sufficiently high that the sustained release formulations can be used to treat patients suffering from pain with only once or twice daily dosing.

The invention provides compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, wherein the sustained release delivery system comprises (i) at least one hydrophilic compound, at least one cross-linking agent, and at least one pharmaceutical diluent; (ii) at least one hydrophilic compound, at least one cross-linking agent, at least one pharmaceutical diluent, and at least one more hydrophobic polymer; (iii) at least one hydrophilic compound, at least one cross-linking agent, at least one pharmaceutical diluent, and at least one cationic cross-linking agent different from the

**3**

first cross-linking agent; (iv) at least one hydrophilic compound, at least one cross-linking agent, at least one pharmaceutical diluent, at least one cationic cross-linking compound different from the first cross-linking agent, and at least one hydrophobic polymer; (v) at least one hydrophilic compound, at least one cationic cross-linking compound, and at least one pharmaceutical diluent; or (vi) at least one hydrophilic compound, at least one cationic cross-linking compound, at least one pharmaceutical diluent, and at least one hydrophobic compound.

The oxymorphone may be homogeneously dispersed in the sustained release delivery system. Preferably, the oxymorphone or pharmaceutically acceptable salt thereof may be present in the composition in an amount of about 1 mg to about 200 mg, more preferably in an amount of about 1 mg to about 100 mg, even more preferably in an amount of about 5 mg to about 80 mg. Preferably, the sustained release delivery system may be present in the composition in an amount from about 80 mg to about 420 mg, more preferably from about 80 mg to about 360 mg, even more preferably from about 80 mg to about 200 mg. "Oxymorphone" includes oxymorphone, metabolites thereof, derivatives thereof, and/or pharmaceutically acceptable salts thereof. Metabolites of oxymorphone include, for example, 6-hydroxy-oxymorphone (e.g., 6-α-hydroxy-oxymorphone and/or 6-β-hydroxy-oxymorphone).

Oxymorphone may be in the form of any pharmaceutically acceptable salt known in the art. Exemplary pharmaceutically acceptable salts include hydrochloric, sulfuric, nitric, phosphoric, hydrobromic, maleric, malic, ascorbic, citric, tartaric, pamoic, lauric, stearic, palmitic, oleic, myristic, lauryl sulfuric, napthalinesulfonic, linoleic, linolenic acid, and the like. The hydrochloride salt of oxymorphone is preferred.

The sustained release delivery system comprises at least one hydrophilic compound. The hydrophilic compound preferably forms a gel matrix that releases the oxymorphone or the pharmaceutically acceptable salt thereof at a sustained rate upon exposure to liquids. The rate of release of the oxymorphone or the pharmaceutically acceptable salt thereof from the gel matrix depends on the drug's partition coefficient between the components of the gel matrix and the aqueous phase within the gastrointestinal tract. In the compositions of the invention, the weight ratio of oxymorphone to hydrophilic compound is generally in the range of about 1:0.5 to about 1:25, preferably in the range of about 1:0.5 to about 1:20. The sustained release delivery system generally comprises the hydrophilic compound in an amount of about 20% to about 80% by weight, preferably in an amount of about 20% to about 60% by weight, more preferably in an amount of about 40% to about 60% by weight, still more preferably in an amount of about 50% by weight.

The hydrophilic compound may be any known in the art. Exemplary hydrophilic compounds include gums, cellulose ethers, acrylic resins, polyvinyl pyrrolidone, protein-derived compounds, and mixtures thereof. Exemplary gums include heteropolysaccharide gums and homopolysaccharide gums, such as xanthan, tragacanth, pectins, acacia, karaya, alginates, agar, guar, hydroxypropyl guar, carrageenan, locust bean gums, and gellan gums. Exemplary cellulose ethers include hydroxyalkyl celluloses and carboxyalkyl celluloses. Preferred cellulose ethers include hydroxyethyl celluloses, hydroxypropyl celluloses, hydroxypropylmethyl-celluloses, carboxy methylcelluloses, and mixtures thereof. Exemplary acrylic resins include polymers and copolymers of acrylic acid, methacrylic acid, methyl acrylate and methyl methacrylate. In some embodiments, the hydrophilic com-

**4**

pound is preferably a gum, more preferably a heteropolysaccharide gum, most preferably a xanthan gum or derivative thereof. Derivatives of xanthan gum include, for example, deacylated xanthan gum, the carboxymethyl esters of xanthan gum, and the propylene glycol esters of xanthan gum.

In another embodiment, the sustained release delivery system may further comprise at least one cross-linking agent. The cross-linking agent is preferably a compound that is capable of cross-linking the hydrophilic compound to form a gel matrix in the presence of liquids. As used herein, "liquids" includes, for example, gastrointestinal fluids and aqueous solutions, such as those used for in vitro dissolution testing. The sustained release delivery system generally comprises the cross-linking agent in an amount of about 0.5% to about 80% by weight, preferably in an amount of about 2% to about 54% by weight, more preferably in an amount of about 20% to about 30% by weight more, still more preferably in an amount of about 25% by weight.

Exemplary cross-linking agents include homopolysaccharides. Exemplary homopolysaccharides include galactomannan gums, such as guar gum, hydroxypropyl guar gum, and locust bean gum. In some embodiments, the cross-linking agent is preferably a locust bean gum or a guar gum. In other embodiments, the cross-linking agents may be alginic acid derivatives or hydrocolloids.

When the sustained release delivery system comprises at least one hydrophilic compound and at least one cross-linking agent, the ratio of hydrophilic compound to cross-linking agent may be from about 1:9 to about 9:1, preferably from about 1:3 to about 3:1.

The sustained release delivery system of the invention may comprise one or more cationic cross-linking compounds. Cationic cross-linking compound may be used instead of or in addition to the cross-linking agent. The cationic cross-linking compounds may be used in an amount sufficient to cross-link the hydrophilic compound to form a gel matrix in the presence of liquids. The cationic cross-linking compound is present in the sustained release delivery system in an amount of about 0.5% to about 30% by weight, preferably from about 5% to about 20% by weight.

Exemplary cationic cross-linking compounds include monovalent metal cations, multivalent metal cations, and inorganic salts, including alkali metal and/or alkaline earth metal sulfates, chlorides, borates, bromides, citrates, acetates, lactates, and mixtures thereof. For example, the cationic cross-linking compound may be one or more of calcium sulfate, sodium chloride, potassium sulfate, sodium carbonate, lithium chloride, tripotassium phosphate, sodium borate, potassium bromide, potassium fluoride, sodium bicarbonate, calcium chloride, magnesium chloride, sodium citrate, sodium acetate, calcium lactate, magnesium sulfate, sodium fluoride, or mixtures thereof.

When the sustained release delivery system comprises at least one hydrophilic compound and at least one cationic cross-linking compound, the ratio of hydrophilic compound to cationic cross-linking compound may be from about 1:9 to about 9:1, preferably from about 1:3 to about 3:1.

Two properties of desirable components of this system (e.g., the at least one hydrophilic compound and the at least one cross-linking agent; or the at least one hydrophilic compound and at least one cationic cross-linking compound) that form a gel matrix upon exposure to liquids are fast hydration of the compounds/agents and the ability to form a gel matrix having a high gel strength. These two properties, which are needed to achieve a slow release gel matrix, are maximized in the invention by the particular combination of compounds (e.g., the at least one hydrophilic compound and

US 7,276,250 B2

5

the at least one cross-linking agent; or the at least one hydrophilic compound and the at least one cationic cross-linking compound). For example, hydrophilic compounds (e.g., xanthan gum) have excellent water-wicking properties which provide fast hydration. The combination of hydrophilic compounds with materials that are capable of cross-linking the rigid helical ordered structure of the hydrophilic compound (e.g., cross-linking agents and/or cationic cross-linking compounds) thereby act synergistically to provide a higher than expected viscosity (i.e., high gel strength) of the gel matrix.

The sustained release delivery system further comprises one or more pharmaceutical diluents known in the art. Exemplary pharmaceutical diluents include monosaccharides, disaccharides, polyhydric alcohols and mixtures thereof. Preferred pharmaceutical diluents include, for example, starch, lactose, dextrose, sucrose, microcrystalline cellulose, sorbitol, xylitol, fructose, and mixtures thereof. In other embodiments, the pharmaceutical diluent is water-soluble, such as lactose, dextrose, sucrose, or mixtures thereof. The ratio of pharmaceutical diluent to hydrophilic compound is generally from about 1:8 to about 8:1, preferably from about 1:3 to about 3:1. The sustained release delivery system generally comprises one or more pharmaceutical diluents in an amount of about 20% to about 80% by weight, preferably about 35% by weight. In other embodiments, the sustained release delivery system comprises one or more pharmaceutical diluents in an amount of about 40% to about 80% by weight.

The sustained release delivery system of the invention may comprise one or more hydrophobic polymers. The hydrophobic polymers may be used in an amount sufficient to slow the hydration of the hydrophilic compound without disrupting it. For example, the hydrophobic polymer may be present in the sustained release delivery system in an amount of about 0.5% to about 20% by weight, preferably in an amount of about 2% to about 10% by weight, more preferably in an amount of about 3% to about 7% by weight, still more preferably in an amount of about 5% by weight.

Exemplary hydrophobic polymers include alkyl celluloses (e.g., $C_{1-6}$ alkyl celluloses, carboxymethylcellulose), other hydrophobic cellulosic materials or compounds (e.g., cellulose acetate phthalate, hydroxypropylmethylcellulose phthalate), polyvinyl acetate polymers (e.g., polyvinyl acetate phthalate), polymers or copolymers derived from acrylic and/or methacrylic acid esters, zein, waxes, shellac, hydrogenated vegetable oils, and mixtures thereof. The hydrophobic polymer is preferably methyl cellulose, ethyl cellulose or propyl cellulose, more preferably ethyl cellulose.

The compositions of the invention may be further admixed with one or more wetting agents (such as polyethoxylated castor oil, polyethoxylated hydrogenated castor oil, polyethoxylated fatty acid from castor oil, polyethoxylated fatty acid from hydrogenated castor oil) one or more lubricants (such as magnesium stearate, sodium stearyl fumarate, and the like), one or more buffering agents, one or more colorants, and/or other conventional ingredients.

In other embodiments, the invention provides oral sustained release solid dosage formulations comprising from about 1 mg to about 200 mg oxymorphone hydrochloride, preferably from about 5 mg to about 80 mg oxymorphone hydrochloride; and about 80 mg to about 200 mg of a sustained release delivery system, preferably from about 120 mg to about 200 mg of a sustained release delivery system, more preferably about 160 mg of a sustained release delivery system; where the sustained release delivery system com-

6

prises about 8.3 to about 41.7% locust bean gum, preferably about 25% locust bean gum; about 8.3 to about 41.7% xanthan gum, preferably about 25% xanthan gum; about 20 to about 55% dextrose, preferably about 35% dextrose; about 5 to about 20% calcium sulfate dihydrate, preferably about 10% calcium sulfate dihydrate; and about 2 to 10% ethyl cellulose, preferably about 5% ethyl cellulose.

In other embodiments, the invention provides oral sustained release solid dosage formulations comprising from about 1 mg to 200 mg oxymorphone hydrochloride, preferably from about 5 mg to about 80 mg oxymorphone hydrochloride; and about 200 mg to about 420 mg of a sustained release delivery system, preferably from about 300 mg to about 420 mg of a sustained release delivery system, more preferably about 360 mg of a sustained release delivery system; where the sustained release delivery system comprises about 8.3 to about 41.7% locust bean gum, preferably about 25% locust bean gum; about 8.3 to about 41.7% xanthan gum, preferably about 25% xanthan gum; about 20 to about 55% dextrose, preferably about 35% dextrose; about 5 to about 20% calcium sulfate dihydrate, preferably about 10% calcium sulfate dihydrate; and about 2 to 10% ethyl cellulose, preferably about 5% ethyl cellulose.

The sustained release formulations of oxymorphone are preferably orally administrable solid dosage formulations which may be, for example, tablets, capsules comprising a plurality of granules, sublingual tablets, powders, or granules; preferably tablets. The tablets may be an enteric coating or a hydrophilic coating.

The sustained release delivery system in the compositions of the invention may be prepared by dry granulation or wet granulation, before the oxymorphone or pharmaceutically acceptable salt thereof is added, although the components may be held together by an agglomeration technique to produce an acceptable product. In the wet granulation technique, the components (e.g., hydrophilic compounds, cross-linking agents, pharmaceutical diluents, cationic cross-linking compounds, hydrophobic polymers, etc.) are mixed together and then moistened with one or more liquids (e.g., water, propylene glycol, glycerol, alcohol) to produce a moistened mass which is subsequently dried. The dried mass is then milled with conventional equipment into granules of the sustained release delivery system. Thereafter, the sustained release delivery system is mixed in the desired amounts with the oxymorphone or the pharmaceutically acceptable salt thereof and, optionally, one or more wetting agents, one or more lubricants, one or more buffering agents, one or more coloring agents, or other conventional ingredients, to produce a granulated composition. The sustained release delivery system and the oxymorphone may be blended with, for example, a high shear mixer. The oxymorphone is preferably finely and homogeneously dispersed in the sustained release delivery system. The granulated composition, in an amount sufficient to make a uniform batch of tablets, is subjected to tableting in a conventional production scale tableting machine at normal compression pressures, i.e., about 2,000-16,000 psi. The mixture should not be compressed to a point where there is subsequent difficulty with hydration upon exposure to liquids.

The average particle size of the granulated composition is from about 50 μm to about 400 μm, preferably from about 185 μm to about 265 μm. The average density of the granulated composition is from about 0.3 g/ml to about 0.8 g/ml, preferably from about 0.5 g/ml to about 0.7 g/ml. The tablets formed from the granulations are generally from about 6 to about 8 kg hardness. The average flow of the granulations are from about 25 to about 40 g/sec.

US 7,276,250 B2

7                                                           8

In other embodiments, the invention provides sustained release coatings over an inner core comprising oxymorphone or a pharmaceutically acceptable salt thereof. For example, the inner core comprising oxymorphone or a pharmaceutically acceptable salt thereof may be coated with a sustained release film which, upon exposure to liquids, releases the oxymorphone or the pharmaceutically acceptable salt thereof from the core at a sustained rate.

In one embodiment, the sustained release coating comprises at least one water insoluble compound. The water insoluble compound is preferably a hydrophobic polymer. The hydrophobic polymer may be the same as or different from the hydrophobic polymer used in the sustained release delivery system. Exemplary hydrophobic polymers include alkyl celluloses (e.g., $C_{1-6}$ alkyl celluloses, carboxymethylcellulose), other hydrophobic cellulosic materials or compounds (e.g., cellulose acetate phthalate, hydroxypropylmethylcellulose phthalate), polyvinyl acetate phthalate (e.g., polyvinyl acetate phthalate), polymers or copolymers derived from acrylic and/or methacrylic acid esters, zein, waxes (alone or in admixture with fatty alcohols), shellac, hydrogenated vegetable oils, and mixtures thereof. The hydrophobic polymer is preferably, methyl cellulose, ethyl cellulose or propyl cellulose, more preferably ethyl cellulose. The sustained release formulations of the invention may be coated with a water insoluble compound to a weight gain from about 1 to about 20% by weight.

The sustained release coating may further comprise at least one plasticizer such as triethyl citrate, dibutyl phthalate, propylene glycol, polyethylene glycol, or mixtures thereof.

The sustained release coating may also contain at least one water soluble compound, such as polyvinylpyrrolidones, hydroxypropylmethylcelluloses, or mixtures thereof. The sustained release coating may comprise at least one water soluble compound in an amount from about 1% to about 6% by weight, preferably in an amount of about 3% by weight.

The sustained release coating may be applied to the oxymorphone core by spraying an aqueous dispersion of the water insoluble compound onto the oxymorphone core. The oxymorphone core may be a granulated composition made, for example, by dry or wet granulation of mixed powders of oxymorphone and at least one binding agent; by coating an inert bead with oxymorphone and at least one binding agent; or by spheronizing mixed powders of oxymorphone and at least one spheronizing agent. Exemplary binding agents include hydroxypropylmethylcelluloses. Exemplary spheronizing agents include microcrystalline celluloses. The inner core may be a tablet made by compressing the granules or by compressing a powder comprising oxymorphone or the pharmaceutically acceptable salt thereof.

In other embodiments, the compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, as described herein, are coated with a sustained release coating, as described herein. In still other embodiments, the compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, as described herein, are coated with a hydrophobic polymer, as described herein. In still other embodiments, the compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, as described herein, are coated with an enteric coating, such as cellulose acetate phthalate, hydroxypropylmethylcellulose phthalate, polyvinylacetate phthalate, methacrylic acid copolymer, shellac, hydroxypropylmethylcellulose succinate, cellulose acetate

trimelliate, or mixtures thereof. In still other embodiments, the compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, as described herein, are coated with a hydrophobic polymer, as described herein, and further coated with an enteric coating, as described herein. In any of the embodiments described herein, the compositions comprising oxymorphone or a pharmaceutically acceptable salt thereof and a sustained release delivery system, as described herein, may optionally be coated with a hydrophilic coating which may be applied above or beneath the sustained release film, above or beneath the hydrophobic coating, and/or above or beneath the enteric coating. Preferred hydrophilic coatings comprise hydroxypropylmethylcellulose.

The invention provides methods for treating pain by administering an effective amount of the sustained release formulations of oxymorphone to a patient in need thereof. An effective amount is an amount sufficient to eliminate all pain or to alleviate the pain (i.e., reduce the pain compared to the pain present prior to administration of the oxymorphone sustained release formulation). "Sustained release" means that the oxymorphone or pharmaceutically acceptable salt thereof is released from the formulation at a controlled rate so that therapeutically beneficial blood levels (but below toxic levels) of the oxymorphone or pharmaceutically acceptable salt thereof are maintained over an extended period of time. The sustained release formulations of oxymorphone are administered in an amount sufficient to alleviate pain for an extended period of time, preferably about 8 hours to about 24 hours, more preferably for a period of about 12 hours to about 24 hours. The oxymorphone sustained release oral solid dosage formulations of the invention may be administered one to four times a day, preferably once or twice daily, more preferably once daily. The pain may be minor to moderate to severe, and is preferably moderate to severe. The pain may be acute or chronic. The pain may be associated with, for example, cancer, autoimmune diseases, infections, surgical traumas, accidental traumas or osteoarthritis. The patient may be an animal, preferably a mammal, more preferably a human.

In certain embodiments, upon oral ingestion of the oxymorphone sustained release formulation and contact of the formulation with gastrointestinal fluids, the sustained release formulation swells and gels to form a hydrophilic gel matrix from which the oxymorphone is released. The swelling of the gel matrix causes a reduction in the bulk density of the formulation and provides the buoyancy necessary to allow the gel matrix to float on the stomach contents to provide a slow delivery of the oxymorphone. The hydrophilic matrix, the size of which is dependent upon the size of the original formulation, can swell considerably and become obstructed near the opening of the pylorus. Since the oxymorphone is dispersed throughout the formulation (and consequently throughout the gel matrix), a constant amount of oxymorphone can be released per unit time in vivo by dispersion or erosion of the outer portions of the hydrophilic gel matrix. The process continues, with the gel matrix remaining buoyant in the stomach, until substantially all of the oxymorphone is released.

In certain embodiments, the chemistry of certain of the components of the formulation, such as the hydrophilic compound (e.g., xanthan gum), is such that the components are considered to be self-buffering agents which are substantially insensitive to the solubility of the oxymorphone and the pH changes along the length of the gastrointestinal tract. Moreover, the chemistry of the components is believed to be similar to certain known muco-adhesive substances,

US 7,276,250 B2

9                                          10

such as polycarbophil. Muco-adhesive properties are desirable for buccal delivery systems. Thus, the sustained release formulation can loosely interact with the mucin in the gastrointestinal tract and thereby provide another mode by which a constant rate of delivery of the oxymorphone is achieved.

The two phenomenon discussed above (buoyancy and muco-adhesive properties) are mechanisms by which the sustained release formulations of the invention can interact with the mucin and fluids of the gastrointestinal tract and provide a constant rate of delivery of the oxymorphone.

When measured by USP Procedure Drug Release USP 23 (incorporated by reference herein in its entirety), the sustained release formulations of the invention exhibit an in vitro dissolution rate of about 15% to about 50% by weight oxymorphone after 1 hour, about 45% to about 80% by weight oxymorphone after 4 hours, and at least about 80% by weight oxymorphone after 10 hours. The in vitro and in vivo release characteristics of the sustained release formulations of the invention may be modified using mixtures of one or more different water insoluble and/or water soluble compounds, using different plasticizers, varying the thickness of the sustained release film, including providing release-modifying compounds in the coating, and/or by providing passageways through the coating.

When administered orally to patients the sustained release formulations of the invention exhibit the following in vivo characteristics: (a) a peak plasma level of oxymorphone occurs within about 2 to about 6 hours after administration; (b) the duration of the oxymorphone analgesic effect is about 8 to about 24 hours; and (c) the relative oxymorphone bioavailability is about 0.5 to about 1.5 compared to an orally administered aqueous solution of oxymorphone.

While the compositions of the invention may be administered as the sole active pharmaceutical compound in the methods described herein, they can also be used in combination with one or more compounds which are known to be therapeutically effective against pain.

The invention also provides pharmaceutical kits comprising one or more containers filled with one or more of the compositions of the invention. The kits may further comprise other pharmaceutical compounds known in the art to be therapeutically effective against pain, and instructions for use.

EXAMPLES

The following examples are for purposes of illustration only and are not intended to limit the scope of the appended claims.

Examples 1 and 2

Two sustained release delivery systems were prepared by dry blending xanthan gum, locust bean gum, calcium sulfate dehydrate, and dextrose in a high speed mixed/granulator for 3 minutes. A slurry was prepared by mixing ethyl cellulose with alcohol. While running choppers/impellers, the slurry was added to the dry blended mixture, and granulated for another 3 minutes. The granulation was then dried to a LOD (loss on drying) of less than about 10% by weight. The granulation was then milled using 20 mesh screen. The relative quantities of the ingredients are listed in Table 1.

TABLE 1

| Sustained Release Delivery System Excipient | Example 1 % | Example 2 % |
|---|---|---|
| Locust Bean Gum, FCC | 25.0 | 30.0 |
| Xanthan Gum, NF | 25.0 | 30.0 |
| Dextrose, USP | 35.0 | 40.0 |
| Calcium Sulfate Dihydrate, NF | 10.0 | 0.0 |
| Ethylcellulose, NF | 5.0 | 0.0 |
| Alcohol, SD3A (Anhydrous)[1] | (10)[1] | (20.0)[1] |
| Total | 100.0 | 100.0 |

[1]Volatile, removed during processing

Examples 3 to 7

A series of tablets containing different amounts of oxymorphone hydrochloride were prepared using the sustained release delivery system of Example 1. The quantities of ingredients per tablet are listed in Table 2.

TABLE 2

| Component | Ex. 3 mg | Ex. 4 mg | Ex. 5 mg | Ex. 6 mg | Ex. 7 mg |
|---|---|---|---|---|---|
| Oxymorphone HCl, USP | 5 | 10 | 20 | 40 | 80 |
| Sustained release delivery system | 160 | 160 | 160 | 160 | 160 |
| Silicified microcrystalline cellulose, N.F. | 20 | 20 | 20 | 20 | 20 |
| Sodium stearyl fumarate, NF | 2 | 2 | 2 | 2 | 2 |
| Total weight | 187 | 192 | 202 | 222 | 262 |
| OPADRY ® (colored) | 7.48 | 7.68 | 8.08 | 8.88 | 10.48 |
| OPADRY ® (clear) | 0.94 | 0.96 | 1.01 | 1.11 | 1.31 |

Examples 8 and 9

Two batches of tablets were prepared as described above for Examples 1-7, using the sustained release delivery system of Example 1. One batch was formulated to provide relatively fast sustained release, the other batch was formulated to provide relatively slow sustained release. Compositions of the tablets are shown in Table 3.

TABLE 3

| Ingredients | Example 8 slow release mg/tablet | Example 9 fast release mg/tablet |
|---|---|---|
| Oxymorphone HCl, USP | 20 | 20 |
| Sustained Release Delivery System | 360 | 160 |
| Silicified Microcrystalline Cellulose, NF | 20 | 20 |
| Sodium stearyl fumarate, NF | 4 | 2 |
| Coating (color) | 12.12 | 12.12 |
| Total weight | 416.12 | 214.12 |

The tablets of Examples 8 and 9 were tested for in vitro release rate according to USP Procedure Drug Release USP 23. The results are shown in Table 4.

TABLE 4

| Time (hr) | Example 8 slow release | Example 9 fast release |
|---|---|---|
| 0.5 | 18.8% | 21.3% |
| 1 | 27.8% | 32.3% |

US 7,276,250 B2

**11**

TABLE 4-continued

| Time (hr) | Example 8 slow release | Example 9 fast release |
|---|---|---|
| 2 | 40.5% | 47.4% |
| 3 | 50.2% | 58.5% |
| 4 | 58.1% | 66.9% |
| 5 | 64.7% | 73.5% |
| 6 | 70.2% | 78.6% |
| 8 | 79.0% | 86.0% |
| 10 | 85.3% | 90.6% |
| 12 | 89.8% | 93.4% |

Example 10

Clinical Study

A clinical study was conducted to (1) assess the relative bioavailability (rate and extent of absorption) of oxymorphone sustained release (20 mg) (fast release formulation of Example 9) compared to oral solution oxymorphone (10 mg) under fasted conditions, (2) to assess the relative bioavailability of oxymorphone sustained release (20 mg) compared to oral solution oxymorphone (10 mg) under fed conditions, (3) to assess the relative bioavailability of oxymorphone sustained release (20 mg) fed compared to oxymorphone sustained release (20 mg) fasted, (4) to assess the relative bioavailability of oral solution oxymorphone fed compared to oral solution oxymorphone fasted, and (5) to assess the relative safety and tolerability of sustained release oxymorphone (20 mg) under fed and fasted conditions.

This study had a single-center, open-label, analytically blinded, randomized, four-way crossover design. Subjects randomized to Treatment A and Treatment C, as described below, were in a fasted state following a 10-hour overnight fast. Subjects randomized to Treatment B and Treatment D, as described below, were in the fed state, having had a high fat meal, completed ten minutes prior to dosing. There was a 14-day washout interval between the four dose administrations. The subjects were confined to the clinic during each study period. The subjects assigned to receive Treatment A and Treatment B were discharged from the clinic on Day 3 following the 48-hour procedures, and subjects assigned to receive Treatment C and Treatment D were discharged from the clinic on Day 2 following the 36-hour procedures. On Day 1 of each study period the subjects received one of four treatments:

Treatments A and B were of oxymorphone sustained release 20 mg tablets. Subjects randomized to Treatment A received a single oral dose of one 20 mg oxymorphone sustained release tablet taken with 240 ml of water after a 10-hour fasting period. Subjects randomized to Treatment B received a single oral dose of one 20 mg oxymorphone sustained release tablet taken with 240 ml of water 10 minutes after a standardized high fat meal.

Treatments C and D were of oxymorphone HCl solutions, USP, 1.5 mg/ml injection 10 ml vials. Subjects randomized to Treatment C received a single oral dose of 10 mg (6.7 ml) oxymorphone solution taken with 240 ml of water after a 10-hour fasting period. Subjects randomized to Treatment D received a single oral dose of 10 mg (6.7 mil) oxymorphone solution taken with 240 ml of water 10 minutes after a standardized high-fat meal.

A total of 28 male subjects were enrolled in the study, and 24 subjects completed the study. The mean age of the subjects was 27 years (range of 19 through 38 years), the mean height of the subjects was 69.6 inches (range of 64.0

**12**

through 75.0 inches), and the mean weight of the subjects was 169.0 pounds (range 117.0 through 202.0 pounds). The subjects were not to consume any alcohol-, caffeine-, or xanthine-containing foods or beverages for 24 hours prior to receiving study medication for each study period. Subjects were to be nicotine and tobacco free for at least 6 months prior to enrolling in the study. In addition, over-the-counter medications were prohibited 7 days prior to dosing and during the study. Prescription medications were not allowed 14 days prior to dosing and during the study.

The subjects were screened within 14 days prior to study enrollment. The screening procedure included medical history, physical examination (height, weight, frame size, vital signs, and ECG), and clinical laboratory tests (hematology, serum chemistry, urinalysis, HIV antibody screen, Hepatitis B surface antigen screen, Hepatitis C antibody screen, and a screen for cannabinoids).

During the study, the subjects were to remain in an upright position (sitting or standing) for 4 hours after the study drug was administered. Water was restricted 2 hours predose to 2 hours postdose. During the study, the subjects were not allowed to engage in any strenuous activity.

Subjects reported to the clinic on the evening prior to each dosing. The subjects then observed a 10-hour overnight fast. On Day 1, subjects randomized to Treatment B and Treatment D received a high-fat breakfast within 30 minutes prior to dosing. A standardized meal schedule was then initiated with lunch 4 hours postdose, dinner 10 hours postdose, and a snack 13 hours postdose. On Day 2, a standardized meal was initiated with breakfast at 0815, lunch at 1200, and dinner at 1800. Subjects randomized to Treatment A and Treatment B received a snack at 2100 on Day 2.

Vital signs (sitting for 5 minutes and consisting of blood pressure, pulse, respiration, and temperature), and 12-lead ECG were assessed at the—13 hour point of each check-in period and at the completion of each period. A clinical laboratory evaluation (hematology, serum chemistry, urinalysis) and a brief physical examination were performed at the—13 hour of each check-in period and at the completion of the each period. Subjects were instructed to inform the study physician and/or nurses of any adverse events that occurred during the study.

Blood samples (7 ml) were collected during each study period at the 0 hour (predose), and at 0.5, 1, 1.5, 2, 3, 4, 5, 6, 8, 10, 12, 14, 16, 20, 24, 30, 36, and 48 hours post-dose (19 samples) for subjects randomized to Treatment A and Treatment B. Blood samples (7 ml) were collected during each study period at the 0 hour (predose), and at 0.25, 0.5, 0.75, 1, 1.25, 1.5, 1.75, 2, 3, 4, 5, 6, 8, 10, 12, 14, 16, 20, and 36 hours post-dose (21 samples) for subjects randomized to Treatment C and Treatment D. A total of 80 blood samples (560 ml) per subject were drawn during the study for drug analysis. Plasma samples were separated by centrifugation, and then frozen at −70° C., and kept frozen until assayed.

An LC/MS/MS method was developed and validated for the determination of oxymorphone in human EDTA plasma. Samples were spiked with internal standard, $d_3$-oxymorphone, and placed on the RapidTrace® (Zymark Corporation, Hopkinton, Mass.) for automatic solid phase extraction. Extracts were dried under nitrogen and reconstituted with acetonitrile before injection onto an LC/MS/MS. The Perkin Elmer Sciex API III+, or equivalent, using a turbo ion spray interface was employed in this study. Positive ions were monitored in the MRM mode.

The pharmacokinetic parameters shown in Table 5 were computed from the plasma oxymorphone concentration-time data.

US 7,276,250 B2

13                                                                          14

TABLE 5

| | |
|---|---|
| AUC(0-t) | Area under the drug concentration-time curve from time zero to the time of the last quantifiable concentration (Ct), calculated using linear trapezoidal summation. |
| AUC(0-inf) | Area under the drug concentration-time curve from time zero to infinity. AUC(0-inf) = AUC(0-t) + Ct/Kel, where Kel is the terminal elimination rate constant. |
| AUC(0-24) | Partial area under the drug concentration-time curve from time zero to 24 hours. |
| Cmax | Maximum observed drug concentration. |
| Tmax | Time of the observed maximum drug concentration. |
| Kel | Elimination rate constant based on the linear regression of the terminal linear portion of the LN(concentration) time curve. |
| T1/2el | Half life, the time required for the concentration to decline by 50%, calculated as LN(2)/Kel |

Terminal elimination rate constants were computed using linear regression of a minimum of three time points, at least two of which were consecutive. Kel values for which correlation coefficients were less than or equal to 0.8 were not reported in the pharmacokinetic parameter tables or included in the statistical analysis. Thus, T1/2el, AUC(0-inf), C1/F, MRT, and LN-transformed T1/2el, AUC(0-inf), and C1/F were also not reported in these cases.

A parametric (normal-theory) general linear model was applied to each of the above parameters (excluding Tmax and Frel), and the LN-transformed parameters $C_{max}$, AUC (0-24), AUC(0-t), AUC(0-inf), C1/F, and T1/2el. Initially, the analysis of variance (ANOVA) model included the following factors: treatment, sequence, subject within sequence, period, and carryover effect. If carryover effect was not significant, it was dropped from the model. The sequence effect was tested using the subject within sequence mean square, and all other main effects were tested using the residual error (error mean square). The following treatment comparisons of relative rate and extent of absorption were made: Treatment B versus Treatment A, Treatment A versus Treatment C (dose normalized to 20 mg). Treatment B versus Treatment D (dose normalized to 20 mg), and Treatment D versus Treatment C (dose normalized to 20 mg for both treatments). The 90% confidence intervals of the ratios of the treatment least squares parameter means were calculated. Tmax was analyzed using the Wilcoxon Signed Ranks test. Summary statistics were presented for Frel.

Plasma oxymorphone concentrations were listed by subject at each collection time and summarized using descriptive statistics. Pharmacokinetic parameters were also listed by subject and summarized using descriptive statistics.

A total of 26 analytical runs were required to process the clinical samples from this study. Of these 26 analytical runs, 26 were acceptable for oxymorphone. Standard curves for the 26 analytical runs in EDTA plasma used in this study covered a range of 0.0500 to 20.000 mg/ml with a limit of quantitation of 0.0500 ng/ml for both compounds. Quality control samples analyzed with each analytical run had coefficients of variation less than or equal to 14.23% for oxymorphone.

A total of 28 subjects received at least one treatment. Only subjects who completed all 4 treatments were included in the summary statistics and statistical analysis.

The mean oxymorphone plasma concentration versus time curves for Treatments A, B, C, and D are presented in FIG. 1 (linear scale, without standard deviation).

Individual concentration versus time curves were characterized by multiple peaks which occurred in the initial 12-hour period following the dose. In addition, a small "bump" in plasma oxymorphone concentration was generally observed in the 24 to 48 hour post-dose period.

The arithmetic means of the plasma oxymorphone pharmacokinetic parameters and the statistical comparisons for Treatment B versus Treatment A are summarized in Table 6.

TABLE 6

Summary of the Pharmacokinetic Parameters of Plasma Oxymorphone for Treatments B and A

| | Plasma Oxymorphone | | | | | |
|---|---|---|---|---|---|---|
| | Treatment A | | Treatment B | | | |
| Pharmacokinetic Parameters | Arithmetic Mean | SD | Arithmetic Mean | SD | 90% CI | Mean Ratio |
| Cmax(ng/ml) | 1.7895 | 0.6531 | 1.1410 | 0.4537 | 125.4-191.0 | 158.2 |
| Tmax(hr) | 5.65 | 9.39 | 5.57 | 7.14 | | |
| Auc(0-24)(ng * hr/ml) | 14.27 | 4.976 | 11.64 | 3.869 | 110.7-134.0 | 122.3 |
| AUC(0-t)(ng * hr/ml) | 19.89 | 6.408 | 17.71 | 8.471 | 100.2-123.6 | 111.9 |
| AUC(0-inf) (ng * hr/ml) | 21.29 | 6.559 | 19.29 | 5.028 | 105.3-133.9 | 119.6 |
| T 1/2el(hr) | 12.0 | 3.64 | 12.3 | 3.99 | 57.4-155.2 | 106.3 |

Treatment B = 1 × 20 mg oxymorphone sustained release Tablet, Fed: test
Treatment A = 1 × 20 mg oxymorphone sustained release Tablet, Fasted: reference

US 7,276,250 B2

15

16

The arithmetic means of the plasma oxymorphone pharmacokinetic parameters and the statistical comparisons for Treatment A versus Treatment C are summarized in Table 7.

TABLE 7

Summary of the Pharmacokinetic Parameters of Plasma
Oxymorphone for Treatments A and C

| Pharmacokinetic Parameters | Plasma Oxymorphone | | | | | |
| | Treatment A | | Treatment C | | | |
| | Arithmetic Mean | SD | Arithmetic Mean | SD | 90% CI | Mean Ratio |
|---|---|---|---|---|---|---|
| Cmax(ng/ml) | 1.1410 | 0.4537 | 2.2635 | 1.0008 | 33.4-66.0 | 49.7 |
| Tmax(hr) | 5.57 | 7.14 | 0.978 | 1.14 | | |
| Auc(0-24)(ng * hr/ml) | 11.64 | 3.869 | 12.39 | 4.116 | 82.8-104.6 | 93.7 |
| AUC(0-t)(ng * hr/ml) | 17.71 | 8.471 | 14.53 | 4.909 | 107.7-136.3 | 122.0 |
| AUC(0-inf) (ng * hr/ml) | 19.29 | 5.028 | 18.70 | 6.618 | 80.2-108.4 | 94.3 |
| T 1/2el(hr) | 12.3 | 3.99 | 16.2 | 11.4 | 32.9-102.1 | 67.5 |

Treatment A = 1 × 20 mg oxymorphone sustained release Tablet, Fasted: test
Treatment C = 10 mg/6.7 ml oxymorphone HCl Oral Solution, Fasted: Dose Normalized to 20 ng: reference.

The arithmetic means of the plasma oxymorphone pharmacokinetic parameters and the statistical comparisons for Treatment D versus Treatment C are summarized in Table 8.

TABLE 8

Summary of the Pharmacokinetic Parameters of Plasma
Oxymorphone for Treatments A and C

| Pharmacokinetic Parameters | Plasma Oxymorphone | | | | | |
| | Treatment B | | Treatment D | | | |
| | Arithmetic Mean | SD | Arithmetic Mean | SD | 90% CI | Mean Ratio |
|---|---|---|---|---|---|---|
| Cmax(ng/ml) | 1.7895 | 0.6531 | 3.2733 | 1.3169 | 42.7-65.0 | 50.0 |
| Tmax(hr) | 5.65 | 9.39 | 1.11 | 0.768 | | |
| Auc(0-24)(ng * hr/ml) | 14.27 | 4.976 | 17.30 | 5.259 | 74.4-90.1 | 82.2 |
| AUC(0-t)(ng * hr/ml) | 19.89 | 6.408 | 19.28 | 6.030 | 92.5-114.1 | 103.3 |
| AUC(0-inf) (ng * hr/ml) | 21.29 | 6.559 | 25.86 | 10.03 | 75.0-95.2 | 85.1 |
| T 1/2el(hr) | 12.0 | 3.64 | 20.6 | 19.3 | 31.9-86.1 | 59.0 |

Treatment B = 1 × 20 mg oxymorphone sustained release Tablet, Fed: test
Treatment D = 10 mg/6.7 ml oxymorphone HCl Oral Solution, Fed: Dose Normalized to 20 mg: reference.

The arithmetic means of the plasma oxymorphone pharmacokinetic parameters and the statistical comparisons for Treatment D versus Treatment C are summarized in Table 9.

TABLE 9

Summary of the Pharmacokinetic Parameters of Plasma
Oxymorphone for Treatments A and C

| Pharmacokinetic Parameters | Plasma Oxymorphone | | | | | |
| | Treatment D | | Treatment C | | | |
| | Arithmetic Mean | SD | Arithmetic Mean | SD | 90% CI | Mean Ratio |
|---|---|---|---|---|---|---|
| Cmax(ng/ml) | 3.2733 | 1.3169 | 2.2635 | 1.0008 | 129.7-162.3 | 146.0 |
| Tmax(hr) | 1.11 | 0.768 | 0.978 | 1.14 | | |
| Auc(0-24)(ng * hr/ml) | 17.30 | 5.259 | 12.39 | 4.116 | 128.5-150.3 | 139.4 |

US 7,276,250 B2

17 18

TABLE 9-continued

Summary of the Pharmacokinetic Parameters of Plasma
Oxymorphone for Treatments A and C

| | Plasma Oxymorphone | | | | | |
| | Treatment D | | Treatment C | | | |
| Pharmacokinetic Parameters | Arithmetic Mean | SD | Arithmetic Mean | SD | 90% CI | Mean Ratio |
|---|---|---|---|---|---|---|
| AUC(0-t)(ng * hr/ml) | 19.20 | 6.030 | 14.53 | 4.909 | 117.9-146.5 | 132.2 |
| AUC(0-inf) (ng * hr/ml) | 25.86 | 10.03 | 18.70 | 6.618 | 118.6-146.6 | 132.6 |
| T 1/2el(hr) | 20.6 | 19.3 | 16.2 | 11.4 | 87.3-155.9 | 121.6 |

Treatment D = 10 mg/6.7 ml oxymorphone HCI Oral Solution, Fed: Dose Normalized to 20 mg: test.
Treatment C = 10 mg/6.7 ml oxymorphone HCI Oral Solution, Fasted: Dose Normalized to 20 mg: reference.

The relative bioavailability calculations are summarized in Table 10.

TABLE 10

Mean (S.D.) Relative Oxymorphone Bioavailability
Determined from AUC (0-inf) and AUC (0-24)

| | Frel BA | | Frel AC | | Frel BD | | Frel DC | |
|---|---|---|---|---|---|---|---|---|
| AUC(0-inf) | 1.169 | (0.2041) | 1.040 | (0.1874) | 0.8863 | (0.2569) | 1.368 | (0.4328) |
| AUC(0-24) | 1.299 | (0.4638) | 0.9598 | (0.2151) | 0.8344 | (0.100) | 1.470 | (0.3922) |

The objectives of this study were to assess the relative bioavailability of oxymorphone from oxymorphone sustained release (20 mg) compared to oxymorphone oral solution (10 mg) under both fasted and fed conditions, and to determine the effect of food on the bioavailability of oxymorphone from the sustained release formulation and from the oral solution.

The presence of a high fat meal had a substantial effect on the oxymorphone Cmax, but less of an effect on oxymorphone AUC from oxymorphone sustained release tablets. Least Squares (LS) mean Cmax was 58% higher and LS mean AUC(0-t) and AUC(0-inf) were 18% higher for the fed condition (Treatment A) compared to the fasted condition (Treatment A) based on LN-transformed data. This was consistent with the relative bioavailability determination from AUC(0-inf) since mean Frel was 1.17. Individual Frel values based on AUC (0-24) were similar (less than 20% different) to Frel values based on AUC (0-inf) for all but 2 subjects. Comparison of mean Frel from AUC (0-inf) to mean Frel from AUC (0-24) is misleading, because not all subjects had a value for AUC (0-inf). Mean Tmax values were similar (approximately 5.6 hours), and no significant differnt in Tmax was shown using nonparametric analysis. Half value durations were significantly different between the two treatments.

The effect of food on oxymorphone bioavailability from the oral solution was more pronounced, particularly in terms of AUC. LS mean Cmax was 50% higher and LS mean AUC(0-t) and AUC(0-inf) were 32-34% higher for the fed condition (Treatment C) compared to the fasted condition (Treatment C) based on LN-transformed data. This was consistent with the relative bioavailability determination from AUC(0-inf) since mean Frel was 1.37. Individual Frel values based on AUC(0-24) were similar (less than 20%

different) to Frel values based on AUC(0-inf.) for all but 5 subjects. Comparison of mean Frel from AUC(0-inf) to mean Frel from AUC(0-24) is misleading because not all subjects had a value for AUC(0-inf). Mean Tmax (approximately 1 hour) was similar for the two treatments and no significant difference was shown.

Under fasted conditions, oxymorphone sustained release 20 mg tablets exhibited similar extent of oxymorphone availability compared to 10 mg oxymorphone oral solution normalized to a 20 mg dose (Treatment A versus Treatment C). From LN-transformed data, LS mean AUC(0-t) was 17% higher for oxymorphone sustained release, whereas LS mean AUC(0-inf) values were nearly equal (mean ratio=99%). However, AUC(0-t) is not the best parameter to evaluate bioavailability since the plasma concentrations were measured for 48 hours for the sustained release formulation versus 36 hours for the oral solution. Mean Frel values calculated from AUC(0-inf) and AUC(0-24), (1.0 and 0.96, respectively) also showed similar extent of oxymorphone availability between the two treatments.

There were differences in parameters reflecting rate of absorption. LS mean Cmax was 49% lower for oxymorphone sustained release tablets compared to the dose-normalized oral solution, based on LN-transformed data. Half-value duration was significantly longer for the sustained release formulation (means, 12 hours versus 2.5 hours).

Under fed conditions, oxymorphone availability from oxymorphone sustained release 20 mg was similar compared to 10 mg oxymorphone oral solution normalized to a 20 mg dose (Treatment B versus Treatment D). From LN-transformed data, LS mean AUC(0-inf) was 12% lower for oxymorphone sustained release. Mean Frel values calculated from AUC(0-inf) and AUC(0-24), (0.89 and 0.83 respectively) also showed similar extent of oxymorphone availability from the tablet. There were differences in parameters reflecting rate of absorption. LS mean Cmax was 46% lower

US 7,276,250 B2

19

for oxymorphone sustained release tablets compared to the dose-normalized oral solution, based on LN-transformed data. Mean Tmax was 5.7 hours for the tablet compared to 1.1 hours for the oral solution. Half-value duration was significantly longer for the sustained release formulation (means, 7.8 hours versus 3.1 hours).

The presence of a high fat meal did not appear to substantially affect the availability following administration of oxymorphone sustained release tablets. LS mean ratios were 97% for AUC(0-t) and 91% for Cmax (Treatment B versus A), based on LN-transformed data. This was consistent with the relative bioavailability determination from AUC(0-24), since mean Frel was 0.97. AUC(0-inf) was not a reliable measure for bioavailability since half-life could not be estimated accurately, and in many cases at all. Half-life estimates were not accurate because in the majority of subjects, the values for half-life were nearly as long or longer (up to 2.8 times longer) as the sampling period. Mean Tmax was later for the fed treatment compared to the fasted treatment (5.2 and 3.6 hours, respectively), and difference was significant.

Under fasted conditions, oxymorphone sustained release 20 mg tablets exhibited similar availability compared to 10 mg oxymorphone oral solution normalized to a 20 mg dose (Treatment A versus Treatment C). From LN-transformed data, LS mean ratio for AUC (0-t) was 104.5%. Mean Frel (0.83) calculated from AUC(0-24) also showed similar extent of oxymorphone availability between the two treatments. There were differences in parameters reflecting rate of absorption. LS mean Cmax was 57% lower for oxymorphone sustained release tablets compared to the dose-normalized oral solution. Mean Tmax was 3.6 hours for the tablet compared to 0.88 for the oral solution. Half-value duration was significantly longer for the sustained release formulation (means, 11 hours versus 2.2 hours).

Under fed conditions, availability from oxymorphone sustained release 20 mg was similar compared to 10 mg oxymorphone oral solution normalized to a 20 mg dose (Treatment B versus Treatment D). From LN-transformed data, LS mean AUC(0-t) was 14% higher for oxymorphone sustained release. Mean Frel (0.87) calculated from AUC (0-24) also indicated similar extent of availability between the treatments. There were differences in parameters reflecting rate of absorption. LS mean Cmax was 40% lower for oxymorphone sustained release tablets compared to the dose-normalized oral solution. Mean Tmax was 5.2 hours for the tablet compared to 1.3 hour for the oral solution. Half-value duration was significantly longer for the sustained release formulation (means, 14 hours versus 3.9 hours).

The extent of oxymorphone availability from oxymorphone sustained release 20 mg tablets was similar under fed and fasted conditions since there was less than a 20% difference in LS mean AUC(0-t) and AUC(0-inf) values for each treatment, based on LN-transformed data. Tmax was unaffected by food; however, LS mean Cmax was increased 58% in the presence of the high fat meal. Both rate and extent of oxymorphone absorption from the oxymorphone oral solution were affected by food since LS mean Cmax and AUC values were increased approximately 50 and 30%, respectively. Tmax was unaffected by food. Under both fed and fasted conditions, oxymorphone sustained release tablets exhibited similar extent of oxymorphone availability compared to oxymorphone oral solution since there was less than a 20% difference in LS mean AUC(0-t) and AUC(0-inf) values for each treatment.

20

Bioavailability following oxymorphone sustained release 20 mg tablets was also similar under fed and fasted conditions since there was less than a 20% difference in LS mean Cmax and AUC values for each treatment. Tmax was later for the fed condition. The presence of food did not affect the extent of availability from oxymorphone oral solution since LS mean AUC values were less than 20% different. However, Cmax was decreased 35% in the presence of food. Tmax was unaffected by food. Under both fed and fasted conditions, oxymorphone sustained release tablets exhibited similar extent of availability compared to oxymorphone oral solution since there was less than a 20% difference in LS mean AUC values for each treatment.

Various modifications of the invention, in addition to those described herein, will be apparent to one skilled in the art from the foregoing description. Such modifications are intended to fall within the scope of the appended claims.

What is claimed is:

1. An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

2. The oral sustained release formulation of claim 1, comprising about 20 mg oxymorphone hydrochloride.

3. The oral sustained release formulation of claim 1, comprising about 160 mg of the granulated sustained release delivery system.

4. An oral sustained release formulation comprising from about 5 to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulate sustained release delivery system, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

5. The oral sustained release formulation of claim 1, further comprising an outer coating.

6. A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 1-5.

7. An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 300 mg to about 420 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

8. The oral sustained release formulation of claim 7, comprising about 20 mg oxymorphone hydrochloride.

9. The oral sustained release formulation of claim 7, comprising about 360 mg of the granulated sustained release delivery system.

10. The oral sustained release formulation of claim 7, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

US 7,276,250 B2

21

**11**. The oral sustained release formulation of claim **7**, further comprising an outer coating.

**12**. A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims **7-11**.

**13**. A solid dosage formulation comprising the oral sustained release formulation of any one of claims **1-5**.

22

**14**. The solid dosage formulation of claim **13**, wherein the solid dosage formulation is a tablet.

**15**. A solid dosage formulation comprising the oral sustained release formulation of anyone of claims **7-11**.

**16**. The solid dosage formulation of claim **15**, wherein the solid dosage formulation is a tablet.

* * * * *

EXHIBIT 3

DUPLICATE



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

October 2, 2007

Benjamin B. Reed
202.719.7531
breed@wileyrein.com

RECEIVED

OCT 0 2 2007

CDER CDR

**BY HAND DELIVERY**

Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD  20705-1266

Re:    **TIME SENSITIVE PATENT INFORMATION**
         NDA 21-610

To whom it may concern:

Enclosed please find a submission on behalf of Endo Pharmaceuticals, Inc. of
supplemental patent information for NDA 21-610, Opana ER.  United States Patent
Number 7,276,250, claiming this product and two approved methods of use (claims
6 and 12) for this product, was issued on October 2, 2007.

Two copies of FDA Form 3542 (Patent Information Submitted Upon and After
Approval of an NDA or Supplement) are enclosed in connection with this
submission.

Please contact me at the number listed above if you have any questions.

Sincerely,

Benjamin B. Reed

Enclosures

cc:    FDA Orange Book Staff
        Guy Donatiello, Esq., Endo Pharmaceuticals, Inc.

| Department of Health and Human Services<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 07/31/06<br>*See OMB Statement on Page 3.* |
|---|---|
| **PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT**<br>*For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation or Composition) and/or Method of Use* | NDA NUMBER<br>21-610 |
| | NAME OF APPLICANT / NDA HOLDER<br>Endo Pharmaceuticals Inc. |

*The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.*

TRADE NAME
Opana ER

| ACTIVE INGREDIENT(S)<br>Oxymorphone HCL | STRENGTH(S)<br>5 mg, 10 mg, 20 mg, 40 mg |
|---|---|
| DOSAGE FORM<br>Tablet | APPROVAL DATE OF NDA OR SUPPLEMENT<br>06/22/2006 |

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) within thirty (30) days after approval of an NDA or supplement or within thirty (30) days of issuance of a patent as required by 21 CFR 314.53(c)(2)(ii) at the address provided in 21 CFR 314.53(d)(4). To expedite review of this patent declaration form, you may submit an additional copy of this declaration form to the Center for Drug Evaluation and Research "Orange Book" staff.

**For hand-written or typewriter versions of this report:** If additional space is required for any narrative answer (i.e., one that does not require a "Yes" or "No" response), please attach an additional page referencing the question number.

*FDA will not list patent information if you file an incomplete patent declaration or the patent declaration indicates that the patent is not eligible for listing.*

*For each patent submitted for the approved NDA or supplement referenced above, you must submit all the information described below. If you are not submitting any patents for this NDA or supplement, complete above section and sections 5 and 6.*

**1. GENERAL**

| a. United States Patent Number<br>7276250 | b. Issue Date of Patent<br>10/02/2007 | c. Expiration Date of Patent<br>07/03/2022 |
|---|---|---|

| d. Name of Patent Owner<br>Penwest Pharmaceuticals Co. | Address *(of Patent Owner)*<br>39 Old Ridgebury Road; Suite #11 |
|---|---|
| | City/State<br>Danbury, CT |
| | ZIP Code<br>06810 / FAX Number *(if available)*<br>(203) 794-1393 |
| | Telephone Number<br>(203) 796-3700 / E-Mail Address *(if available)* |

| e. <u>Name of agent or representative</u> who resides or maintains a place of business within the United States authorized to receive notice of patent certification under section 505(b)(3) and (j)(2)(B) of the Federal Food, Drug, and Cosmetic Act and 21 CFR 314.52 and 314.95 (if patent owner or NDA applicant/holder does not reside or have a place of business within the United States) ☞ | Address *(of agent or representative named in 1.e.)* |
|---|---|
| | City/State |
| | ZIP Code / FAX Number *(if available)* |
| | Telephone Number / E-Mail Address *(if available)* |

| f.  Is the patent referenced above a patent that has been submitted previously for the approved NDA or supplement referenced above? | ☐ Yes  ☑ No |
|---|---|
| g. If the patent referenced above has been submitted previously for listing, is the expiration date a new expiration date? | ☐ Yes  ☐ No |

PSC Media Arts (301) 443-1090   EF

*For the patent referenced above, provide the following information on each patent that claims the drug substance, drug product, or method of use that is the subject of the approved NDA or supplement. FDA will not list patent information if you file an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing. FDA will consider an incomplete patent declaration to be a declaration that does not include a response to all the questions contained within each section below applicable to the patent referenced above.*

## 2. Drug Substance (Active Ingredient)

| | | |
|---|---|---|
| **2.1** Does the patent claim the drug substance that is the active ingredient in the drug product described in the approved NDA or supplement? | ☐ Yes | ☑ No |
| **2.2** Does the patent claim a drug substance that is a different polymorph of the active ingredient described in the NDA? | ☐ Yes | ☑ No |
| **2.3** If the answer to question 2.2 is "Yes," do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b). | ☐ Yes | ☐ No |

**2.4** Specify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3.

| | | |
|---|---|---|
| **2.5** Does the patent claim only a metabolite of the approved active ingredient? (Complete the information in section 4 below if the patent claims an approved method of using the approved drug product to administer the metabolite.) | ☐ Yes | ☑ No |
| **2.6** Does the patent claim only an intermediate? | ☐ Yes | ☑ No |
| **2.7** If the patent referenced in 2.1 is a product-by-process patent, is the product claimed in the patent novel? (An answer is required only if the patent is a product-by-process patent.) | ☐ Yes | ☐ No |

FDA will not list the patent in the Orange Book as claiming the drug substance if:
- the answers to 2.1 and 2.2 are "No," or,
- the answer to 2.2 is "Yes" and the answer to 2.3 is "No," or,
- the answer to 2.3 is "Yes" and there is no response to 2.4, or,
- the answer to 2.5 or 2.6 is "Yes."
- the answer to 2.7 is "No."

## 3. Drug Product (Composition/Formulation)

| | | |
|---|---|---|
| **3.1** Does the patent claim the approved drug product as defined in 21 CFR 314.3? | ☑ Yes | ☐ No |
| **3.2** Does the patent claim only an intermediate? | ☐ Yes | ☑ No |
| **3.3** If the patent referenced in 3.1 is a product-by-process patent, is the product claimed in the patent novel? (An answer is required only if the patent is a product-by-process patent.) | ☐ Yes | ☐ No |

FDA will not list the patent in the Orange Book as claiming the drug product if:
- the answer to question 3.1 is "No," or,
- the answer to question 3.2 is "Yes," or,
- the answer to question 3.3 is "No."

## 4. Method of Use

*Sponsors must submit the information in section 4 separately for each patent claim claiming an approved method of using the approved drug product. For each method of use claim referenced, provide the following information:*

| | | |
|---|---|---|
| **4.1** Does the patent claim one or more approved methods of using the approved drug product? | ☑ Yes | ☐ No |

| **4.2** Patent Claim Number *(as listed in the patent)*<br>6, 12 | Does the patent claim referenced in 4.2 claim an approved method of use of the approved drug product? | ☑ Yes | ☐ No |
|---|---|---|---|

| **4.2a** If the answer to 4.2 is "Yes," identify the use with specific reference to the approved labeling for the drug product. | Use: *(Submit indication or method of use information as identified specifically in the approved labeling.)*<br>OPANA ER is indicated for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. |
|---|---|

| 4.2b If the answer to 4.2 is "Yes," also provide the information on the indication or method of use for the Orange Book "Use Code" description. | Use: *(Submit the description of the approved indication or method of use that you propose FDA include as the "Use Code" in the Orange Book, using no more than 240 total characters including spaces.)*<br><br>Relief of moderate to severe pain |
|---|---|

**FDA will not list the patent in the Orange Book as claiming the method of use if:**

- the answer to question 4.1 or 4.2 is "No," or
- If the answer to 4.2 is "Yes" and the information requested in 4.2a and 4.2b is not provided in full.

## 5. No Relevant Patents

| For this NDA or supplement, there are no relevant patents that claim the approved drug substance (active ingredient) or the approved drug product (formulation or composition) or approved method(s) of use with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product. | ☐ Yes |
|---|---|

## 6. Declaration Certification

**6.1** *The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.*

*Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.*

| 6.2 Authorized Signature of NDA Applicant/Holder or Patent Owner *(Attorney, Agent, Representative or other Authorized Official) (Provide information below)* | Date Signed<br><br>*28 September 2007* |
|---|---|

NOTE: Only an NDA applicant/holder may submit this declaration directly to the FDA. A patent owner who is not the NDA applicant/holder is authorized to sign the declaration but may not submit it directly to FDA. 21 CFR 314.53(c)(4) and (d)(4).

Check applicable box and provide information below.

| | ☐ NDA Applicant/Holder | ☑ NDA Applicant's/Holder's Attorney, Agent (Representative) or other Authorized Official |
|---|---|---|
| | ☐ Patent Owner | ☐ Patent Owner's Attorney, Agent (Representative) or Other Authorized Official |

| Name | |
|---|---|
| Guy Donatiello, Esq | |
| Address<br>100 Endo Boulevard | City/State<br>Chadds Ford, PA |
| ZIP Code<br>19317 | Telephone Number<br>(610) 558-9800 |
| FAX Number *(if available)*<br>(610) 558-9682 | E-Mail Address *(if available)* |

The public reporting burden for this collection of information has been estimated to average 9 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Food and Drug Administration
CDER (HFD-007)
5600 Fishers Lane
Rockville, MD 20857

*An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.*

FORM FDA 3542 (7/03)

## INFORMATION AND INSTRUCTIONS FOR FORM 3542

## PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

### General Information

• To submit patent information to the agency the appropriate patent declaration form must be used. Two forms are available for patent submissions. The approval status of your New Drug Application will determine which form you should use.

• Form 3542a should be used when submitting patent information with original NDA submissions, NDA amendments and NDA supplements prior to approval.

• Form 3542 should be used after NDA or supplemental approval. This form is to be submitted within 30 days after approval of an application. This form should also be used to submit patent information relating to an approved supplement under 21 CFR 314.53(d) to change the formulation, add a new indication or other condition of use, change the strength, or to make any other patented change regarding the drug, drug product, or any method of use. Form 3542 is also to be used for patents issued after drug approval. Patents issued after drug approval are required to be submitted within 30 days of patent issuance for the patent to be considered "timely filed."

• Only information from form 3542 will be used for Orange Book Publication purposes.

• Forms should be submitted as described in 21 CFR 314.53. An additional copy of form 3542 to the Orange Book Staff will expedite patent publication in the Orange Book. The Orange Book Staff address (as of July 2003) is: Orange Book Staff, Office of Generic Drugs OGD/HFD-610, 7500 Standish Place, Rockville, MD 20855.

• The receipt date is the date that the patent information is date stamped in the central document room. Patents are considered listed on the date received.

• Additional copies of these forms may be downloaded from the Internet at: *http://forms.psc.gov/forms/fdahtm/fdahtm.html*.

### First Section

Complete all items in this section.

### 1. General Section

Complete all items in this section with reference to the patent itself.

1c) Include patent expiration date, including any Hatch-Waxman patent extension already **granted**. Do not include any applicable pediatric exclusivity. The agency will include pediatric exclusivities where applicable upon publication.

1d) Include full address of patent owner. If patent owner resides outside the U.S. indicate the country in the zip code block.

1e) Answer this question if applicable. If patent owner and NDA applicant/holder reside in the United States, leave space blank.

### 2. Drug Substance (Active Ingredient)

Complete all items in this section if the patent claims the drug substance that is the subject of the approved NDA or supplement.

2.4) Name the polymorphic form of the drug identified by the patent.

2.5) A patent for a metabolite of the approved active ingredient may not be listed. If the patent claims an approved method of using the approved drug product to administer the metabolite, the patent may be listed as a method of use patent depending on the responses to section 4 of this form.

2.7) Answer this question only if the patent is a product-by-process patent.

### 3. Drug Product (Composition/Formulation)

Complete all items in this section if the patent claims the drug product that is the subject of the approved NDA or supplement.

3.3) An answer to this question is required only if the referenced patent is a product-by-process patent.

### 4. Method of Use

Complete all items in this section if the patent claims one or more methods of use of the drug product that is the subject of the approved NDA or supplement.

4.2) Identify by number each claim in the patent that claims the approved use(s) of the drug. Indicate whether or not each individual claim is a claim for the approved method(s) of use of the drug.

4.2a) Specify the part of the approved drug labeling that is claimed by the patent.

4.2b) The answer to this question will be what FDA uses to create a "use-code" for Orange Book publication. Each approved use claimed by the patent should be separately identified in this section.

### 5. No Relevant Patents

Complete this section only if applicable.

### 6. Declaration Certification

Complete all items in this section.

6.2) Authorized signature. Check one of the four boxes that best describes the authorized signature.

DUPLICATE



**Wiley Rein LLP**

1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

October 2, 2007

Benjamin B. Reed
202.719.7531
breed@wileyrein.com

**BY HAND DELIVERY**

Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD  20705-1266

Re:     **TIME SENSITIVE PATENT INFORMATION**
        NDA 21-610

To whom it may concern:

Enclosed please find a submission on behalf of Endo Pharmaceuticals, Inc. of supplemental patent information for NDA 21-610, Opana ER.  United States Patent Number 7,276,250, claiming this product and two approved methods of use (claims 6 and 12) for this product, was issued on October 2, 2007.

Two copies of FDA Form 3542 (Patent Information Submitted Upon and After Approval of an NDA or Supplement) are enclosed in connection with this submission.

Please contact me at the number listed above if you have any questions.

Sincerely,

Benjamin B. Reed

Enclosures

cc:     FDA Orange Book Staff
        Guy Donatiello, Esq., Endo Pharmaceuticals, Inc.

RECEIVED

OCT - 2 2007

CGD

| Department of Health and Human Services<br>Food and Drug Administration | Form Approved: OMB No. 0910-0513<br>Expiration Date: 07/31/06<br>*See OMB Statement on Page 3.* |
|---|---|

# PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

### *For Each Patent That Claims a Drug Substance (Active Ingredient), Drug Product (Formulation or Composition) and/or Method of Use*

**NDA NUMBER**
21-610

**NAME OF APPLICANT / NDA HOLDER**
Endo Pharmaceuticals Inc.

---

*The following is provided in accordance with Section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act.*

**TRADE NAME**
Opana ER

| **ACTIVE INGREDIENT(S)**<br>Oxymorphone HCL | **STRENGTH(S)**<br>5 mg, 10 mg, 20 mg, 40 mg |
|---|---|
| **DOSAGE FORM**<br>Tablet | **APPROVAL DATE OF NDA OR SUPPLEMENT**<br>06/22/2006 |

This patent declaration form is required to be submitted to the Food and Drug Administration (FDA) within thirty (30) days after approval of an NDA or supplement or within thirty (30) days of issuance of a patent as required by 21 CFR 314.53(c)(2)(ii) at the address provided in 21 CFR 314.53(d)(4). To expedite review of this patent declaration form, you may submit an additional copy of this declaration form to the Center for Drug Evaluation and Research "Orange Book" staff.

**For hand-written or typewriter versions of this report:** If additional space is required for any narrative answer (i.e., one that does not require a "Yes" or "No" response), please attach an additional page referencing the question number.

*FDA will not list patent information if you file an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing.*

*For each patent submitted for the approved NDA or supplement referenced above, you must submit all the information described below. If you are not submitting any patents for this NDA or supplement, complete above section and sections 5 and 6.*

## 1. GENERAL

| a. United States Patent Number<br>7276250 | b. Issue Date of Patent<br>10/02/2007 | c. Expiration Date of Patent<br>07/03/2022 |
|---|---|---|

| d. Name of Patent Owner<br>  Penwest Pharmaceuticals Co. | Address *(of Patent Owner)*<br>39 Old Ridgebury Road; Suite #11 |
|---|---|
| | City/State<br>Danbury, CT |
| | ZIP Code<br>06810 | FAX Number *(if available)*<br>(203) 794-1393 |
| | Telephone Number<br>(203) 796-3700 | E-Mail Address *(if available)* |

| e. <u>Name of agent or representative</u> who resides or maintains a place of business within the United States authorized to receive notice of patent certification under section 505(b)(3) and (j)(2)(B) of the Federal Food, Drug, and Cosmetic Act and 21 CFR 314.52 and 314.95 (if patent owner or NDA applicant/holder does not reside or have a place of business within the United States) ☞ | Address *(of agent or representative named in 1.e.)* |
|---|---|
| | City/State |
| | ZIP Code | FAX Number *(if available)* |
| | Telephone Number | E-Mail Address *(if available)* |

| f. Is the patent referenced above a patent that has been submitted previously for the approved NDA or supplement referenced above? | ☐ Yes   ☑ No |
|---|---|
| g. If the patent referenced above has been submitted previously for listing, is the expiration date a new expiration date? | ☐ Yes   ☐ No |

*For the patent referenced above, provide the following information on each patent that claims the drug substance, drug product, or method of use that is the subject of the approved NDA or supplement. FDA will not list patent information if you file an incomplete patent declaration or the patent declaration indicates the patent is not eligible for listing. FDA will consider an incomplete patent declaration to be a declaration that does not include a response to all the questions contained within each section below applicable to the patent referenced above.*

## 2. Drug Substance (Active Ingredient)

| | | Yes | No |
|---|---|---|---|
| 2.1 | Does the patent claim the drug substance that is the active ingredient in the drug product described in the approved NDA or supplement? | ☐ Yes | ☑ No |
| 2.2 | Does the patent claim a drug substance that is a different polymorph of the active ingredient described in the NDA? | ☐ Yes | ☑ No |
| 2.3 | If the answer to question 2.2 is "Yes," do you certify that, as of the date of this declaration, you have test data demonstrating that a drug product containing the polymorph will perform the same as the drug product described in the NDA? The type of test data required is described at 21 CFR 314.53(b). | ☐ Yes | ☐ No |

2.4  Specify the polymorphic form(s) claimed by the patent for which you have the test results described in 2.3.

| | | Yes | No |
|---|---|---|---|
| 2.5 | Does the patent claim only a metabolite of the approved active ingredient? (Complete the information in section 4 below if the patent claims an approved method of using the approved drug product to administer the metabolite.) | ☐ Yes | ☑ No |
| 2.6 | Does the patent claim only an intermediate? | ☐ Yes | ☑ No |
| 2.7 | If the patent referenced in 2.1 is a product-by-process patent, is the product claimed in the patent novel? (An answer is required only if the patent is a product-by-process patent.) | ☐ Yes | ☐ No |

**FDA will not list the patent in the Orange Book as claiming the drug substance if:**
- the answers to 2.1 and 2.2 are "No," or,
- the answer to 2.2 is "Yes" and the answer to 2.3 is "No," or,
- the answer to 2.3 is "Yes" and there is no response to 2.4, or,
- the answer to 2.5 or 2.6 is "Yes."
- the answer to 2.7 is "No."

## 3. Drug Product (Composition/Formulation)

| | | Yes | No |
|---|---|---|---|
| 3.1 | Does the patent claim the approved drug product as defined in 21 CFR 314.3? | ☑ Yes | ☐ No |
| 3.2 | Does the patent claim only an intermediate? | ☐ Yes | ☑ No |
| 3.3 | If the patent referenced in 3.1 is a product-by-process patent, is the product claimed in the patent novel? (An answer is required only if the patent is a product-by-process patent.) | ☐ Yes | ☐ No |

**FDA will not list the patent in the Orange Book as claiming the drug product if:**
- the answer to question 3.1 is "No," or,
- the answer to question 3.2 is "Yes," or,
- the answer to question 3.3 is "No."

## 4. Method of Use

*Sponsors must submit the information in section 4 separately for each patent claim claiming an approved method of using the approved drug product. For each method of use claim referenced, provide the following information:*

| | | Yes | No |
|---|---|---|---|
| 4.1 | Does the patent claim one or more approved methods of using the approved drug product? | ☑ Yes | ☐ No |

| 4.2 Patent Claim Number *(as listed in the patent)*<br><br>6, 12 | Does the patent claim referenced in 4.2 claim an approved method of use of the approved drug product? | ☑ Yes | ☐ No |
|---|---|---|---|

| 4.2a  If the answer to 4.2 is "Yes," identify the use with specific reference to the approved labeling for the drug product. | Use: *(Submit indication or method of use information as identified specifically in the approved labeling.)*<br>OPANA ER is indicated for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time. |
|---|---|

FORM FDA 3542  (7/03)                                                                                                            Page 2

| 4.2b If the answer to 4.2 is "Yes," also provide the information on the indication or method of use for the Orange Book "Use Code" description. | Use: *(Submit the description of the approved indication or method of use that you propose FDA include as the "Use Code" in the Orange Book, using no more than 240 total characters including spaces.)*<br><br>Relief of moderate to severe pain |
|---|---|

**FDA will not list the patent in the Orange Book as claiming the method of use if:**

- the answer to question 4.1 or 4.2 is "No," or
- if the answer to 4.2 is "Yes" and the information requested in 4.2a and 4.2b is not provided in full.

## 5. No Relevant Patents

| For this NDA or supplement, there are no relevant patents that claim the approved drug substance (active ingredient) or the approved drug product (formulation or composition) or approved method(s) of use with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product. | ☐ Yes |
|---|---|

## 6. Declaration Certification

**6.1** *The undersigned declares that this is an accurate and complete submission of patent information for the NDA or supplement approved under section 505 of the Federal Food, Drug, and Cosmetic Act. This time-sensitive patent information is submitted pursuant to 21 CFR 314.53. I attest that I am familiar with 21 CFR 314.53 and this submission complies with the requirements of the regulation. I verify under penalty of perjury that the foregoing is true and correct.*

*Warning: A willfully and knowingly false statement is a criminal offense under 18 U.S.C. 1001.*

| 6.2 Authorized Signature of NDA Applicant/Holder or Patent Owner *(Attorney, Agent, Representative or other Authorized Official) (Provide information below)* | Date Signed |
|---|---|
| *[signature]* | *28 September 2007* |

NOTE: Only an NDA applicant/holder may submit this declaration directly to the FDA. A patent owner who is not the NDA applicant/holder is authorized to sign the declaration but may not submit it directly to FDA. 21 CFR 314.53(c)(4) and (d)(4).

Check applicable box and provide information below.

| ☐ NDA Applicant/Holder | ☑ NDA Applicant's/Holder's Attorney, Agent (Representative) or other Authorized Official |
|---|---|
| ☐ Patent Owner | ☐ Patent Owner's Attorney, Agent (Representative) or Other Authorized Official |

| Name<br>Guy Donatiello, Esq | |
|---|---|
| Address<br>100 Endo Boulevard | City/State<br>Chadds Ford, PA |
| ZIP Code<br>19317 | Telephone Number<br>(610) 558-9800 |
| FAX Number *(if available)*<br>(610) 558-9682 | E-Mail Address *(if available)* |

The public reporting burden for this collection of information has been estimated to average 9 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Food and Drug Administration
CDER (HFD-007)
5600 Fishers Lane
Rockville, MD. 20857

*An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.*

FORM FDA 3542 (7/03)                                                                 Page 3

## INFORMATION AND INSTRUCTIONS FOR FORM 3542

## PATENT INFORMATION SUBMITTED UPON AND AFTER APPROVAL OF AN NDA OR SUPPLEMENT

### General Information

- To submit patent information to the agency the appropriate patent declaration form must be used. Two forms are available for patent submissions. The approval status of your New Drug Application will determine which form you should use.

- Form 3542a should be used when submitting patent information with original NDA submissions, NDA amendments and NDA supplements prior to approval.

- Form 3542 should be used after NDA or supplemental approval. This form is to be submitted within 30 days after approval of an application. This form should also be used to submit patent information relating to an approved supplement under 21 CFR 314.53(d) to change the formulation, add a new indication or other condition of use, change the strength, or to make any other patented change regarding the drug, drug product, or any method of use. Form 3542 is also to be used for patents issued after drug approval. Patents issued after drug approval are required to be submitted within 30 days of patent issuance for the patent to be considered "timely filed."

- Only information from form 3542 will be used for Orange Book Publication purposes.

- Forms should be submitted as described in 21 CFR 314.53. An additional copy of form 3542 to the Orange Book Staff will expedite patent publication in the Orange Book. The Orange Book Staff address (as of July 2003) is: Orange Book Staff, Office of Generic Drugs OGD/HFD-610, 7500 Standish Place, Rockville, MD 20855.

- The receipt date is the date that the patent information is date stamped in the central document room. Patents are considered listed on the date received.

- Additional copies of these forms may be downloaded from the Internet at: *http://forms.psc.gov/forms/fdahtm/fdahtm.html*.

### First Section

Complete all items in this section.

### 1. General Section

Complete all items in this section with reference to the patent itself.

1c) Include patent expiration date, including any Hatch-Waxman patent extension already **granted**. Do not include any applicable pediatric exclusivity. The agency will include pediatric exclusivities where applicable upon publication.

1d) Include full address of patent owner. If patent owner resides outside the U.S. indicate the country in the zip code block.

1e) Answer this question if applicable. If patent owner and NDA applicant/holder reside in the United States, leave space blank.

### 2. Drug Substance (Active Ingredient)

Complete all items in this section if the patent claims the drug substance that is the subject of the approved NDA or supplement.

2.4) Name the polymorphic form of the drug identified by the patent.

2.5) A patent for a metabolite of the approved active ingredient may not be listed. If the patent claims an approved method of using the approved drug product to administer the metabolite, the patent may be listed as a method of use patent depending on the responses to section 4 of this form.

2.7) Answer this question only if the patent is a product-by-process patent.

### 3. Drug Product (Composition/Formulation)

Complete all items in this section if the patent claims the drug product that is the subject of the approved NDA or supplement.

3.3) An answer to this question is required only if the referenced patent is a product-by-process patent.

### 4. Method of Use

Complete all items in this section if the patent claims one or more methods of use of the drug product that is the subject of the approved NDA or supplement.

4.2) Identify by number each claim in the patent that claims the approved use(s) of the drug. Indicate whether or not each individual claim is a claim for the approved method(s) of use of the drug.

4.2a) Specify the part of the approved drug labeling that is claimed by the patent.

4.2b) The answer to this question will be what FDA uses to create a "use-code" for Orange Book publication. Each approved use claimed by the patent should be separately identified in this section.

### 5. No Relevant Patents

Complete this section only if applicable.

### 6. Declaration Certification

Complete all items in this section.

6.2) Authorized signature. Check one of the four boxes that best describes the authorized signature.

EXHIBIT 4





30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

October 2, 2007

Via Federal Express

Endo Pharmaceuticals Inc.
100 Endo Blvd.
Chadds Ford, PA 19317

Tracking # 8613 5929 4551

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11
Danbury, CT 06810

Tracking # 8613 5929 4919

Re:    Patent Certification Notice – U.S. Patent No. 7,276,250
       Oxymorphone Hydrochloride Extended-release Tablets
       ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent No. 7,276,250.

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

An Offer of Confidential Access to Impax's ANDA 79-087, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on September 24, 2007.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance

MCS/aks

Enclosures:    Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal Bases That U.S. Patent No. 7,276,250 Is Invalid, Unenforceable Or Not Infringed

Impax Laboratories, Inc.'s Offer of Confidential Access to ANDA 79-087

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R. § 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent No. 7,276,250 is invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

## I.    Applicable Legal Standards

A U.S. patent gives the owner the right to preclude others from making, using or selling the invention defined by the claims of the patent in the United States and its territories for the term of the patent.[1] Those making, using or selling an invention defined by the claims of a patent are said to be directly infringing the claims of the patent. The patent statute also describes remedies for contributory infringement and inducement of infringement.[2] For there to be indirect infringement by one party, there must be direct infringement by another party. Furthermore, the act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

Evaluating infringement is a two-step process. First, the scope of the claims is determined, and second, the accused product or process is compared to the properly interpreted claims. The claims, properly construed as a matter of law by the court,[4] are the measure of the grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

Claim construction may involve the use of both intrinsic and extrinsic evidence; however, the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate weight to such evidence.[6] In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7] In determining the ordinary and customary meaning, the trial

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9] Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10]  When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent.  The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12]  Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13] What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §103 because they are obvious in light of the prior art.  With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

---

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985).  See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950).  See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

[14] 35 U.S.C. § 282.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

a person having ordinary skill in the art to which said subject matter pertains."[15] The
"combination of familiar elements according to known methods" is likely be obvious when it
yields predictable results, and common sense, not a "formalistic conception of the words
teaching, suggestion, and motivation" should guide obviousness analysis.[16] Factors to be
considered in determining obviousness include the scope and content of the prior art, differences
between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary
considerations.[17]

A patent application must describe how to make and use the invention in such full, clear,
concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to
make and use the same.[18] For a claim to be enabled, the disclosure must be sufficiently
described as to enable one of ordinary skill in the art to practice the invention without undue
experimentation. A patent can be enabled even if it requires some experimentation to practice
the invention: what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a
later filed publication cannot supplement an insufficient disclosure to render it enabling.[19] Later
filed publications can be considered as evidence of the level of ordinary skill in the art at the time
of filing the application, reinforcing the standard that the issue is whether one skilled in the art
would have believed the application to be enabled at the time of filing. *In re Wands* set out 8
factors to be considered for enablement: (1) the breadth of the claims, (2) the nature of the
invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of
predictability in the art, (6) the amount of direction provided in the application, (7) the existence
of working examples in the specification, and (8) the quantity of experimentation needed to
make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description
requirements of 35 U.S.C. § 112, Paragraph 1. The goals of the written description requirement
are to (1) convey to the public what was invented, (2) put the public in possession of what the
applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that

---

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

[20] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

was not described in the specification as filed. As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21] Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23] To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24] Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims be amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26] "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[27] Intent need not, and rarely can, be proven by direct evidence.[28] "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29] Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that

---

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs*, 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 7,276,250

U.S. Patent No. 7,276,250 (the "'250 patent") was filed on July 3, 2002 and issued on October 2, 2007.   The '250 patent claims priority to U.S. Provisional Application No. 60/329,352, filed October 15, 2001, U.S. Provisional Application No. 60/329,426, filed October 15, 2001, and U.S. Provisional Application No. 60/303,357, filed July 6, 2001.  The '250 patent is assigned to Penwest Pharmaceuticals Company of Patterson, New York.

### A.  The Claims of the '250 patent

There are sixteen claims issued in the '250 patent, which read as follows:

1.    An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

2.    The oral sustained release formulation of claim 1, comprising about 20 mg oxymorphone hydrochloride.

3.    The oral sustained release formulation of claim 1, comprising about 160 mg of the granulated sustained release delivery system.

4.    An oral sustained release formulation comprising from about 5 to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

---

[30] *Ferring,* 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253 (Fed. Cir. 1997)).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

5.    The oral sustained release formulation of claim 1, further comprising an outer coating.

6.    A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 1-5.

7.    An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 300 mg to about 420 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

8.    The oral sustained release formulation of claim 7, comprising about 20 mg oxymorphone hydrochloride.

9.    The oral sustained release formulation of claim 7, comprising about 360 mg of the granulated sustained release delivery system.

10.    The oral sustained release formulation of claim 7, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

11.    The oral sustained release formulation of claim 7, further comprising an outer coating.

12.    A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 7-11.

13.    A solid dosage formulation comprising the oral sustained release formulation of any one of claims 1-5.

14.    The solid dosage formulation of claim 13, wherein the solid dosage formulation is a tablet.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

15.     A solid dosage formulation comprising the oral sustained release formulation of any one of claims 7-11.

16.     The solid dosage formulation of claim 15, wherein the solid dosage formulation is a tablet.

## B.  No Infringement of the Claims of the '250 patent

The '250 patent contains only 3 independent claims. Each of the independent claims 1, 4, and 7 of the '250 patent contains the specific limitation that the composition must include dextrose, among other ingredients. Specifically, the compositions of claims 1 and 7 require "about 20% to about 55% by weight dextrose." The composition of claim 4 requires "about 35% dextrose." Because each remaining claim contains the limitations of the independent claim from it depends, all of the claims in the '250 patent require the presence of dextrose, in the respective amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claims of the '250 patent because Impax Oxymorphone ER does not contain dextrose in the claimed amounts. Furthermore, Impax's Oxymorphone ER would not infringe any claim under the doctrine of equivalents. Patentees are entitled to no range of equivalents around the "about 20% to about 55% by weight dextrose" and "about 35% dextrose" claim limitations. During prosecution, in order to obtain allowance, claims requiring "at least one pharmaceutical diluent" were cancelled in favor of the narrower claims specifying dextrose in the amounts listed above. Applicants are estopped from arguing equivalents to these claim limitations as no exceptions to the complete bar to the doctrine of equivalents apply in this case. Therefore, the Impax Oxymorphone ER does not contain any equivalent to the amounts of dextrose claimed in the '250 patent.

## C.    Conclusion

For the reasons stated above, none of the claims of U.S. Patent No. 7,276,250 are infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER. Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not infringed.

## ABBREVIATED NEW DRUG APPLICATION 79-087
## OFFER OF CONFIDENTIAL ACCESS
## PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

**WHEREAS** Impax Laboratories, Inc. ("Impax") has provided notice to Endo Pharmaceuticals Inc. (hereinafter "Recipient") that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 79-087 for Impax's Oxymorphone Hydrochloride Extended-release Tablets, (hereinafter referred to in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 7,276,250 (the "Listed Patent") which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations;" and

**WHEREAS** this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355 (j)(5)(C)(i)(III) which provides:

> The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;

> and

**WHEREAS** Impax offers to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

**WHEREAS** this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

**NOW, THEREFORE,** Impax makes this offer:

1.    Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions recited in clause 2 below, Impax hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.    The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

    A.    **Persons Entitled to Access:** Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to

outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

    i.      Such outside counsel has been identified to Impax in writing;

    ii.     Such outside counsel is not involved in patent prosecution matters for Recipient;

    iii.    Within five (5) business days of receiving such written identification, Impax has not objected, in writing, to provision of confidential access to the identified outside counsel.

**B.**    **Materials Accessible by Authorized Evaluators**:  A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.**    **Use of the ANDA and Information in the ANDA**:

    i.     Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

    ii.    Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

    iii.  Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert the Listed Patent, provided, however, that the information in the ANDA is not thereby disclosed.

**D.**    **Disposition of the Information in the ANDA:**

    i.    If Recipient does not assert the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period") which this offer accompanies, Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within thirty (30) days after the expiration of the 45-day period, destroy or send to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify Impax that this has been done.

    ii.  Recipient agrees that if Recipient asserts the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement which this offer accompanies:

        a.  While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax. Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

        b.  Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

    iii.  Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

**E.**    **Accidental Disclosure:**  Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact Impax and identify:

    **i.**  What has been disclosed;

    **ii.**  The individuals to whom such information has been disclosed; and

    **iii.**  Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

3.    Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to Impax, and that an adequate legal remedy does not exist. Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

4.    Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5. Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6. This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7. Each of Recipient, Authorized Evaluators and Impax, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or *forum non conveniens* and agrees to be bound by any judgment rendered thereby arising under or in respect of this Agreement.

8. When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9. An Authorized Evaluator may request access to the ANDA by executing one copy of this Confidential Access Agreement where indicated and returning the executed copy to Impax within the 45-day period. Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.

Charles Hildenbrand, Sr. Vice-President of Operations

Date: 27 Sept , 2007

Recipient
By its authorized agent(s):

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007

4

# EXHIBIT 5

Print Page  Close Window



**Press Release**

**IMPAX Comments on Status of ANDA for Generic Opana(R) ER**

HAYWARD, Calif., Oct 04, 2007 (BUSINESS WIRE) -- IMPAX Laboratories, Inc. (OTC:IPXL) today confirmed reports that it has provided notice to Endo Pharmaceuticals Holdings Inc. and Penwest Pharmaceuticals Co. that it has submitted an Abbreviated New Drug Application (ANDA) for oxymorphone hydrochloride extended-release tablets CII, generic of Opana (R) ER, to the U.S. Food and Drug Administration (FDA). IMPAX's ANDA, as amended, contains a Paragraph IV certification stating that the Company believes its product does not infringe US Patent No. 7,276,250, or that the patent is invalid or unenforceable. Following an acceptance for filing by the FDA the Company was informed by the agency that it has rescinded its initial acceptance. IMPAX believes that the rescission is inappropriate and is working with the FDA to correct any deficiencies of the ANDA.

Endo Pharmaceuticals Holdings Inc. and Penwest Pharmaceuticals Co. manufacture and market Opana ER for the treatment of moderate to severe pain. According to Wolters Kluwer Health, U.S. sales of Opana ER tablets were approximately $42.9 million in the 12 months ended August 31, 2007.

About IMPAX Laboratories, Inc.

IMPAX Laboratories, Inc. is a technology based specialty pharmaceutical company applying its formulation expertise and drug delivery technology to the development of controlled-release and specialty generics in addition to the development of branded products. IMPAX markets its generic products through its Global Pharmaceuticals division and markets its branded products through the IMPAX Pharmaceuticals division. Additionally, where strategically appropriate, IMPAX has developed marketing partnerships to fully leverage its technology platform. IMPAX Laboratories is headquartered in Hayward, California, and has a full range of capabilities in its Hayward and Philadelphia facilities. For more information, please visit the Company's Web site at: www.impaxlabs.com.

"Safe Harbor" statement under the Private Securities Litigation Reform Act of 1995:

To the extent any statements made in this news release contain information that is not historical, these statements are forward-looking in nature and express the beliefs and expectations of management. Such statements are based on current expectations and involve a number of known and unknown risks and uncertainties that could cause IMPAX's future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, possible adverse effects resulting from the delisting of and suspension of trading in IMPAX's stock, the SEC proceeding to determine whether to suspend or revoke the registration of IMPAX's securities under section 12 of the Securities Exchange Act, IMPAX's delay in filing its 2004 Form 10-K, its Form 10-Q for each of the first three quarters of 2005 and 2006, its Form 10-K for 2005 and 2006, and its Form 10-Q for the first quarter of 2007, the actual time that will be required to complete the filing of IMPAX's delinquent periodic reports, IMPAX's ability to obtain sufficient capital to fund its operations, the difficulty of predicting FDA filings and approvals, consumer acceptance and demand for new pharmaceutical products, the impact of competitive products and pricing, IMPAX's ability to successfully develop and commercialize pharmaceutical products, IMPAX's reliance on key strategic alliances, the uncertainty of patent litigation, the availability of raw materials, the regulatory environment, dependence on patent and other protection for innovative products, exposure to product liability claims, fluctuations in operating results and other risks detailed from time to time in IMPAX's filings with the Securities and Exchange Commission. Forward-looking statements speak only as to the date on which they are made, and IMPAX undertakes no obligation to update publicly or revise any forward-looking statement, regardless of whether new information becomes available, future developments occur or otherwise.

SOURCE: IMPAX Laboratories, Inc.

Company Contacts:
IMPAX Laboratories, Inc.
Larry Hsu, Ph.D. President & CEO
510-476-2000, Ext. 1111

Arthur A. Koch, Jr. CFO
215-933-0351
www.impaxlabs.com
or
Investor Relations Contacts:
Lippert/Heilshorn & Associates, Inc.
Kim Sutton Golodetz, 212-838-3777
kgolodetz@lhai.com
Bruce Voss, 310-691-7100
bvoss@lhai.com
www.lhai.com

EXHIBIT 6

 

**30831 Huntwood Avenue Hayward, CA 94544**
**Phone (510) 476-2000  Fax (510) 476-2092**

October 3, 2007

Via Federal Express

Endo Pharmaceuticals Inc.
100 Endo Blvd.
Chadds Ford, PA 19317

Tracking # 8613 5929 4920

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11
Danbury, CT 06810

Tracking # 8613 5929 4930

Re:    Patent Certification Notice – U.S. Patent No. 7,276,250
       Oxymorphone Hydrochloride Extended-release Tablets
       ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent No. 7,276,250.

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

An Offer of Confidential Access to Impax's ANDA 79-087, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on September 24, 2007.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance

MCS/aks

Enclosures:    Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal Bases That U.S. Patent No. 7,276,250 Is Invalid, Unenforceable Or Not Infringed

Impax Laboratories, Inc.'s Offer of Confidential Access to ANDA 79-087

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R. § 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent No. 7,276,250 is invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

## I.    Applicable Legal Standards

A U.S. patent gives the owner the right to preclude others from making, using or selling the invention defined by the claims of the patent in the United States and its territories for the term of the patent.[1]  Those making, using or selling an invention defined by the claims of a patent are said to be directly infringing the claims of the patent.  The patent statute also describes remedies for contributory infringement and inducement of infringement.[2]  For there to be indirect infringement by one party, there must be direct infringement by another party.  Furthermore, the act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

Evaluating infringement is a two-step process.  First, the scope of the claims is determined, and second, the accused product or process is compared to the properly interpreted claims.  The claims, properly construed as a matter of law by the court,[4] are the measure of the grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

Claim construction may involve the use of both intrinsic and extrinsic evidence; however, the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate weight to such evidence.[6]  In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7]  In determining the ordinary and customary meaning, the trial

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9] Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10] When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent. The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12] Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13] What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §103 because they are obvious in light of the prior art. With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

---

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985). See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

[14] 35 U.S.C. § 282.

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

a person having ordinary skill in the art to which said subject matter pertains."[15]    The "combination of familiar elements according to known methods" is likely be obvious when it yields predictable results, and common sense, not a "formalistic conception of the words teaching, suggestion, and motivation" should guide obviousness analysis.[16]    Factors to be considered in determining obviousness include the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary considerations.[17]

A patent application must describe how to make and use the invention in such full, clear, concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to make and use the same.[18]    For a claim to be enabled, the disclosure must be sufficiently described as to enable one of ordinary skill in the art to practice the invention without undue experimentation.  A patent can be enabled even if it requires some experimentation to practice the invention:  what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a later filed publication cannot supplement an insufficient disclosure to render it enabling.[19]    Later filed publications can be considered as evidence of the level of ordinary skill in the art at the time of filing the application, reinforcing the standard that the issue is whether one skilled in the art would have believed the application to be enabled at the time of filing.  *In re Wands* set out 8 factors to be considered for enablement:  (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of predictability in the art, (6) the amount of direction provided in the application, (7) the existence of working examples in the specification, and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description requirements of 35 U.S.C. § 112, Paragraph 1.  The goals of the written description requirement are to (1) convey to the public what was invented, (2) put the public in possession of what the applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that

---

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

[20] *In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

was not described in the specification as filed. As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21] Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23] To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24] Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims be amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26] "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[27] Intent need not, and rarely can, be proven by direct evidence.[28] "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29] Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that

---

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs*, 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent
the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 7,276,250

U.S. Patent No. 7,276,250 (the "'250 patent") was filed on July 3, 2002 and issued on
October 2, 2007.    The '250 patent claims priority to U.S. Provisional Application No.
60/329,352, filed October 15, 2001, U.S. Provisional Application No. 60/329,426, filed October
15, 2001, and U.S. Provisional Application No. 60/303,357, filed July 6, 2001. The '250 patent
is assigned to Penwest Pharmaceuticals Company of Patterson, New York.

### A. The Claims of the '250 patent

There are sixteen claims issued in the '250 patent, which read as follows:

1.    An oral sustained release formulation comprising from about 5 mg to
about 80 mg oxymorphone hydrochloride and from about 80 mg to about
360 mg of a granulated sustained release delivery system, wherein the
granulated sustained release delivery system comprises from about 8.3%
to about 41.7% by weight locust bean gum, from about 8.3% to about
41.7% by weight xanthan gum, from about 20% to about 55% by weight
dextrose, from about 5% to about 20% by weight calcium sulfate
dihydrate, and from about 2% to about 10% ethyl cellulose.

2.    The oral sustained release formulation of claim 1, comprising about 20 mg
oxymorphone hydrochloride.

3.    The oral sustained release formulation of claim 1, comprising about 160
mg of the granulated sustained release delivery system.

4.    An oral sustained release formulation comprising from about 5 to about 80
mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of
a granulated sustained release delivery system, wherein the granulated
sustained release delivery system comprises about 25% locust bean gum,
about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate
dihydrate, and about 5% ethyl cellulose.

---

[30] *Ferring*, 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed.
Cir. 1997)).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

5.      The oral sustained release formulation of claim 1, further comprising an outer coating.

6.      A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 1-5.

7.      An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 300 mg to about 420 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

8.      The oral sustained release formulation of claim 7, comprising about 20 mg oxymorphone hydrochloride.

9.      The oral sustained release formulation of claim 7, comprising about 360 mg of the granulated sustained release delivery system.

10.     The oral sustained release formulation of claim 7, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

11.     The oral sustained release formulation of claim 7, further comprising an outer coating.

12.     A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 7-11.

13.     A solid dosage formulation comprising the oral sustained release formulation of any one of claims 1-5.

14.     The solid dosage formulation of claim 13, wherein the solid dosage formulation is a tablet.

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

15.    A solid dosage formulation comprising the oral sustained release formulation of any one of claims 7-11.

16.    The solid dosage formulation of claim 15, wherein the solid dosage formulation is a tablet.

### B.  No Infringement of the Claims of the '250 patent

The '250 patent contains only 3 independent claims.  Each of the independent claims 1, 4, and 7 of the '250 patent contains the specific limitation that the composition must include dextrose, among other ingredients.  Specifically, the compositions of claims 1 and 7 require "about 20% to about 55% by weight dextrose."  The composition of claim 4 requires "about 35% dextrose."  Because each remaining claim contains the limitations of the independent claim from it depends, all of the claims in the '250 patent require the presence of dextrose, in the respective amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claims of the '250 patent because Impax Oxymorphone ER does not contain dextrose in the claimed amounts.  Furthermore, Impax's Oxymorphone ER would not infringe any claim under the doctrine of equivalents.  Patentees are entitled to no range of equivalents around the "about 20% to about 55% by weight dextrose" and "about 35% dextrose" claim limitations.  During prosecution, in order to obtain allowance, claims requiring "at least one pharmaceutical diluent" were cancelled in favor of the narrower claims specifying dextrose in the amounts listed above.  Applicants are estopped from arguing equivalents to these claim limitations as no exceptions to the complete bar to the doctrine of equivalents apply in this case.  Therefore, the Impax Oxymorphone ER does not contain any equivalent to the amounts of dextrose claimed in the '250 patent.

### C.    Conclusion

For the reasons stated above, none of the claims of U.S. Patent No. 7,276,250 are infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER.  Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not infringed.

### ABBREVIATED NEW DRUG APPLICATION 79-087
### OFFER OF CONFIDENTIAL ACCESS
### PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

**WHEREAS** Impax Laboratories, Inc. ("Impax") has provided notice to Endo Pharmaceuticals Inc. (hereinafter "Recipient") that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 79-087 for Impax's Oxymorphone Hydrochloride Extended-release Tablets, (hereinafter referred to in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 7,276,250 (the "Listed Patent") which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations;" and

**WHEREAS** this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355 (j)(5)(C)(i)(III) which provides:

The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;

and

**WHEREAS** Impax offers to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

**WHEREAS** this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

**NOW, THEREFORE**, Impax makes this offer:

1.    Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions recited in clause 2 below, Impax hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.    The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

A.    **Persons Entitled to Access**: Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to

outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

i.      Such outside counsel has been identified to Impax in writing;

ii.     Such outside counsel is not involved in patent prosecution matters for Recipient;

iii.    Within five (5) business days of receiving such written identification, Impax has not objected, in writing, to provision of confidential access to the identified outside counsel.

**B.      Materials Accessible by Authorized Evaluators:**  A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.      Use of the ANDA and Information in the ANDA:**

i.      Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

ii.     Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

iii.    Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert the Listed Patent, provided, however, that the information in the ANDA is not thereby disclosed.

**D.      Disposition of the Information in the ANDA:**

i.      If Recipient does not assert the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period") which this offer accompanies, Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within thirty (30) days after the expiration of the 45-day period, destroy or send to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify Impax that this has been done.

  ii. Recipient agrees that if Recipient asserts the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement which this offer accompanies:

    a. While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax.  Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

    b. Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

  iii. Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

**E.** **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact Impax and identify:

 **i.** What has been disclosed;

 **ii.** The individuals to whom such information has been disclosed; and

 **iii.** Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

**3.** Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to Impax, and that an adequate legal remedy does not exist.  Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access.  It is further agreed that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

**4.** Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5.   Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6.   This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7.   Each of Recipient, Authorized Evaluators and Impax, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or *forum non conveniens* and agrees to be bound by any judgment rendered thereby arising under or in respect of this Agreement.

8.   When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9.   An Authorized Evaluator may request access to the ANDA by executing one copy of this Confidential Access Agreement where indicated and returning the executed copy to Impax within the 45-day period.  Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.

_____
Charles Hildenbrand, Sr. Vice-President of Operations

Date: 27 Sept , 2007


Recipient
By its authorized agent(s):

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007

-4-

 

30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

October 4, 2007

Via Federal Express

Endo Pharmaceuticals Inc.
100 Endo Blvd.                          Tracking # 8613 5929 4941
Chadds Ford, PA 19317

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11           Tracking # 8613 5929 4952
Danbury, CT 06810

Re:    Patent Certification Notice – U.S. Patent No. 7,276,250
       Oxymorphone Hydrochloride Extended-release Tablets
       ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent No. 7,276,250.

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

An Offer of Confidential Access to Impax's ANDA 79-087, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on September 24, 2007.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance

MCS/aks

Enclosures:     Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal Bases That U.S. Patent No. 7,276,250 Is Invalid, Unenforceable Or Not Infringed

Impax Laboratories, Inc.'s Offer of Confidential Access to ANDA 79-087

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R. § 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent No. 7,276,250 is invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

## I.    Applicable Legal Standards

A U.S. patent gives the owner the right to preclude others from making, using or selling the invention defined by the claims of the patent in the United States and its territories for the term of the patent.[1]  Those making, using or selling an invention defined by the claims of a patent are said to be directly infringing the claims of the patent. The patent statute also describes remedies for contributory infringement and inducement of infringement.[2] For there to be indirect infringement by one party, there must be direct infringement by another party. Furthermore, the act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

Evaluating infringement is a two-step process.  First, the scope of the claims is determined, and second, the accused product or process is compared to the properly interpreted claims. The claims, properly construed as a matter of law by the court,[4] are the measure of the grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

Claim construction may involve the use of both intrinsic and extrinsic evidence; however, the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate weight to such evidence.[6]  In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7] In determining the ordinary and customary meaning, the trial

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9] Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10] When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent. The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12] Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13] What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §103 because they are obvious in light of the prior art. With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

---

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985). See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

[14] 35 U.S.C. § 282.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

a person having ordinary skill in the art to which said subject matter pertains."[15]    The
"combination of familiar elements according to known methods" is likely be obvious when it
yields predictable results, and common sense, not a "formalistic conception of the words
teaching, suggestion, and motivation" should guide obviousness analysis.[16]    Factors to be
considered in determining obviousness include the scope and content of the prior art, differences
between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary
considerations.[17]

A patent application must describe how to make and use the invention in such full, clear,
concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to
make and use the same.[18]    For a claim to be enabled, the disclosure must be sufficiently
described as to enable one of ordinary skill in the art to practice the invention without undue
experimentation.  A patent can be enabled even if it requires some experimentation to practice
the invention:  what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a
later filed publication cannot supplement an insufficient disclosure to render it enabling.[19]    Later
filed publications can be considered as evidence of the level of ordinary skill in the art at the time
of filing the application, reinforcing the standard that the issue is whether one skilled in the art
would have believed the application to be enabled at the time of filing.  *In re Wands* set out 8
factors to be considered for enablement:  (1) the breadth of the claims, (2) the nature of the
invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of
predictability in the art, (6) the amount of direction provided in the application, (7) the existence
of working examples in the specification, and (8) the quantity of experimentation needed to
make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description
requirements of 35 U.S.C. § 112, Paragraph 1.  The goals of the written description requirement
are to (1) convey to the public what was invented, (2) put the public in possession of what the
applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that

---

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

[20] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

was not described in the specification as filed. As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21] Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23] To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24] Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims be amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26] "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[27] Intent need not, and rarely can, be proven by direct evidence.[28] "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29] Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that

---

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs*, 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 7,276,250

U.S. Patent No. 7,276,250 (the "'250 patent") was filed on July 3, 2002 and issued on October 2, 2007. The '250 patent claims priority to U.S. Provisional Application No. 60/329,352, filed October 15, 2001, U.S. Provisional Application No. 60/329,426, filed October 15, 2001, and U.S. Provisional Application No. 60/303,357, filed July 6, 2001. The '250 patent is assigned to Penwest Pharmaceuticals Company of Patterson, New York.

### A.  The Claims of the '250 patent

There are sixteen claims issued in the '250 patent, which read as follows:

1.     An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

2.     The oral sustained release formulation of claim 1, comprising about 20 mg oxymorphone hydrochloride.

3.     The oral sustained release formulation of claim 1, comprising about 160 mg of the granulated sustained release delivery system.

4.     An oral sustained release formulation comprising from about 5 to about 80 mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

---

[30] *Ferring*, 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997)).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

5.    The oral sustained release formulation of claim 1, further comprising an outer coating.

6.    A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 1-5.

7.    An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 300 mg to about 420 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

8.    The oral sustained release formulation of claim 7, comprising about 20 mg oxymorphone hydrochloride.

9.    The oral sustained release formulation of claim 7, comprising about 360 mg of the granulated sustained release delivery system.

10.   The oral sustained release formulation of claim 7, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

11.   The oral sustained release formulation of claim 7, further comprising an outer coating.

12.   A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 7-11.

13.   A solid dosage formulation comprising the oral sustained release formulation of any one of claims 1-5.

14.   The solid dosage formulation of claim 13, wherein the solid dosage formulation is a tablet.

Page 6 of 7

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

15.     A solid dosage formulation comprising the oral sustained release formulation of any one of claims 7-11.

16.     The solid dosage formulation of claim 15, wherein the solid dosage formulation is a tablet.

## B. No Infringement of the Claims of the '250 patent

The '250 patent contains only 3 independent claims. Each of the independent claims 1, 4, and 7 of the '250 patent contains the specific limitation that the composition must include dextrose, among other ingredients. Specifically, the compositions of claims 1 and 7 require "about 20% to about 55% by weight dextrose." The composition of claim 4 requires "about 35% dextrose." Because each remaining claim contains the limitations of the independent claim from it depends, all of the claims in the '250 patent require the presence of dextrose, in the respective amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claims of the '250 patent because Impax Oxymorphone ER does not contain dextrose in the claimed amounts. Furthermore, Impax's Oxymorphone ER would not infringe any claim under the doctrine of equivalents. Patentees are entitled to no range of equivalents around the "about 20% to about 55% by weight dextrose" and "about 35% dextrose" claim limitations. During prosecution, in order to obtain allowance, claims requiring "at least one pharmaceutical diluent" were cancelled in favor of the narrower claims specifying dextrose in the amounts listed above. Applicants are estopped from arguing equivalents to these claim limitations as no exceptions to the complete bar to the doctrine of equivalents apply in this case. Therefore, the Impax Oxymorphone ER does not contain any equivalent to the amounts of dextrose claimed in the '250 patent.

## C.     Conclusion

For the reasons stated above, none of the claims of U.S. Patent No. 7,276,250 are infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER. Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not infringed.

ABBREVIATED NEW DRUG APPLICATION 79-087
OFFER OF CONFIDENTIAL ACCESS
PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

**WHEREAS** Impax Laboratories, Inc. ("Impax") has provided notice to Endo Pharmaceuticals Inc. (hereinafter "Recipient") that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 79-087 for Impax's Oxymorphone Hydrochloride Extended-release Tablets, (hereinafter referred to in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 7,276,250 (the "Listed Patent") which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations;" and

**WHEREAS** this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355 (j)(5)(C)(i)(III) which provides:

> The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;

> and

**WHEREAS** Impax offers to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

**WHEREAS** this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

**NOW, THEREFORE,** Impax makes this offer:

1.     Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions recited in clause 2 below, Impax hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.     The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

   A.     **Persons Entitled to Access:** Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to

outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

i.  Such outside counsel has been identified to Impax in writing;

ii.  Such outside counsel is not involved in patent prosecution matters for Recipient;

iii.  Within five (5) business days of receiving such written identification, Impax has not objected, in writing, to provision of confidential access to the identified outside counsel.

**B.**  **Materials Accessible by Authorized Evaluators**:  A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.**  **Use of the ANDA and Information in the ANDA**:

i.  Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

ii.  Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

iii.  Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert the Listed Patent, provided, however, that the information in the ANDA is not thereby disclosed.

**D.**  **Disposition of the Information in the ANDA**:

i.  If Recipient does not assert the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period") which this offer accompanies, Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within thirty (30) days after the expiration of the 45-day period, destroy or send to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify Impax that this has been done.

    ii. Recipient agrees that if Recipient asserts the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement which this offer accompanies:

        a. While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax. Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

        b. Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

    iii. Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

**E.** **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact Impax and identify:

    i. What has been disclosed;

    ii. The individuals to whom such information has been disclosed; and

    iii. Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

3. Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to Impax, and that an adequate legal remedy does not exist. Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

4. Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5.    Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6.    This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7.    Each of Recipient, Authorized Evaluators and Impax, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or *forum non conveniens* and agrees to be bound by any judgment rendered thereby arising under or in respect of this Agreement.

8.    When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9.    An Authorized Evaluator may request access to the ANDA by executing one copy of this Confidential Access Agreement where indicated and returning the executed copy to Impax within the 45-day period.  Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.

_____

Charles Hildenbrand, Sr. Vice-President of Operations

Date: _____, 2007

Recipient
By its authorized agent(s):

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007





30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

October 5, 2007

Via Federal Express

Endo Pharmaceuticals Inc.
100 Endo Blvd.
Chadds Ford, PA 19317

Tracking # 8613 5929 4963

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11
Danbury, CT 06810

Tracking # 8613 5929 4974

Re:   Patent Certification Notice – U.S. Patent No. 7,276,250
      Oxymorphone Hydrochloride Extended-release Tablets
      ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent No. 7,276,250.

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

An Offer of Confidential Access to Impax's ANDA 79-087, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on September 24, 2007.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance

MCS/aks

Enclosures:     Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal Bases That U.S. Patent No. 7,276,250 Is Invalid, Unenforceable Or Not Infringed

Impax Laboratories, Inc.'s Offer of Confidential Access to ANDA 79-087

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R. § 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent No. 7,276,250 is invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

## I.    Applicable Legal Standards

A U.S. patent gives the owner the right to preclude others from making, using or selling the invention defined by the claims of the patent in the United States and its territories for the term of the patent.[1] Those making, using or selling an invention defined by the claims of a patent are said to be directly infringing the claims of the patent. The patent statute also describes remedies for contributory infringement and inducement of infringement.[2] For there to be indirect infringement by one party, there must be direct infringement by another party. Furthermore, the act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

Evaluating infringement is a two-step process. First, the scope of the claims is determined, and second, the accused product or process is compared to the properly interpreted claims. The claims, properly construed as a matter of law by the court,[4] are the measure of the grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

Claim construction may involve the use of both intrinsic and extrinsic evidence; however, the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate weight to such evidence.[6] In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7] In determining the ordinary and customary meaning, the trial

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9] Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10]. When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent. The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12] Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13] What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §103 because they are obvious in light of the prior art. With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

---

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985). See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608 (1950). See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

[14] 35 U.S.C. § 282.

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

a person having ordinary skill in the art to which said subject matter pertains."[15]   The "combination of familiar elements according to known methods" is likely be obvious when it yields predictable results, and common sense, not a "formalistic conception of the words teaching, suggestion, and motivation" should guide obviousness analysis.[16]   Factors to be considered in determining obviousness include the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary considerations.[17]

A patent application must describe how to make and use the invention in such full, clear, concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to make and use the same.[18]   For a claim to be enabled, the disclosure must be sufficiently described as to enable one of ordinary skill in the art to practice the invention without undue experimentation.  A patent can be enabled even if it requires some experimentation to practice the invention: what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a later filed publication cannot supplement an insufficient disclosure to render it enabling.[19]   Later filed publications can be considered as evidence of the level of ordinary skill in the art at the time of filing the application, reinforcing the standard that the issue is whether one skilled in the art would have believed the application to be enabled at the time of filing.  *In re Wands* set out 8 factors to be considered for enablement:  (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of predictability in the art, (6) the amount of direction provided in the application, (7) the existence of working examples in the specification, and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description requirements of 35 U.S.C. § 112, Paragraph 1.  The goals of the written description requirement are to (1) convey to the public what was invented, (2) put the public in possession of what the applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that

---

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

[20] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

was not described in the specification as filed.  As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21]  Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23]  To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24]  Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims be amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct.  "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26]  "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[27]  Intent need not, and rarely can, be proven by direct evidence.[28]  "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29]  Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that

---

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs*, 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent
the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 7,276,250

U.S. Patent No. 7,276,250 (the "'250 patent") was filed on July 3, 2002 and issued on
October 2, 2007.   The '250 patent claims priority to U.S. Provisional Application No.
60/329,352, filed October 15, 2001, U.S. Provisional Application No. 60/329,426, filed October
15, 2001, and U.S. Provisional Application No. 60/303,357, filed July 6, 2001.  The '250 patent
is assigned to Penwest Pharmaceuticals Company of Patterson, New York.

### A.  The Claims of the '250 patent

There are sixteen claims issued in the '250 patent, which read as follows:

1.    An oral sustained release formulation comprising from about 5 mg to
about 80 mg oxymorphone hydrochloride and from about 80 mg to about
360 mg of a granulated sustained release delivery system, wherein the
granulated sustained release delivery system comprises from about 8.3%
to about 41.7% by weight locust bean gum, from about 8.3% to about
41.7% by weight xanthan gum, from about 20% to about 55% by weight
dextrose, from about 5% to about 20% by weight calcium sulfate
dihydrate, and from about 2% to about 10% ethyl cellulose.

2.    The oral sustained release formulation of claim 1, comprising about 20 mg
oxymorphone hydrochloride.

3.    The oral sustained release formulation of claim 1, comprising about 160
mg of the granulated sustained release delivery system.

4.    An oral sustained release formulation comprising from about 5 to about 80
mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of
a granulated sustained release delivery system, wherein the granulated
sustained release delivery system comprises about 25% locust bean gum,
about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate
dihydrate, and about 5% ethyl cellulose.

---

[30] *Ferring*, 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed.
Cir. 1997)).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

5.    The oral sustained release formulation of claim 1, further comprising an outer coating.

6.    A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 1-5.

7.    An oral sustained release formulation comprising from about 5 mg to about 80 mg oxymorphone hydrochloride and from about 300 mg to about 420 mg of a granulated sustained release delivery system, wherein the granulated sustained release delivery system comprises from about 8.3% to about 41.7% by weight locust bean gum, from about 8.3% to about 41.7% by weight xanthan gum, from about 20% to about 55% by weight dextrose, from about 5% to about 20% by weight calcium sulfate dihydrate, and from about 2% to about 10% ethyl cellulose.

8.    The oral sustained release formulation of claim 7, comprising about 20 mg oxymorphone hydrochloride.

9.    The oral sustained release formulation of claim 7, comprising about 360 mg of the granulated sustained release delivery system.

10.    The oral sustained release formulation of claim 7, wherein the granulated sustained release delivery system comprises about 25% locust bean gum, about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate dihydrate, and about 5% ethyl cellulose.

11.    The oral sustained release formulation of claim 7, further comprising an outer coating.

12.    A method for treating a patient suffering from pain comprising administering an effective amount of the oral sustained release formulation of any one of claims 7-11.

13.    A solid dosage formulation comprising the oral sustained release formulation of any one of claims 1-5.

14.    The solid dosage formulation of claim 13, wherein the solid dosage formulation is a tablet.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

15.    A solid dosage formulation comprising the oral sustained release
formulation of any one of claims 7-11.

16.    The solid dosage formulation of claim 15, wherein the solid dosage
formulation is a tablet.

**B.  No Infringement of the Claims of the '250 patent**

The '250 patent contains only 3 independent claims.  Each of the independent claims 1, 4,
and 7 of the '250 patent contains the specific limitation that the composition must include
dextrose, among other ingredients.  Specifically, the compositions of claims 1 and 7 require
"about 20% to about 55% by weight dextrose."  The composition of claim 4 requires "about 35%
dextrose."  Because each remaining claim contains the limitations of the independent claim from
it depends, all of the claims in the '250 patent require the presence of dextrose, in the respective
amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claims of the '250 patent
because Impax Oxymorphone ER does not contain dextrose in the claimed amounts.
Furthermore, Impax's Oxymorphone ER would not infringe any claim under the doctrine of
equivalents.  Patentees are entitled to no range of equivalents around the "about 20% to about
55% by weight dextrose" and "about 35% dextrose" claim limitations.  During prosecution, in
order to obtain allowance, claims requiring "at least one pharmaceutical diluent" were cancelled
in favor of the narrower claims specifying dextrose in the amounts listed above.  Applicants are
estopped from arguing equivalents to these claim limitations as no exceptions to the complete bar
to the doctrine of equivalents apply in this case.  Therefore, the Impax Oxymorphone ER does not
contain any equivalent to the amounts of dextrose claimed in the '250 patent.

**C.    Conclusion**

For the reasons stated above, none of the claims of U.S. Patent No. 7,276,250 are
infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of
Impax Oxymorphone ER.  Impax reserves the right to develop additional grounds, reasons and
authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not
infringed.

**ABBREVIATED NEW DRUG APPLICATION 79-087**
**OFFER OF CONFIDENTIAL ACCESS**
**PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)**

**WHEREAS** Impax Laboratories, Inc. ("Impax") has provided notice to Endo Pharmaceuticals Inc. (hereinafter "Recipient") that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 79-087 for Impax's Oxymorphone Hydrochloride Extended-release Tablets, (hereinafter referred to in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 7,276,250 (the "Listed Patent") which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations;" and

**WHEREAS** this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355 (j)(5)(C)(i)(III) which provides:

> The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;

and

**WHEREAS** Impax offers to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

**WHEREAS** this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

**NOW, THEREFORE,** Impax makes this offer:

1.  Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions recited in clause 2 below, Impax hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.  The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

    A.  **Persons Entitled to Access:** Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to

outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

    **i.**    Such outside counsel has been identified to Impax in writing;

    **ii.**    Such outside counsel is not involved in patent prosecution matters for Recipient;

    **iii.**    Within five (5) business days of receiving such written identification, Impax has not objected, in writing, to provision of confidential access to the identified outside counsel.

**B.**    **Materials Accessible by Authorized Evaluators**:  A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.**    **Use of the ANDA and Information in the ANDA**:

    **i.**    Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

    **ii.**    Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

    **iii.**    Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert the Listed Patent, provided, however, that the information in the ANDA is not thereby disclosed.

**D.**    **Disposition of the Information in the ANDA**:

    **i.**    If Recipient does not assert the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period") which this offer accompanies, Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within thirty (30) days after the expiration of the 45-day period, destroy or send to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify Impax that this has been done.

      ii. Recipient agrees that if Recipient asserts the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement which this offer accompanies:

          a. While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax. Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

          b. Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

      iii. Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

**E.**    **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact Impax and identify:

      i. What has been disclosed;

      ii. The individuals to whom such information has been disclosed; and

      iii. Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

**3.** Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to Impax, and that an adequate legal remedy does not exist. Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

**4.** Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5.     Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6.     This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7.     Each of Recipient, Authorized Evaluators and Impax, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or *forum non conveniens* and agrees to be bound by any judgment rendered thereby arising under or in respect of this Agreement.

8.     When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9.     An Authorized Evaluator may request access to the ANDA by executing one copy of this Confidential Access Agreement where indicated and returning the executed copy to Impax within the 45-day period. Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.

Charles Hildenbrand, Sr. Vice-President of Operations

Date: 27 Sept , 2007

Recipient
By its authorized agent(s):

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007



**IMPAX**
*LABORATORIES, INC.*

30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

October 9, 2007

Via Federal Express

Endo Pharmaceuticals Inc.
100 Endo Blvd.
Chadds Ford, PA 19317

Tracking # 8613 5929 5000

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11
Danbury, CT 06810

Tracking # 8613 5929 5010

Re:    Patent Certification Notice – U.S. Patent No. 7,276,250
       Oxymorphone Hydrochloride Extended-release Tablets
       ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent No. 7,276,250.

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

An Offer of Confidential Access to Impax's ANDA 79-087, pursuant to 21 U.S.C. §355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on September 24, 2007.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance

MCS/aks

Enclosures:    Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal Bases That U.S. Patent No. 7,276,250 Is Invalid, Unenforceable Or Not Infringed

Impax Laboratories, Inc.'s Offer of Confidential Access to ANDA 79-087

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, AND 40 mg TABLETS**

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R. § 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent No. 7,276,250 is invalid, unenforceable or not infringed, either literally or under the doctrine of equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

**I.    Applicable Legal Standards**

A U.S. patent gives the owner the right to preclude others from making, using or selling the invention defined by the claims of the patent in the United States and its territories for the term of the patent.[1] Those making, using or selling an invention defined by the claims of a patent are said to be directly infringing the claims of the patent. The patent statute also describes remedies for contributory infringement and inducement of infringement.[2] For there to be indirect infringement by one party, there must be direct infringement by another party. Furthermore, the act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

Evaluating infringement is a two-step process. First, the scope of the claims is determined, and second, the accused product or process is compared to the properly interpreted claims. The claims, properly construed as a matter of law by the court,[4] are the measure of the grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

Claim construction may involve the use of both intrinsic and extrinsic evidence; however, the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate weight to such evidence.[6] In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7] In determining the ordinary and customary meaning, the trial

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996); *Network, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9] Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10] When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent. The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12] Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13] What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §103 because they are obvious in light of the prior art. With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to

---

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985). See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

[14] 35 U.S.C. § 282.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

a person having ordinary skill in the art to which said subject matter pertains."[15]   The "combination of familiar elements according to known methods" is likely be obvious when it yields predictable results, and common sense, not a "formalistic conception of the words teaching, suggestion, and motivation" should guide obviousness analysis.[16]   Factors to be considered in determining obviousness include the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary considerations.[17]

A patent application must describe how to make and use the invention in such full, clear, concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to make and use the same.[18]   For a claim to be enabled, the disclosure must be sufficiently described as to enable one of ordinary skill in the art to practice the invention without undue experimentation.  A patent can be enabled even if it requires some experimentation to practice the invention: what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a later filed publication cannot supplement an insufficient disclosure to render it enabling.[19]   Later filed publications can be considered as evidence of the level of ordinary skill in the art at the time of filing the application, reinforcing the standard that the issue is whether one skilled in the art would have believed the application to be enabled at the time of filing.  *In re Wands* set out 8 factors to be considered for enablement:  (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of predictability in the art, (6) the amount of direction provided in the application, (7) the existence of working examples in the specification, and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description requirements of 35 U.S.C. § 112, Paragraph 1.  The goals of the written description requirement are to (1) convey to the public what was invented, (2) put the public in possession of what the applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that

---

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

[20] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

was not described in the specification as filed. As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21] Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23] To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24] Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims be amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26] "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[27] Intent need not, and rarely can, be proven by direct evidence.[28] "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29] Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that

---

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs*, 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent
the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 7,276,250

U.S. Patent No. 7,276,250 (the "'250 patent") was filed on July 3, 2002 and issued on
October 2, 2007.   The '250 patent claims priority to U.S. Provisional Application No.
60/329,352, filed October 15, 2001, U.S. Provisional Application No. 60/329,426, filed October
15, 2001, and U.S. Provisional Application No. 60/303,357, filed July 6, 2001. The '250 patent
is assigned to Penwest Pharmaceuticals Company of Patterson, New York.

### A. The Claims of the '250 patent

There are sixteen claims issued in the '250 patent, which read as follows:

1.    An oral sustained release formulation comprising from about 5 mg to
about 80 mg oxymorphone hydrochloride and from about 80 mg to about
360 mg of a granulated sustained release delivery system, wherein the
granulated sustained release delivery system comprises from about 8.3%
to about 41.7% by weight locust bean gum, from about 8.3% to about
41.7% by weight xanthan gum, from about 20% to about 55% by weight
dextrose, from about 5% to about 20% by weight calcium sulfate
dihydrate, and from about 2% to about 10% ethyl cellulose.

2.    The oral sustained release formulation of claim 1, comprising about 20 mg
oxymorphone hydrochloride.

3.    The oral sustained release formulation of claim 1, comprising about 160
mg of the granulated sustained release delivery system.

4.    An oral sustained release formulation comprising from about 5 to about 80
mg oxymorphone hydrochloride and from about 80 mg to about 360 mg of
a granulated sustained release delivery system, wherein the granulated
sustained release delivery system comprises about 25% locust bean gum,
about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate
dihydrate, and about 5% ethyl cellulose.

---

[30] *Ferring*, 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed.
Cir. 1997)).

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF
IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

5.      The oral sustained release formulation of claim 1, further comprising an
        outer coating.

6.      A method for treating a patient suffering from pain comprising
        administering an effective amount of the oral sustained release
        formulation of any one of claims 1-5.

7.      An oral sustained release formulation comprising from about 5 mg to
        about 80 mg oxymorphone hydrochloride and from about 300 mg to about
        420 mg of a granulated sustained release delivery system, wherein the
        granulated sustained release delivery system comprises from about 8.3%
        to about 41.7% by weight locust bean gum, from about 8.3% to about
        41.7% by weight xanthan gum, from about 20% to about 55% by weight
        dextrose, from about 5% to about 20% by weight calcium sulfate
        dihydrate, and from about 2% to about 10% ethyl cellulose.

8.      The oral sustained release formulation of claim 7, comprising about 20 mg
        oxymorphone hydrochloride.

9.      The oral sustained release formulation of claim 7, comprising about 360
        mg of the granulated sustained release delivery system.

10.     The oral sustained release formulation of claim 7, wherein the granulated
        sustained release delivery system comprises about 25% locust bean gum,
        about 25% xanthan gum, about 35% dextrose, about 10% calcium sulfate
        dihydrate, and about 5% ethyl cellulose.

11.     The oral sustained release formulation of claim 7, further comprising an
        outer coating.

12.     A method for treating a patient suffering from pain comprising
        administering an effective amount of the oral sustained release
        formulation of any one of claims 7-11.

13.     A solid dosage formulation comprising the oral sustained release
        formulation of any one of claims 1-5.

14.     The solid dosage formulation of claim 13, wherein the solid dosage
        formulation is a tablet.

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NO. 7,276,250 IS NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS

15.     A solid dosage formulation comprising the oral sustained release formulation of any one of claims 7-11.

16.     The solid dosage formulation of claim 15, wherein the solid dosage formulation is a tablet.

### B. No Infringement of the Claims of the '250 patent

The '250 patent contains only 3 independent claims. Each of the independent claims 1, 4, and 7 of the '250 patent contains the specific limitation that the composition must include dextrose, among other ingredients. Specifically, the compositions of claims 1 and 7 require "about 20% to about 55% by weight dextrose." The composition of claim 4 requires "about 35% dextrose." Because each remaining claim contains the limitations of the independent claim from it depends, all of the claims in the '250 patent require the presence of dextrose, in the respective amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claims of the '250 patent because Impax Oxymorphone ER does not contain dextrose in the claimed amounts. Furthermore, Impax's Oxymorphone ER would not infringe any claim under the doctrine of equivalents. Patentees are entitled to no range of equivalents around the "about 20% to about 55% by weight dextrose" and "about 35% dextrose" claim limitations. During prosecution, in order to obtain allowance, claims requiring "at least one pharmaceutical diluent" were cancelled in favor of the narrower claims specifying dextrose in the amounts listed above. Applicants are estopped from arguing equivalents to these claim limitations as no exceptions to the complete bar to the doctrine of equivalents apply in this case. Therefore, the Impax Oxymorphone ER does not contain any equivalent to the amounts of dextrose claimed in the '250 patent.

### C.     Conclusion

For the reasons stated above, none of the claims of U.S. Patent No. 7,276,250 are infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER. Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not infringed.

## ABBREVIATED NEW DRUG APPLICATION 79-087
## OFFER OF CONFIDENTIAL ACCESS
## PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

**WHEREAS** Impax Laboratories, Inc. ("Impax") has provided notice to Endo Pharmaceuticals Inc. (hereinafter "Recipient") that Impax submitted to the U.S. Food and Drug Administration ("FDA") Abbreviated New Drug Application No. 79-087 for Impax's Oxymorphone Hydrochloride Extended-release Tablets, (hereinafter referred to in whole or in part as the "ANDA"), containing a Paragraph IV certification with respect to U.S. Patent No. 7,276,250 (the "Listed Patent") which is listed in the FDA Publication, "Approved Drug Products with Therapeutic Equivalence Evaluations;" and

**WHEREAS** this document constitutes Impax's Offer of Confidential Access to that ANDA pursuant to 21 U.S.C. § 355 (j)(5)(C)(i)(III) which provides:

> The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement;
>
> and

**WHEREAS** Impax offers to provide Recipient confidential access to the ANDA subject to restrictions as to persons entitled access to, and on the use and disposition of, the ANDA; and

**WHEREAS** this document accompanies Impax's Notice and Detailed Statement under 21 U.S.C. § 355(j)(2)(B) with respect to the Listed Patent;

**NOW, THEREFORE,** Impax makes this offer:

1.  Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions recited in clause 2 below, Impax hereby provides Recipient this Offer of Confidential Access for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patent.

2.  The right of confidential access offered herein is subject to the following restrictions as to persons entitled to access, and the use and disposition of any information accessed, pursuant to this Offer of Confidential Access:

    A.  **Persons Entitled to Access**: Persons entitled to access (hereinafter referred to as "Authorized Evaluators") under this Offer of Confidential Access are restricted to

outside counsel engaged by Recipient to represent Recipient and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel, provided that:

i.   Such outside counsel has been identified to Impax in writing;

ii.  Such outside counsel is not involved in patent prosecution matters for Recipient;

iii. Within five (5) business days of receiving such written identification, Impax has not objected, in writing, to provision of confidential access to the identified outside counsel.

**B.**   **Materials Accessible by Authorized Evaluators**:   A copy of the ANDA, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

**C.**   **Use of the ANDA and Information in the ANDA**:

i.   Subject to paragraph 2(D)(ii)(a), use of the ANDA, and all information contained therein or derived therefrom, and all notes, analyses, studies, or documents prepared by Authorized Evaluators to the extent they reflect the contents of the ANDA furnished herein, is for the sole and limited purpose of evaluating possible infringement of the Listed Patent and for no other purpose.

ii.  Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than an Authorized Evaluator.

iii. Notwithstanding the provisions of subparagraphs 2(C)(i) and 2(C)(ii) above, Authorized Evaluators shall be permitted to advise Recipient on whether or not to assert the Listed Patent, provided, however, that the information in the ANDA is not thereby disclosed.

**D.**   **Disposition of the Information in the ANDA**:

i.   If Recipient does not assert the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period") which this offer accompanies, Authorized Evaluators shall, and Recipient shall direct and ensure that Authorized Evaluators, within thirty (30) days after the expiration of the 45-day period, destroy or send to Impax the portions of the ANDA provided, and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, and Recipient or Authorized Evaluators shall notify Impax that this has been done.

2

ii. Recipient agrees that if Recipient asserts the Listed Patent against Impax within forty-five (45) days of receipt of the Notice and Detailed Statement which this offer accompanies:

    a. While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Impax. Until such a protective order is entered, subsection 2(C)(ii) above continues to apply.

    b. Recipient shall direct and ensure that Authorized Evaluators destroy the portions of the ANDA provided and all notes, analyses, studies or other documents prepared or received by Authorized Evaluators to the extent that they reflect information in the ANDA, within thirty (30) days after the final determination of the action brought against Impax.

iii. Notwithstanding the provisions of subparagraphs 2(D)(i) and 2(D)(ii) above, the Authorized Evaluators identified in subparagraph 2(A) shall be permitted to retain one copy of the portions of the ANDA provided and each note, analysis, study or other document prepared by Authorized Evaluators to the extent that they reflect information in the ANDA.

E. **Accidental Disclosure:** Should information from the ANDA be disclosed, inadvertently or otherwise, Recipient shall, at Recipient's earliest opportunity, contact Impax and identify:

i. What has been disclosed;

ii. The individuals to whom such information has been disclosed; and

iii. Steps taken by Recipient and Authorized Evaluators to ensure the information in the ANDA continues to be treated pursuant to the terms of this agreement and is not further disseminated.

3. Recipient and Authorized Evaluators recognize that violation of any provision of this Offer of Confidential Access will cause irreparable injury to Impax, and that an adequate legal remedy does not exist. Impax, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit Recipient and Authorized Evaluators from violating the terms of this Offer of Confidential Access. It is further agreed that in such an action Impax is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

4. Should any provision set forth in this Offer of Confidential Access be found by a court of competent jurisdiction to be illegal, unconstitutional and/or unenforceable, the remaining provisions shall continue in full force and effect.

5.     Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA, except for the purpose expressly stated herein.

6.     This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law or choice of law principles.

7.     Each of Recipient, Authorized Evaluators and Impax, irrevocably submit to and accept, generally and unconditionally, the exclusive personal jurisdiction of the courts of the State of California, and of the U.S. District Court for the Northern District of California, waives its right to assert any objection or defense based on venue or *forum non conveniens* and agrees to be bound by any judgment rendered thereby arising under or in respect of this Agreement.

8.     When accepted by the parties hereto, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

9.     An Authorized Evaluator may request access to the ANDA by executing one copy of this Confidential Access Agreement where indicated and returning the executed copy to Impax within the 45-day period. Thereupon, the terms contained in this document shall be considered an enforceable contract between Impax and the Recipient.

Impax Laboratories, Inc.

_____

Charles Hildenbrand, Sr. Vice-President of Operations

Date: _____, 2007


Recipient
By its authorized agent(s):

Signature: _____

Name (Print): _____

Title: _____

Company: _____

Date: _____, 2007

EXHIBIT 7

    

**VIA FEDERAL EXPRESS**

October 17, 2007

Mark C. Shaw
Vice-President, Regulatory Affairs and Compliance
Impax Laboratories, Inc.
30831 Huntwood Avenue
Hayward, CA 94544

Re:    Paragraph IV Certification Notice – U.S. Patent No. 7,276,250

Dear Mr. Shaw:

We are writing with reference to your October 2, 2007 letter providing notice that Impax has submitted ANDA 79-087, which includes a Paragraph IV notification with respect to the above-referenced patent.

As an initial matter, we understand from a press release issued by Impax on October 4 that the Food and Drug Administration (FDA) has rescinded its acceptance of the above-referenced ANDA. In light of these public statements by Impax, it appears that Impax's ANDA was not "substantially complete" at the time it was submitted to FDA. Moreover, the predicate required for serving a Paragraph IV Notification, FDA's acceptance of Impax's ANDA, does not exist. *See* 21 CFR 314.95(b). Absent an ANDA that has been accepted by FDA for substantive review, Impax has no legitimate basis to initiate the Paragraph IV process. As a consequence, we believe that the Paragraph IV Notification you have sent to Endo and Penwest is null, void, and without legal effect, including with respect to the 45-day time period referenced in 21 U.S.C. §§ 355(j)(5)(B)(iii) and 355(j)(5)(C).

Nevertheless, Impax has continued to send additional Paragraph IV Notifications even after issuing its press release, in direct violation of FDA regulations. Impax's conduct is – among other things – a blatant abuse of the regulatory process, and it continues to inflict on Endo and Penwest grievous and irreparable harm. The seriousness of that harm is evidenced by the hundreds of millions of dollars in market capitalization that Endo and Penwest have lost because of Impax's conduct.

As a result, we request that you confirm on or before October 17, 2007 that (1) the initial submission of the ANDA referenced in your letter was not "substantially complete" and (2) Impax is withdrawing its Paragraph IV Notifications. We further request that, also on or before October 17, 2007, you explain the full basis for the FDA rescinding its acceptance of Impax's ANDA for substantive review and confirm the date on which Impax first learned that the FDA was rescinding its acceptance of Impax's ANDA.

Mark C. Shaw,
 Vice-President, Regulatory Affairs and Compliance
October 17, 2007
Page 2

In the event that Impax does not withdraw its Paragraph IV Notifications, we will need to proceed on a parallel track with the process for obtaining materials necessary to evaluate Impax's non-infringement claim.  However, the Offer of Confidential Access you have proposed is unduly restrictive.  First, we will require a complete copy of Impax's ANDA, as well as a samples (*i.e.*, 250-500 tablets for each dosage) of the material for which Impax is seeking approval.  Second, in addition to outside counsel who are not engaged in patent prosecution, we will need to provide the confidential information to the following additional individuals: Caroline Manogue (Chief Legal Officer) and Robert Cobuzzi, Ph.D. (Senior Director Business Development) from Endo and Amale Hawi (Sr. Vice President, Pharmaceutical Development) from Penwest.  In addition, we will need to discuss the evaluation of the confidential information in sufficient detail that the following members of management of Endo and Penwest can understand the basis of any conclusions: Peter Lankau (Chief Executive Officer), Nancy Wysenski (Chief Operating Officer), and Charles Rowland (Chief Financial Officer) for Endo and Jennifer Good (President & CEO) and Benjamin Palleiko (Sr. Vice President, Corporate Development & CFO) for Penwest.  Third, the terms specifying application of California law and submission to the jurisdiction of California courts are unacceptable.  We would be happy to discuss these issues with you at your convenience.

Finally, please be advised that in making the foregoing request for information and materials, Penwest and Endo do not admit that the Paragraph IV Notifications that have been sent to them by Impax are valid; to the contrary, our position, as stated more fully above, is that these Paragraph IV Notifications are null, void and without legal effect.

Regards,

Caroline B. Manogue
Chief Legal Officer
Endo Pharmaceuticals Inc.

_____

Benjamin Palleiko
Sr. Vice President, Corporate Development & CFO
Penwest Pharmaceuticals Co.



Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
+1 609 620 3200 Main
+1 609 620 3259 Fax
www.dechert.com

Delivery Address:
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Suite 210
Lawrenceville, NJ 08648-2317

ROBERT D. RHOAD

robert.rhoad@dechert.com
+1 609 620 3269 Direct
+1 609 873 9142 Fax

October 24, 2007

**By Fax – (510) 476-2092**
**and First-Class Mail**

**By Fax – (415) 397-7188**
**and First-Class Mail**

Margaret Snowden
Vice-President, Intellectual Property
Impax Laboratories, Inc.
30831 Huntwood Avenue
Hayward, CA 94544

Daralyn Durie, Esquire)
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

Re:    Impax Laboratories, Inc.
       Patent Certification Notice – U.S. Patent No. 7,276,250

Dear Ms. Snowden and Ms. Durie:

This firm represents Endo Pharmaceuticals, Inc. in connection Impax Laboratories, Inc.'s letter of October 2 providing notice that Impax had submitted ANDA 79-087, which includes a purported Paragraph IV notification with respect to the above-referenced patent. We are writing on behalf of both Endo and Penwest Pharmaceuticals Co. as a follow-up to their letter of October 17, 2007 to Impax in response to Impax's notice letter.

Endo and Penwest have not yet received any response to their October 17 letter. Accordingly, I called Impax today to follow-up on the letter, and in particular, to discuss Impax's offer of confidential access to its ANDA. This will confirm that I spoke with Ms. Snowden, who advised me that Impax had asked its outside counsel, Ms. Durie, to respond to our October 17 letter. I then called Ms. Durie, but was unable to reach her, and her voicemail message stated she would be out of the office until November 6. I then called Ms. Snowden back to advise her of that fact, and asked her to have Ms. Durie or someone else from her firm return my call. We ask that Impax provide its response to

James J. Marino, Resident Managing Partner
A Pennsylvania Limited Liability Partnership

Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton  San Francisco  Washington DC
Brussels  Frankfurt  London  Luxembourg  Munich  Paris


**Dechert**
LLP

October 24, 2007
Page 2

our October 17 without delay, and that someone on behalf of Impax prepared to discuss Impax's offer of confidential access to its ANDA return my call as soon as possible.

In the meantime, in accordance with the terms of Impax's offer of confidential access to its ANDA and without waiver of the issues raised in our letter of October 17 and any objections we have to Impax's offer, we hereby give notice to Impax that Endo designates the following outside counsel that it has engaged in connection with this matter as "Authorized Evaluators" under the terms of Impax's offer: George G. Gordon, Thomas Lihan, Martin J. Black, Ann M. Caviani Pease, Robert D. Rhoad, and Lynn M. Terrebonne; and Penwest designates the following outside counsel that it has engaged in connection with this matter as "Authorized Evaluators" under the terms of Impax's offer: Robert Gunther, Lisa Pirozzolo, Michael Twomey and Christopher Noye. Each of the designated outside counsel for Endo is an attorney in the firm of Dechert LLP, and each of the designated outside counsel for Penwest Pharmaceuticals is an attorney in the firm of Wilmer Cutler Pickering Hale and Dorr LLP. None of the designated outside counsel are involved in patent prosecution matters either for Endo or Penwest.

Accordingly, we request that Impax send a confidential copy of the above-referenced ANDA, without delay, to the following designated outside counsel by overnight delivery at the listed addresses:

Ann Pease
Dechert LLP
2440 W. El Camino Real
Suite 700
Mountain View, CA 94040-1499

Lisa Pirozzolo
WilmerHale
60 State Street
Boston, MA 02109

Thank you in advance for your anticipated prompt attention to this matter.

Sincerely,

Robert D. Rhoad
RDR/wp

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

DARALYN J. DURIE
DDURIE@KVN.COM

October 25, 2007

Robert D. Rhoad, Esq.
Dechert, LLC
Princeton Pike Corporate Center
997 Lenox Drive
Building 3, Suite 210
Lawrenceville, NJ 08648-2317

Dear Mr. Rhoad:

I represent Impax Laboratories, Inc.. I am in receipt of your letter regarding Impax's extended release oxymorphone hydrochloride product. As you are no doubt aware, the FDA initially accepted Impax's ANDA for extended release oxymorphone and then later rescinded that acceptance. We believe that the rescission was improper. We are taking steps to have the rescission reversed, and are confident that those efforts will be successful. We also believe that the PIV notice was proper, and we do not intend to withdraw it. With respect to your request regarding confidential access, you appear not to have signed the document. We are not inclined to modify it, but if you sign it, we will provide access to your Authorized Evaluators.

Very truly yours,

Daralyn J. Durie

DJD/dbm

405228.01

**Petrow, Lois**

| | |
|---|---|
| **From:** | Petrow, Lois |
| **Sent:** | November 05 2007 4:32 PM |
| **To:** | 'ABhansali@kvn.com' |
| **Subject:** | Letter from George G. Gordon |

**Importance:** High

**Attachments:** Document.pdf



Document.pdf (54 KB)

Please see attached letter from George G. Gordon, which has also been faxed to you this afternoon.


Lois I. Petrow, Secretary to George G. Gordon
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
Direct:  +1.215.994.2937
Fax:     +1.215.994.2222
Lois.Petrow@dechert.com
www.dechert.com



Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
+1 215 994 4000 Main
+1 215 994 2222 Fax
www.dechert.com

GEORGE G. GORDON

george.gordon@dechert.com
+1 215 994 2382 Direct
+1 215 655 2382 Fax

November 5, 2007

**By Fax  415-397-7188**
**and Email**

Asim M. Bhansali, Esquire
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

Re:     Impax Laboratories, Inc.
        Patent Certification Notices - U.S. Patent Nos. 5,662,933; 5,958,456; and 7,276,250

Dear Mr. Bhansali:

Endo Pharmaceuticals Inc. and Penwest Pharmaceuticals Co. are in receipt of Impax's paragraph IV notice letters regarding the above-referenced patents. These notice letters, combined with Impax's announcement that the FDA rescinded initial acceptance of Impax's ANDA 79-087, raise several questions.

Please confirm whether the produced portions of ANDA 79-087 are from (1) the ANDA as originally filed, or (2) the ANDA as supplemented, amended or otherwise modified, other than by merely adding a paragraph IV certification. If the latter, please confirm that the produced portions are from the most recent ANDA submission made to the FDA and provide us with the corresponding portions from any other ANDA submissions made to the FDA, including the original ANDA, to the extent they differ. Please also advise us of any supplemental filings, amendments, or modifications concerning ANDA 79-087 since the date of filing, other than those merely adding a paragraph IV certification.

Also, please provide answers to the following questions:

Since the FDA's notice to Impax that it rescinded initial acceptance of Impax's ANDA 79-087, has the FDA notified Impax that ANDA 79-087 has been accepted for filing? If so, when was this notification made? Did the FDA accept the original ANDA 79-087? If not, did the FDA accept an ANDA that Impax had supplemented, amended, or otherwise modified in some manner other than merely adding a paragraph IV certification?



Has the FDA notified Impax that it has withdrawn, or intends to withdraw, its decision to rescind initial acceptance of Impax's ANDA 79-087?  If so, when was this notification made?

We look forward to hearing from you on these issues.

Sincerely,

George G. Gordon

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188

## FACSIMILE TRANSMISSION COVER SHEET

November 7, 2007

| To | Telephone | Facsimile |
|---|---|---|
| George Gordon | (215) 994-2382 | (215) 994-2222 |
| Dechert LLP | | |

| From | Telephone | Code |
|---|---|---|
| Asim M. Bhansali | (415) 773-6608 | **6171/GAP** |

Re   ***Abbott Laboratories, et al. v. Teva Pharmaceuticals, et al.***
     **USDC, Dist. of Delaware, Case No. 02-1512-KAJ**

### Number of Pages (Including Cover): 2

## ORIGINAL WILL NOT FOLLOW THIS TRANSMISSION

## COMMENTS

Please see attached correspondence.

Operator _____                    Time Sent _____

## IF YOU ENCOUNTER ANY DIFFICULTIES RECEIVING THIS TRANSMISSION, PLEASE CALL (415) 676-2277 OR (415) 391-5400

The information contained in this facsimile transmission is legally privileged and confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error, please notify us immediately by telephone, and return the original transmission to us at the above address via the U.S. Postal Service. Thank you.

354205.01

LAW OFFICES

# KEKER & VAN NEST
### LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

ASIM M. BHANSALI
ABHANSALI@KVN.COM

November 7, 2007

**VIA FACSIMILE**

George Gordon
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808

Re:     Generic Oxymorphone ANDA

Dear Mr. Gordon:

I write in response to your letter of Monday, November 5.

In response to your first set of questions, I can say that no changes have been made to the parts of the ANDA that we disclosed to you. As I stated in my letter accompanying those excerpts from the ANDA, Impax believes those excerpts are sufficient for Endo and Penwest to determine that Impax does not infringe the patents for which a paragraph IV certification has been made.

In response to the second set of questions you posed regarding the issues surrounding the FDA's acceptance of Impax's ANDA, I can say that there have been no status changes since Daralyn Durie's letter to Robert Rhoad of October 25.

Sincerely,

ASIM M. BHANSALI

AMB/gap

405970.01

# EXHIBIT 8



**RECEIVED**

NOV 0 1 2007

Caroline B. Manogue

30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 476-2092

October 29, 2007

*Via Certified Mail – Return
Receipt Requested*

Endo Pharmaceuticals Inc.
100 Endo Blvd.                                     Article # 70053110000157619446
Chadds Ford, PA 19317

Penwest Pharmaceuticals Co.
39 Old Ridgebury Rd., Suite 11                     Article # 70053110000157619453
Danbury, CT 06810

Re:   Patent Certification Notice – U.S. Patent Nos. 5,662,933
      and 5,958,456
      Oxymorphone Hydrochloride Extended-release Tablets
      ANDA 79-087

To Whom It May Concern:

This is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and (ii) (§§ 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act) that Impax Laboratories, Inc. ("Impax"), a Delaware corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to U.S. Patent Nos. 5,662,933 and 5,958,456.

A detailed statement of the factual and legal bases for Impax's position regarding these patents is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patents are invalid, unenforceable, or not infringed.

Sincerely,
IMPAX Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs and
Compliance


MCS/aks

Enclosure:    Impax Laboratories, Inc.'s Detailed Statement Of The Factual And Legal
Bases That U.S. Patent Nos. 5,662,933 and 5,958,456 Are Invalid,
Unenforceable Or Not Infringed

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section
505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii), and 21 C.F.R.
§ 314.95(c), of the factual and legal basis for Impax's opinion that U.S. Patent Nos. 5,662,933
and 5,958,456 are invalid, unenforceable or not infringed, either literally or under the doctrine of
equivalents, by the manufacture, importation, use or sale of Impax's Oxymorphone HCl
Extended Release 5 mg, 10 mg, 20 mg, and 40 mg tablets ("Impax Oxymorphone ER"), for
which this detailed statement is submitted. Impax's factual and legal bases are set forth below.

I.      Applicable Legal Standards

        A U.S. patent gives the owner the right to preclude others from making, using or selling
the invention defined by the claims of the patent in the United States and its territories for the
term of the patent.[1]  Those making, using or selling an invention defined by the claims of a
patent are said to be directly infringing the claims of the patent. The patent statute also describes
remedies for contributory infringement and inducement of infringement.[2]  For there to be indirect
infringement by one party, there must be direct infringement by another party. Furthermore, the
act of filing an ANDA with patent invalidity or non-infringement certification pursuant to 21
U.S.C. § 355(j)(2)(A)(vii) may create a cause of action for patent infringement.[3]

        Evaluating infringement is a two-step process.  First, the scope of the claims is
determined, and second, the accused product or process is compared to the properly interpreted
claims. The claims, properly construed as a matter of law by the court,[4] are the measure of the
grant of the exclusive right to the patentee, and set out the metes and bounds of the invention.[5]

        Claim construction may involve the use of both intrinsic and extrinsic evidence; however,
the Federal Circuit in an *en banc* decision stressed the importance of giving the appropriate

---

[1] 35 U.S.C. § 271(a).

[2] 35 U.S.C. § 271(b) & (c).

[3] 35 U.S.C. § 271(e)(2)(A).

[4] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996);
*Network, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

[5] *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

weight to such evidence.[6]  In particular, the Federal Circuit has instructed trial courts that as a starting point, claim terms are to be given their ordinary and customary meaning as understood by one of ordinary skill in the art.[7]  In determining the ordinary and customary meaning, the trial court must first consider the claim term not only in the context of the particular claim, but also in the context of the rest of the claims, the specification, and the prosecution history.[8]

Once the language of the claims is properly interpreted, the claims must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present.[9]  Under the "all-elements" rule, a claim is not infringed unless each element of the claim, or a substantial equivalent of that element, is found in the accused device[10]  When any limitation recited in a claim is not met, literal infringement is avoided.[11]

The absence of literal infringement does not necessarily mean that a process or device does not infringe a patent.  The judicially created "doctrine of equivalents" allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes.[12]  Thus, even though the language of a claim cannot be read literally upon a process or device, a claim can be infringed if the process or device "performs substantially the same function in substantially the same way to obtain the same result."[13]  What constitutes "equivalency" must be determined against the context of the patent, the prior art, and the particular circumstances of the case.

---

[6] *Phillips v. AWH Corp. et al.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*).

[7] *Innova*, 381 F.3d at 1116; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[8] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582-83 (Fed. Cir. 1996).

[9] *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989).

[10] *Pennwalt Corp. v. Durand-Wayland Co.*, 833 F.2d 931, 935, (Fed. Cir. 1987); *Corning Glass Works*, 868 F.2d at 1259.

[11] *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985).  See also, *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317 (Fed. Cir. 2002).

[12] *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. et al.*, 535 U.S. 722, 723 (2002).

[13] *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950).  See also *Jonnson v. Stanley Works*, 711 F. Supp. 1395, 1407 (N.D. Ohio, 1989), *aff'd*, 903 F.2d 812 (Fed. Cir. 1990); *Fantasy Sports Properties, Inc. v. SportsLine.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002).

AO 1781083.2

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

A patent and each of its issued claims is presumed to be valid.[14] Proof of invalidity of a patent or its claims is a complete defense to a charge of infringement of the claims of that patent. The claims of a patent can be found to be invalid under 35 U.S.C. §102 as anticipated or under §103 because they are obvious in light of the prior art. With respect to patent claim invalidity, "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[15]  The "combination of familiar elements according to known methods" is likely be obvious when it yields predictable results, and common sense, not a "formalistic conception of the words teaching, suggestion, and motivation" should guide obviousness analysis.[16]  Factors to be considered in determining obviousness include the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary considerations.[17]

A patent application must describe how to make and use the invention in such full, clear, concise and exact terms as to enable any person of ordinary skill in the art to which it pertains to make and use the same.[18]  For a claim to be enabled, the disclosure must be sufficiently described as to enable one of ordinary skill in the art to practice the invention without undue experimentation.  A patent can be enabled even if it requires some experimentation to practice the invention: what is proscribed is undue experimentation.

Furthermore, the specification must be enabled at the time of filing the application, and a later filed publication cannot supplement an insufficient disclosure to render it enabling.[19]  Later filed publications can be considered as evidence of the level of ordinary skill in the art at the time of filing the application, reinforcing the standard that the issue is whether one skilled in the art would have believed the application to be enabled at the time of filing.  *In re Wands* set out 8 factors to be considered for enablement:  (1) the breadth of the claims, (2) the nature of the invention, (3) the state of the prior art, (4) the level of ordinary skill in the art, (5) the level of predictability in the art, (6) the amount of direction provided in the application, (7) the existence

---

[14] 35 U.S.C. § 282.

[15] 35 U.S.C. § 103(a).

[16] *KSR Int'l Co. v. Teleflex Inc., et al.*, 127 S.Ct. 1727, 1739-41 (2007).

[17] *Graham v. John Deere Co.*, 383 U.S. 1, 148 U.S.P.Q. 459 (1966).

[18] *See* 35 U.S.C. §112, 1st paragraph.

[19] *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987).

AO 1781083.2

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

of working examples in the specification, and (8) the quantity of experimentation needed to make or use the invention based on the content of the disclosure.[20]

In order for a claim to be patentable, it also must meet the written description requirements of 35 U.S.C. § 112, Paragraph 1. The goals of the written description requirement are to (1) convey to the public what was invented, (2) put the public in possession of what the applicant claims as the invention, and (3) prevent an applicant from claiming subject matter that was not described in the specification as filed. As stated by the Federal Circuit, "compliance with [the] § 112 [written description requirement] has always required sufficient information in the original disclosure to show that the inventor possessed the invention at the time of the original filing."[21] Possession of the invention is shown by describing the invention with specificity such as by words, structures, figures, diagrams, and formulas.[22]

The second paragraph of §112 requires the specification of a patent to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[23] To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.[24] Moreover, claims need not "be plain on their face in order to avoid condemnation for indefiniteness; rather, what [the Federal Circuit Court has] asked is that the claims are amenable to construction, however difficult that task may be."[25]

Furthermore, a patent may be rendered unenforceable for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.'"[26] "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation or material fact, failed to disclose material information, or submitted false

---

[20] *In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988).

[21] *Chiron Corp. v. Genentech Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).

[22] Revised Interim Written Description Guidelines, available at <http://www.uspto.gov/web/menu/written.pdf>.

[23] *See* 35 U.S.C. § 112, 2nd paragraph.

[24] *Miles Lab. v. Shandon, Inc.,* 997 F.2d 870, 875 (Fed. Cir. 1993).

[25] *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed. Cir. 2001).

[26] *Ferring B.V. v. Barr Labs,* 437 F.3d 1181, 1186-87 (Fed. Cir. 2006) (quoting *Warner-Lambert Co. v. Teva Pharms. USA, Inc.,* 418 F.3d 1326, 1342 (Fed. Cir. 2005)).

AO 1781083.2

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

material information, and (2) intended to deceive the [PTO]."[27] Intent need not, and rarely can, be proven by direct evidence.[28] "[I]n the absence of a credible explanation, intent to deceive *is generally inferred* from the facts and circumstances surrounding a knowing failure to disclose material information."[29] Further, the Federal Circuit recently "made it clear that 'a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead.'"[30]

## II.    U.S. Patent No. 5,662,933

U.S. Patent No. 5,662,933 ("the '933 patent") entitled "Controlled Release Formulation (Albuterol)" was filed on November 3, 1995 and issued on September 2, 1997. The '933 patent is a continuation-in-part application of Serial No. 08/118,924, filed September 9, 1993. The '933 patent is assigned to Edward Mendell Co., Inc. of Patterson, New York.

### A.    The Claims of the '933 patent

There are 48 claims issued in the '933 patent, which read as follows:

1. A controlled release solid dosage form for oral administration of a therapeutically active medicament to a patient in need thereof, comprising: a pharmaceutically effective amount of a medicament to be administered to a patient in need of said medicament; a sustained release excipient comprising a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum capable of reciprocally cross-linking when exposed to an environmental fluid, the ratio of said heteropolysaccharide gum to said homopolysaccharide gum being from about 1:3 to about 3:1; an inert pharmaceutical diluent selected from the group consisting of a pharmaceutically acceptable saccharide, polyhydric alcohol, a pre-manufactured direct compression diluent, and mixtures of any of the foregoing, the ratio of said inert diluent to said gelling agent being from about 1:8 to about 8:1, said dosage form providing a sustained release of said medicament when exposed to an environmental fluid and a pharmaceutically acceptable hydrophobic material.

---

[27] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007).

[28] *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1422 (Fed. Cir. 1989).

[29] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005) (emphasis added).

[30] *Ferring*, 437 F.3d at 1191 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997)).

AO 1781083.2

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

2. The controlled release solid dosage form according to claim 1 wherein said diluent is a saccharide selected from the group consisting of sucrose, dextrose, lactose, microcrystalline cellulose, fructose, xylitol, sorbitol, a starch, and mixtures thereof.

3. The controlled release solid dosage form according claim 1, wherein said heteropolysaccharide gum comprises xanthan gum and said homopolysaccharide gum comprises locust bean gum.

4. The controlled release solid dosage form according claim 2, wherein said xanthan gum and said locust bean gum are present in about a 1:1 ratio, respectively, by weight.

5. The controlled release solid dosage form according to claim 1, wherein said hydrophobic material is selected from the group consisting of a cellulose ether, a cellulose ester and an alkylcellulose.

6. The controlled release solid dosage form according claim 1, wherein said hydrophobic material is selected from the group consisting of ethylcellulose, carboxymethylcellulose, cellulose acetate phthalate, hydroxypropyl-methylcellulose phthalate and a polyvinyl acetate polymer.

7. The controlled release solid dosage form according claim 1, wherein said hydrophobic material is present in an amount ranging from about 1 through about 90%, by weight, of the solid dosage form.

8. The controlled release solid dosage form according claim 1, wherein said hydrophobic material is present in an amount ranging from about 25% through about 50%, by weight, of the solid dosage form.

9. The controlled release solid dosage form according to claim 1 wherein said medicament is a pharmaceutically effective amount of albuterol or a salt or derivative thereof.

10. The controlled release solid dosage form according to claim 1 which is a tablet.

11. The controlled release solid dosage form according to claim 1 which is in granular form.

12. The controlled release solid dosage form according to claim 11, which comprises a gelatin capsule containing a sufficient amount of said granules to provide an effective dose of said therapeutically active medicament.

13. The controlled release solid dosage form according to claim 9, wherein said hydrophobic material is selected from the group consisting of carboxymethylcellulose, cellulose acetate phthalate, polyvinyl acetate phthalate, hydroxypropylmethylcellulose phthalate, ethylcellulose, a copolymer of acrylic and methacrylic and esters, waxes, shellac, zein, and mixtures of any of the foregoing, prior to incorporation of said medicament, said hydrophobic material being included in said dosage form in an amount effective to slow the hydration of said gelling agent when exposed to an environmental fluid.

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

14. The controlled release solid dosage form according to claim 12 which is a tablet, at least part of a surface of said tablet being coated with a hydrophobic material to a weight gain from about 1 to about 20 percent, by weight.

15. The controlled release solid dosage form according to claim 1 which comprises a granulation which is coated with a hydrophobic material to a weight gain from about 1% to about 20%.

16. The controlled release solid dosage form according to claim 14, wherein said hydrophobic material is selected from the group consisting of a cellulose ether, a cellulose ester and an alkylcellulose.

17. The controlled release solid dosage form according to claim 16 which is a tablet, at least part of a surface of said tablet being coated with a hydrophobic material to a weight gain from about 1 to about 20 percent, by weight.

18. The controlled release solid dosage form according to claim 17, wherein said mixture of sustained release excipient and medicament are coated with a hydrophobic material prior to tableting.

19. The controlled release solid dosage form according to claim 1 which is a tablet, said tablet further comprising a coating containing from about 10 to about 40 percent of the total amount of said medicament included in said dosage form.

20. The controlled release solid dosage form according to claim 1 wherein the amount of albuterol is an amount equivalent to about 4 mg to about 16 mg of albuterol free base.

21. A method of preparing a controlled release solid dosage form comprising a medicament for oral administration, the method comprising preparing a sustained release excipient comprising from about 10 to about 99 percent by weight of a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum capable of cross-linking said heteropolysaccharide gum when exposed to an environmental fluid, the ratio of said heteropolysaccharide gum to said homopolysaccharide gum being from about 1:3 to about 3:1, and from about 0 to about 89 percent by weight of an inert pharmaceutical diluent, and from about 1 to 90% by weight of a pharmaceutically acceptable hydrophobic material; and adding an effective amount of a medicament thereto, such that a final product is obtained having a ratio of said medicament to said gelling agent from about 1:3 to about 1:8, such that a gel matrix is created when said formulation is exposed to environmental fluid and said formulation provides therapeutically effective blood levels of said medicament for at least 12 hours.

22. The method of claim 21, further comprising tableting said mixture of said sustained release excipient and said medicament.

23. The method of claim 21, further comprising coating said tablets with a hydrophobic coating to a weight gain from about 1% to about 20%.

24. The method of claim 21, further comprising granulating said sustained release excipient with a hydrophobic material.

AO 1781083.2

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

25. The method of claim 21, wherein said medicament is albuterol or a salt or derivative thereof.

26. The method of claim 21, wherein said hydrophobic coating comprises ethylcellulose.

27. The method of claim 25, wherein the amount of albuterol is an amount equivalent to about 4 mg to about 16 mg of albuterol free base.

28. The method of claim 21, wherein said sustained release excipient comprises from about 10 to about 75 percent gelling agent, from about 0 to about 90% hydrophobic material and from about 30 to about 75 percent inert diluent.

29. The method of claim 21, wherein said formulation provides therapeutically effective blood levels of said medicament for at least 24 hours.

30. The method of claim 21, further comprising compressing the mixture of said sustained release excipient and said tablet into tablets.

31. The method of claim 21, wherein said medicament comprises a therapeutically effective dose of albuterol or salts and derivatives of the same.

32. A method of treating a patient with albuterol comprising, preparing a sustained release excipient comprising from about 10 to about 99 percent by weight of a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum capable of cross-linking said heteropolysaccharide gum when exposed to an environmental fluid, the ratio of said heteropolysaccharide gum to said homopolysaccharide gum being from about 1:3 to about 3:1, and from about 0 to about 89 percent by weight of an inert pharmaceutical diluent, and from about 1 to 90% by weight of a pharmaceutically acceptable hydrophobic material; and adding an effective amount of a albuterol, or a salt or derivative thereof, to said sustained release excipient, such that a final product is obtained having a ratio of albuterol to said gelling agent from about 1:3 to about 1:8, such that a gel matrix is created when said formulation is exposed to environmental fluid and said formulation provides therapeutically effective blood levels of albuterol for at least 12 hours. adding an amount of albuterol effective to render a desired therapeutic effect; tableting the resultant mixture such that a final product is obtained having a ratio of albuterol to said gelling agent from about 1:3 to about 1:8, such that a gel matrix is created when said tablet is exposed to gastrointestinal fluid and said tablet provides therapeutically effective blood levels of albuterol; and administering said tablet to a patient at a predetermined dosage interval from about 12 to about 24 hours.

33. The method of claim 32, further comprising coating said tablets with a hydrophobic material to a weight gain from about 1% to about 20%.

34. The method of claim 32, further comprising preparing said formulation such that it provides therapeutically effective blood levels of said medicament for at least 24 hours.

AO 1781083.2

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

35. The controlled release solid dosage form of claim 1 which, when orally administered to a patient, provides a medicament plasma concentration-time curve with an area under the curve, to infinity, ranging from about 89 to about 150 (ng-hours/ml).

36. The controlled release solid dosage form of claim 1 which, when orally administered to a fasting patient, provides a medicament plasma concentration-time curve with an area under the curve, to infinity, ranging from about 57 to about 157 (ng-hours/ml).

37. The controlled release solid dossage form of claim 1 which, when orally administered to a fed patient, provides a medicament plasma concentration-time curve with an area under the curve, to infinity, ranging from about 75 to about 162 (ng-hour s/ml).

38. The controlled release solid dosage form of claim 1 which, when orally administered to a patient, provides a mean peak plasma concentration ranging from about 7 to about 12 ng/ml.

39. The controlled release solid dosage form of claim 1 which, when orally administered to a fasting patient, provides a mean peak plasma concentration ranging from about 4.5 to about 19 ng/ml.

40. The controlled release solid dosage form of claim 1 which, when orally administered to a fed patient, provides a mean peak plasma concentration ranging from about 6 to about 16 ng/ml.

41. The controlled release solid dosage form of claim 1 which, when orally administered to a patient, provides a time to mean peak plasma concentration ranging from about 3 to about 10 hours.

42. The controlled release solid dosage form of claim 1 which, when orally administered to a fasting patient, provides a time to mean peak plasma concentration ranging from about 3 to about 6 hours.

43. The controlled release solid dosage form of claim 1 which, when orally administered to a fed patient, provides a time to mean peak plasma concentration ranging from about 3 to about 8 hours.

44. The controlled release solid dosage form of claim 35 wherein the area under the plasma concentration curve, to infinity, ranges from about 112 to about 129 (ng-hours/ml).

45. The controlled release solid dosage form of claim 38 wherein the mean peak plasma concentration ranges from about, 9.5 to about 12 ng.

46. The controlled release solid dosage form of claim 42 wherein the time to mean peak plasma concentration ranges from about 3.5 to about 8 hours.

47. The controlled release solid dosage form of claim 1 which, when orally administered to a patient, provides a medicament plasma concentration-time curve wherein time to peak plasma concentration in a fasted patient divided by a time to peak plasma concentration in a fed patient ranges from about 0.50 to about 0.70.

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

48. The controlled release solid dosage form of claim 1 which, when orally administered to a patient, provides a medicament plasma concentration-time curve wherein peak plasma concentration in a fasted patient divided by peak plasma concentration in a fed patient ranges from about 0.90 to about 1.10.

## B. No Infringement of the Claims of the '933 patent

The '933 patent contains only 3 independent claims. Each of the independent claims 1, 21, and 32 of the '933 patent contains the specific limitation that the composition must include, among other ingredients, a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum, in a ratio of about 1:3 to 3:1. Specifically, the composition of claim 1 requires "a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum capable of reciprocally cross-linking when exposed to an environmental fluid, the ratio of said heteropolysaccharide gum to said homopolysaccharide gum being from about 1:3 to 3:1." The compositions of claims 21 and 32 require "about 10 to about 99 percent by weight of a gelling agent comprising a heteropolysaccharide gum and a homopolysaccharide gum capable of cross-linking said heteropolysaccharide gum when exposed to an environmental fluid, the ratio of said heteropolysaccharide gum to said homopolysaccharide gum being from about 1:3 to 3:1." Because each remaining claim contains the limitations of the independent claim from it depends, all of the claims in the '933 patent require the presence of a homopolysaccharide gum as a distinct ingredient from the heteropolysacharide gum, in the respective amounts claimed, for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claim of the '933 patent because Impax Oxymorphone ER does not contain a homopolysaccharide gum. Furthermore, the Impax Oxymorphone ER does not contain any equivalent to the homopolysaccharide gum claimed in the '933 patent.

Additionally, claims 9, 13, 20, 25, 27, and 31-34 contain the specific limitation that those compositions must also include albuterol. The Impax Oxymorphone ER does not literally infringe any of claims 9, 13, 20, 25, 27, or 31-34 of the '933 patent because Impax Oxymorphone ER does not contain albuterol. Furthermore, the Impax Oxymorphone ER does not contain any equivalent to the albuterol claimed in the '933 patent.

Therefore, for at least the reasons stated above, U.S. Patent No. 5,662,933 is not infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER.

AO 1781083.2

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

## III.    U.S. Patent No. 5,958,456

U.S. Patent No. 5,958,456 ("the '456 patent") entitled "Controlled Release Formulation (Albuterol)" was filed on July 1, 1997 and issued on September 28, 1999. The '456 patent is a continuation application of Serial No. 08/533,088, filed November 3, 1995. The '456 patent is assigned to Edward Mendell Co., Inc. of Patterson, New York.

### A.    The Claims of the '456 patent

There are 16 claims issued in the '456 patent, which read as follows:

1. A controlled release solid dosage form for oral administration of a therapeutically active medicament to a patient in need thereof, comprising: a pharmaceutically effective amount of a medicament to be administered to a patient in need of said medicament; a sustained release excipient comprising a gelling agent; a pharmaceutically acceptable hydrophobic material; and an inert pharmaceutical diluent wherein the ratio of said inert diluent to said gelling agent is from about 1:8 to about 8:1, said dosage form providing a sustained release of said medicament when exposed to an environmental fluid.

2. The controlled release solid dosage form according to claim 1 wherein said inert diluent is selected from the group consisting of pharmaceutically acceptable saccharides, polyhydric alcohols, pre-manufactured direct compression diluents, and mixtures of any of the foregoing.

3. The controlled release solid dosage form according to claim 1, wherein said hydrophobic material is selected from the group consisting of a cellulose ether, a cellulose ester and an alkylcellulose.

4. The controlled release solid dosage form according to claim 1, wherein said hydrophobic material is selected from the group consisting of ethylcellulose, carboxymethylcellulose, cellulose acetate phthalate, hydroxypropylmethylcellulose phthalate and a polyvinyl acetate polymer.

5. The controlled release solid dosage form according claim 1, wherein said hydrophobic material is present in an amount ranging from about 25 percent to about 50 percent, by weight, of the solid dosage form.

6. The controlled release solid dosage form according to claim 1, wherein said medicament is a pharmaceutically effective amount of albuterol or a salt or derivative thereof.

7. The controlled release solid dosage form according to claim 1 which is a tablet.

8. The controlled release solid dosage form according to claim 1, which is in granulate form.

9. The controlled release solid dosage form according to claim 8, wherein said granulate is coated with a hydrophobic material to a weight gain from about 1 percent to about 20 percent.

Page 11 of 13

CONFIDENTIAL

IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE
MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE
5 mg, 10 mg, 20 mg, and 40 mg TABLETS

10. The controlled release solid dosage form according to claim 1, wherein the medicament comprises an amount of albuterol equivalent to about 4 mg to about 16 mg of albuterol free base.

11. A method of preparing a controlled release solid dosage form comprising a medicament for oral administration, the method comprising preparing of a sustained release excipient comprising from about 10 to about 99 percent by weight of a gelling agent, from about 0 to about 89 percent by weight of an inert pharmaceutical diluent, and from about 1 to about 90 percent by weight of a pharmaceutically acceptable hydrophobic material; and adding a therapeutically effective amount of a medicament to said excipient, such that a final product is obtained having a ratio of said medicament to said gelling agent from about 1:3 to about 1:8, wherein said formulation provides therapeutically effective blood levels of said medicament for at least 12 hours.

12. The method of claim 11, further comprising compressing said mixture of said sustained release excipient and said medicament into tablets.

13. The method of claim 11, wherein said medicament is albuterol or a salt or derivative thereof.

14. The method of claim 13, further comprising coating the resultant tablets with a hydrophobic coating to a weight gain from about 1 percent to about 20 percent.

15. A method of treating a patient with albuterol comprising: preparing a sustained release excipient comprising from about 10 to about 99 percent by weight of a gelling agent, from about 0 to about 89 percent by weight of an inert pharmaceutical diluent, and from about 1 to 90 percent by weight of a pharmaceutically acceptable hydrophobic material; and adding an effective amount of albuterol or a salt or derivative thereof to said sustained release excipient, tableting the resultant mixture into tablets such that said tablets have a ratio of albuterol to said gelling agent from about 1:3 to about 1:8, such that a gel matrix is created when said tablet is exposed to gastrointestinal fluid and said tablet provides therapeutically effective blood levels of albuterol for at least 12 hours; and administering said tablet to a patient on a once-a-day or twice-a-day basis.

16. The method of claim 15, further comprising preparing said formulation such that it provides therapeutically effective blood levels of said medicament for at least 24 hours.

## B.    No Infringement of the Claims of the '456 patent

The '456 patent contains only 3 independent claims. Each of the independent claims 1, 11, and 15 of the '456 patent have the limitation that the composition must contain the separate component "a pharmaceutically acceptable hydrophobic material" among other ingredients. Specifically, the composition of claim 1 comprises "a pharmaceutically acceptable hydrophobic material." The composition of claims 11 and 15 comprise "from about 1 to 90 percent by weight of a pharmaceutically acceptable hydrophobic material." Because each remaining claim contains the limitations of the independent claim from which it depends, all dependent claims in the '456 patent require either "a pharmaceutically acceptable hydrophobic material" or "from about 1 to

Page 12 of 13

CONFIDENTIAL

**IMPAX LABORATORIES, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES THAT U.S. PATENT NOS. 5,662,933 AND 5,958,456 ARE NOT INFRINGED BY THE MANUFACTURE, USE OR SALE OF IMPAX'S OXYMORPHONE HCl EXTENDED RELEASE 5 mg, 10 mg, 20 mg, and 40 mg TABLETS**

90 percent by weight of a pharmaceutically acceptable hydrophobic material" for a finding of infringement.

The Impax Oxymorphone ER does not literally infringe any claim of the '456 patent because Impax Oxymorphone ER does not contain a "pharmaceutically acceptable hydrophobic material" as defined and claimed in the '456 patent. Furthermore, the Impax Oxymorphone ER does not contain any equivalent to the pharmaceutically acceptable hydrophobic material as defined and claimed in the '456 patent.

Additionally, claims 6, 10, 13, and 15-16 contain the specific limitation that those compositions must also include albuterol. The Impax Oxymorphone ER does not literally infringe any of claims 6, 10, 13, and 15-16 of the '456 patent because Impax Oxymorphone ER does not contain albuterol. Furthermore, the Impax Oxymorphone ER does not contain any equivalent to the albuterol claimed in the '456 patent.

Therefore, for at least the reasons stated above, U.S. Patent No. 5,958,456 is not infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER.

## IV.    Conclusion

For the reasons stated above, none of the claims of U.S. Patent Nos. 5,662,933 or 5,958,456 are infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Impax Oxymorphone ER. Impax reserves the right to develop additional grounds, reasons and authorities that any or all of the claims of these U.S. Patents are invalid, unenforceable or not infringed.

# EXHIBIT 9

Print Page  Close Window



**Press Release**

**IMPAX Comments on Lawsuit Related to Generic Version of Opana(R) ER**

HAYWARD, Calif.--(BUSINESS WIRE)--Nov. 19, 2007--IMPAX Laboratories, Inc. (OTC:IPXL) today confirmed that Endo Pharmaceuticals Holdings Inc. and Penwest Pharmaceuticals Co. have filed a lawsuit against the Company in the United States District Court for the District of Delaware alleging patent infringement related to IMPAX's filing of an Abbreviated New Drug Application (ANDA) with the U.S. Food and Drug Administration (FDA) for oxymorphone hydrochloride extended-release tablets CII, a generic version of Opana(R) ER.

IMPAX's submission includes a Paragraph IV certification stating the Company believes its product does not infringe U.S. Patent Nos. 7,276,250, 5,662,933 and 5,958,456 or that the patents are invalid or unenforceable. The suit alleges infringement of U.S. Patent Nost. 5,662,933 and 5,958,456 and also seeks declaratory judgment that the court to declare that the Paragraph IV Certification Notices that IMPAX served on Endo and Penwest are null, void and of no legal effect and that, therefore, the Court has no subject matter jurisdiction over the patent infringement claims.

"We believe that our Paragraph IV certification for generic Opana ER was proper, that our product does not infringe any valid, enforceable patent, and, as such, we will vigorously defend this lawsuit. Furthermore, we believe that the rescission of our ANDA by the FDA was inappropriate and we are continuing to work with the FDA to allow our ANDA to stand," said Larry Hsu, Ph.D., president and chief executive officer of IMPAX Laboratories.

Endo Pharmaceuticals Holdings Inc. and Penwest Pharmaceuticals Co. manufacture and market Opana ER for the treatment of moderate to severe pain. According to Wolters Kluwer Health, U.S. sales of Opana ER tablets were approximately $48.8 million in the 12 months ended September 30th, 2007.

About IMPAX Laboratories, Inc.

IMPAX Laboratories, Inc. is a technology based specialty pharmaceutical company applying its formulation expertise and drug delivery technology to the development of controlled-release and specialty generics in addition to the development of branded products. IMPAX markets its generic products through its Global Pharmaceuticals division and markets its branded products through the IMPAX Pharmaceuticals division. Additionally, where strategically appropriate, IMPAX has developed marketing partnerships to fully leverage its technology platform. IMPAX Laboratories is headquartered in Hayward, California, and has a full range of capabilities in its Hayward and Philadelphia facilities. For more information, please visit the Company's Web site at: www.impaxlabs.com.

"Safe Harbor" statement under the Private Securities Litigation Reform Act of 1995:

To the extent any statements made in this news release contain information that is not historical, these statements are forward-looking in nature and express the beliefs and expectations of management. Such statements are based on current expectations and involve a number of known and unknown risks and uncertainties that could cause IMPAX's future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements. Such risks and uncertainties include, but are not limited to, possible adverse effects resulting from the delisting of and suspension of trading in IMPAX's stock, the SEC proceeding to determine whether to suspend or revoke the registration of IMPAX's securities under section 12 of the Securities Exchange Act, IMPAX's delay in filing its 2004 Form 10-K, its Form 10-Q for each of the first three quarters of 2005, 2006, and 2007, its Form 10-K for 2005 and 2006, the actual time that will be required to complete the filing of IMPAX's delinquent periodic reports, IMPAX's ability to obtain sufficient capital to fund its operations, the difficulty of predicting FDA filings and approvals, consumer acceptance and demand for new pharmaceutical products, the impact of competitive products and pricing, IMPAX's ability to successfully develop and commercialize pharmaceutical products, IMPAX's reliance on key strategic alliances, the uncertainty of patent litigation, the availability of raw materials, the regulatory environment, dependence on patent and other protection for innovative products, exposure to product liability claims, fluctuations in operating results and other risks detailed from time to time in IMPAX's filings with the Securities and Exchange Commission. Forward-looking statements speak only as to the date on which they are made, and IMPAX undertakes no obligation to update publicly or revise any forward-looking statement, regardless of whether new information becomes available, future developments occur or

otherwise.

CONTACT: IMPAX Laboratories, Inc.
Larry Hsu, Ph.D. President & CEO
510-476-2000, Ext. 1111
Arthur Koch, CFO
215-933-0351
www.impaxlabs.com
or
Investor Relations Contacts:
Lippert/Heilshorn & Associates, Inc.
Kim Sutton Golodetz, 212-838-3777
kgolodetz@lhai.com
Bruce Voss, 310-691-7100
bvoss@lhai.com
www.lhai.com

SOURCE: IMPAX Laboratories, Inc.

EXHIBIT 10



CDER Home | About CDER | Drug Information | Regulatory Guidance | CDER Calendar | Specific Audiences | CDER Archives

Search [                    ] [GO] powered by Google™

# Paragraph IV Patent Certifications
## As of November 16, 2007

Below is a list of drug products for which an Abbreviated New Drug Application (ANDA) has been received by the Office of Generic Drugs (OGD) containing a "Paragraph IV" patent certification. This list includes the name of the drug product, dosage form, strength (subject of Paragraph IV certification), reference listed drug (RLD), **and the date on which the first substantially complete generic drug application was submitted to the Agency (on a prospective basis beginning 3/2/04).** The Agency will not disclose the identity of the applicant. This information will be updated twice a month and will be as current as the last update. This information should be used for reference only. The Agency will make every effort to ensure the accuracy of the information disclosed in this list. However, any discrepancies or disparities should be discussed with the Regulatory Support Branch at 301-827-5862, before making any decisions based on this information.

Any additions from the preceding list are marked with the **New!!** icon.

- FDA News: FDA announces measure to improve generic drug access
- Docket # 2000P-1556   Policy regarding ANDA holder confidentiality ✍

| DRUG NAME | DOSAGE FORM | STRENGTH | RLD | DATE OF SUBMISSION |
|---|---|---|---|---|
| Acarbose | Tablets | 25 mg, 50 mg and 100 mg | Precose | 3/22/2005 |
| Acetaminophen | Extended-release Tablets | 650 mg | Tylenol | |
| Acetaminophen/ Aspirin/ Caffeine | Tablets | 250 mg/250 mg/ 65 mg | Excedrin (migraine) | |
| Acetaminophen and Tramadol Hydrochloride | Tablets | 325 mg/ 37.5 mg | Ultracet | |
| Acyclovir Sodium | Injection | 50 mg/mL, 10 mL and 20 mL vials | Zovirax | |
| Adenosine | Injection | 3 mg/mL, 20 mL and 30 mL vials | Adenoscan | 4/18/2005 |
| Albuterol Sulfate | Oral Syrup | 2 mg(base)/ 5 mL | Ventolin | |
| Albuterol Sulfate | Extended-release Tablets | 4 mg and 8 mg | Volmax | |
| Albuterol Sulfate | Inhalation | 0.021% and | Accuneb | 10/19/2005 |

| | Solution | 0.042% | | |
|---|---|---|---|---|
| Albuterol Sulfate/ Ipratropium Bromide | Inhalation Solution | 0.083%/ 0.017% | Duoneb | |
| Alendronate Sodium New!! | Oral Solution | 70 mg/75 mL | Fosamax | 9/7/2007 |
| Alendronate Sodium | Tablets | 5 mg, 10 mg, 35 mg, 40 mg and 70 mg | Fosamax | |
| Alfuzosin Hydrochloride | Extended-release Tablets | 10 mg | Uroxatral | 6/12/2007 |
| Alprazolam | Orally Disintegrating Tablets | 0.25 mg, 0.5 mg, 1 mg and 2 mg | Niravam | 12/27/2005 |
| Alprazolam | Tablets | 0.25 mg, 0.5 mg, 1 mg and 2 mg | Xanax | |
| Almotriptan Malate | Tablets | 6.25 mg and 12.5 mg | Axert | 12/8/2005 |
| Amifostine | For Injection | 500 mg/vial | Ethyol | 4/16/2004 |
| Amlodipine Besylate | Tablets | 2.5 mg, 5 mg and 10 mg | Norvasc | |
| Amlodipine Besylate and Atorvastatin Calcium Tablets | Tablets | 5 mg/10 mg, 5 mg/20 mg, 5 mg/40 mg, 10 mg/10 mg, 10 mg/20 mg and 10 mg/80 mg | Caduet | 12/29/2006 |
| Amlodipine Besylate and Benazepril Hydrochloride | Capsules | 2.5 mg/10 mg, 5 mg/10 mg, 5 mg/20 mg and 10 mg/20 mg | Lotrel | 6/9/2004 |
| Amlodipine Besylate and Benazepril Hydrochloride | Capsules | 5 mg/40 mg and 10 mg/40 mg | Lotrel | 11/17/2006 |
| Argatroban New!! | Injection | 100 mg/mL, 2.5 mL vials | Argatroban | 9/24/2007 |
| Aripiprazole | Tablets | 2 mg, 5 mg, 10 mg, 15 mg, 20 mg and 30 mg | Abilify | 11/15/2006 |
| Aripiprazole | Orally Disintegrating Tablets | 10 mg, 15 mg, 20 mg and 30 mg | Abilify | 11/15/2006 |
| Aspirin and Dipyridamole | Extended-release Capsules | 25 mg and 200 mg | Aggrenox | 2/1/2007 |
| Atenolol | Tablets | 25 mg, 50 mg and 100 mg | Tenormin | |
| Atenolol/ Chlorthalidone | Tablets | 50 mg/25 mg and 100 mg/25 mg | Tenoretic | |

| Atomoxetine Hydrochloride | Capsules | 10 mg, 18 mg, 25 mg, 40 mg, 60 mg, 80 mg and 100 mg | Strattera | 5/29/2007 |
|---|---|---|---|---|
| Atorvastatin Calcium | Tablets | 10 mg, 20 mg, 40 mg and 80 mg | Lipitor | |
| Azelastine Hydrochloride | Nasal Spray | 0.125 mg base/spray | Astelin | 11/14/2005 |
| Azelastine Hydrochloride | Ophthalmic Solution | 0.05% | Optivar | 12/13/2006 |
| Betamethasone Valerate | Foam | 0.12% | Luxiq | 8/10/2007 |
| Betaxolol | Ophthalmic Solution | 0.5%(base) | Betoptic | |
| Brimonidine Tartrate | Ophthalmic Solution | 0.1% | Alphagan P | 12/20/2006 |
| Brimonidine Tartrate | Ophthalmic Solution | 0.15% | Alphagan P | 11/03/2006 |
| Brimonidine Tartrate | Ophthalmic Solution | 0.2% | Alphagan | |
| Budesonide | Inhalation Suspension | 0.25 mg/2 mL and 0.5 mg/2 mL | Pulmicort Respules | 9/15/2005 |
| Budesonide | Nasal Spray | 0.032 mg (32 mcg)/spray | Rhinocort | 5/14/2007 |
| Bupropion Hydrochloride | Extended-release Tablets | 100 mg, 150 mg and 200 mg | Wellbutrin SR | |
| Bupropion Hydrochloride | Extended-release Tablets | 150 mg | Zyban | |
| Bupropion Hydrochloride | Extended-release Tablets | 150 mg and 300 mg | Wellbutrin XL | 9/21/2004 |
| Bupropion Hydrochloride | Tablets | 75 mg and 100 mg | Wellbutrin | |
| Buspirone Hydrochloride | Tablets | 5 mg, 7.5 mg, 10 mg, 15 mg and 30 mg | Buspar | |
| Butorphanol Tartrate | Nasal Spray | 10 mg/mL | Stadol NS | |
| Calcipotriene | Topical Solution | 0.005% | Dovonex | 5/19/2006 |
| Calcitonin-Salmon | Nasal Spray | 200 IU/spray | Miacalcin | |
| Calcitonin-Salmon (Recombinant) | Nasal Spray | 200 IU/spray | Fortical | 3/29/2006 |
| Calcitriol | Injection | 1 mcg/mL and 2 mcg/mL, 1 mL vials | Calcijex | |
| Calcium Acetate | Capsules | EQ 169 mg calcium | PhosLo | 5/31/2005 |
| Calcium Carbonate/ | Chewable | 800 mg/ 10 | Pepcid | 11/1/2004 |

| | | | | |
|---|---|---|---|---|
| Famotadine/ Magnesium Hydroxide | Tablets | mg/ 165 mg (OTC) | Complete | |
| Candesartan Cilexetil | Tablets | 4 mg, 8 mg, 16 mg and 32 mg | Atacand | 12/22/2006 |
| Captopril | Tablets | 12.5 mg, 25 mg, 50 mg, and 100 mg | Capoten | |
| Carbamazepine | Extended-release Capsules | 100 mg and 200 mg | Carbatrol | 2/2/2006 |
| Carbamazepine New!! | Extended-release Capsules | 200 mg and 300 mg | Equetro | 8/21/2007 |
| Carbamazepine | Extended-release Capsules | 300 mg | Carbatrol | |
| Carbamazepine | Extended-release Tablets | 100 mg | Tegretol-XR | 12/30/2005 |
| Carbamazepine | Extended-release Tablets | 200 mg and 400 mg | Tegretol-XR | |
| Carbidopa/ Levodopa | Extended-release Tablets | 25 mg/100 mg and 50 mg/200 mg | Sinemet CR | |
| Carbidopa, Levodopa and Entacapone | Tablets | 25/100/200 mg and 37.5/150/200 mg | Stalevo 100 and Stalevo 150 | 6/29/2007 |
| Carboplatin | For Injection | 50 mg/vial, 150 mg/vial and 450 mg/vial | Paraplatin | |
| Carboplatin | Injection | 50 mg/vial, 150 mg/vial and 450 mg/vial | Paraplatin | |
| Carisoprodol/ Aspirin | Tablets | 200 mg/ 325 mg | Soma Compound | |
| Carisoprodol/ Aspirin/ Codeine | Tablets | 200 mg/ 325 mg/ 16 mg | Soma Compound with Codeine | |
| Carvedilol | Tablets | 3.125 mg, 6.25 mg, 12.5 mg and 25 mg | Coreg | |
| Celecoxib | Capsules | 100 mg, 200 mg and 400 mg | Celebrex | |
| Cetirizine HCL | Syrup | 5 mg/5 mL | zyrtec | 3/19/2007 |
| Cetirizine Hydrochloride and Pseudoephedrine | Extended-release Tablets | 5 mg/120 mg | Zyrtec-D | 6/2/2004 |
| Cetirizine Hydrochloride | Chewable | 5 mg and 10 | Zyrtec | 3/25/2005 |

| | Tablets | mg | | |
|---|---|---|---|---|
| Chlorhexidine Gluconate | Scrub brush/sponge | 4% | Hibiclens | |
| Chlorpheniramine Polistirex and Hydrocodone Polistirex | Extended-release Capsules | 8 mg/10 mg and 4 mg/5 mg | Tussionex | 9/10/2004 |
| Ciclopirox | Gel | 0.77% | Loprox | 5/10/2006 |
| Ciprofloxacin Hydrochloride | Tablets | 100 mg, 250 mg, 500 mg and 750 mg | Cipro | |
| Cisplatin | Injection | 1 mg/mL, 10 mL, 50 mL, 100 mL and 200 mL vials | Platinol-AQ | |
| Cisplatin | For Injection | 10 mg/vial and 50 mg/vial | Platinol | |
| Clobetasol Propionate | Topical Foam | 0.05% | Olux | 6/27/2005 |
| Clobetasol Propionate | Lotion | 0.05% | Clobex | 3/27/2006 |
| Clonidine Hydrochloride | Transdermal System | 0.1 mg/day, 0.2 mg/day, and 0.3 mg/day | Catapres-TTS | |
| Clopidogrel Bisulfate | Tablets | 75 mg | Plavix | |
| Colestipol Hydrochloride | Tablets | 1 g | Colestid | 8/23/2005 |
| Conjugated Estrogens | Tablets | 0.3 mg and 0.625 mg | Premarin | |
| Cyclobenzaprine Hydrochloride | Tablets | 10 mg | Flexeril | |
| Cyclophosphamide | For Injection | 100 mg/vial, 200 mg/vial, 500 mg/vial, 1 g/vial and 2 g/vial | Cytoxan | |
| Desloratadine | Tablets | 5 mg | Clarinex | 6/21/2006 |
| Desloratadine | Orally Disintegrating Tablets | 2.5 mg and 5 mg | Clarinex | 6/21/2006 |
| Desloratadine and Pseudoephedrine Sulfate | Extended-release Tablets | 2.5 mg/120 mg | Clarinex-D 24 Hour | 6/1/2007 |
| Desloratadine and Pseudoephedrine Sulfate | Extended-release Tablets | 5 mg/240 mg | Clarinex-D 24 Hour | 6/21/2006 |
| Desmopressin Acetate | Injection | 4 mcg/mL, 1 mL and 10 mL vials | DDAVP | |
| Desmopressin Acetate | Nasal Spray | 0.01% | DDAVP | |
| Desmopressin Acetate | Tablets | 0.1 mg and 0.2 mg | DDAVP | |
| Desogestrel; Ethinyl | Tablets | 0.15mg/ 0.02 | Mircette | |

| Estradiol Tablets | | mg and 0.01 mg | | |
|---|---|---|---|---|
| Dexmethylphenidate Hydrochloride | Tablets | 2.5 mg | Focalin | 7/27/2004 |
| Dexmethylphenidate Hydrochloride | Tablets | 5 mg and 10 mg | Focalin | 5/27/2004 |
| Dexmethylphenidate Hydrochloride | Extended-release Capsules | 15 mg | Focalin XR | 5/14/2007 |
| Dexmethylphenidate Hydrochloride | Extended-release Capsules | 5 mg, 10 mg and 20 mg | Focalin XR | 3/30/2007 |
| Dexrazoxane | For Injection | 250 mg/vial | Zinecard | |
| Dextroamphetamine saccharate; Amphetamine aspartate; Dextroamphetamine Sulfate; Amphetamine Sulfate | Extended-release Capsules | 5 mg, 10 mg, 15 mg, 20 mg, 25 mg and 30 mg | Adderall XR | |
| Dextroamphetamine saccharate; Amphetamine aspartate; Dextroamphetamine Sulfate; Amphetamine Sulfate | Tablets | 7.5 mg, 12.5 mg and 15 mg | Adderall | |
| Diazepam | Tablets | 2 mg, 5 mg and 10 mg | Valium | |
| Diazepam | Rectal Gel | 2.5 mg/0.5 mL, 5 mg/mL, 10 mg/2 mL, 15 mg/3 mL and 20 mg/4 mL | Diastat | 3/23/2004 |
| Didanosine | Delayed-release Capsules | 200 mg, 250 mg and 400 mg | Videx EC | 6/1/2004 |
| Diltiazem Hydrochloride | Extended-release Capsules | 60 mg, 90 mg and 120 mg | Cardizem SR | |
| Diltiazem Hydrochloride | Extended-release Capsules | 120 mg, 180 mg and 240 mg | Dilacor XR | |
| Diltiazem Hydrochloride | Extended-release Capsules | 120 mg, 180 mg, 240 mg and 300 mg | Cardizem CD | |
| Diltiazem Hydrochloride | Extended-release Capsules | 120 mg, 180 mg, 240 mg, 300 mg, 360 mg and 420 mg | Tiazac | |
| Diltiazem Hydrochloride | Extended-release Tablets | 120 mg, 180 mg, 240 mg, | Cardizem LA | 8/30/2005 |

|  |  | 300 mg and 360 mg |  |  |
| --- | --- | --- | --- | --- |
| Diltiazem Hydrochloride | Extended-release Tablets | 420 mg | Cardizem LA | 4/25/2005 |
| Divalproex Sodium | Delayed-release Tablets | 125 mg, 250 mg and 500 mg | Depakote |  |
| Divalproex Sodium | Extended-release Tablets | 250 mg | Depakote ER | 5/3/2004 |
| Divalproex Sodium | Extended-release Tablets | 500 mg | Depakote ER | 2/8/2005 |
| Donepezil Hydrochloride | Tablets | 5 mg and 10 mg | Aricept |  |
| Dorzolamide Hydrochloride | Ophthalmic Solution | 2% | Trusopt | 10/7/2005 |
| Dorzolamide Hydrochloride and Timolol Maleate | Ophthalmic Solution | 2%/0.5% | Cosopt | 10/7/2005 |
| Doxazosin Mesylate | Tablets | 1 mg, 2 mg, 4 mg and 8 mg | Cardura |  |
| Drospirenone and Ethinyl Estradiol | Tablets | 3 mg/0.02 mg | Yaz | 9/29/2006 |
| Drospirenone and Ethinyl Estradiol | Tablets | 3 mg/0.03 mg | Yasmin | 1/7/2005 |
| Enalapril Maleate | Tablets | 2.5 mg, 5 mg, 10 mg and 20 mg | Vasotec |  |
| Enoxaparin Sodium | Injection | 100 mg/mL, 0.3 mL, 0.4 mL, 0.6 mL, 0.8 mL and 1 mL prefilled syringes | Lovenox |  |
| Enoxaparin Sodium | Injection | 150 mg/mL, 0.6 mL, 0.8 mL and 1 mL prefilled syringes | Lovenox |  |
| Enoxaparin Sodium | Injection | 100 mg/mL, 3 mL vials | Lovenox | 12/7/2006 |
| Entacapone | Tablets | 200 mg | Comtan | 4/11/2007 |
| Eplerenone | Tablets | 25 mg and 50 mg | Inspra | 9/27/2006 |
| Escitalopram Oxalate | Capsules | 5 mg | Lexapro | 8/17/2005 |
| Escitalopram Oxalate | Capsules | 10 mg and 20 mg | Lexapro | 3/30/2005 |
| Escitalopram Oxalate | Tablets | 5 mg, 10 mg and 20 mg | Lexapro |  |
| Esmolol Hydrochloride | Injection | 10 mg/mL, 10 mL vial | Brevibloc |  |

| Esomeprazole Magnesium | Delayed-release Capsules | 20 mg and 40 mg | Nexium | 8/5/2005 |
|---|---|---|---|---|
| Estradiol | Transdermal System | 0.0375 mg/day and 0.06 mg/day | Climara | |
| Estradiol | Transdermal System | 0.05 mg/day and 0.1 mg/day | Climara | 9/12/2005 |
| Estradiol; Estradiol and Norgestimate | Tablets | 1 mg; 1 mg and 0.09 mg | Prefest | |
| Etodolac | Extended-release Tablets | 400 mg, 500 mg and 600 mg | Lodine XL | |
| Ezetimibe | Tablets | 10 mg | Zetia | 10/25/2006 |
| Famciclovir | Tablets | 125 mg, 250 mg and 500 mg | Famvir | 12/28/2004 |
| Famotidine | Injection | 10 mg/mL, 2 mL vials; unpreserved | Pepcid | |
| Famotidine | Injection | 10 mg/mL, 4 mL and 20 mL vials; preserved | Pepcid | |
| Famotidine | Injection | 10 mg/mL, 50 mL vial, pharmacy bulk package; unpreserved | Pepcid | |
| Famotidine | Tablets | 10 mg (OTC) | Pepcid AC | |
| Famotidine | Tablets | 20 mg and 40 mg | Pepcid | |
| Famotidine | Tablets (Chewable) | 10 mg (OTC) | Pepcid AC (chewable) | |
| Felodipine | Extended-release Tablets | 2.5 mg, 5 mg and 10 mg | Plendil ER | |
| Fenofibrate | Capsules | 67 mg, 134 mg and 200 mg | Tricor | |
| Fenofibrate | Tablets | 54 mg, 107 mg and 160 mg | Tricor | |
| Fentanyl | Transdermal Extended-release Film | 0.6 mg/24 hr, 1.2 mg/ 24 hr, 1.8 mg/ 24 hr and 2.4 mg/ 24 hr | Duragesic | |
| Fentanyl Citrate | Lozenges | 0.2 mg | Actiq | 10/29/2004 |
| Fentanyl Citrate | Lozenges | 0.4 mg | Actiq | 10/6/2004 |
| Fentanyl Citrate | Lozenges | 0.6 mg | Actiq | 12/20/2004 |

| Fentanyl Citrate | Lozenges | 0.8 mg, 1.2 mg and 1.6 mg | Actiq | 11/22/2004 |
|---|---|---|---|---|
| Fexofenadine Hydrochloride | Capsules | 60 mg | Allegra | |
| Fexofenadine Hydrochloride | Tablets | 30 mg, 60 mg and 180 mg | Allegra | |
| Fexofenadine Hydrochloride and Pseudoephedrine Hydrochloride | Extended-release Tablets | 60 mg/120 mg | Allegra-D | |
| Fexofenadine Hydrochloride and Pseudoephedrine Hydrochloride | Extended-release Tablets | 180 mg/240 mg | Allegra-D 24 Hour | 6/6/2007 |
| Finasteride | Tablets | 1 mg | Propecia | |
| Finasteride | Tablets | 5 mg | Proscar | |
| Flecainide Acetate | Tablets | 50 mg, 100 mg and 150 mg | Tambocor | |
| Fluconazole | For Oral Suspension | 50 mg/5 mL and 200 mg/5 mL | Diflucan for Oral Suspension | |
| Fluconazole | Tablets | 50 mg, 100 mg, 150 mg and 200 mg | Diflucan | |
| Flunisolide | Nasal Solution | 0.025% | Nasalide | |
| Fluocinonide | Ointment | 0.05% | Lidex | |
| Fluoxetine Hydrochloride | Tablets | 10 mg and 20 mg | Prozac | |
| Fluoxetine Hydrochloride | Capsules | 10 mg, 20 mg and 40 mg | Prozac | |
| Fluoxetine Hydrochloride | Delayed-release Capsules | 90 mg | Prozac Weekly | |
| Fluoxetine Hydrochloride | Oral Solution | 20 mg (base)/5 mL | Prozac | |
| Fluoxetine Hydrochloride | Capsules | 10 mg and 20 mg | Sarafem | |
| Flutamide | Capsules | 125 mg | Eulexin | |
| Fluvastatin Sodium | Extended-release Tablets | 80 mg | Lescol XL | 3/15/2007 |
| Fosinopril Sodium | Tablets | 10 mg, 20 mg and 40 mg | Monopril | |
| Fosinopril Sodium and Hydrochlorothiazide | Tablets | 10 mg/12.5 mg and 20 mg/12.5 mg | Monopril HCT | |
| Gabapentin | Capsules | 100 mg, 300 mg and 400 mg | Neurontin | |
| Gabapentin | Oral Solution | 250 mg/5 mL | Neurontin | |

| Gabapentin | Tablets | 100 mg, 300 mg and 400 mg | Neurontin | |
| Gabapentin | Tablets | 600 mg and 800 mg | Neurontin | |
| Galantamine Hydrobromide | Extended-release Capsules | 8 mg | Razadyne ER | 3/2/2006 |
| Galantamine Hydrobromide | Extended-release Capsules | 16 mg and 24 mg | Razadyne ER | 3/11/2006 |
| Galantamine Hydrobromide | Tablets | 4 mg, 8 mg and 12 mg | Razadyne | 2/28/2005 |
| Ganciclovir Sodium | Capsules | 250 mg and 500 mg | Cytovene | |
| Gatifloxacin | Injection | 10 mg/mL, 20 mL and 40 mL vials | Tequin | 11/24/2004 |
| Gatifloxacin | Ophthalmic Solution | 0.3 % | Zymar | 7/19/2007 |
| Gatifloxacin | Tablets | 200 mg and 400 mg | Tequin | |
| Gatifloxacin in Dextrose 5% in Plastic Container | Injection | 2 mg/mL, 100 mL and 200 mL containers (plastic) | Tequin | 12/13/2004 |
| Gemcitabine | For Injection | 200 mg/vial | Gemzar | 11/1/2005 |
| Gemcitabine | For Injection | 1g/vial | Gemzar | 11/14/2005 |
| Gemcitabine New! | For Injection | 2 g/vial | Gemzar | 8/24/2007 |
| Glimepiride and Rosiglitazone Maleate | Tablets | 1 mg/4 mg, 2 mg/4 mg and 4 mg/4 mg | Avandaryl | 12/22/2006 |
| Glipizide | Extended-release Tablets | 2.5 mg, 5 mg and 10 mg | Glucotrol XL | |
| Glyburide | Tablets | 1.5 mg, 3 mg, 4.5 mg and 6 mg | Glynase | |
| Glyburide/ Metformin Hydrochloride | Tablets | 1.25mg/250 mg, 2.5 mg/500 mg and 5 mg/500 mg | Glucovance | |
| Granisetron Hydrochloride | Injection | 0.1 mg/mL, 1 mL single dose vial | Kytril | 3/8/2007 |
| Granisetron Hydrochloride | Injection | 1 mg/mL, 1 mL vials | Kytril | 6/1/2004 |
| Granisetron Hydrochloride | Injection | 1 mg/mL, 4 mL multi-dose | Kytril | 7/19/2004 |

| | | vials | | |
|---|---|---|---|---|
| Guaifenesin* | Extended-release Tablets | 600 mg and 1.2 gm | Mucinex | 6/9/2006 |
| Hydrocodone Bitartrate and Ibuprofen | Tablets | 2.5 mg/200 mg | Vicoprofen | 2/24/2006 |
| Hydrocodone Bitartrate and Ibuprofen | Tablets | 5 mg/200 mg | Vicoprofen | 5/27/2005 |
| Hydrocodone Bitartrate and Ibuprofen | Tablets | 7.5 mg/200 mg | Vicoprofen | |
| Hydrocodone Bitartrate and Ibuprofen | Tablets | 10 mg/200 mg | Vicoprofen | |
| Ibandronate Sodium | Injection | 1 mg/mL, 3 mL Vial | Boniva | 8/31/2007 |
| Ibandronate Sodium | Tablets | 2.5 mg and 150 mg | Boniva | 5/16/2007 |
| Ibuprofen | Oral Drops | 40 mg/mL | Children's Motrin Drops | |
| Ibuprofen | Oral Suspension | 50 mg/1.25 mL | Concentrated Motrin Infant Drops | 6/29/2007 |
| Ibuprofen | Oral Suspension | 100 mg/5 mL (Rx) | Motrin | |
| Ibuprofen | Oral Suspension | 100 mg/5 mL (OTC) | Children's Motrin | |
| Ibuprofen | Chewable Tablets | 50 mg and 100 mg | Children's Motrin, Junior Strength Motrin | |
| Ibuprofen Potassium and Pseudoephedrine Hydrochloride | Capsules | 200 mg/30 mg | Advil Cold and Sinus | 12/27/2004 |
| Ibuprofen and Pseudoephedrine Hydrochloride | Oral Suspension | 100 mg/ 15 mg per 5 mL | Children's Motrin Cold | |
| Ibuprofen and Pseudoephedrine Hydrochloride | Tablets | 200 mg/30 mg | Advil Cold and Sinus | |
| Ifosfamide | For Injection | 1 g/vial and 3 g/vial | Ifex | |
| Ifosfamide | Injection | 50 mg/mL, 20 mL vials and 60 mL vials | Ifex | |
| Ifosfamide/ Mesna | For Injection/ Injection Kit | 1 g/vial; 100 mg/mL, 10 mL vials and 3 g/vial; 100 mg/mL, 10 mL vials | Ifex/ Mesnex Kit | |
| Ifosfamide/ Mesna | Injection/ | 50 mg/mL, 20 | Ifex/ Mesnex | |

|  | Injection Kit | mL and 60 mL vials; 100 mg/mL, 10 mL vial | Kit |  |
| --- | --- | --- | --- | --- |
| Imatinib Mesylate | Tablets | 100 mg and 400 mg | Gleevec | 3/12/2007 |
| Imiquimod | Cream | 5% | Aldara | 10/17/2006 |
| Indomethacin | Extended-release Capsules | 75 mg | Indocin SR |  |
| Irbesartan | Tablets | 75 mg, 150 mg and 300 mg | Avapro | 5/25/2004 |
| Irbesartan and Hydrochlorothiazide | Tablets | 150 mg/12.5 mg and 300 mg/12.5 mg | Avalide | 11/10/2004 |
| Irbesartan and Hydrochlorothiazide | Tablets | 300 mg/25 mg | Avalide | 6/6/2006 |
| Irinotecan Hydrochloride | Injection | 20 mg/mL, 2 mL and 5 mL vials | Camptosar | 7/26/2004 |
| Itraconazole | Capsules | 100 mg | Sporanox |  |
| Ketoprofen | Capsules | 25 mg, 50 mg and 75 mg | Orudis |  |
| Ketorolac Tromethamine | Injection | 15 mg/mL and 30 mg/mL | Toradol |  |
| Ketorolac Tromethamine | Ophthalmic Solution | 0.5% | Acular |  |
| Ketorolac Tromethamine | Ophthalmic Solution | 0.4% | Acular LS | 1/28/2005 |
| Ketorolac Tromethamine | Tablets | 10 mg | Toradol |  |
| Ketotifen Fumarate | Ophthalmic Solution | 0.025% | Zaditor | 12/23/2004 |
| Lactulose | Oral Syrup | 10 g/15 mL | Cephulac |  |
| Lamivudine and Zidovudine | Tablets | 150 mg/300 mg | Combivir | 6/26/2007 |
| Lactulose | Oral Syrup | 10 g/15 mL | Chronulac |  |
| Lamotrigine | Tablets | 25 mg, 100 mg, 150 mg and 200 mg | Lamictal |  |
| Lamotrigine | Chewable Tablets | 2 mg, 5 mg and 25 mg | Lamictal CD |  |
| Latanoprost | Ophthalmic Solution | 0.005% | Xalatan |  |
| Lansoprazole | Delayed-release Pellets/Capsules | 15 mg and 30 mg | Prevacid | 12/05/2005 |
| Lansoprazole | Delayed-release Orally Disintegrating | 15 mg and 30 mg | Prevacid | 12/27/2006 |

|  | Tablets |  |  |  |
|---|---|---|---|---|
| Letrozole | Tablets | 2.5 mg | Femara | 3/2/2006 |
| Leuprolide Acetate | Injection (depot) | 7.5 mg/vial | Lupron Depot |  |
| Levalbuterol Hydrochloride | Inhalation Solution | 0.0103%, 0.021% and 0.042% | Xopenex | 6/20/2005 |
| Levalbuterol Hydrochloride | Inhalation Solution | 0.25% | Xopenex | 5/23/2006 |
| Levetiracetam | Tablets | 250 mg, 500 mg and 750 mg | Keppra |  |
| Levetiracetam | Tablets | 1000 mg | Keppra | 1/24/2007 |
| Levofloxacin | Injection | 5 mg/mL; 50 mL, 100 mL and 150 mL vials | Levaquin in Dextrose 5% in Plastic Container |  |
| Levofloxacin | Injection | 25 mg/mL | Levaquin |  |
| Levofloxacin | Ophthalmic Solution | 0.5% | Quixin |  |
| Levofloxacin | Tablets | 250 mg, 500 mg and 750 mg | Levaquin |  |
| Levonorgestrel and Ethinyl Estradiol | Tablets | 0.15 mg/0.03 mg | Seasonale | 3/29/2004 |
| Levothyroxine Sodium | Tablets | 0.025 mg, 0.05 mg, 0.075 mg, 0.088 mg, 0.1 mg, 0.112 mg, 0.125 mg, 0.150 mg, 0.175 mg, 0.2 mg and 0.3 mg | Levoxyl |  |
| Linezolid | Tablets | 600 mg | Zyvox | 12/21/2005 |
| Loperamide Hydrochloride and Simethicone | Chewable Tablets | 2 mg/125 mg | Imodium Advanced |  |
| Loperamide Hydrochloride and Simethicone | Tablets | 2 mg/125 mg | Imodium Advanced | 12/29/2004 |
| Loratadine | Syrup | 1 mg/mL | Claritin |  |
| Loratadine | Tablets | 10 mg | Claritin |  |
| Loratadine | Orally Disintegrating Tablets | 10 mg | Claritin RediTabs |  |
| Loratadine/ Pseudoephedrine | Extended-release Tablets | 5 mg/120 mg | Claritin D-12 hour |  |
| Loratadine/ Pseudoephedrine | Extended-release Tablets | 10 mg/240 mg | Claritin D-24 hour |  |
| Losartan Potassium | Tablets | 25 mg, 50 mg, | Cozaar |  |

|  |  | and 100 mg |  |  |
|---|---|---|---|---|
| Losartan Potassium and Hydrochlorothiazide | Tablets | 50 mg/12.5 mg and 100 mg/25 mg | Hyzaar | 5/24/2004 |
| Losartan Potassium and Hydrochlorothiazide | Tablets | 100 mg/12.5 mg | Hyzaar | 4/4/2006 |
| Mefloquine Hydrochloride | Tablets | 250 mg | Lariam |  |
| Megestrol Acetate | Oral Suspension | 40 mg/mL | Megace |  |
| Mesalamine | Delayed-release Tablets | 400 mg | Asacol | 6/22/2007 |
| Metaxalone | Tablets | 400 mg | Skelaxin |  |
| Metaxalone | Tablets | 800 mg | Skelaxin | 11/4/2004 |
| Metformin Hydrochloride | Extended-release Tablets | 500 mg | Glucophage XR |  |
| Metformin Hydrochloride | Extended-release Tablets | 750 mg | Glucophage XR |  |
| Methylphenidate Hydrochloride | Extended-release Capsules | 10 mg | Ritalin LA | 5/21/2007 |
| Methylphenidate Hydrochloride | Extended-release Capsules | 10 mg, 20 mg and 30 mg | Metadate CD | 5/13/2005 |
| Methylphenidate Hydrochloride | Extended-release Capsules | 20 mg, 30 mg and 40 mg | Ritalin LA | 8/21/06 |
| Methylphenidate Hydrochloride | Extended-release Capsules | 40 mg | Metadate CD | 3/15/2007 |
| Methylphenidate Hydrochloride | Extended-release Tablets | 18 mg, 27 mg, 36 mg and 54 mg | Concerta | 7/19/2005 |
| Metoclopramide Hydrochloride | Injection | 5 mg/mL, 2 mL, 10 mL, and 20 mL and 30 mL vials | Reglan |  |
| Metoprolol Succinate | Extended-release Tablets | 25 mg, 50 mg, 100 mg and 200 mg | Toprol XL |  |
| Metronidazole | Vaginal Gel | 0.75% | MetroGel-Vaginal | 9/2/2004 |
| Mirtazapine | Tablets | 7.5 mg, 15 mg, 30 mg, and 45 mg | Remeron |  |
| Mirtazapine | Orally Disintegrating Tablets | 15 mg, 30 mg and 45 mg | Remeron SolTab |  |
| Modafinil | Tablets | 100 mg and 200 mg | Provigil |  |
| Moexipril Hydrochloride | Tablets | 7.5 and 15 | Univasc |  |

| | | mg | | |
|---|---|---|---|---|
| Moexipril Hydrochloride and Hydrochlorothiazide | Tablets | 7.5mg/12.5mg 15 mg/25 mg and 15 mg/12.5 mg | Uniretic | 1/15/2004 |
| Mometasone Furoate | Topical Solution (Cream) | 0.1% | Elocon | |
| Mometasone Furoate | Topical Solution (Lotion) | 0.1% | Elocon | 6/10/2004 |
| Montelukast Sodium | Chewable Tablets | 4 mg and 5 mg | Singulair | 12/26/2006 |
| Montelukast | Tablets | 10 mg | Singulair | 2/20/2007 |
| Montelukast | Tablets | 10 mg | Singulair | 2/20/2007 |
| Morphine Sulfate | Extended-release Capsules | 30 mg, 60 mg, 90 mg and 120 mg | Avinza | 6/4/2007 |
| Moxifloxacin Hydrochloride | Ophthalmic Solution/Drops | 0.5% | Vigamox | 12/22/2005 |
| Moxifloxacin Hydrochloride | Tablets | 400 mg | Avelox | |
| Nabumetone | Tablets | 500 mg and 750 mg | Relafen | |
| Naproxen Sodium | Extended-release Tablets | 375 mg (base) and 500 mg (base) | Naprelan | |
| Nateglinide | Tablets | 60 mg and 120 mg | Starlix | 12/22/2004 |
| Nefazodone Hydrochloride | Tablets | 50 mg, 100 mg, 150 mg 200 mg and 250 mg | Serzone | |
| Niacin | Extended-release Tablets | 500 mg, 750 mg and 1000 mg | Niaspan | |
| Nicardipine Hydrochloride | Injection | 2.5 mg/mL, 10 mL Ampoules | Cardene | 12/27/2006 |
| Nicotine | Transdermal System | 7 mg/day, 14 mg/day and 21 mg/day | Habitrol | |
| Nicotine Polacrilex | Troche/Lozenge | 2 mg and 4 mg | Commit | |
| Nifedipine | Capsules | 10 mg and 20 mg | Procardia | |
| Nifedipine | Extended-release Tablets | 30 mg, 60 mg and 90 mg | Adalat CC | |
| Nisoldipine | Extended-release Tablets | 40 mg | Sular | 6/11/2007 |
| Nifedipine | Extended-release Tablets | 30 mg, 60 mg and 90 mg | Procardia XL | |

| Nitrofurantoin Monohydrate/ Macrocrystals | Capsules | 75 mg/25 mg | Macrobid | |
|---|---|---|---|---|
| Nitroglycerin | Sublingual Tablets | 0.3 mg, 0.4 mg and 0.6 mg | Nitrostat | 10/19/2005 |
| Nitroglycerin | Transdermal System | 0.1 mg/hr | Transderm-Nitro | |
| Nitroglycerin | Transdermal System | 0.1 mg/hr, 0.2 mg/hr, 0.3 mg/hr, 0.4 mg/hr, 0.6 mg/hr and 0.8 mg/hr | Nitro-dur | |
| Nizatidine | Capsules | 150 mg and 300 mg | Axid | |
| Norelgestromin and Ethinyl Estradiol | Transdermal System | 0.15 mg/0.02 mg per 24 hours | Ortho Evra | 3/22/2007 |
| Norethindrone/ Ethinyl Estradiol | Tablets | 0.5 mg/ 0.035 mg, 0.75 mg/ 0.035 mg and 1 mg /0.035 mg | Ortho-Novum 7/7/7, 21 and 28 day | |
| Norethindrone Acetate/ Ethinyl Estradiol | Tablets | 1 mg/0.005 mg | Femhrt | |
| Norethindrone Acetate/ Ethinyl Estradiol | Tablets | 1 mg/ 0.02 mg, 1 mg/0.03 mg and 1 mg /0.035 mg | Estrostep Fe | |
| Norethindrone Acetate/ Ethinyl Estradiol | Tablets | 1 mg/0.02 mg, 1 mg/ 0.03 mg and 1 mg /0.035 mg | Estrostep 21 | |
| Norethindrone Acetate/ Ethinyl Estradiol and Ferrous Fumarate | Tablets | 1 mg/0.02 mg and 75 mg | Loestrin 24 Fe | 4/17/2006 |
| Norethindrone and Ethinyl Estradiol and Ferrous Fumarate | Chewable Tablets | 0.4 mg/0.035 mg | Ovcon-35 Fe | 4/27/2007 |
| Norgestimate/ Ethinyl Estradiol | Tablets | 0.18 mg /0.025 mg, 0.215 mg /0.025 mg and 0.25 mg /0.025 mg | Ortho Tri-Cyclen Lo, 28 day | |
| Norgestimate/ Ethinyl Estradiol | Tablets | 0.18 mg /0.035 mg, 0.215 mg /0.035 mg and 0.25 mg /0.035 mg | Ortho Tri-Cyclen, 21 and 28 day | |
| Nortriptyline Hydrochloride | Capsules | 10 mg, 25 mg, 50 mg and 75 | Pamelor | |

|  |  | mg |  |  |
| --- | --- | --- | --- | --- |
| Octreotide Acetate | Injection | 0.05 mg /mL, 0.1 mg /mL and 0.5 mg/mL, 1 mL vials | Sandostatin (Preservative-free) |  |
| Octreotide Acetate | Injection | 0.2 mg/mL and 1 mg /mL, 5 mL vials | Sandostatin |  |
| Ofloxacin | Otic Solution | 0.3% | Floxin |  |
| Olanzapine | Tablets | 2.5 mg, 5 mg, 7.5 mg, 10 mg and 15 mg | Zyprexa |  |
| Olanzapine | Tablets | 20 mg | Zyprexa |  |
| Olanzapine | Orally Disintegrating Tablets | 5 mg, 10 mg, 15 mg and 20 mg | Zyprexa Zydis |  |
| Olanzapine and Fluoxetine Hydrochloride | Capsules | 6 mg/25 mg, 12 mg/25 mg, 6 mg/50 mg and 12 mg/50 mg | Symbyax | 1/10/2005 |
| Olmesartan Medoxomil and Hydrochlorothiazide | Tablets | 20 mg/12.5 mg | Benicar HCT | 5/11/2007 |
| Omeprazole Magnesium | Delayed-release Capsules | 20 mg | Prilosec OTC | 3/19/2007 |
| Olmesartan Medoxomil | Tablets | 5 mg, 20 mg and 40 mg | Benicar | 4/25/2006 |
| Olmesartan Medoxomil and Hydrochlorothiazide | Tablets | 40 mg/12.5 mg and 40 mg/25 mg | Benicar HCT | 2/15/2007 |
| Olopatadine Hydrochloride | Ophthalmic Solution | 0.1% | Patanol | 7/17/2006 |
| Omeprazole | Delayed-release Capsules | 10 mg, 20 mg and 40 mg | Prilosec |  |
| Omeprazole and Sodium Bicarbonate | Capsules | 20 mg/1100 mg and 40 mg/1100 mg | Zegerid | 4/30/2007 |
| Ondansetron Hydrochloride | Injection | 2 mg/mL, 2 mL vials (Preservative-free) | Zofran |  |
| Ondansetron Hydrochloride | Injection | 2 mg/mL, 20 mL vials | Zofran |  |
| Ondansetron Hydrochloride | Injection | 0.64 mg/mL, 50 mL container (plastic) | Zofran in Plastic Container |  |
| Ondansetron Hydrochloride | Oral Solution | 4 mg/5 mL | Zofran | 12/20/2004 |

| Ondansetron Hydrochloride | Orally Disintegrating Tablets | 4 mg and 8 mg | Zofran ODT | |
| Ondansetron Hydrochloride | Tablets | 4 mg, 8 mg, 16 mg and 24 mg | Zofran | |
| Oxaliplatin | For Injection | 50 mg/vial and 100 mg/vial | Eloxatin | 2/9/2007 |
| Oxaliplatin | Injection | 5 mg/mL, 10 mL and 20 mL vials | Eloxatin | 2/9/2007 |
| Oxandrolone | Tablets | 2.5 mg and 10 mg | Oxandrin | 6/19/2006 |
| Oxazepam | Capsules | 10 mg, 15 mg and 30 mg | Serax | |
| Oxcarbazepine [1] | Tablets | 150 mg, 300 mg and 600 mg | Trileptal | 5/5/2006 |
| Oxcarbazepine | Oral Suspension | 300 mg/5 mL | Trileptal | 12/26/2006 |
| Oxybutynin Chloride | Extended-release Tablets | 5 mg, 10 mg and 15 mg | Ditropan XL | |
| Oxycodone | Extended-release Tablets | 10 mg, 20 mg, 40 mg, 80 mg and 160 mg | Oxycontin | |
| Oxycodone Hydrochloride | Extended-release Tablets | 15 mg | Oxycontin | 2/15/2007 |
| Oxycodone Hydrochloride | Extended-release Tablets | 30 mg and 60 mg | Oxycontin | 1/3/2007 |
| Paclitaxel | Injection | 6 mg/mL, 5 mL, 16.7 mL, 25 mL, 33.3 mL and 50 mL vials | Taxol | |
| Pamidronate Disodium | For Injection | 30 mg/vial, 60 mg/vial and 90 mg/vial | Aredia | |
| Pamidronate Disodium | Injection | 30 mg/vial, 60 mg/vial and 90 mg/vial | Aredia | |
| Pantoprazole Sodium | For Injection | 40 mg/vial | Prontonix IV | 4/7/2005 |
| Pantoprazole Sodium | Delayed-release Tablets | 20 mg and 40 mg | Protonix | 2/2/2004 |
| Paroxetine Hydrochloride | Capsules | 10 mg and 20 mg | Paxil | |
| Paroxetine Hydrochloride | Oral Suspension | 10 mg/5 mL | Paxil | 2/10/2005 |
| Paroxetine Hydrochloride | Tablets | 10 mg, 20 mg, 30 mg and 40 mg | Paxil | |

| Paroxetine Hydrochloride | Extended-release Tablets | 25 mg | Paxil CR | 9/9/2005 |
|---|---|---|---|---|
| Pergolide Mesylate | Tablets | 0.05 mg, 0.25 mg and 1 mg | Permax | |
| Perindopril Erbumine | Tablets | 2 mg, 4 mg and 8 mg | Aceon | 6/6/2006 |
| Pioglitazone Hydrochloride | Tablets | 15 mg, 30 mg and 45 mg | Actos | |
| Polyethylene Glycol 3350 | Powder for Oral Solution | 17g/Scoopful | Miralax | |
| Potassium Chloride | Extended-release Capsules | 8 mEq and 10 mEq | Micro K | |
| Potassium Chloride | Extended-release Tablets | 10 mEq and 20 mEq | K-Dur | |
| Pramipexole Dihydrochloride | Tablets | 0.25 mg | Mirapex | 5/27/2005 |
| Pramipexole Dihydrochloride | Tablets | 0.125 mg, 0.5 mg, 1 mg and 1.5 mg | Mirapex | 6/24/2005 |
| Pravastatin Sodium | Tablets | 10 mg, 20 mg, 40 mg and 80 mg | Pravachol | |
| Pravastatin Sodium | Tablets | 30 mg | Pravachol | 6/1/2005 |
| Prazosin Hydrochloride | Capsules | 1 mg, 2 mg and 5 mg | Minipress | |
| Prednisolone Sodium Phosphate | Oral Solution | 5 mg(base)/ 5 mL and 15 mg (base)/ 5 mL | Pediapred | |
| Propafenone | Extended-release Capsules | 325 mg | Rythmol SR | 11/07/2006 |
| Propafenone Hydrochloride | Extended-release Capsules | 225 mg and 425 mg | Rythmol SR | 10/11/2006 |
| Propofol | Injection | 10 mg/mL ; 20 mL, 50 mL and 100 mL vials and 20 mL syringe | Diprivan | |
| Propranolol Hydrochloride | Extended-release Capsules | 60 mg, 80 mg, 120 mg and 160 mg | Inderal LA | |
| Quetiapine Fumarate | Tablets | 25 mg | Seroquel | 8/12/2005 |
| Quetiapine Fumarate | Tablets | 50 mg, 150 mg and 400 mg | Seroquel | 2/12/2007 |
| Quetiapine Fumarate | Tablets | 100 mg, 200 mg and 300 mg | Seroquel | 2/21/2006 |
| Quinapril Hydrochloride | Tablets | 5 mg, 10 mg, 20 mg and 40 | Accupril | |

| | | mg | | |
|---|---|---|---|---|
| Quinapril Hydrochloride/ Hydrochlorothiazide | Tablets | 10 mg/12.5 mg, 20 mg/12.5 mg and 20mg/25 mg | Accuretic | |
| Rabeprazole Sodium | Delayed-release Tablets | 20 mg | Aciphex | |
| Raloxifene Hydrochloride | Tablets | 60 mg | Evista | |
| Ramipril | Capsules | 1.25 mg, 2.5 mg, 5 mg and 10 mg | Altace | |
| Ranitidine | Capsules | 150 mg and 300 mg | Zantac | |
| Ranitidine | Injection | 25 mg/mL, 2 mL and 6 mL and 40 mL vials | Zantac | |
| Ranitidine | Oral Solution | 15 mg/mL | Zantac | |
| Ranitidine | Tablets | 75 mg, 150 mg and 300 mg | Zantac | |
| Repaglinide | Tablets | 0.5 mg, 1 mg and 2 mg | Prandin | 2/10/2005 |
| Ribavirin | Capsules | 200 mg | Rebetol | |
| Risedronate Sodium | Tablets | 5 mg, 30 mg and 35 mg | Actonel | 4/23/2004 |
| Risperidone | Oral Solution | 1 mg/mL | Risperdal | |
| Risperidone | Tablets | 0.25 mg, 1 mg, 2 mg, 3 mg and 4 mg | Risperdal | |
| Risperidone [1] | Orally Disintegrating Tablets | 0.25 mg | Risperdal | 4/11/2005 |
| Risperidone | Orally Disintegrating Tablets | 0.5 mg, 1 mg and 2 mg | Risperdal | |
| Risperidone [1] | Orally Disintegrating Tablets | 3 mg and 4 mg | Risperdal | 3/23/2005 |
| Rivastigmine Tartrate | Capsules | 1.5 mg, 3 mg, 4.5 mg and 6 mg | Exelon | 4/21/2004 |
| Rivastigmine Tartrate | Oral Solution | 2 mg/mL | Exelon | 11/5/2004 |
| Rizatriptan Benzoate | Tablets | 5 mg and 10 mg | Maxalt | 9/2/2004 |
| Rizatriptan Benzoate | Orally Disintegrating Tablets | 5 mg and 10 mg | Maxalt-MLT | 2/17/2006 |
| Rofecoxib | Tablets | 12.5 mg, 25 | Vioxx | |

| | | mg and 50 mg | | |
|---|---|---|---|---|
| Ropinirole Hydrochloride | Tablets | 0.25 mg, 0.5 mg, 1 mg and 2 mg | Requip | 12/22/2004 |
| Ropinirole Hydrochloride | Tablets | 3 mg, 4 mg and 5 mg | Requip | 2/4/2005 |
| Ropivacaine Hydrochloride | Injection | 2 mg/mL, 5 mg/mL and 10 mg/mL, 20 mL, 30 mL and 20 mL vials | Naropin | 11/13/2006 |
| Rosiglitazone Maleate | Tablets | 2 mg, 4 mg and 8 mg | Avandia | |
| Rosiglitazone Maleate and Metformin Hydrochloride | Tablets | 1 mg/ 500 mg, 2 mg/ 500mg, 4 mg/ 500 mg, 2 mg/ 1000 mg and 4 mg/ 1000 mg | Avandamet | 10/22/2004 |
| Rosuvastatin Calcium | Tablets | 5 mg, 10 mg, 20 mg and 40 mg | Crestor | 8/13/2007 |
| Sertraline Hydrochloride | Oral Concentrate | 20 mg/mL | Zoloft | |
| Sertraline Hydrochloride | Tablets | 25 mg, 50 mg and 100 mg | Zoloft | |
| Sertraline Hydrochloride | Tablets | 150 mg and 200 mg | Zoloft | 11/9/2005 |
| Sevoflurane | Inhalation | 100%, 250 mL | Ultane | |
| Sildenafil Citrate | Tablets | 25 mg and 50 mg | Viagra | 11/19/2004 |
| Sildenafil Citrate | Tablets | 100 mg | Viagra | 10/25/2004 |
| Silver Sulfadiazine | Cream | 1% | Silvadene | |
| Simvastatin | Tablets | 5 mg, 10 mg, 20 mg, 40 mg and 80 mg | Zocor | |
| Sumatriptan Succinate | Injection | 6 mg/0.5 mL, 0.5 mL vials | Imitrex | 10/25/2004 |
| Sumatriptan Succinate | Injection | 6 mg/0.5 mL, 0.5 mL (prefilled syringes) | Imitrex | 5/9/2006 |
| Sumatriptan Succinate | Tablets | 25 mg, 50 mg and 100 mg | Imitrex | |
| Tamoxifen Citrate | Tablets | 10 mg and 20 mg | Nolvadex | |
| Tamsulosin Hydrochloride | Capsules | 0.4 mg | Flomax | 12/20/2004 |
| Telmisartan | Tablets | 20 mg, 40 mg | Micardis | 12/26/2006 |

| | | and 80 mg | | |
|---|---|---|---|---|
| Temazepam | Capsules | 7.5 mg | Restoril | 11/01/2006 |
| Temozolomide | Capsules | 5 mg, 20 mg, 100 mg, and 250 mg | Temodar | 3/20/2007 |
| Terazosin Hydrochloride | Capsules | 1 mg, 2 mg, 5 mg and 10 mg | Hytrin | |
| Terazosin Hydrochloride | Tablets | 1 mg, 2 mg, 5 mg and 10 mg | Hytrin | |
| Terbinafine Hydrochloride | Tablets | 250 mg | Lamisil | |
| Terfenadine | Tablets | 60 mg | Seldane | |
| Testosterone | Gel | 1% | Androgel | |
| Thalidomide | Capsules | 50 mg and 100 mg | Thalomid | 12/18/2006 |
| Thalidomide | Capsules | 200 mg | Thalomid | 9/25/2006 |
| Tiagabine Hydrochloride | Tablets | 2 mg and 4 mg | Gabitril | 2/1/2005 |
| Ticlopidine Hydrochloride | Tablets | 250 mg | Ticlid | |
| Timolol Maleate | Ophthalmic Solution | 0.25% and 0.5% | Timoptic | |
| Tizanidine Hydrochloride | Capsules | 2 mg, 4 mg and 6 mg | Zanaflex | 8/10/2007 |
| Tolterodine Tartrate | Extended-release Capsules | 2 mg and 4 mg | Detrol LA | 7/30/2007 |
| Tolterodine Tartrate | Tablets | 1 mg and 2 mg | Detrol | |
| Topiramate | Capsules | 15 mg and 25 mg | Topamax Sprinkle | 9/7/2005 |
| Topiramate | Tablets | 25 mg, 100 mg and 200 mg | Topamax | 12/26/2001 |
| Topiramate | Tablets | 50 mg | Topamax | 9/8/2005 |
| Torsemide | Tablets | 5 mg, 10 mg, 20 mg, and 100 mg | Demadex | |
| Tramadol Hydrochloride | Tablets | 50 mg | Ultram | |
| Tramadol Hydrochloride | Extended-release Tablets | 100 mg | Ultram ER | 1/8/2007 |
| Tramadol Hydrochloride | Extended-release Tablets | 200 mg | Ultram ER | 3/28/2007 |
| Tramadol Hydrochloride | Extended-release Tablets | 300 mg | Ultram ER | 9/25/2007 |
| Trandolapril | Tablets | 1 mg, 2 mg and 4 mg | Mavik | 10/4/2004 |
| Trandolapril/Verapamil Hydrochloride | Extended-release Tablets | 4 mg/ 240 mg | Tarka | 7/24/2007 |
| Trazodone Hydrochloride | Tablets | 150 mg | Desyrel | |
| Tretinoin | Cream | 0.025%, 0.05% and | Retin-A | |

| | | 0.1% | | |
|---|---|---|---|---|
| Tretinoin | Gel | 0.025% | Retin-A | |
| Triamcinolone Acetonide | Nasal Spray | 0.055 mg/Spray | Nasacort AQ | 12/29/2005 |
| Triamterene/ Hydrochlorothiazide | Tablets | 37.5 mg/25 mg and 75 mg/50 mg | Maxzide | |
| Valacyclovir Hydrochloride | Tablets | 500 mg and 1 g | Valtrex | |
| Valganciclovir Hydrochloride | Tablets | 450 mg | Valcyte | 12/27/2005 |
| Valsartan | Tablets | 40 mg, 80 mg, 160 mg and 320 mg | Diovan | 12/28/2004 |
| Valsartan and Hydrochlorothiazide | Tablets | 80 mg/12.5 mg, 160 mg/12.5 mg and 160 mg/25 mg | Diovan HCT | 12/2/2005 |
| Valsartan and Hydrochlorothiazide | Tablets | 320 mg/12.5 mg and 320 mg/25 mg | Diovan HCT | 2/7/2007 |
| Venlafaxine Hydrochloride | Extended-release Capsules | 37.5 mg, 75 mg and 150 mg | Effexor XR | |
| Venlafaxine Hydrochloride | Tablets | 25 mg, 37.5 mg, 50 mg, 75 mg and 100 mg | Effexor | 11/03/2005 |
| Venlafaxine Hydrochloride | Extended-release Tablets | 37.5 mg, 75 mg and 150 mg | Effexor XR | 5/3/2007 |
| Vecuronium Bromide | For Injection | 10 mg/vial and 20 mg/vial | Norcuron | |
| Verapamil Hydrochloride | Extended-release Capsules | 100 mg and 200 mg | Verelan PM | 7/20/2006 |
| Verapamil Hydrochloride | Extended-release Capsules | 120 mg, 180 mg and 240 mg | Verelan SR | |
| Verapamil Hydrochloride | Extended-release Tablets | 180 mg | Isoptin SR | |
| Verapamil Hydrochloride | Extended-release Tablets | 240 mg | Covera HS | |
| Verapamil Hydrochloride | Extended-release Capsules | 300 mg | Verelan PM | 5/19/2006 |
| Vincristine Sulfate | Injection | 1 mg/mL, 1 mL, 2 mL and 5 mL vials | Oncovin | |

| Zaleplon | Capsules | 5 mg and 10 mg | Sonata | 6/21/2005 |
|---|---|---|---|---|
| Zidovudine | Capsules | 100 mg | Retrovir | |
| Ziprasidone Hydrochloride | Capsules | 20 mg, 40 mg, 60 mg and 80 mg | Geodon | 2/7/2005 |
| Zolpidem Tartrate | Extended-release Tablets | 6.25 mg | Ambien CR | 2/24/2006 |
| Zolpidem Tartrate | Extended-release Tablets | 12.5 mg | Ambien CR | 1/19/2006 |

\* ANDA withdrawn

Footnote:
[1] Date of Submission has been updated.

⬆ Back to Top    ↖ Back to OGD

Date created: February 16, 2005; Last updated: November 16, 2007

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research

EXHIBIT 11



H.R. REP. 98-857(I)                                                          Page 1

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


**\*\*2647** P.L. 98-417, DRUG PRICE COMPETITION AND PATENT TERM
RESTORATION ACT
SEE PAGE 98 STAT. 1585
SENATE REPORT (JUDICIARY COMMITTEE) NO. 98-547, JUNE 26,
1984 (TO ACCOMPANY S. 1538)
HOUSE REPORT (ENERGY AND COMMERCE COMMITTEE) NO. 98-857(I),
JUNE 21, 1984 (TO ACCOMPANY H.R. 3605)
HOUSE REPORT (JUDICIARY COMMITTEE) NO. 98-857(II), AUG. 1,
1984 (TO ACCOMPANY H.R. 3605)
CONG. RECORD VOL. 130 (1984)
DATES OF CONSIDERATION AND PASSAGE
SENATE JUNE 29, AUGUST 10, SEPTEMBER 12, 1984
HOUSE SEPTEMBER 6, 1984
S. 1538 WAS PASSED IN LIEU OF THE HOUSE BILL AFTER AMENDING
ITS LANGUAGE TO CONTAIN THE TEXT OF THE HOUSE BILL.  THE
HOUSE REPORT (PART I, THIS PAGE, AND PART II, PAGE 2686)
AND A RELATED REPORT (PAGE 2721) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)


HOUSE REPORT NO. 98-857(I)
JUNE 21, 1984
**\*1** THE COMMITTEE ON ENERGY AND COMMERCE, TO WHOM WAS REFERRED THE BILL  (H.R.
3605) TO AMEND THE FEDERAL FOOD, DRUG, AND COSMETIC ACT TO AUTHORIZE AN
ABBREVIATED NEW DRUG APPLICATION UNDER SECTION 505 OF THAT ACT FOR GENERIC NEW
DRUGS EQUIVALENT TO APPROVED NEW DRUGS, HAVING CONSIDERED THE SAME, REPORT
FAVORABLY THEREON WITH AMENDMENTS AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.


\*          \*          \*          \*


**\*14** PURPOSE AND SUMMARY

TITLE I

THE PURPOSE OF TITLE I OF THE BILL IS TO MAKE AVAILABLE MORE LOW COST GENERIC
DRUGS BY ESTABLISHING A GENERIC DRUG APPROVAL PROCEDURE FOR PIONEER DRUGS FIRST
APPROVED AFTER 1962.  UNDER CURRENT LAW, THERE IS A GENERIC DRUG APPROVAL
PROCEDURE FOR PIONEER DRUGS APPROVED BEFORE 1962, BUT NOT FOR PIONEER DRUGS
APPROVED AFTER 1962.
TITLE I OF THE BILL GENERALLY EXTENDS THE PROCEDURES USED TO APPROVE GENERIC

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

COPIES OF PRE-62 DRUGS TO POST-62 DRUGS.  GENERIC COPIES **\*15 \*\*2648** OF ANY DRUGS
MAY BE APPROVED IF THE GENERIC IS THE SAME AS THE ORIGINAL DRUG OR SO SIMILAR THAT
FDA HAS DETERMINED THE DIFFERENCES DO NOT REQUIRE SAFETY AND EFFECTIVENESS
TESTING.
    TITLE I ALSO REQUIRES PATENT OWNERS TO SUBMIT INFORMATION TO FDA REGARDING
PRODUCE AND USE PATENTS THAT COVER APPROVED DRUGS.  GENERIC COPIES OF THESE DRUGS
MAY BE APPROVED WHEN THE PATENTS EXPIRE UNLESS THE GENERIC COMPANY CERTIFIES THAT
THE PATENT IS INVALID OR WILL NOT BE INFRINGED.  IN SUCH CASES, THE GENERIC
COMPANY MUST NOTIFY THE PATENT OWNER ABOUT ITS CERTIFICATION AND APPROVAL OF THE
GENERIC DRUG MAY NOT BE MADE EFFECTIVE UNTIL THE COURT DECIDES THE SUIT FOR PATENT
INFRINGEMENT OR A PERIOD OF 18 MONTHS, WHICHEVER OCCURS FIRST. NOTIFICATION MUST
BE GIVEN WHEN THE GENERIC HAS SUBMITTED AN ANDA WITH BIOEQUIVALENCE DATA.
    IN ADDITION, TITLE I AFFORDS FOUR YEARS OF EXCLUSIVE MARKET LIFE TO DRUGS WHICH
MAY NOT BE PATENTED AND WHICH ARE APPROVED FOR THE FIRST TIME AFTER ENACTMENT OF
THE BILL.  FURTHER, DRUGS WHICH WERE APPROVED FOR THE FIRST TIME BETWEEN 1982 AND
THE DATE OF ENACTMENT RECEIVED TEN YEARS OF EXCLUSIVE MARKET LIFE.

                                   TITLE II

    THE PURPOSE OF TITLE II OF THE BILL IS TO CREATE A NEW INCENTIVE FOR INCREASED
EXPENDITURES FOR RESEARCH AND DEVELOPMENT OF CERTAIN PRODUCTS WHICH ARE SUBJECT TO
PREMARKET GOVERNMENT APPROVAL.  THE INCENTIVE IS THE RESTORATION OF SOME OF THE
TIME LOST ON PATENT LIFE WHILE THE PRODUCT IS AWAITING PRE-MARKET APPROVAL.  UNDER
CURRENT LAW, A PATENT CONTINUES TO RUN WHILE THE MAKER OF THE PRODUCT IS TESTING
AND AWAITING APPROVAL TO MARKET IT.
    TITLE II OF H.R. 3605 PROVIDES FOR ONE EXTENSION OF THE EARLIEST PATENT ON
CERTAIN PRODUCTS SUBJECT TO PRE-MARKET APPROVAL.  THE EXTENSION WOULD BE FOR A
PERIOD EQUAL TO:  (1) HALF OF THE TIME REQUIRED TO TEST THE PRODUCT FOR SAFETY
(AND EFFECTIVENESS IN SOME CASES); AND (2) ALL OF THE TIME REQUIRED FOR THE AGENCY
TO APPROVE MARKETING OF THE PRODUCT.  THESE PRODUCTS INCLUDE: HUMAN DRUGS, ANIMAL
DRUGS, MEDICAL DEVICES, AND FOOD AND COLOR ADDITIVES.
    TITLE II PLACES SEVERAL LIMITS ON THE PERIOD OF PATENT EXTENSION. FIRST, THE
PERIOD OF EXTENSION MAY NOT EXCEED TWO YEARS FOR PRODUCTS EITHER CURRENTLY BEING
TESTED OR AWAITING APPROVAL.  FOR ALL OTHER PRODUCTS, THE PERIOD OF EXTENSION MAY
NOT EXCEED FIVE YEARS.  SECOND, THE PERIOD OF PATENT EXTENSION WHEN ADDED TO THE
PATENT TIME LEFT AFTER APPROVAL OF THE PRODUCT MAY NOT EXCEED FOURTEEN YEARS.
THIRD, ANY TIME THAT THE PRODUCT'S MANUFACTURER DID NOT ACT WITH DUE DILIGENCE
DURING THE REGULATORY REVIEW PERIOD WOULD BE SUBTRACTED.
    FINALLY, TITLE II PROVIDES THAT IT IS NOT AN ACT OF PATENT INFRINGEMENT FOR A
GENERIC DRUG MAKER TO IMPORT OR TO TEST A PATENTED DRUG IN PREPARATION FOR SEEKING
FDA APPROVAL IF MARKETING OF THE DRUG WOULD OCCUR AFTER EXPIRATION OF THE PATENT.

                                   HEARINGS

    THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT HELD ONE DAY OF
HEARINGS ON H.R. 3605, THE DRUG PRICE COMPETITION ACT, ON JULY 15, 1983. TESTIMONY
WAS RECEIVED FROM 15 WITNESSES, **\*16 \*\*2649** REPRESENTING NINE ORGANIZATIONS, WITH

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                        Page 3

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


ADDITIONAL MATERIAL SUBMITTED BY TWO INDIVIDUALS AND ORGANIZATIONS.

COMMITTEE CONSIDERATION

   ON AUGUST 2, 1983, THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT
MET IN OPEN SESSION AND ORDERED FAVORABLY REPORTED H.R. 3605 WITHOUT AMENDMENT BY
VOICE VOTE.  ON JUNE 12, 1984, THE COMMITTEE MET IN OPEN SESSION ON H.R. 3605,
AMENDED THE BILL, AND ORDERED IT FAVORABLY REPORTED BY A VOICE VOTE. THE TITLE OF
THE BILL, AS AMENDED, IS THE 'DRUG PRICE COMPETITION AND PATENT TERM RESTORATION
ACT OF 1984.'

BACKGROUND AND NEED FOR THE LEGISLATION

TITLE I-- ABBREVIATED NEW DRUG APPLICATIONS

   PRIOR TO 1962, THE FEDERAL FOOD, DRUG AND COSMETIC ACT (FFDCA) REQUIRED THAT ALL
DRUGS BE APPROVED AS SAFE BEFORE THEY COULD BE MARKETED.  THE 1962 AMENDMENTS
REQUIRED THAT ALL NEW DRUGS, GENERIC AND PIONEER, MUST BE APPROVED AS SAFE AND
EFFECTIVE PRIOR TO MARKETING.
   AS A RESULT OF THE 1962 AMENDMENTS, FDA DID TWO THINGS REGARDING PRE-1962 DRUGS.
FIRST, THE AGENCY CREATED THE DRUG EFFICACY STUDY (DESI) TO DETERMINE IF ALL
PRE-1962 DRUGS WERE EFFECTIVE.  SECOND, FDA ESTABLISHED A POLICY PERMITTING THE
APPROVAL OF A GENERIC DRUG EQUIVALENT TO A SAFE AND EFFECTIVE PRE-1962 PIONEER
DRUG.
   AS A RESULT OF THE 1962 AMENDMENTS, THE MANUFACTURER OF A PIONEER DRUG MUST
CONDUCT TESTS ON HUMANS THAT SHOW THE PRODUCT TO BE SAFE AND EFFECTIVE AND SUBMIT
THE RESULTS IN A NEW DRUG APPLICATION (NDA).  A MANUFACTURER OF A GENERIC DRUG
MUST CONDUCT TESTS THAT SHOW THE GENERIC DRUG IS THE SAME AS THE PIONEER DRUG AND
THAT IT WILL BE PROPERLY MANUFACTURED AND LABELED.  THIS INFORMATION IS SUBMITTED
IN AN ABBREVIATED NEW DRUG APPLICATION (ANDA).
   THE ONLY DIFFERENCE BETWEEN A NDA AND AN ANDA IS THAT THE GENERIC MANUFACTURER
IS NOT REQUIRED TO CONDUCT HUMAN CLINICAL TRIALS.  FDA CONSIDERS SUCH RETESTING TO
BE UNNECESSARY AND WASTEFUL BECAUSE THE DRUG HAS ALREADY BEEN DETERMINED TO BE
SAFE AND EFFECTIVE.  MOREOVER, SUCH RETESTING IS UNETHICAL BECAUSE IT REQUIRES
THAT SOME SICK PATIENTS TAKE PLACEBOS AND BE DENIED TREATMENT KNOWN TO BE
EFFECTIVE.
   THE FDA ALLOWS THIS ANDA PROCEDURE ONLY FOR PIONEER DRUGS APPROVED BEFORE 1962.
THERE IS NO ANDA PROCEDURE FOR APPROVING GENERIC EQUIVALENTS OF PIONEER DRUGS
APPROVED AFTER 1962.  WHILE THE FDA HAS BEEN CONSIDERING SINCE 1978 AN EXTENSION
OF THE PRE-1962 ANDA POLICY TO POST-1962 DRUGS, IT HAS NOT EXTENDED THE
REGULATION.  BECAUSE OF THE AGENCY'S FAILURE TO ACT, TITLE I OF H.R. 3605 IS
NECESSARY TO ESTABLISH A POST-1962 ANDA POLICY.
   SOME HAVE SUGGESTED THAT 'PAPER NDAS' BE USED TO APPROVE GENERIC EQUIVALENTS OF
PIONEER DRUGS APPROVED AFTER 1962.  UNDER THE PAPER NDA PROCEDURE, THE GENERIC
MANUFACTURER MAY SUBMIT SCIENTIFIC REPORTS, INSTEAD OF CLINICAL TRIALS, TO SUPPORT
FINDINGS OF SAFETY AND EFFICACY.  THIS PROCEDURE IS INADEQUATE, HOWEVER, BECAUSE
FDA ESTIMATES THAT SATISFACTORY REPORTS ARE NOT AVAILABLE FOR 85 PERCENT OF ALL

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


POST-1962 DRUGS.
  **\*17 \*\*2650** CURRENTLY, THERE ARE APPROXIMATELY 150 DRUGS APPROVED AFTER 1962 THAT
ARE OFF PATENT AND FOR WHICH THERE IS NO GENERIC EQUIVALENT.  ALL OF THESE DRUGS
COULD BE APPROVED IN GENERIC FORM IF THERE WAS A PROCEDURE.  EACH YEAR, MORE
PIONEER DRUGS GO OFF PATENT AND BECOME AVAILABLE FOR APPROVAL AS GENERICS.
  AMONG THE DRUGS AVAILABLE OR SOON TO BE AVAILABLE FOR GENERIC APPROVAL ARE FIVE
BEST SELLERS:  VALIUM, MOTRIN, INDERAL, DYAZIDE, AND LASIX.  DYAZIDE, FOR EXAMPLE,
IS THE MOST WIDELY USED DIURETIC FOR THE TREATMENT OF HIGH BLOOD PRESSURE.  ITS
PATENT EXPIRED IN 1981.  VALIUM IS A POPULAR TRANQUILIZER WHOSE PATENT EXPIRES IN
1985.  ANOTHER DRUG WHOSE PATENT HAS EXPIRED IS INDOCIN, AN ANTI-INFLAMMATORY DRUG
USED IN THE TREATMENT OF ARTHRITIS THAT IS THE TENTH HIGHEST SELLING DRUG IN THE
UNITED STATES.
  THE AVAILABILITY OF GENERIC VERSIONS OF PIONEER DRUGS APPROVED AFTER 1962 WOULD
SAVE AMERICAN CONSUMERS $920 MILLION OVER THE NEXT 12 YEARS.  OLDER AMERICANS, IN
PARTICULAR, WOULD BENEFIT BECAUSE THEY USE ALMOST 25 PERCENT OF ALL PRESCRIPTION
DRUGS.
  MOREOVER, THE LACK OF GENERICS FOR POST-1962 PIONEER DRUGS WILL COST FEDERAL AND
STATE GOVERNMENTS MILLIONS OF DOLLARS.  FOR THE DRUG METRONIDAZOLE, PURCHASED BY
THE DEPARTMENT OF DEFENSE, THE TAXPAYERS SAVED APPROXIMATELY $1.2 MILLION IN ONE
YEAR AS A RESULT OF THE AVAILABILITY OF A LOWER PRICED GENERIC VERSION.  FEDERAL
AND STATE GOVERNMENTS WILL BE DENIED COMPARABLE SAVINGS ON DRUGS APPROVED AFTER
1962 BECAUSE OF THE LACK OF AN APPROVAL PROCEDURE.

                     TITLE II-- PATENT TERM RESTORATION

  PATENTS ARE DESIGNED TO PROMOTE INNOVATION BY PROVIDING THE RIGHT TO EXCLUDE
OTHERS FROM MAKING, USING, OR SELLING AN INVENTION.  THEY ENABLE INNOVATORS TO
OBTAIN GREATER PROFITS THAN COULD HAVE BEEN OBTAINED IF DIRECT COMPETITION
EXISTED.  THESE PROFITS ACT AS INCENTIVES FOR INNOVATIVE ACTIVITIES.
  ALTHOUGH THE PATENT TERM IN THE UNITED STATES IS 17 YEARS, THE PERIOD DURING THE
PATENT TERM IN WHICH PRODUCTS ARE MARKETED (THE EFFECTIVE PATENT TERM) IS USUALLY
LESS THAN 17 YEARS BECAUSE PATENTS OFTEN ARE OBTAINED BEFORE PRODUCTS ARE READY TO
BE MARKETED.
  EFFECTIVE PATENT TERMS ARE INFLUENCED BY MANY FACTORS, INCLUDING FEDERAL
PREMARKETING AND PREMANUFACTURING REGULATIONS.  THE PRODUCTS COVERED BY THESE
REGULATIONS INCLUDE PHARMACEUTICALS, MEDICAL DEVICES, FOOD ADDITIVES, AND COLOR
ADDITIVES.  PHARMACEUTICALS FOR INSTANCE CANNOT BE MARKETED IN THE UNITED STATES
UNTIL THEY HAVE BEEN APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA).  TO
OBTAIN SUCH APPROVAL, DRUGS MUST UNDERGO EXTENSIVE TESTING TO PROVE THEY ARE BOTH
SAFE AND EFFECTIVE.  ALL THESE PRODUCTS ARE SUBJECT TO DIFFERENT REGULATIONS THAT
HAVE HAD VARYING IMPACTS ON EFFECTIVE PATENT TERMS.
  IN TESTIMONY BEFORE SEVERAL CONGRESSIONAL COMMITTEES, REPRESENTATIVES FROM THE
PHARMACEUTICAL FIRMS THAT ARE HEAVILY INVOLVED IN BASIC RESEARCH AND RELY UPON
PATENTS, CLAIMED THAT THE AVERAGE EFFECTIVE PATENT TERM OF DRUGS HAS DECLINED.
THEY ARGUED THAT A CONTINUATION OF THE DECLINE WOULD RESULT IN DECREASED
EXPENDITURES FOR RESEARCH AND DEVELOPMENT AND, EVENTUALLY, IN A DECLINE IN THE
INTRODUCTION OF NEW DRUGS.

          © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

**\*18 \*\*2651** AS COMPENSATION FOR THE LOSS OF PATENT TERM DUE TO GOVERNMENT REVIEW,
THE RESEARCH INTENSIVE FIRMS ARGUED FOR PATENT TERM EXTENSION LEGISLATION.  THEY
STATED THAT THE LEGISLATION WOULD CREATE A SIGNIFICANT, NEW INCENTIVE WHICH WOULD
RESULT IN INCREASED EXPENDITURES FOR RESEARCH AND DEVELOPMENT, AND ULTIMATELY IN
MORE INNOVATIVE DRUGS.

### COMMITTEE OVERSIGHT FINDINGS

PURSUANT TO CLAUSE 2(1)(3)(A) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE REPORTS THAT OVERSIGHT OF THE FOOD AND DRUG
ADMINISTRATION AND THE FEDERAL FOOD, DRUG, AND COSMETIC ACT WAS CONDUCTED BY THE
SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT.  A HEARING WAS HELD ON JULY 15, 1983.
THE FINDINGS OF THE COMMITTEE'S OVERSIGHT ACTIVITIES HAVE BEEN INCORPORATED INTO
THE LEGISLATION AND ARE DISCUSSED IN THOSE PORTIONS OF THIS REPORT ENTITLED
'BACKGROUND AND NEED FOR THE LEGISLATION' AND 'SECTION-BY-SECTION ANALYSIS.'

### COMMITTEE ON GOVERNMENT OPERATIONS

PURSUANT TO CLAUSE 2(1)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, NO OVERSIGHT FINDINGS HAVE BEEN SUBMITTED TO THE COMMITTEE BY THE
COMMITTEE ON GOVERNMENT OPERATIONS.

### COMMITTEE COST ESTIMATE

IN COMPLIANCE WITH CLAUSE 7(A) OF RULE XIII OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE BELIEVES THAT THE COSTS, IF ANY, INCURRED IN
CARRYING OUT H.R. 3605 WILL BE OFFSET BY SAVINGS TO THE FEDERAL GOVERNMENT. IN
TESTIFYING BEFORE THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT,
OFFICIALS FROM THE FOOD AND DRUG ADMINISTRATION ESTIMATED THAT ANY GREATER
WORKLOAD RESULTING FROM THE APPROVAL OF GENERIC DRUGS UNDER TITLE I WOULD BE
ABSORBED INITIALLY.  LATER, THE OFFICIALS ESTIMATED, SOME ADDITIONAL STAFF MIGHT
BE REQUIRED TO PROCESS GENERIC DRUG APPLICATIONS.  THIS ADDITIONAL STAFF COULD
COST UP TO $1.1 MILLION.  THE ACTUAL COST TO THE FEDERAL GOVERNMENT CANNOT BE
ESTIMATED BECAUSE IT IS UNKNOWN HOW MUCH ADDITIONAL STAFF, IF ANY, MIGHT BE HIRED.
ENACTMENT OF THE LEGISLATION, HOWEVER, WILL RESULT IN SIGNIFICANT COST SAVINGS
TO THE FEDERAL GOVERNMENT.  UNLIKE THE COSTS OF H.R. 3605, THESE SAVINGS ARE
CERTAIN.  THE FEDERAL GOVERNMENT SPENT ABOUT $2.4 BILLION FOR DRUGS IN 1983.  MANY
OF THESE DRUGS WILL BE AVAILABLE AS LOW COST GENERIC AFTER ENACTMENT OF H.R. 3605.
FOR EXAMPLE, THE DEPARTMENT OF DEFENSE SAVED APPROXIMATELY $1.2 MILLION IN ONE
YEAR WHEN A LOWER PRICED GENERIC VERSION OF METRONIDAZOLE BECAME AVAILABLE.

### CONGRESSIONAL BUDGET OFFICE ESTIMATE

PURSUANT TO CLAUSES 2(1)(3)(B) AND (C) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE SETS FORTH THE FOLLOWING LETTER AND COST ESTIMATE
PREPARED BY THE CONGRESSIONAL BUDGET OFFICE WITH RESPECT TO THE REPORTED BILL:
**\*19 \*\*2652** U.S. CONGRESS,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                                    Page 6

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

        CONGRESSIONAL BUDGET OFFICE,
        WASHINGTON, DC, JUNE 19, 1984
        HON. JOHN D. DINGELL,
        CHAIRMAN, COMMITTEE ON ENERGY AND COMMERCE,
        HOUSE OF REPRESENTATIVES, WASHINGTON, DC.
        DEAR MR. CHAIRMAN: THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED H.R. 3605, THE
DRUG PRICE COMPETITION AND PATENT TERM RESTORATION ACT OF 1984, AS ORDERED
REPORTED BY THE HOUSE COMMITTEE ON ENERGY AND COMMERCE ON JUNE 12, 1984.
        TITLE I OF THIS BILL WOULD ALLOW DRUG MANUFACTURERS TO USE AN ABBREVIATED NEW
DRUG APPLICATION (ANDA) WHEN SEEKING APPROVAL TO MAKE GENERIC COPIES OF DRUGS THAT
WERE APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA) AFTER 1962.  AN ESTIMATED
150 DRUG PRODUCTS APPROVED AFTER 1962 ARE CURRENTLY OFF PATENT AND WOULD BECOME
AVAILABLE FOR GENERIC COPY USING THE ANDA PROCEDURE PROPOSED IN THIS BILL.
        THE FDA ESTIMATES THAT THE ENACTMENT OF H.R. 3605 WOULD AT LEAST TRIPLE THE
WORKLOAD OF THE DIVISION RESPONSIBLE FOR APPROVING ANDAS. CURRENTLY, THIS DIVISION
REVIEWS ANDAS FOR GENERIC COPIES OF PRE-1962 APPROVED DRUG PRODUCTS. THE WORKLOAD
WOULD INCREASE AS SEVERAL MANUFACTURERS FILE AN ANDA FOR EACH DRUG PRODUCT THAT
BECOMES AVAILABLE FOR GENERIC COPY. BECAUSE THEY WOULD BE REVIEWING INFORMATION
ON NEW DRUGS, THE FDA BELIEVES IT WOULD TAKE THEM A YEAR TO PROCESS EACH OF THE
NEW APPLICATIONS.  THIS IS ABOUT THREE MONTHS LONGER ON AVERAGE THAN IT CURRENTLY
TAKES TO PROCESS A PRE-1962 ANDA.  DR. MARVIN SEIFE, DIRECTOR OF FDA'S DIVISION OF
GENERIC DRUG MONOGRAPHS, TESTIFIED BEFORE THE SUBCOMMITTEE ON HEALTH AND THE
ENVIRONMENT THAT A GREATER WORKLOAD COULD AT FIRST BE ABSORBED, BUT MAY LATER
REQUIRE ADDITIONAL OFFICE SPACE AND 15 NEW FDA EMPLOYEES.  ASSUMING AN AVERAGE
FULL-TIME EQUIVALENT POSITION PLUS OVERHEAD AND FRINGE BENEFITS IS $70,000, THE
POTENTIAL COST TO THE FDA OF IMPLEMENTING THIS LEGISLATION COULD BE ABOUT $1.1
MILLION.  THE ACTUAL COST TO THE FEDERAL GOVERNMENT WOULD DEPEND ON THE EXTENT TO
WHICH THE FDA WOULD EXPAND TO ACCOMMODATE THE INCREASED WORKLOAD.
        ENACTMENT OF THIS LEGISLATION COULD ALSO RESULT IN SAVINGS TO BOTH THE FEDERAL
AND STATE AND LOCAL GOVERNMENTS.  IN FISCAL YEAR 1983, THE FEDERAL GOVERNMENT
SPENT APPROXIMATELY $2.4 BILLION FOR DRUGS IN THE MEDICAID PROGRAM, AND IN VETERAN
AND MILITARY HOSPITALS.  DATA ON DRUG COSTS IN THE MEDICARE PROGRAM ARE
UNAVAILABLE.  IF THE FEDERAL GOVERNMENT IS CURRENTLY PURCHASING THESE 150 COPIABLE
DRUG PRODUCTS AT HIGHER, BRAND NAME PRICES, SAVINGS MAY RESULT IF LOWER PRICED,
GENERIC COPIES OF THESE DRUGS ARE SUBSTITUTED.
        IT IS DIFFICULT TO KNOW IN ADVANCE WHICH OF THE AVAILABLE 150 DRUG PRODUCTS
MANUFACTURERS WOULD CHOOSE TO COPY.  IT IS ALSO DIFFICULT TO ESTIMATE THE PRICE AT
WHICH THESE GENERIC COPIES WOULD BE SOLD. GENERIC VERSIONS OF TEN POPULAR DRUG
PRODUCTS SHOW THEIR PRICE TO BE ON AVERAGE 50 PERCENT LESS THAN THEIR BRAND NAME
EQUIVALENT.  THE DOLLAR AMOUNT OF THE FEDERAL GOVERNMENT CURRENTLY SPENT ON THESE
150 BRAND NAME DRUG PRODUCTS IS UNKNOWN.
        TITLE II OF THIS BILL WOULD EXTEND THE AMOUNT OF TIME FOR WHICH CERTAIN PATENTS
ARE ISSUED TO INCLUDE SOME OR ALL OF THE TIME REQUIRED**2653 *20 FOR A
MANUFACTURER TO TEST A PRODUCT FOR SAFETY AND EFFICACY AND TO RECEIVE MARKETING
APPROVAL.  PRODUCTS AFFECTED BY THIS LEGISLATION WOULD BE DRUGS, MEDICAL DEVICES,
AND FOOD AND COLOR ADDITIVES.  MANUFACTURERS MUST SHOW DUE DILIGENCE IN THEIR
PRODUCT TESTING OR THIS AMOUNT OF TIME WILL BE SUBTRACTED FROM THE TOTAL LIFE OF

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


THE PATENT.  THIS PROVISION WOULD PLACE AN ADDITIONAL BURDEN ON THE FDA.  THEY
WOULD BE RESPONSIBLE FOR KEEPING TRACK OF A MANUFACTURER'S PRODUCT TESTING TIME
AND FOR DETERMINING THEIR DILIGENCE IN COMPLETING THE TESTING.  THESE COSTS,
HOWEVER, WOULD BE NEGLIGIBLE.
   ENACTMENT OF THIS BILL COULD RESULT IN INCREASED PERSONNEL COSTS TO THE FEDERAL
GOVERNMENT OF APPROXIMATELY $1.1 MILLION.  THE BILL, HOWEVER, DOES NOT
SPECIFICALLY AUTHORIZE ADDITIONAL APPROPRIATIONS FOR THE FDA.  THIS BILL MAY ALSO
RESULT IN SAVINGS IF CHEAPER, GENERIC DRUGS ARE MADE AVAILABLE FOR PURCHASE BY THE
FEDERAL GOVERNMENT.  THESE SAVINGS WOULD OCCUR IN VARIOUS PROGRAMS THROUGHOUT THE
BUDGET SUCH AS MEDICARE, MEDICAID, AND THE VETERANS ADMINISTRATION.  HOWEVER, THE
MAGNITUDE OF THESE SAVINGS IS UNKNOWN.
   PLEASE CALL ME IF I CAN BE OF ADDITIONAL ASSISTANCE, OR YOUR STAFF MAY WISH TO
CONTACT CARMELA PENA (226-2820) OF OUR BUDGET ANALYSIS DIVISION FOR FURTHER
DETAILS ON THIS ESTIMATE.
   SINCERELY,
   ERIC HANUSHEK
   (FOR RUDOLPH G. PENNER, DIRECTOR).

                    INFLATIONARY IMPACT STATEMENT

   PURSUANT TO CLAUSE 2(1)(4) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE MAKES THE FOLLOWING STATEMENT WITH REGARD TO THE
INFLATIONARY IMPACT OF THE REPORTED BILL:
   THE COMMITTEE BELIEVES THAT ENACTMENT OF H.R. 3605 WILL NOT HAVE AN INFLATIONARY
IMPACT UPON THE ECONOMY.  IN FACT, TITLE I OF THE BILL WILL HAVE A DEFLATIONARY
EFFECT BECAUSE IT MAKES AVAILABLE LOWER PRICED GENERIC VERSIONS OF DRUGS.  SUCH
GENERIC DRUGS ARE THREE TO FIFTEEN TIMES LESS COSTLY THAN THEIR BRAND NAME
COUNTER-PARTS.  THE ESTIMATED $1 BILLION COST SAVINGS TO CONSUMERS AS A RESULT OF
TITLE I'S GENERIC DRUG APPROVAL PROCEDURE WILL HAVE A DEFLATIONARY EFFECT UPON THE
NATIONAL ECONOMY.  WHILE TITLE II OF THE BILL PROVIDES FOR A LIMITED EXTENSION OF
THE PATENTS ON CERTAIN PRODUCTS, THE COMMITTEE BELIEVES THAT THE ADDITIONAL PATENT
TERM WILL ACT AS A SPUR TO DEVELOP INNOVATIVE AND, ULTIMATELY, LESS COSTLY
TREATMENTS FOR DISEASES.

                    SECTION-BY-SECTION ANALYSIS

                TITLE I-- DRUG PRICE COMPETITION ACT

                           SECTION 101

   SECTION 101 AMENDS SECTION 505 OF THE FEDERAL FOOD, DRUG AND COSMETIC ACT
(FFDCA) [FN1]  TO ESTABLISH A NEW SUBSECTION (J) PROVIDING FOR THE APPROVAL OF
ABBREVIATED NEW DRUG APPLICATIONS (ANDA).  PAR GRAPH (1) OF SECTION (J) SETS FORTH
THE INFORMATION WHICH MUST BE INCLUDED IN AN ANDA.


        **21 **2654 ANDA'S FOR DRUGS WHICH ARE THE SAME


© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

   IN THE CASE OF DRUGS WHICH ARE THE SAME AS THE LISTED DRUG, THE FOCUS OF THE
BILL IS TO PROVIDE THE FOOD AND DRUG ADMINISTRATION (FDA) WITH SUFFICIENT
INFORMATION TO ASSURE THAT THE GENERIC DRUG IS THE SAME AS THE LISTED DRUG [FN2]
THAT HAS PREVIOUSLY BEEN DETERMINED TO BE SAFE AND EFFECTIVE.  SOME HAVE SUGGESTED
THAT A GENERIC DRUG MUST BE IDENTICAL IN ALL RESPECTS TO THE LISTED DRUG INSTEAD
OF THE SAME.  THE REGULATIONS THAT PERMIT ANDA'S FOR PRE-1962 PIONEER DRUGS MAKE
NO SUCH DISTINCTION.  [FN3]  IN REJECTING THE USE OF THE TERM IDENTICAL, THE FDA
REGULATION COMMENTS THAT 'IDENTICAL MEANS A PRODUCT THAT IS THE SAME IN DOSAGE
FORM, STRENGTH, AND ROUTE OF ADMINISTRATION, CONTAINS THE SAME ACTIVE INGREDIENT,
AND IS RECOMMENDED FOR USE UNDER THE SAME CONDITIONS OF USE.'  [FN4]  THE
COMMITTEE HAS ADOPTED THE FDA'S POLICY OF UTILIZING THE TERM 'SAME' EXCEPT THAT
THE BILL PERMITS AN ANDA TO BE APPROVED FOR LESS THAN ALL OF THE INDICATIONS FOR
WHICH THE LISTED DRUG HAS BEEN APPROVED AS EXPLAINED BELOW.
   FIRST, AN ANDA MUST INCLUDE SUFFICIENT INFORMATION TO SHOW THAT THE CONDITIONS
OF USE FOR WHICH THE APPLICANT IS SEEKING APPROVAL ARE THE SAME AS THOSE THAT HAVE
BEEN PREVIOUSLY APPROVED FOR THE LISTED DRUG.  THE APPLICANT NEED NOT SEEK APPROVAL
FOR ALL OF THE INDICATIONS FOR WHICH THE LISTED DRUG HAS BEEN APPROVED.  FOR
EXAMPLE, IF THE LISTED DRUG HAS BEEN APPROVED FOR HYPERTENSION AND ANGINA
PECTORIS, AND IF THE INDICATION FOR HYPERTENSION IS PROTECTED BY PATENT, THEN THE
APPLICANT COULD SEEK APPROVAL FOR ONLY THE ANGINA PECTORIS INDICATION.
   WHILE THE FDA'S CURRENT REGULATIONS FOR CONSIDERING ANDA'S FOR PIONEER DRUGS
APPROVED BEFORE 1962 PERMIT AN APPLICANT TO PETITION FOR APPROVAL FOR AN
INDICATION OTHER THAN THAT WHICH HAS BEEN APPROVED FOR THE PIONEER DRUG, SECTION
101 OF THE BILL OVERTURNS THAT POLICY.  [FN5]  THUS, AN ANDA MAY NOT BE CONSIDERED
FOR A CONDITION OF USE THAT HAS NOT BEEN PREVIOUSLY APPROVED FOR THE LISTED DRUG.
   AN ANDA MUST ALSO CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ACTIVE
INGREDIENTS OF THE GENERIC DRUG ARE THE SAME AS THOSE OF THE LISTED DRUG.  IF THE
LISTED DRUG HAS ONE ACTIVE INGREDIENT, THEN THE ACTIVE INGREDIENT OF THE GENERIC
MUST BE THE SAME.  IF THE LISTED DRUG HAS MORE THAN ONE ACTIVE INGREDIENT, THEN
SUFFICIENT INFORMATION MUST BE INCLUDED TO SHOW THAT ALL OF THE ACTIVE INGREDIENTS
IN THE GENERIC DRUG ARE THE SAME.
   IN ADDITION, AN ANDA MUST CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ROUTE
OF ADMINISTRATION, THE DOSAGE FORM AND THE STRENGTH OF THE GENERIC DRUG ARE THE
SAME AS THOSE OF THE LISTED DRUG.
   FURTHER, AN ANDA MUST INCLUDE SUFFICIENT INFORMATION TO SHOW THAT THE GENERIC
DRUG IS BIOEQUIVALENT TO THE LISTED DRUG.
   **\*22 \*\*2655** FIFTH, AN ANDA MUST CONTAIN ADEQUATE INFORMATION TO SHOW THAT THE
PROPOSED LABELING FOR THE GENERIC DRUG IS THE SAME AS THAT OF THE LISTED DRUG.
THE COMMITTEE RECOGNIZES THAT THE PROPOSED LABELING FOR THE GENERIC DRUG MAY NOT
BE EXACTLY THE SAME.  FOR EXAMPLE, THE NAME AND ADDRESS OF THE MANUFACTURERS WOULD
VARY AS MIGHT THE EXPIRATION DATES FOR THE TWO PRODUCTS.  ANOTHER EXAMPLE IS THAT
ONE COLOR IS USED IN THE COATING OF THE LISTED DRUG AND ANOTHER COLOR IS USED IN
THAT OF THE GENERIC DRUG.  THE FDA MIGHT REQUIRE THE LISTED DRUG MAKER TO SPECIFY
THE COLOR IN ITS LABEL.  THE GENERIC MANUFACTURER, WHICH HAS USED A DIFFERENT
COLOR, WOULD HAVE TO SPECIFY A DIFFERENT COLOR IN ITS LABEL.
   SIXTH, AN ANDA MUST INCLUDE A LIST OF ALL THE COMPONENTS OF THE GENERIC DRUG, A
DESCRIPTION OF THE COMPOSITION OF THE GENERIC DRUG, A DESCRIPTION OF THE METHODS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.A.N. 2647)**

AND CONTROLS USED IN THE MANUFACTURE, PROCESSING AND PACKING OF THE GENERIC DRUG,
SAMPLES OF THE GENERIC DRUG AND ITS COMPONENTS, AND SPECIMENS OF THE PROPOSED
LABELING.
   SEVENTH, AN ANDA MUST INCLUDE A CERTIFICATION BY THE APPLICANT REGARDING THE
STATUS OF CERTAIN PATENTS APPLICABLE TO THE LISTED DRUG IF THE PATENT INFORMATION
HAS BEEN SUBMITTED UNDER SECTION 505(B) OR (C).  WITH RESPECT TO ALL PRODUCT
PATENTS WHICH CLAIM THE LISTED DRUG AND ALL USE PATENTS WHICH CLAIM AN INDICATION
FOR THE DRUG FOR WHICH THE APPLICANT IS SEEKING APPROVAL (HEREAFTER DESCRIBED AS A
CONTROLLING USE PATENT), THE APPLICANT MUST CERTIFY, IN HIS OPINION AND TO THE
BEST OF HIS KNOWLEDGE, AS TO ONE OF FOUR CIRCUMSTANCES.
   THE APPLICANT MAY CERTIFY THAT THE PATENT INFORMATION REQUIRED UNDER  SECTIONS
505(B) AND (C) HAS NOT BEEN SUBMITTED IF THAT IS THE CASE.  IF APPROPRIATE, THE
APPLICANT MAY CERTIFY THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS
PROVIDED HAVE EXPIRED.  THIRD, THE APPLICANT MAY CERTIFY WHEN APPROPRIATE THAT ONE
OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS WILL EXPIRE AT SOME SPECIFIED
DATE IN THE FUTURE.  WHEN THE APPLICANT MAKES THESE CERTIFICATIONS, IT MUST RELY
UPON THE PATENT INFORMATION SUPPLIED TO THE FDA.  LAST, AN APPLICANT MAY CERTIFY
IF APPLICABLE THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS ARE
INVALID OR WILL NOT BE INFRINGED.
   THE COMMITTEE RECOGNIZES THAT IN SOME INSTANCES AN APPLICANT WILL HAVE TO MAKE
MULTIPLE CERTIFICATIONS WITH RESPECT TO PRODUCT OR CONTROLLING USE PATENTS.  FOR
EXAMPLE, IF THE PRODUCT PATENT HAS EXPIRED AND A VALID CONTROLLING USE PATENT WILL
NOT EXPIRE FOR THREE YEARS, THEN THE APPLICANT MUST CERTIFY THAT ONE PATENT HAS
EXPIRED AND THE OTHER WILL EXPIRE IN THREE YEARS. THE COMMITTEE INTENDS THAT THE
APPLICANT MAKE THE APPROPRIATE CERTIFICATION FOR EACH PRODUCT AND CONTROLLING USE
PATENT.
   EIGHTH, IF THERE ARE INDICATIONS WHICH ARE CLAIMED BY ANY USE PATENT AND FOR
WHICH THE APPLICANT IS NOT SEEKING APPROVAL, THEN AN ANDA MUST STATE THAT THE
APPLICANT IS NOT SEEKING APPROVAL FOR THOSE INDICATIONS WHICH ARE CLAIMED BY SUCH
USE PATENT.  FOR EXAMPLE, THE LISTED DRUG MAY BE APPROVED FOR TWO INDICATIONS.  IF
THE APPLICANT IS SEEKING APPROVAL ONLY FOR INDICATION NO. 1, AND NOT INDICATION
NO. 2 BECAUSE IT IS PROTECTED BY A USE PATENT, THEN THE APPLICANT MUST MAKE THE
APPROPRIATE CERTIFICATION AND A STATEMENT EXPLAINING THAT IT IS NOT SEEKING
APPROVAL FOR INDICATION NO. 2.
   FINALLY, THE COMMITTEE INTENDS THAT AN ANDA CONTAIN ANY INFORMATION AVAILABLE TO
THE APPLICANT REGARDING REPORTS OF ADVERSE EFFECTS**2656 *23 NOT REFLECTED IN THE
LABELING, AN ENVIRONMENTAL IMPACT ANALYSIS PURSUANT TO FDA REGULATIONS, STATEMENTS
REGARDING THE PROTECTION OF HUMAN SUBJECTS IN CLINICAL INVESTIGATIONS AS REQUIRED
BY FDA REGULATIONS, AND A STATEMENT REGARDING COMPLIANCE WITH GOOD LABORATORY
PRACTICES IN NON-CLINICAL INVESTIGATIONS AS REQUIRED BY FDA REGULATIONS.  [FN6]

                    ANDA'S FOR DRUGS WHICH ARE DIFFERENT

   PARAGRAPH (2)(C) PROHIBITS ANY PERSON FROM SUBMITTING AN ANDA FOR A GENERIC DRUG
WHICH DIFFERS FROM THE LISTED DRUG UNLESS THE CHANGE IS PERMITTED BY THE STATUTE
AND THE FDA HAS GRANTED A PETITION REQUESTING THE CHANGE.
   IF AN APPLICANT WISHES TO VARY THE ROUTE OF ADMINISTRATION, DOSAGE FORM OR

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)

STRENGTH OF THE GENERIC DRUG FROM THE LISTED DRUG, IT MUST FIRST PETITION THE FDA
FOR PERMISSION TO FILE AN ANDA FOR THE DIFFERING GENERIC DRUG.  IN ADDITION, AN
APPLICANT MAY REQUEST TO VARY ONE OF THE ACTIVE INGREDIENTS IN THE GENERIC DRUG
FROM THE LISTED DRUG WHEN THE LISTED DRUG IS A COMBINATION PRODUCT.  THE REMAINING
ACTIVE INGREDIENTS OF THE GENERIC DRUG MUST BE THE SAME AS THE OTHER ACTIVE
INGREDIENTS OF THE LISTED DRUG.
   THESE ARE THE ONLY CHANGES FROM THE LISTED DRUG FOR WHICH AN APPLICANT MAY
PETITION.  AS IS EXPLAINED IN THE ANDA REGULATIONS FOR PRE-1962 DRUGS, THE
COMMITTEE GENERALLY EXPECTS THAT APPROVAL OF PETITIONS WILL 'ORDINARILY BE LIMITED
TO DOSAGE FORMS FOR THE SAME ROUTE OF ADMINISTRATION OR TO CLOSELY RELATED
INGREDIENTS.'  [FN7]  IF THE FDA GRANTS A PETITION FOR A CHANGE FROM THE LISTED
DRUG, THE FDA MAY REQUIRE SUCH ADDITIONAL INFORMATION IN THE ANDA REGARDING THE
CHANGE AS IT DEEMS NECESSARY.
   THE FDA MUST APPROVE A PETITION TO SUBMIT AN ANDA FOR A DIFFERING GENERIC DRUG
UNLESS CLINICAL STUDIES ARE NEEDED TO SHOW THE SAFETY AND EFFECTIVENESS OF THE
CHANGE.  IN REVIEWING A PETITION TO CHANGE ONE OF THE ACTIVE INGREDIENTS IN A
COMBINATION PRODUCT, THE COMMITTEE DOES NOT INTEND TO CHANGE THE FDA'S CURRENT
POLICY REGARDING THE EVALUATION OF THE SAFETY AND EFFECTIVENESS OF COMBINATION
PRODUCTS.  IF THE FDA FINDS THAT SAFETY AND EFFECTIVENESS TESTING OF THE ACTIVE
INGREDIENTS OF THE DRUG, INDIVIDUALLY OR IN COMBINATION, IS REQUIRED, THEN THE FDA
MUST DENY THE PETITION.
   THE FDA MUST EITHER APPROVE OR DISAPPROVE A PETITION WITHIN 90 DAYS OF ITS
SUBMISSION.  AS IS THE CASE UNDER THE CURRENT REGULATIONS, 'THERE IS NO LEGAL
REQUIREMENT THAT THE HEARING OPPORTUNITY PROVIDED BY SECTION 505(C) BE MADE
AVAILABLE TO ANDA APPLICANTS WHO DISAGREE WITH AN ADVERSE AGENCY DECISION' ON
WHETHER CLINICAL STUDIES ARE NEEDED TO SHOW THE SAFETY AND EFFECTIVENESS OF THE
DIFFERING GENERIC DRUG.  [FN8]  'APPROPRIATE REVIEW OF SUCH DECISIONS MAY BE HAD .
. . UNDER THE APPLICABLE STANDARD-- THAT APPLICABLE TO ADMINISTRATIVE
DECISIONMAKING GENERALLY-- WHICH IS WHETHER THE AGENCY'S DECISION IS ARBITRARY,
CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW (5
U.S.C. 706(2)(A)).'  [FN9]  IF THE FDA *24 **2657 DOES NOT APPROVE A PETITION,
THEN AN ANDA MAY NOT BE FILED FOR A GENERIC DRUG THAT VARIES FROM THE LISTED DRUG.
   AN ANDA FOR A DRUG WHICH DIFFERS FROM THE LISTED DRUG AND FOR WHICH A PETITION
HAS BEEN APPROVED BY THE FDA MUST CONTAIN SUCH ADDITIONAL INFORMATION REGARDING
THE DIFFERENCE AS THE FDA MAY REQUIRE WHEN IT GRANTED THE PETITION. FOR EXAMPLE,
IF THE ROUTE OF ADMINISTRATION OF THE GENERIC DRUG DIFFERS FROM THAT OF THE LISTED
DRUG, THEN THE FDA MAY REQUIRE SUCH ADDITIONAL INFORMATION ON THAT CHANGE AS IT
DEEMS NECESSARY.
   IF THE FDA APPROVES A PETITION PERMITTING AN APPLICANT TO VARY ONE OF THE ACTIVE
INGREDIENTS OF A GENERIC DRUG FROM THOSE OF THE LISTED COMBINATION DRUG, THE ANDA
MUST CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ACTIVE INGREDIENTS OF THE
GENERIC DRUG (INCLUDING THE VARYING ACTIVE INGREDIENT) ARE OF THE SAME
PHARMACOLOGICAL OR THERAPEUTIC CLASS AS THOSE OF THE LISTED DRUG. IN ADDITION, THE
DIFFERING GENERIC DRUG MUST BE EXPECTED TO HAVE THE SAME THERAPEUTIC EFFECT WHEN
ADMINISTERED TO PATIENTS FOR AN APPROVED CONDITION OF USE.
   AN EXAMPLE OF SUCH A CHANGE IN ONE OF THE ACTIVE INGREDIENTS THAT THE FDA MIGHT
FIND ACCEPTABLE IS THE SUBSTITUTION OF ACETAMINOPHEN FOR ASPIRIN IN A COMBINATION

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


PRODUCT.  ANOTHER EXAMPLE MIGHT BE THE SUBSTITUTION OF ONE ANTIHISTAMINE FOR
ANOTHER.  THE ACTIVE INGREDIENT, WHICH THE APPLICANT WISHES TO VARY AND WHICH THE
FDA HAS GRANTED A PETITION, MUST HAVE BEEN APPROVED FOR SAFETY AND EFFECTIVENESS
OR MUST NOT BE WITHIN THE REQUIREMENTS OF SECTION 201(P) OF FFDCA.  [FN10]

               CERTIFICATION OF INVALIDITY OF NONINFRINGEMENT OF A PATENT

    WHEN AN APPLICANT CERTIFIES THAT ANY PRODUCT OR CONTROLLING USE PATENT IS
INVALID OR WILL NOT BE INFRINGED, PARAGRAPH (2)(B) REQUIRES THAT IT MUST GIVE
NOTICE OF SUCH CERTIFICATION TO EITHER THE OWNER OF THE PATENT OR THE
REPRESENTATIVE OF THE PATENT OWNER THAT WAS DESIGNATED WHEN THE PATENT INFORMATION
WAS SUBMITTED UNDER SECTION 505(B) OR (C) OF THE FFDCA.  THE FDA MAY, BY
REGULATION, ESTABLISH A PROCEDURE FOR DESIGNATING IN THE NDA THE REPRESENTATIVE OF
THE PATENT OWNER.  IN ADDITION, NOTICE OF THE CERTIFICATION MUST BE GIVEN TO THE
HOLDER OF THE APPROVED NEW DRUG APPLICATION (NDA) FOR THE DRUG WHICH IS CLAIMED BY
A PRODUCT PATENT OR THE USE OF WHICH IS CLAIMED BY A USE PATENT.
    THIS NOTICE MUST BE GIVEN SIMULTANEOUSLY WITH THE SUBMISSION OF AN ANDA.  THE
COMMITTEE DOES NOT INTEND THAT APPLICANTS BE PERMITTED TO CIRCUMVENT THIS NOTICE
REQUIREMENT BY FILING SHAM ANDA'S OR ANDA'S WHICH ARE SUBSTANTIALLY INCOMPLETE.
THE COMMITTEE INTENDS THAT THE APPLICANT MUST HAVE MADE A GOOD FAITH EFFORT TO
MEET THE REQUIREMENTS SET FORTH IN PARAGRAPH (2)(A) REGARDING THE CONTENTS OF AN
ANDA.
    WHILE THE COMMITTEE DOES NOT INTEND THAT FAILURE TO INCLUDE A MINOR PIECE OF
INFORMATION IN AN ANDA VITIATES THE EFFECTIVENESS OF THE NOTICE REQUIRED UNDER
PARAGRAPH (2)(B), AN ANDA MUST INCLUDE **25 **2658 THE RESULTS OF ANY REQUIRED
BIOAVAILABILITY OR BIOEQUIVALENCE TESTS.  FAILURE TO INCLUDE THE RESULTS OF SUCH
TESTS WHEN REQUIRED WILL VOID THE EFFECTIVENESS OF ANY NOTICE UNDER PARAGRAPH
(2)(B).  NOTICE MUST THEN BE GIVEN AGAIN WHEN AN ANDA WITH ANY REQUIRED
BIOAVAILABILITY OR BIOEQUIVALENCE DATA IS SUBMITTED TO THE FDA.
    WHEN THE APPLICANT GIVES NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR
NON-INFRINGEMENT, THE NOTICE MUST STATE THAT AN ANDA HAS BEEN SUBMITTED TO OBTAIN
APPROVAL OF THE DRUG TO ENGAGE IN THE COMMERCIAL MANUFACTURE, USE OR SALE OF THE
GENERIC DRUG BEFORE THE EXPIRATION OF THE PATENT WHICH HAS BEEN CERTIFIED AS
INVALID OR NON-INFRINGED.
    IF AN ANDA IS AMENDED AFTER SUBMISSION TO INCLUDE A CERTIFICATION THAT A PRODUCT
PATENT OR CONTROLLING USE PATENT IS INVALID OR NOT INFRINGED, THEN THE NOTICE OF
SUCH CERTIFICATION MUST BE GIVEN TO THE APPROPRIATE PARTIES WHEN THE AMENDED
APPLICATION IS SUBMITTED.

                      GROUNDS FOR DISAPPROVAL OF AN ANDA

    PARAGRAPH (3) PROVIDES THAT THE FDA SHALL APPROVE AN ANDA EXCEPT IN ONE OF THE
FOLLOWING CIRCUMSTANCES.
    FIRST, THE FDA SHALL NOT APPROVE AN ANDA IF THE METHODS USED IN, OR THE
FACILITIES AND CONTROLS USED FOR, THE MANUFACTURE, PROCESSING AND PACKING OF THE
GENERIC DRUG ARE INADEQUATE TO ASSURE AND PRESERVE ITS IDENTITY, STRENGTH, QUALITY
AND PURITY.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SECOND, AN ANDA SHALL NOT BE APPROVED IF IT DOES NOT CONTAIN ADEQUATE
INFORMATION TO SHOW THAT EACH OF THE CONDITIONS FOR USE FOR THE GENERIC DRUG HAVE
BEEN PREVIOUSLY APPROVED FOR THE LISTED DRUG.  IF AN ANDA INCLUDES A CONDITION FOR
USE FOR WHICH THE LISTED DRUG HAS NOT BEEN APPROVED, THEN THE GENERIC DRUG MAY NOT
BE APPROVED.

THIRD, AN ANDA MUST BE DISAPPROVED IF THE ACTIVE INGREDIENT OF THE GENERIC DRUG
IS NOT THE SAME AS THAT OF THE LISTED DRUG AND THE LISTED DRUG HAS ONLY ONE ACTIVE
INGREDIENT.  AN ANDA MUST ALSO BE DISAPPROVED IF ANY OF THE ACTIVE INGREDIENTS IN
THE GENERIC DRUG ARE NOT THE SAME AS THOSE OF THE LISTED DRUG UNLESS A PETITION
REGARDING A CHANGE IN ONE OF THE ACTIVE INGREDIENTS HAS BEEN GRANTED.  IF THE
LISTED DRUG IS A COMBINATION PRODUCT AND A PETITION PERMITTING A CHANGE IN ONE OF
THE ACTIVE INGREDIENTS IN THE GENERIC DRUG HAS BEEN GRANTED, THEN THE ANDA MUST BE
DISAPPROVED IF THE OTHER ACTIVE INGREDIENTS OF THE GENERIC DRUG ARE NOT THE SAME
AS THOSE OF THE LISTED DRUG.  FURTHER, ANDA MUST BE DISAPPROVED IN SUCH A
CIRCUMSTANCE IF THE DIFFERENT ACTIVE INGREDIENT IN THE GENERIC DRUG IS NOT A
LISTED DRUG OR IF THE DIFFERENT ACTIVE INGREDIENT IS A DRUG WITHIN THE
REQUIREMENTS OF SECTION 201(P) OF THE FFDCA.

FOURTH, AN ANDA FOR A DRUG WHICH IS THE SAME MUST BE DISAPPROVED IF IT DOES NOT
SHOW THAT THE ROUTE OF ADMINISTRATION, DOSAGE FORM, OR STRENGTH OF THE GENERIC
DRUG ARE ALL THE SAME AS THOSE OF THE LISTED DRUG.  IF THE ROUTE OF
ADMINISTRATION, DOSAGE FORM, OR STRENGTH OF THE GENERIC DRUG DIFFERS FROM THAT OF
THE LISTED DRUG, AN ANDA MUST BE DISAPPROVED IF NO PETITION REGARDING THE CHANGE
WAS GRANTED.

FIFTH, AN ANDA MUST BE DISAPPROVED IF THE GENERIC DRUG DIFFERS FROM THE LISTED
DRUG AND A PETITION REGARDING THE CHANGE HAS BEEN *26 **2659 GRANTED, BUT THE ANDA
DOES NOT CONTAIN ALL OF THE ADDITIONAL INFORMATION THAT THE FDA REQUIRED IN
GRANTING THE PETITION.

A SIXTH GROUND REQUIRING DISAPPROVAL OF AN ANDA FOR A GENERIC DRUG WHOSE ACTIVE
INGREDIENTS ARE THE SAME AS THOSE OF THE LISTED DRUG IS THAT THERE IS UNSUFFICIENT
INFORMATION TO SHOW THAT THE GENERIC DRUG IS BIOEQUIVALENT TO THE LISTED DRUG.  IF
A PETITION REGARDING A CHANGE IN ONE OF THE ACTIVE INGREDIENTS IN A COMBINATION
GENERIC DRUG HAS BEEN GRANTED, THEN THE ANDA MUST BE DISAPPROVED IF THE
APPLICATION FAILS TO SHOW THAT THE ACTIVE INGREDIENTS OF THE GENERIC DRUG ARE OF
THE SAME PHARMACOLOGICAL OR THERAPEUTIC CLASS AS THOSE OF THE LISTED DRUG.  IN
ADDITION, SUCH AN ANDA MUST BE DISAPPROVED IF IT FAILS TO SHOW THAT THE DIFFERING
GENERIC COMBINATION DRUG CAN BE EXPECTED TO HAVE THE SAME THERAPEUTIC EFFECT AS
THE LISTED COMBINATION PRODUCT WHEN ADMINISTERED TO PATIENTS FOR AN APPROVED
CONDITION OF USE.

SEVENTH, AN ANDA MUST ALSO BE DISAPPROVED IF IT FAILS TO SHOW THAT THE PROPOSED
LABELING FOR THE GENERIC DRUG IS THE SAME AS THAT OF THE LISTED DRUG. CHANGES IN
THE PROPOSED LABELING DUE TO THE FACT THAT THE GENERIC DRUG IS PRODUCED OR
DISTRIBUTED BY A DIFFERENT MANUFACTURER ARE NOT A GROUNDS FOR DISAPPROVAL.
SIMILARLY, CHANGES IN THE PROPOSED LABELING OF THE GENERIC DRUG BECAUSE A PETITION
REGARDING A CHANGE HAS BEEN GRANTED IS NOT A GROUNDS FOR DISAPPROVAL.

EIGHTH, AN ANDA MUST BE DISAPPROVED IF IT OR ANY OTHER INFORMATION BEFORE THE
FDA SHOWS THAT THE INACTIVE INGREDIENTS OF THE GENERIC DRUG ARE UNSAFE FOR USE
UNDER THE CONDITIONS PRESCRIBED, RECOMMENDED, OR SUGGESTED IN THE PROPOSED

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

LABELING FOR THE GENERIC DRUG.  AN ANDA MUST ALSO BE DISAPPROVED IF THE
COMPOSITION OF THE GENERIC DRUG IS UNSAFE UNDER APPROVED CONDITIONS OF USE. FOR
EXAMPLE, THE COMPOSITION OF THE GENERIC DRUG MIGHT BE UNSAFE BECAUSE OF THE TYPE
OR QUANTITY OF THE INACTIVE INGREDIENT INCLUDED OR BECAUSE OF THE MANNER IN WHICH
THE INACTIVE INGREDIENT WAS INCLUDED.

   NINTH, AN ANDA MAY NOT BE APPROVED IF THE APPROVAL OF THE LISTED DRUG HAS BEEN
WITHDRAWN OR SUSPENDED FOR REASONS OF SAFETY OR EFFECTIVENESS UNDER SECTION
505(E)(1)-(4) OF THE FFDCA.  [FN11]  THE ANDA MAY ALSO NOT BE APPROVED IF THE FDA
DETERMINES THAT THE LISTED DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET FOR
SAFETY OR EFFECTIVENESS REASONS.  THE COMMITTEE RECOGNIZES THAT THE MAKER OF A
LISTED DRUG MIGHT WITHDRAW IT FROM THE MARKET WITHOUT SPECIFYING THE REASON OR
WITHOUT ARTICULATING SAFETY OR EFFECTIVENESS CONCERNS.  FOR THIS REASON, THE
COMMITTEE AUTHORIZED THE FDA TO EXAMINE WHETHER SAFETY OR EFFECTIVENESS CONCERNS
WERE ONE OF THE REASONS FOR THE VOLUNTARY WITHDRAWAL OF THE DRUG FROM THE MARKET.
IF THE FDA SO FINDS, THEN AN ANDA FOR A GENERIC VERSION OF THAT DRUG MAY NOT BE
APPROVED.

   TENTH, AN ANDA MAY NOT BE APPROVED IF IT DOES NOT MEET ANY OF THE REQUIREMENTS
SET FORTH IN PARAGRAPH (2)(A).  FOR EXAMPLE, AN ANDA THAT DOES NOT CONTAIN THE
CERTIFICATIONS REGARDING PATENTS REQUIRED IN PARAGRAPH (A)(A)(VII) CANNOT BE
APPROVED.

   LAST, AN ANDA MAY NOT BE APPROVED IF IT CONTAINS ANY UNTRUE STATEMENT OF
MATERIAL FACT.  [FN12]

                         **\*27 \*\*2660** APPROVAL OF AN ANDA

   PARAGRAPH (4)(A) REQUIRES THE FDA TO APPROVE OR DISAPPROVE AN ANDA WITHIN 180
DAYS OF INITIAL RECEIPT OF THE APPLICATION.  THE COMMITTEE RECOGNIZES THAT
EXTENSIONS MAY BE NECESSARY SO THE BILL PERMITS EXTENSIONS OF THIS PERIOD FOR SO
LONG AS THE APPLICANT AND THE FDA MAY AGREE UPON.

                         EFFECTIVENESS OF AN ANDA APPROVAL

   THE COMMITTEE RECOGNIZES THAT SOME ANDA'S WILL BE SUBMITTED AND READY FOR
APPROVAL BEFORE THE PATENT ON THE LISTED DRUG HAS EXPIRED. TO DEAL WITH THIS
SITUATION AND TO ASSURE THAT THE FDA CONCERNS ITSELF SOLELY WITH THE SAFETY AND
EFFECTIVENESS OF THE GENERIC DRUG, PARAGRAPH (4)(B) PERMITS THE FDA TO APPROVE AN
ANDA BUT MAKE THE APPROVAL EFFECTIVE AT SOME LATER DATE WHEN APPROPRIATE.

   IF THE APPLICANT CERTIFIED IN AN ANDA THAT NO PATENT INFORMATION WAS SUPPLIED OR
THAT THE RELEVANT PATENTS HAVE EXPIRED, THEN THE APPROVAL OF THE ANDA MAY BE MADE
EFFECTIVE IMMEDIATELY.  IF THE APPLICANT CERTIFIED BASED UPON THE SUBMITTED PATENT
INFORMATION THAT THE PATENT OR PATENTS WOULD EXPIRE IN ONE YEAR, THEN AN ANDA MAY
BE APPROVED AND THE APPROVAL MADE EFFECTIVE IN ONE YEAR.

   IF THE APPLICANT CERTIFIED THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE
PATENTS WERE INVALID OR NOT INFRINGED, THEN APPROVAL OF THE ANDA MAY BE MADE
EFFECTIVE IMMEDIATELY EXCEPT IN THE FOLLOWING SITUATION.  IF WITHIN 45 DAYS AFTER
NOTICE OF THE CERTIFICATION OF INVALIDITY OR NON-INFRINGEMENT IS RECEIVED, AN
ACTION FOR PATENT INFRINGEMENT REGARDING ONE OR MORE OF THE PATENTS SUBJECT TO THE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

CERTIFICATION IS BROUGHT, [FN13] THEN APPROVAL OF THE ANDA MAY NOT BE MADE
EFFECTIVE IMMEDIATELY. INSTEAD, APPROVAL OF THE ANDA MAY NOT BE MADE EFFECTIVE
UNTIL 18 MONTHS AFTER THE NOTICE OF THE CERTIFICATION WAS PROVIDED UNLESS A
DISTRICT COURT HAS DECIDED A CASE FOR PATENT INFRINGEMENT EARLIER. ONCE EITHER OF
THESE EVENTS OCCURS AND THE APPROVAL OF THE ANDA BECOMES EFFECTIVE, THEN THE FDA
HAS DISCHARGED ITS STATUTORY RESPONSIBILITY WITH RESPECT TO MAKING THE APPROVAL OF
THE GENERIC DRUG EFFECTIVE.
   EACH PARTY TO THE ACTION HAS AN AFFIRMATIVE DUTY TO REASONABLY COOPERATE IN
EXPEDITING THE ACTION. IF THE PLAINTIFF BREACHES THAT DUTY, THE COURT MAY SHORTEN
THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE. IF THE DEFENDANT BREACHES THAT DUTY,
THE COURT MAY EXTEND THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE.
   IF THE COURT DECIDES THAT THE PATENT IS INVALID OR NOT INFRINGED BEFORE THE
EXPIRATION OF THE 18 MONTH PERIOD (OR SUCH SHORTER OR LONGER PERIOD AS THE COURT
DECIDES), THEN THE APPROVAL MAY BE MADE EFFECTIVE ON THE DATE OF THE COURT
DECISION. IF THE COURT DECIDES THAT THE PATENT IS VALID OR INFRINGED BEFORE THE
EXPIRATION OF THE 18 MONTH PERIOD, THEN THE APPROVAL MAY BE MADE EFFECTIVE ON SUCH
DATA AS THE COURT ORDERS. THE COMMITTEE WISHES TO EMPHASIZE THAT THE COURT MAY
NOT ORDER AN ANDA APPROVED UNDER THIS PROVISION. **28 **2661 THESE ARE TIMES WHEN
APPROVAL OF AN ANDA MAY BE MADE EFFECTIVE IF THE FDA HAS APPROVED THE ANDA.
   THIS ADDITIONAL REMEDY PERMITS THE COMMENCEMENT OF A LEGAL ACTION FOR PATENT
INFRINGEMENT BEFORE THE GENERIC DRUG MAKER HAS BEGUN MARKETING. THE COMMITTEE
BELIEVES THIS PROCEDURE FAIRLY BALANCES THE RIGHTS OF A PATENT OWNER TO PREVENT
OTHERS FROM MAKING, USING, OR SELLING ITS PATENTED PRODUCT AND THE RIGHTS OF THIRD
PARTIES TO CONTEST THE VALIDITY OF A PATENT OR TO MARKET A PRODUCT WHICH THEY
BELIEVE IS NOT CLAIMED BY THE PATENT.
   THE PROVISIONS OF THIS BILL RELATING TO THE LITIGATION OF DISPUTES INVOLVING
PATENT VALIDITY AND INFRINGEMENT ARE NOT INTENDED TO MODIFY EXISTING PATENT LAW
WITH RESPECT TO THE BURDEN OF PROOF AND THE NATURE OF THE PROOF TO BE CONSIDERED
BY THE COURTS IN DETERMINING WHETHER A PATENT IS VALID OR INFRINGED.
   CONCERN HAS BEEN EXPRESSED THAT PERMITTING AN APPLICANT TO MARKET ITS DRUG AT
THE CONCLUSION OF THE 18 MONTH PERIOD AND POSSIBLY BEFORE THE RESOLUTION OF THE
PATENT INFRINGEMENT SUIT OVERTURNS THE STATUTORY PRESUMPTION OF A PATENT'S
VALIDITY. ON THE CONTRARY, THE COMMITTEE INTENDS THAT A PATENT WOULD HAVE THE
SAME STATUTORY PRESUMPTION OF VALIDITY AS IS AFFORDED UNDER CURRENT LAW.
   IN MOST INSTANCES, AN ANDA WILL CONTAIN MULTIPLE CERTIFICATIONS. THE FDA SHOULD
MAKE APPROVAL OF THE ANDA EFFECTIVE UPON THE LAST CERTIFICATION. FOR EXAMPLE, IF
AN ANDA CONTAINS A CERTIFICATION THAT A PRODUCT PATENT IS EXPIRED AND A
CONTROLLING USE PATENT WILL EXPIRE IN THREE YEARS, THEN THE FDA MUST MAKE APPROVAL
OF THE ANDA EFFECTIVE IN THREE YEARS. IN THE CASE WHERE THE PATENT CERTIFICATION
IS AMENDED IN AN ANDA TO ALLEGE INVALIDITY OR NON-INFRINGEMENT OF A PATENT, THE
FDA MAY NOT MAKE THE APPROVAL EFFECTIVE WITHIN THE 45 DAY PERIOD THAT AN ACTION
FOR PATENT INFRINGEMENT MAY BE BROUGHT.
   NO ACTION FOR A DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE MAY BE
BROUGHT BEFORE THE EXPIRATION OF THE 45 DAY PERIOD COMMENCING WITH THE PROVISION
OF NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR NON-INFRINGEMENT. ANY SUIT
FOR DECLARATORY JUDGMENT AFTER THE 45 DAY PERIOD MUST BE BROUGHT IN THE JUDICIAL
DISTRICT WHERE THE DEFENDANT HAS ITS PRINCIPAL OF BUSINESS OR A REGULAR AND

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

ESTABLISHED PLACE OF BUSINESS.

SUBSEQUENT ANDA'S CERTIFYING PATENT INVALIDITY OR NONINFRINGEMENT

IF AN ANDA CERTIFYING PATENT INVALIDITY OR NON-INFRINGEMENT IS FILED SUBSEQUENT
TO AN ANDA FOR THE SAME LISTED DRUG THAT HAS MADE THE SAME CERTIFICATION OF
INVALIDITY OR NON-INFRINGEMENT, PARAGRAPH (4)(B)(IV) PROVIDES THAT THE APPROVAL OF
THE SUBSEQUENT ANDA MAY NOT BE MADE EFFECTIVE SOONER THAN 180 DAYS AFTER THE
PREVIOUS APPLICANT HAS BEGUN COMMERCIAL MARKETING, OR THE DATE ON WHICH THE COURT
HOLDS THE PATENT INVALID OR NOT INFRINGED, WHICHEVER OCCURS FIRST.  IN THE EVENT
OF MULTIPLE ANDA'S CERTIFYING PATENT INVALIDITY OR NON-INFRINGEMENT, THE COURTS
SHOULD EMPLOY THE EXISTING RULES FOR MULTIDISTRICT LITIGATION, WHEN APPROPRIATE,
TO AVOID HARDSHIP ON THE PARTIES AND WITNESSES AND TO PROMOTE THE JUST AND
EFFICIENT CONDUCT OF THE PATENT INFRINGEMENT ACTIONS.  [FN14]

**\*29 \*\*2662** DISAPPROVAL OF AN ANDA

IF THE FDA DECIDES TO DISAPPROVE AN ANDA, PARAGRAPH (4)(C) PROVIDES THAT THE FDA
MUST GIVE THE APPLICANT NOTICE OF THE OPPORTUNITY FOR A HEARING ON THE ISSUE OF
THE APPROVABILITY OF THE ANDA.  TO AVAIL ITSELF OF THIS HEARING, THE APPLICANT
MUST SUBMIT A WRITTEN REQUEST WITHIN 30 DAYS OF THE NOTICE.  IF A HEARING IS
REQUESTED, IT MUST BEGIN NOT LATER THAN 120 DAYS AFTER THE NOTICE. HOWEVER, THE
HEARING MAY BE HELD LATER IF BOTH THE APPLICANT AND THE FDA AGREE.  THE HEARING
SHALL BE CONDUCTED ON AN EXPEDITED BASIS.  THE FDA'S ORDER REGARDING THE HEARING
SHALL BE ISSUED WITHIN 90 DAYS AFTER THE DATE FOR FILING FINAL BRIEFS.

TRANSITION RULE

PARAGRAPH (4)(D)(I) PROVIDES THAT THE FDA MAY NOT MAKE EFFECTIVE THE APPROVAL OF
AN ANDA FOR A DRUG INCLUDING AN ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF
THE ACTIVE INGREDIENT) WHICH WAS APPROVED FOR THE FIRST TIME IN AN NDA BETWEEN
JANUARY 1, 1982 AND THE DATE OF ENACTMENT OF THIS BILL UNTIL 10 YEARS AFTER THE
DATE OF APPROVAL OF THE NDA.  FOR EXAMPLE, IF ACTIVE INGREDIENT X WAS APPROVED IN
A DRUG FOR THE FIRST TIME IN 1983, WHEN THE APPROVAL OF AN ANDA FOR A DRUG
CONTAINING ACTIVE INGREDIENT X COULD NOT BE MADE EFFECTIVE UNTIL 1993.

UNPATENTABLE DRUGS

IF THE ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF THE ACTIVE INGREDIENT)
OF A DRUG IS APPROVED FOR THE FIRST TIME IN AN NDA AFTER THE ENACTMENT OF THIS
BILL, THEN PARAGRAPH (4)(D)(II) PROVIDES THAT THE FDA MAY NOT MAKE THE APPROVAL OF
AN ANDA FOR A DRUG WHICH CONTAINS THE SAME ACTIVE INGREDIENT EFFECTIVE UNTIL FOUR
YEARS AFTER THE APPROVAL OF THE NDA IF THE FOLLOWING CONDITIONS ARE MET.
FIRST, THE HOLDER OF THE NDA MUST CERTIFY THAT NO PATENT HAS EVER BEEN ISSUED TO
ANY PERSON FOR SUCH DRUG, OR FOR A METHOD OF USING SUCH DRUG.  SECOND, THE HOLDER
MUST CERTIFY THAT IT CANNOT RECEIVE A PATENT FOR SUCH DRUG OR FOR A METHOD USING
SUCH DRUG FOR ANY KNOWN THERAPEUTIC PURPOSE.  IN DETERMINING WHETHER A DRUG MEETS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


THESE TWO PATENT STIPULATIONS, THE FDA MAY RELY UPON THE CERTIFICATIONS OF THE NDA
HOLDER.
   IF THE FDA DETERMINES AT ANY TIME DURING THE FOUR YEAR PERIOD THAT AN ADEQUATE
SUPPLY OF THE DRUG WILL NOT BE AVAILABLE, IT MAY MAKE THE APPROVAL OF AN ANDA
EFFECTIVE BEFORE THE EXPIRATION OF THE FOUR YEAR PERIOD.  THE FDA MAY ALSO MAKE
THE APPROVAL OF AN ANDA FOR SUCH DRUG EFFECTIVE BEFORE THE FOUR YEAR PERIOD IF THE
HOLDER OF THE NDA CONSENTS.


                    WITHDRAWAL OR SUSPENSION OF LISTED DRUG'S APPROVAL

   PARAGRAPH (5) PROVIDES THAT THE APPROVAL OF AN ANDA IS WITHDRAWN OR SUSPENDED IF
APPROVAL OF THE LISTED VERSION OF THE GENERIC DRUG HAS BEEN WITHDRAWN OR SUSPENDED
FOR SAFETY OR EFFECTIVENESS REASONS AS SET FORTH IN SECTION 505(E)(1)-(4) OF THE
FFDCA.  THE APPROVAL OF AN ANDA IS ALSO WITHDRAWN OR SUSPENDED IF IT REFERS TO A
DRUG WHOSE APPROVAL IS WITHDRAWN OR SUSPENDED UNDER SECTION 505(J)(5) OF THE
FFDCA.  IN ADDITION, THE APPROVAL OF AN ANDA IS WITHDRAWN OR SUSPENDED IF THE FDA
DETERMINES THAT THE LISTED **30 **2663 DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM
SALE FOR SAFETY OR EFFECTIVENESS CONCERNS.
   THE COMMITTEE RECOGNIZES THAT THE MAKER OF A LISTED DRUG MIGHT WITHDRAW IT FROM
THE MARKET WITHOUT SPECIFYING THE REASON OR WITHOUT ARTICULATING SAFETY OR
EFFECTIVENESS CONCERNS.  FOR THIS REASON, THE COMMITTEE AUTHORIZED THE FDA TO
EXAMINE WHETHER SAFETY OR EFFECTIVENESS CONCERNS WERE ONE OF THE REASONS FOR THE
VOLUNTARY WITHDRAWAL OF THE DRUGS FROM THE MARKET.  IF THE FDA SO FINDS, THEN THE
APPROVAL OF AN ANDA FOR A GENERIC VERSION OF THAT DRUG MUST BE WITHDRAWN OR
SUSPENDED.
   THE ANDA MUST BE WITHDRAWN OR SUSPENDED FROM SALE FOR THE SAME PERIOD AS THE
APPROVAL OF THE DRUG TO WHICH IT REFERS HAS BEEN WITHDRAWN OR SUSPENDED.  WHEN THE
LISTED DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET AND THE FDA HAS
DETERMINED THAT THE LISTED DRUG WAS WITHDRAWN DUE TO SAFETY OR EFFECTIVENESS
REASONS, THEN THE APPROVAL OF THE ANDA MUST BE WITHDRAWN UNTIL SUCH TIME AS THE
FDA DETERMINES THAT THE LISTED DRUG WAS NOT WITHDRAWN FROM SALE FOR SAFETY OR
EFFECTIVENESS REASONS.


                               LISTINGS OF DRUGS

   WITHIN 60 DAYS AFTER ENACTMENT OF THIS BILL, PARAGRAPH (6) REQUIRES THE FDA TO
PUBLISH AND TO MAKE AVAILABLE A LIST OF DRUGS ELIGIBLE FOR CONSIDERATION IN AN
ANDA.  THE LIST MUST INCLUDE THE OFFICIAL AND PROPRIETARY NAME OF EACH DRUG THAT
HAS BEEN APPROVED FOR SAFETY AND EFFECTIVENESS PRIOR TO THE DATE OF ENACTMENT OF
THE BILL.  THE LIST MUST BE IN ALPHABETICAL ORDER.  IF THE DRUG WAS APPROVED AFTER
1981, THE LIST MUST INCLUDE THE DATE OF APPROVAL OF THE DRUG AND THE NDA NUMBER.
THIRD, THE LIST MUST SPECIFY WHETHER IN VITRO OR IN VIVO BIOEQUIVALENCE STUDIES,
OR BOTH, ARE REQUIRED FOR ANDA'S.
   AT 30-DAY INTERVALS, THE FDA MUST UPDATE THE LIST TO INCLUDE DRUGS THAT HAVE
BEEN APPROVED FOR SAFETY AND EFFECTIVENESS AFTER ENACTMENT OF H.R. 3605 AND DRUGS
APPROVED IN ANDA'S UNDER THIS SUBSECTION.  IN ADDITION, THE FDA MUST INTEGRATE
INTO THE LIST PATENT INFORMATION SUBMITTED UNDER SECTIONS 505(B) AND (C) OF THE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


FFDCA AS IT BECOMES AVAILABLE.
   A DRUG APPROVED FOR SAFETY AND EFFECTIVENESS UNDER SECTION 505(C) OR UNDER
SUBSECTION (J) SHALL BE CONSIDERED AS PUBLISHED AND THUS ELIGIBLE FOR APPROVAL IN
AN ANDA ON THE DATE OF ITS APPROVAL OR THE DATE OF ENACTMENT, WHICHEVER IS LATER.
   PARAGRAPH (6)(C) PROVIDES A DRUG MAY NOT BE LISTED AS ELIGIBLE FOR CONSIDERATION
IN AN ANDA IF THE APPROVAL OF THE PIONEER DRUG IS WITHDRAWN OR SUSPENDED FOR
SAFETY OR EFFECTIVENESS REASONS AS SET FORTH IN SECTION 505(E)(1)-(4) OF THE FFDCA
OR IF APPROVAL OF THE GENERIC DRUG WAS WITHDRAWN OR SUSPENDED UNDER SECTION
505(J)(5) OF THE FFDCA. IN ADDITION, A DRUG MAY NOT BE LISTED IF THE FDA
DETERMINES THAT THE DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM SALE DUE TO SAFETY OR
EFFECTIVENESS CONCERNS.  IF SUCH A DRUG HAS ALREADY BEEN LISTED, THEN IT MUST BE
IMMEDIATELY REMOVED FROM THE LIST.
   THE COMMITTEE RECOGNIZES THAT THE MAKER OF A LISTED DRUG MIGHT WITHDRAW IT FROM
THE MARKET WITHOUT SPECIFYING THE REASON OF WITHOUT ARTICULATING SAFETY OR
EFFECTIVENESS CONCERNS.  FOR THIS REASON, THE COMMITTEE AUTHORIZED THE FDA TO
EXAMINE WHETHER SAFETY OR EFFECTIVENESS CONCERNS WERE ONE OF THE REASONS FOR THE
VOLUNTARY WITHDRAWAL OF THE DRUGS FROM THE MARKET.  IF THE FDA SO FINDS, THEN **31
**2664 THE DRUG MAY NOT BE LISTED.  PERSONS ADVERSELY AFFECTED BY THIS DECISION
MAY SEEK JUDICIAL REVIEW UNDER TITLE 5 OF THE UNITED STATES CODE.
   A DRUG MAY NOT BE LISTED AS LONG AS ITS APPROVAL IS WITHDRAWN OR SUSPENDED.  IF
THE DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET, THEN THE DRUG MAY NOT BE
LISTED UNTIL THE FDA DETERMINES THAT THE DRUG WAS NOT WITHDRAWN FROM SALE FOR
SAFETY OR EFFECTIVENESS REASONS.  A NOTICE REGARDING THE REMOVAL OF ANY DRUG FROM
THE LIST MUST BE PUBLISHED IN THE FEDERAL REGISTER.

                  BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES

   AS USED IN THIS BILL, THE TERM 'BIOAVAILABILITY' MEANS THE RATE AND EXTENT TO
WHICH THE ACTIVE INGREDIENT OR THERAPEUTIC INGREDIENT IS ABSORBED FROM A DRUG AND
BECOMES AVAILABLE AT THE SITE OF DRUG ACTION. [FN15]
   A DRUG SHALL BE CONSIDERED BIOEQUIVALENT TO A LISTED DRUG IF THE RATE AND EXTENT
OF ABSORPTION OF THE GENERIC DRUG DO NOT SHOW A SIGNIFICANT DIFFERENCE FROM THE
RATE AND EXTENT OF ABSORPTION OF THE LISTED DRUG WHEN ADMINISTERED AT THE SAME
MOLAR DOSE OF THE THERAPEUTIC INGREDIENT UNDER SIMILAR EXPERIMENTAL CONDITIONS IN
EITHER A SINGLE DOSE OR MULTIPLE DOSES.  A GENERIC DRUG SHALL ALSO BE CONSIDERED
TO BE BIOEQUIVALENT TO A LISTED DRUG IF THE EXTENT OF ABSORPTION OF THE GENERIC
DRUG DOES NOT SHOW A SIGNIFICANT DIFFERENCE FROM THE EXTENT OF ABSORPTION OF THE
LISTED DRUG WHEN ADMINISTERED AT THE SAME MOLAR DOSE OF THE THERAPEUTIC INGREDIENT
UNDER SIMILAR EXPERIMENTAL CONDITIONS IN EITHER A SINGLE DOSE OR MULTIPLE DOSES
AND THE DIFFERENCE FROM THE LISTED DRUG IN THE RATE OF ABSORPTION OF THE GENERIC
DRUG IS INTENTIONAL, IS REFLECTED IN THE PROPOSED LABELING, IS NOT ESSENTIAL TO
THE ATTAINMENT OF EFFECTIVE BODY DRUG CONCENTRATIONS ON CHRONIC USE, AND IS
CONSIDERED MEDICALLY INSIGNIFICANT FOR THE DRUG.  [FN16]


                              SECTION 102

   SECTION 102 OF THE BILL REQUIRES THAT CERTAIN PATENT INFORMATION BE FILED WITH

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


ALL NEW NDA'S AND WITH ALL NDA'S PREVIOUSLY FILED BUT NOT YET APPROVED.  PENDING
AND FUTURE NDA'S MAY NOT BE APPROVED UNLESS THEY CONTAIN THE APPROPRIATE PATENT
INFORMATION.  THE FDA SHALL PUBLISH THE PATENT INFORMATION UPON APPROVAL OF THE
NDA.
    THIS SECTION ALSO REQUIRES THAT ANY PREVIOUSLY APPROVED NDA BE AMENDED WITHIN 30
DAYS OF ENACTMENT OF THIS BILL TO INCLUDE CERTAIN PATENT INFORMATION.  THE FDA
SHALL PUBLISH THE PATENT INFORMATION UPON ITS SUBMISSION.  AN NDA MAY BE REVOKED
IF THE PATENT INFORMATION AVAILABLE IS ADVISABLE AND IS NOT FILED WITHIN 30 DAYS
AFTER RECEIPT OF A WRITTEN NOTICE FROM THE FDA SPECIFYING THE FAILURE TO PROVIDE
THE PATENT INFORMATION.
    THE PATENT INFORMATION TO BE FILED INCLUDES THE PATENT NUMBER AND THE EXPIRATION
DATE OF ANY PATENT WHICH CLAIMS THE DRUG IN THE NDA OR WHICH CLAIMS A METHOD OF
USING SUCH DRUG WITH RESPECT TO WHICH A CLAIM OF PATENT INFRINGEMENT COULD
REASONABLY BE ASSERTED **32 **2665 IF A PERSON NOT LICENSED BY THE OWNER ENGAGED IN
THE MANUFACTURE, SALE OR USE OF THE DRUG. PATENTS WHICH CLAIM A METHOD OF
MANUFACTURING SUCH DRUG ARE NOT REQUIRED TO BE SUBMITTED.
    FINALLY, SECTION 102 MAKES A NUMBER OF TECHNICAL CHANGES.


                            SECTION 103

    SECTION 103 AMENDS SECTION 505(B) OF THE FFDCA TO REQUIRE AN APPLICANT FILING A
PAPER NDA'S FOR A LISTED DRUG UNDER SECTION 505(J)(6) TO MAKE THE SAME
CERTIFICATIONS REGARDING PATENTS AS MANDATED IN THE FILING OF ANDA'S UNDER NEW
SUBSECTION (J) OF THE FFDCA.  IN ADDITION, THE FDA MUST MAKE APPROVALS FOR SUCH
PAPER NDA'S EFFECTIVE UNDER THE SAME CONDITIONS THAT APPLY TO ANDA'S SUBMITTED
UNDER SUBSECTION (J).  FINALLY, SECTION 103 APPLIES THE 10 YEAR TRANSITION RULE
AND THE 4 YEAR UNPATENTABLE SUBSTANCES RULE TO PAPER NDA'S.


                            PAPER NDA'S

    PAPER NDA'S ARE DEFINED AS ANY APPLICATION SUBMITTED UNDER SECTION 505(B) OF THE
FFDCA IN WHICH THE INVESTIGATIONS RELIED UPON BY THE APPLICANT TO SHOW SAFETY AND
EFFECTIVENESS WERE NOT CONDUCTED BY OR FOR THE APPLICANT AND THE APPLICANT HAS NOT
OBTAINED A RIGHT OF REFERENCE OR USE FROM THE PERSON WHO CONDUCTED THE STUDIES OR
FOR WHOM THE STUDIES WERE CONDUCTED.


            PATENT CERTIFICATIONS IN PAPER NDA'S FOR LISTED DRUGS

    WHEN A PAPER NDA'S IS SUBMITTED FOR A LISTED DRUG UNDER SECTION 505(J)(6), IT
MUST INCLUDE A CERTIFICATION BY THE APPLICANT REGARDING THE STATUS OF CERTAIN
PATENTS APPLICABLE TO THE LISTED DRUG IF SUCH INFORMATION HAS BEEN PROVIDED TO THE
FDA.  WITH RESPECT TO ALL PRODUCT PATENTS WHICH CLAIM THE LISTED DRUG AND ALL USE
PATENTS WHICH CLAIM AN INDICATION FOR THE DRUG FOR WHICH THE APPLICANT IS SEEKING
APPROVAL (HEREAFTER DESCRIBED AS A CONTROLLING USE PATENT), THE APPLICANT MUST
CERTIFY, IN HIS OPINION AND TO THE BEST OF HIS KNOWLEDGE, AS TO ONE OF FOUR
CIRCUMSTANCES.
    FIRST, THE APPLICANT MAY CERTIFY THAT THE PATENT INFORMATION REQUIRED UNDER

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SECTIONS 505(B) AND (C) HAS NOT BEEN SUBMITTED IF THAT IS THE CASE.  SECOND, IF
APPROPRIATE, THE APPLICANT MAY CERTIFY THAT ONE OR MORE OF THE PRODUCT OR
CONTROLLING USE PATENTS WILL EXPIRE AT SOME SPECIFIED DATE IN THE FUTURE.  WHEN
THE APPLICANT MAKES THESE CERTIFICATIONS, IT MUST RELY UPON THE PATENT INFORMATION
SUPPLIED TO THE FDA.  LAST, AN APPLICANT MAY CERTIFY IF APPLICABLE THAT ONE OR
MORE OF THE PRODUCT OR CONTROLLING USE PATENTS ARE INVALID OR WILL NOT BE
INFRINGED.

   THE COMMITTEE RECOGNIZES THAT IN SOME INSTANCES AN APPLICANT WILL HAVE TO MAKE
MULTIPLE CERTIFICATIONS WITH RESPECT TO PRODUCT AND CONTROLLING USE PATENTS.  FOR
EXAMPLE, IF THE PRODUCT PATENT HAS EXPIRED AND VALID CONTROLLING USE PATENT WILL
NOT EXPIRE FOR THREE YEARS, THEN THE APPLICANT MUST CERTIFY THAT ONE PATENT HAS
EXPIRED AND THE OTHER WILL EXPIRE IN THREE YEARS.  THE COMMITTEE INTENDS THAT THE
APPLICANT MAKE THE APPROPRIATE CERTIFICATION FOR EACH PRODUCT AND CONTROLLING USE
PATENT.

   **\*33 \*\*2666** EVERY PAPER NDA FOR A LISTED DRUG MUST ALSO STATE, WHEN APPLICABLE,
THAT THE APPLICANT IS NOT SEEKING APPROVAL FOR AN INDICATION WHICH IS CLAIMED BY
ANY USE PATENT FOR WHICH IT HAS NOT MADE A CERTIFICATION.  FOR EXAMPLE, THE LISTED
DRUG MAY BE APPROVED FOR TWO INDICATIONS.  IF THE APPLICANT IS SEEKING APPROVAL
ONLY FOR INDICATION NO. 1, AND NOT INDICATION NO. 2 BECAUSE IT IS PROTECTED BY A
USE PATENT, THEN THE APPLICANT MUST MAKE THE APPROPRIATE CERTIFICATIONS AND A
STATEMENT EXPLAINING THAT IT IS NOT SEEKING APPROVAL FOR INDICATION NO. 2.

                 CERTIFICATION OF INVALIDITY OR NONINFRINGEMENT OF A PATENT

   WHEN AN APPLICANT CERTIFIES THAT ANY PRODUCT OR CONTROLLING USE PATENT IS
INVALID OR WILL NOT BE INFRINGED, SECTION 505(B)(3) REQUIRES THAT IT MUST GIVE
NOTICE OF SUCH CERTIFICATION TO EITHER THE OWNER OF THE PATENT OR THE
REPRESENTATIVE OF THE PATENT OWNER THAT WAS SO DESIGNATED WHEN THE PATENT
INFORMATION WAS SUBMITTED UNDER SECTION 505(B) OR (C) OF THE FFDCA.  THE FDA MAY,
BY REGULATION, ESTABLISH A PROCEDURE FOR DESIGNATING IN THE NDA THE REPRESENTATIVE
OF THE PATENT OWNER.  IN ADDITION, NOTICE OF THE CERTIFICATION MUST BE GIVEN TO
THE HOLDER OF THE APPROVED NEW DRUG APPLICATION (NDA) FOR THE DRUG WHICH IS
CLAIMED BY THE PRODUCT PATENT OR THE USE OF WHICH IS CLAIMED BY THE USE PATENT.

   THIS NOTICE MUST BE GIVEN SIMULTANEOUSLY WITH THE SUBMISSION OF A PAPER NDA.
THE COMMITTEE DOES NOT INTEND THAT APPLICANTS BE PERMITTED TO CIRCUMVENT THIS
NOTICE REQUIREMENT BY FILING SHAM PAPER NDA'S OR PAPER NDA'S WHICH ARE
SUBSTANTIALLY INCOMPLETE.  THE COMMITTEE INTENDS THAT THE APPLICANT MUST HAVE MADE
A GOOD FAITH EFFORT TO MEET THE REQUIREMENTS REGARDING THE CONTENTS OF A PAPER NDA
AS SET FORTH IN SECTION 505(B) OF FFDCA.

   WHEN THE APPLICANT GIVES NOTICE OF THE CERTIFICATION OF INVALIDITY OR
NON-INFRINGEMENT, THE NOTICE MUST STATE THAT A PAPER NDA HAS BEEN SUBMITTED TO
OBTAIN APPROVAL OF THE DRUG TO ENGAGE IN THE COMMERCIAL MANUFACTURE, USE OF SALE
OF THE GENERIC DRUG BEFORE THE EXPIRATION OF THE PATENT WHICH HAS BEEN CERTIFIED
AS INVALID OR NON-INFRINGED.

   IF A PAPER NDA IS AMENDED AFTER SUBMISSION TO INCLUDE A CERTIFICATION THAT A
PRODUCT PATENT OR CONTROLLING USE PATENT IS INVALID, THEN THE NOTICE OF SUCH
CERTIFICATION MUST BE GIVEN TO THE APPROPRIATE PARTIES WHEN THE AMENDED

            © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 20

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


APPLICATION IS SUBMITTED.

            EFFECTIVENESS OF APPROVAL OF A PAPER NDA FOR A LISTED DRUG

   THE COMMITTEE RECOGNIZES THAT SOME PAPER NDA'S FOR LISTED DRUGS WILL BE
SUBMITTED AND READY FOR APPROVAL BEFORE THE PATENT ON THE LISTED DRUG HAS EXPIRED.
 TO DEAL WITH THIS SITUATION AND TO ASSURE THAT THE FDA CONCERNS ITSELF SOLELY
WITH THE SAFETY AND EFFECTIVENESS OF THE GENERIC DRUG, SECTION 505(C)(3) REQUIRES
THE FDA TO APPROVE A PAPER NDA BUT MAKE THE APPROVAL EFFECTIVE AT SOME LATER DATE
WHEN APPROPRIATE.
   IF THE APPLICANT CERTIFIED IN THE PAPER NDA THAT NO PATENT INFORMATION WAS
SUPPLIED OR THAT THE RELEVANT PATENTS HAVE EXPIRED, THEN THE APPROVAL OF THE PAPER
NDA MAY BE MADE EFFECTIVE IMMEDIATELY. IF THE APPLICANT CERTIFIED BASED UPON THE
SUBMITTED PATENT INFORMATION THAT THE PATENT WOULD EXPIRE IN ONE YEAR, THEN THE **34**
**\*\*2667** PAPER NDA MAY BE APPROVED AND THE APPROVAL MADE EFFECTIVE IN ONE YEAR.
   IF THE APPLICANT CERTIFIED THAT ONE OR MORE OF THE PRODUCT OF CONTROLLING USE
PATENTS WERE INVALID OR NOT INFRINGED, THEN APPROVAL OF THE PAPER NDA MAY BE MADE
EFFECTIVE IMMEDIATELY EXCEPT IN THE FOLLOWING SITUATION.  IF WITHIN 45 DAYS AFTER
NOTICE OF THE CERTIFICATION OF INVALIDITY OR NON-INFRINGEMENT IS RECEIVED, AN
ACTION FOR PATENT INFRINGEMENT REGARDING ONE OR MORE OF THE PATENT SUBJECT TO THE
CERTIFICATION IS BROUGHT, [FN17] THEN APPROVAL OF THE PAPER NDA MAY NOT BE MADE
EFFECTIVE IMMEDIATELY. INSTEAD, APPROVAL OF THE PAPER NDA MAY NOT BE MADE
EFFECTIVE UNTIL 18 MONTHS AFTER THE NOTICE OF THE CERTIFICATION WAS PROVIDED.
   EACH PARTY TO THE ACTION HAS AN AFFIRMATIVE DUTY TO REASONABLY COOPERATE IN
EXPEDITING THE ACTION.  IF THE PLAINTIFF BREACHES THAT DUTY, THE COURT MAY SHORTEN
THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE.  IF THE DEFENDANT BREACHES THAT DUTY,
THE COURT MAY EXTEND THE 18-MONTH PERIOD AS IT DEEMS APPROPRIATE.
   IF THE COURT DECIDES THAT THE PATENT IS INVALID OR NOT INFRINGED BEFORE THE
EXPIRATION OF THE 18-MONTH PERIOD (OR SUCH SHORTER OR LONGER PERIOD AS THE COURT
DECIDES), THEN THE APPROVAL MAY BE MADE EFFECTIVE ON THE DATE OF THE COURT
DECISION.  IF THE COURT DECIDES THAT THE PATENT INVALID OR INFRINGED BEFORE THE
EXPIRATION OF THE 18 MONTH PERIOD, THEN THE APPROVAL MAY BE MADE EFFECTIVE ON SUCH
DATE AS THE COURT ORDERS.  THE COMMITTEE WANTS TO EMPHASIZE THAT THE COURT MAY NOT
ORDER THE PAPER NDA APPROVED.  THESE ARE TIMES WHEN THE APPROVAL OF A PAPER NDA
MAY BE MADE EFFECTIVE IF THE FDA HAS COMPLETED ITS REVIEW OF THE PAPER NDA.
   NO ACTION FOR A DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE MAY BE
BROUGHT BEFORE THE EXPIRATION OF THE 45 DAY PERIOD COMMENCING WITH THE PROVISION
OF NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR NON-INFRINGEMENT.  AFTER
THE 45 DAY PERIOD, ANY SUIT FOR DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE
MUST BE BROUGHT IN THE JUDICIAL DISTRICT WHERE THE DEFENDANT HAS ITS PRINCIPAL
PLACE OF BUSINESS OR A REGULAR AND ESTABLISHED PLACE OF BUSINESS.

                                TRANSITION RULE

   SECTION 505(C)(3)(D)(I) PROVIDES THAT THE FDA MAY NOT MAKE EFFECTIVE THE
APPROVAL OF A PAPER NDA FOR A DRUG WHICH CONTAINS AN ACTIVE INGREDIENT (INCLUDING
ANY ESTER OR SALT OF THE ACTIVE INGREDIENT) WHICH WAS APPROVED FOR THE FIRST TIME

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

IN AN NDA BETWEEN JANUARY 1, 1982 AND THE DATE OF ENACTMENT OF THIS BILL UNTIL 10
YEARS AFTER THE DATE OF APPROVAL OF THE NDA.  FOR EXAMPLE, IF ACTIVE INGREDIENT X
WAS APPROVED IN A DRUG FOR THE FIRST TIME IN 1983, THEN THE APPROVAL OF A PAPER
NDA FOR A DRUG CONTAINING ACTIVE INGREDIENT X COULD NOT BE MADE EFFECTIVE UNTIL
1993.

UNPATENTABLE DRUGS

    IF THE ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF THE ACTIVE INGREDIENT)
OF A DRUG IS APPROVED FOR THE FIRST TIME IN AN NDA AFTER **35 \*\*2668** THE ENACTMENT
OF THIS BILL, THEN SECTION 505(C)(3)(D)(II) PROVIDES THAT THE FDA MAY NOT MAKE THE
APPROVAL OF A PAPER NDA FOR A DRUG WHICH CONTAINS THAT ACTIVE INGREDIENT EFFECTIVE
UNTIL FOUR YEARS AFTER THE APPROVAL OF THE NDA IF THE FOLLOWING CONDITIONS ARE
MET.
    THE HOLDER OF THE NDA MUST CERTIFY THAT NO PATENT HAS EVER BEEN ISSUED TO ANY
PERSON FOR SUCH DRUG OR FOR A METHOD OF USING SUCH DRUG. FURTHER, THE HOLDER MUST
CERTIFY THAT HE CANNOT RECEIVE A PATENT FOR SUCH DRUG OR FOR A METHOD USING SUCH
DRUG FOR ANY KNOWN THERAPEUTIC PURPOSE.
    IF THE FDA DETERMINES AT ANY TIME DURING THE FOUR YEAR PERIOD THAT AN ADEQUATE
SUPPLY OF THE DRUG WILL NOT BE AVAILABLE, IT MAY MAKE THE APPROVAL OF A PAPER NDA
EFFECTIVE BEFORE THE EXPIRATION OF THE FOUR YEAR PERIOD.  THE FDA MAY ALSO MAKE
THE APPROVAL OF A PAPER NDA FOR THE DRUG EFFECTIVE BEFORE THE FOUR YEAR PERIOD IF
THE HOLDER OF THE NDA CONSENTS.

SECTION 104

    SECTION 104 AMENDS SECTION 505 OF THE FFDCA TO ADD A NEW SUBSECTION  (1).  THIS
NEW SUBSECTION PROVIDES THAT SAFETY AND EFFECTIVENESS INFORMATION THAT HAS BEEN
SUBMITTED IN AN NDA AND WHICH HAS NOT BEEN PREVIOUSLY DISCLOSED TO THE PUBLIC
SHALL BE MADE AVAILABLE TO THE PUBLIC UPON REQUEST UNDER THE FOLLOWING
CIRCUMSTANCES UNLESS EXTRAORDINARY CIRCUMSTANCES ARE SHOWN.
    FIRST, THE SAFETY AND EFFECTIVENESS INFORMATION AND DATA SHALL BE DISCLOSED UPON
REQUEST IF THE NDA HAS BEEN ABANDONED.  SECOND, SUCH INFORMATION AND DATA SHALL BE
MADE AVAILABLE UPON REQUEST IF THE FDA HAS DETERMINED THAT THE NDA IF NOT
APPROVABLE AND ALL LEGAL APPEALS HAVE BEEN EXHAUSTED.  THIRD, THE DATA AND
INFORMATION SHALL BE RELEASED UPON REQUEST IF THE APPROVAL OF THE NDA UNDER
SECTION 505(C) OF THE FFDCA HAS BEEN WITHDRAWN AND ALL LEGAL APPEALS HAVE BEEN
EXHAUSTED. FOURTH, SUCH INFORMATION AND DATA SHALL BE RELEASED UPON REQUEST IF THE
FDA HAS DETERMINED THAT THE DRUG WHICH IS THE SUBJECT OF THE NDA IS NOT A NEW
DRUG.
    THESE CONDITIONS UNDER WHICH SUCH SAFETY AND EFFECTIVENESS DATA SHALL BE
RELEASED UPON REQUEST, UNLESS EXTRAORDINARY CIRCUMSTANCES ARE SHOWN, ARE MERELY A
RESTATEMENT OF THE CURRENT REGULATION.  THE COMMITTEE INTENDS THAT ALL TERMS IN
NEW SECTION 505(1) BE GIVEN THE SAME MEANING THAT THEY HAVE IN THE REGULATION.
[FN18]  IT IS NOT THE INTENT OF THE COMMITTEE TO ALTER THE RIGHTS OF THE PUBLIC
UNDER THE FREEDOM OF INFORMATION ACT.
    THE COMMITTEE DOES INTEND, HOWEVER, TO CLARIFY THE INTERPRETATION OF 21 C.F.R.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 22

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

314.14(F)(5). [FN19] IN THIS CIRCUMSTANCE, SAFETY AND EFFECTIVENESSDATA *36
**2669 AND INFORMATION MAY BE RELEASED UPON THE EFFECTIVE DATE OF THE FIRST
APPROVAL OF AN ANDA FOR SUCH DRUG UNDER NEW SUBSECTION (J) OF SECTION 505 OF THE
FFDCA.  FURTHER, THE INFORMATION AND DATA MAY BE RELEASED ON THE DATE UPON WHICH
AN APPROVAL OF AN ANDA COULD BE MADE EFFECTIVE IF AN ANDA HAD BEEN SUBMITTED.  THE
COMMITTEE RECOGNIZES THAT AN ANDA MAY NOT BE SUBMITTED FOR ALL DRUGS THAT ARE
ELIGIBLE FOR APPROVAL AS GENERICS.  TO DEAL WITH THAT POSSIBILITY, THE COMMITTEE
INTENDS TO MAKE AVAILABLE THIS DATA WHEN THE APPROVAL OF AN ANDA WOULD HAVE BECOME
EFFECTIVE.

    THE COMMITTEE DOES NOT INTEND THAT ANY SAFETY AND EFFECTIVENESS DATA AND
INFORMATION BE RELEASED PURSUANT TO THIS SECTION DURING THE 30 DAY PERIOD AFTER
ENACTMENT OF THIS BILL WHEN PATENT INFORMATION MUST BE SUBMITTED UNDER SECTION
505(B) OR (C).  OTHERWISE, ANDA'S FILED DURING THAT PERIOD COULD BE APPROVED
EFFECTIVE IMMEDIATELY, THUS ALLOWING FOR THE DISCLOSURE OF SAFETY AND
EFFECTIVENESS INFORMATION AND DATA FOR THOSE DRUGS.

    THE COMMITTEE ALSO DOES NOT INTEND THAT SAFETY AND EFFECTIVENESS DATA AND
INFORMATION BE RELEASED UNDER THIS SECTION IF AN ANDA CHALLENGING THE VALIDITY OF
A PATENT IS APPROVED BEFORE THERE HAS BEEN A COURT DECISION HOLDING THE PATENT
INVALID AND IF THE NDA HOLDER BRINGS AN ACTION TO RESTRAIN THE DISCLOSURE.

    FINALLY, EXCEPT AS PROVIDED IN THIS SECTION, THE COMMITTEE DOES NOT INTEND TO
CHANGE OTHER REGULATIONS REGARDING FREEDOM OF INFORMATION ACT REQUESTS, TRADE
SECRETS, AND CONFIDENTIALITY OF IND, NDA AND MASTER FILE SAFETY AND EFFECTIVENESS
INFORMATION AND DATA.

    SECTION 104 ALSO ADDS A NEW SUBSECTION (M) TO SECTION 505 OF THE FFDCA.  THIS
PROVISION CLARIFIES THAT ANY REFERENCE TO PATENT INFORMATION IN SECTION 505
APPLIES ONLY TO PATENTS ISSUED BY THE PATENT AND TRADEMARK OFFICE OF THE
DEPARTMENT OF COMMERCE.  IT DOES NOT INCLUDE ANY PATENTS ISSUED BY FOREIGN
GOVERNMENTS.

                                  SECTION 105

    SECTION 105(A) OF THE BILL REQUIRES THE FDA TO PROMULGATE SUCH REGULATIONS AS
ARE NECESSARY TO IMPLEMENT NEW SUBSECTION (J).  THESE REGULATIONS MUST BE
PROMULGATED IN ACCORDANCE WITH THE INFORMAL RULEMAKING REQUIREMENTS OF TITLE 5 OF
THE U.S.C. AND NOT LATER THAN ONE YEAR AFTER ENACTMENT OF THIS BILL.

    SECTION 105(B) OF THE BILL ESTABLISHES AN INTERIM PROCEDURE FOR APPROVING ANDA'S
FOR POST-1962 DRUGS UNTIL THE FINAL IMPLEMENTING REGULATIONS ARE PROMULGATED.
DURING THE PERIOD AFTER ENACTMENT OF THIS BILL AND UNTIL THE PROMULGATION OF
REGULATIONS BY THE FDA, ANDA'S FOR LISTED POST-1962 DRUGS MAY BE SUBMITTED IN
ACCORDANCE WITH THE CURRENT REGULATIONS APPLICABLE TO PRE-1962 PIONEER DRUGS.

    TO THE EXTENT THAT THERE ARE INCONSISTENCIES BETWEEN THE CURRENT REGULATIONS AND
THIS ACT, THE FDA SHALL FOLLOW THIS ACT.  UNDER NO CIRCUMSTANCES MAY THE FDA
APPROVE AN ANDA OR PAPER NDA UNDER THIS INTERIM PROCEDURE FOR A DRUG THAT IS
ELIGIBLE FOR FOUR OR TEN YEARS OF MARKET EXCLUSIVITY EXCEPT IN ACCORDANCE WITH
THOSE PROVISIONS.

                            *37 **2670 SECTION 106

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


SECTION 106 OF THE BILL AMENDS SECTION 2201 OF TITLE 28 TO INSERT A CROSS
REFERENCE TO EXPLAIN THAT A SUIT FOR DECLARATORY JUDGMENT REGARDING A PATENT MAY
NOT BE BROUGHT UNDER CERTAIN CIRCUMSTANCES SET FORTH IN SECTION 505 OF THE FFDCA.

TITLE II-- PATENT TERM RESTORATION ACT

SECTION 201 OF THE BILL

SECTION 201 ADDS A NEW SECTION 156 TO TITLE 35 OF THE U.S.C.  THE PATENT LAW.
IT IS ENTITLED 'EXTENSION OF PATENT TERM.'  THE NEW SECTION PROVIDES FOR THE
EXTENSION OF THE NORMAL 17 YEAR TERM OF A PRODUCT, USE, OR PROCESS PATENT IF A
PRODUCT WHICH IS THE SUBJECT OF THE PATENT IS REQUIRED BY FEDERAL LAW TO BE
APPROVED BEFORE IT IS COMMERCIALLY MARKETED.

SECTION 156(A)

CONDITIONS FOR EXTENSION APPLICABLE TO ALL PATENTS

THE TERM OF A PATENT WHICH CLAIMS A PRODUCT, A METHOD OF USING A PRODUCT, OR A
METHOD OF MANUFACTURING A PRODUCT SHALL BE EXTENDED ONE TIME FROM ITS ORIGINAL
EXPIRATION DATE IF THE CONDITIONS DESCRIBED IN SECTION 156(A) ARE MET.  THE TERM
'CLAIMS' WAS SELECTED BECAUSE IT IS THE TERM USED IN THE PATENT LAW TO DESCRIBE
THE INVENTION WHICH THE PATENT OWNER OR ITS ASSIGNEE MAY PREVENT OTHERS FROM
MAKING, USING OR SELLING DURING THE SEVENTEEN YEAR TERM OF THE PATENT.  FOR
INSTANCE, IN THE CASE OF A PRODUCT PATENT WHICH 'CLAIMS' A BROAD GENUS OF
COMPOUNDS, THE PATENT OWNER COULD PREVENT OTHERS FROM MAKING, USING OR SELLING ANY
COMPOUND WHICH IS A SPECIES OF THAT GENUS.
SIX OF THE EIGHT CONDITIONS DESCRIBED IN THE NUMBERED PARAGRAPHS UNDER  SECTION
156(A) ARE APPLICABLE TO ALL PATENTS TO BE EXTENDED. THEY ARE FOUND IN PARAGRAPHS
(1)-(3) AND (6)-(8).
PARAGRAPH (1) REQUIRES THE PATENT TO BE IN FORCE AT THE TIME AN APPLICATION FOR
ITS EXTENSION IS SUBMITTED TO THE COMMISSIONER OF PATENTS AND TRADEMARKS.
PARAGRAPH (2) ALLOWS EXTENSION ONLY IF THE TERM OF THE PATENT HAS NOT BEEN
EXTENDED PREVIOUSLY.  AND PARAGRAPH (3) REQUIRES THE APPLICATION FOR EXTENSION TO
BE SUBMITTED BY THE OWNER OF RECORD OF THE PATENT, OR ITS AGENT, IN ACCORDANCE
WITH THE REQUIREMENTS OF SECTION 156(D).
PARAGRAPHS (6) AND (7) DESCRIBE TWO CONDITIONS WHICH MUST BE MET BY THE PRODUCT
WHICH IS CLAIMED IN THE PRODUCT PATENT TO BE EXTENDED, OR THE USE OR MANUFACTURE
OF WHICH IS CLAIMED IN THE USE OR PROCESS PATENT TO BE EXTENDED. FIRST, THE
PRODUCT MUST HAVE BEEN SUBJECTED TO A REGULATORY REVIEW PERIOD UNDER AN APPLICABLE
FEDERAL LAW, AND APPROVED, BEFORE THE PRODUCT WAS ALLOWED TO BE COMMERCIALLY
MARKETED.  (THE PRODUCT WHICH CAN BE THE SUBJECT OF A PATENT EXTENSION IS
HEREAFTER REFERRED TO AS THE 'APPROVED PRODUCT.') SECOND, WITH ONE EXCEPTION, THE
APPROVED PRODUCT MUST HAVE BEEN APPROVED FOR COMMERCIAL MARKETING FOR THE FIRST
TIME.  THE EXCEPTION INVOLVES AN APPROVED PRODUCT MADE UNDER A PATENTED PROCESS
WHICH PRIMARILY USES RECOMBINANT DNA TECHNOLOGY. SUCH AN APPROVED PRODUCT COULD

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


HAVE RECEIVED ITS SECOND APPROVAL FOR COMMERCIAL *38 **2671 MARKETING, BUT IT MUST
BE THE FIRST TIME A PRODUCT MADE BY THE CLAIMED PROCESS HAS BEEN APPROVED.
    THE COMMITTEE'S BILL REQUIRES EXTENSIONS TO BE BASED ON THE FIRST APPROVAL OF A
PRODUCT BECAUSE THE ONLY EVIDENCE AVAILABLE TO CONGRESS SHOWING THAT PATENT TIME
HAS BEEN LOST IS DATA ON SO-CALLED CLASS I, NEW CHEMICAL ENTITY DRUGS. THESE DRUGS
HAD BEEN APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA) FOR THE FIRST TIME.
AN EXCEPTION WAS ALLOWED FOR PRODUCTS MADE THROUGH RECOMBINANT DNA BECAUSE THIS
INNOVATIVE, NEW TECHNIQUE IS BEING EMPLOYED TO IMPROVE ALREADY APPROVED DRUGS.
    PARAGRAPH (8) ADDRESSES THE CIRCUMSTANCES WHERE TWO DIFFERENT APPROVED PRODUCTS
ARE THE SUBJECT OF THE SAME PATENT. AN EXTENSION WOULD BE GRANTED ONLY FOR THE
FIRST APPROVED PRODUCT WHICH HAS BEEN THE SUBJECT OF A REGULATORY REVIEW PERIOD.

             CONDITIONS OF EXTENSION APPLICABLE TO PRODUCT AND USE PATENTS

    PARAGRAPH (4) OF SECTION 156(A) DESCRIBES CONDITIONS WHICH ARE APPLICABLE TO
PRODUCT AND USE PATENTS ONLY.
    PARAGRAPH (4)(A) PERMITS SUCH A PATENT TO BE EXTENDED IF TWO REQUIREMENTS ARE
MET. THE FIRST IS THAT THE APPROVED PRODUCT IS NOT CLAIMED IN ANOTHER PRODUCT
PATENT WHICH HAS BEEN EXTENDED OR WHICH AS AN EARLIER ISSUANCE DATE. THE SECOND
IS THAT THE APPROVED PRODUCT AND THE USE FOR WHICH THE PRODUCT IS APPROVED ARE NOT
IDENTICALLY DISCLOSED OR DESCRIBED IN ANOTHER PRODUCT OR USE PATENT WHICH HAS BEEN
EXTENDED OR WHICH HAS AN EARLIER ISSUANCE DATE. THE PHRASE 'IDENTICALLY DISCLOSED
OR DESCRIBED' IS INTENDED TO HAVE THE SAME MEANING WHICH IT HAS UNDER CURRENT
PATENT LAW. [FN20]
    THE POLICY WHICH THE COMMITTEE SEEKS TO IMPLEMENT IN PARAGRAPH (4)(A) IS, IN
BRIEF, THAT THE FIRST PATENT (1) WHICH CLAIMS THE APPROVED PRODUCT, IN THE SENSE
THAT THE APPROVED PRODUCT WOULD INFRINGE A CLAIM OF THAT PATENT, OR (2) WHICH
FULLY DISCLOSES THAT PRODUCT AND ITS APPROVED USE, IS THE PATENT WHICH SHOULD BE
REWARDED WITH AN EXTENSION. FOR EXAMPLE, IF THE APPROVED PRODUCT IS THE SUBJECT
OF SEVERAL PATENTS AS A RESULT OF FILING CONTINUATION, CONTINUATION-IN-PART,
DIVISIONAL OR OTHERWISE RELATED PATENT APPLICATIONS, EACH OF WHICH DISCLOSES THE
APPROVED PRODUCT AND ITS APPROVED USE, THEN ONLY THE EARLIEST ISSUED PATENT IS
ELIGIBLE FOR AN EXTENSION.
    PARAGRAPH (4)(B) IS AN EXCEPTION TO THE RULE IN PARAGRAPH (4)(A) FOR CERTAIN
PRODUCT PATENTS. IF TWO CONDITIONS ARE MET, A PRODUCT PATENT CAN BE EXTENDED EVEN
THOUGH THE APPROVED PRODUCT IS ALSO CLAIMED IN ANOTHER PRODUCT PATENT WHICH HAS
BEEN EXTENDED OR WHICH HAS AN EARLIER ISSUANCE DATE. FIRST, THE PRODUCT PATENT
WHICH WAS ISSUED EARLIER OR PREVIOUSLY EXTENDED CANNOT IDENTICALLY DISCLOSE OR
DESCRIBE THE APPROVED PRODUCT. SECOND, THE HOLDER OF EACH OF THE TWO PRODUCT
PATENTS MUST NEVER HAVE BEEN AND MUST NEVER BECOME THE HOLDER OF THE OTHER PATENT.
 IN THIS PARAGRAPH, THE TERM 'HOLDER' IS ANY PERSON WHO OWNS THE PATENT OR IS AN
EXCLUSIVE LICENSEE OF THE OWNER. THIS EXCEPTION WAS INCLUDED TO PREVENT AN
EARLIER ISSUED PATENT WHICH CLAIMS A BROAD GENUS OF COMPOUNDS FROM BLOCKING THE
POSSIBLE EXTENSION OF A LATER ISSUED PATENT CLAIMING A *39 **2672 SPECIFIC MEMBER
OF THAT GENUS WHERE NEITHER PATENT HOLDER HAD A CHOICE AS TO WHICH PATENT TO
EXTEND.


© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.A.N. 2647)**

CONDITIONS OF EXTENSION APPLICABLE TO PROCESS PATENTS

PARAGRAPH (5) OF SECTION 156(A) DESCRIBES CONDITIONS WHICH ARE APPLICABLE TO
PROCESS PATENTS ONLY.

PARAGRAPH (5)(A) PERMITS A PROCESS PATENT, WHICH DOES NOT PRIMARILY UTILIZE
RECOMBINANT DNA IN THE MANUFACTURE OF THE APPROVED PRODUCT, TO BE EXTENDED IF TWO
CONDITIONS ARE MET.  FIRST, THERE CAN NOT BE ANY ISSUED PRODUCT PATENT WHICH
CLAIMS THE APPROVED PRODUCT OR ANY ISSUED USE PATENT WHICH CLAIMS A METHOD OF
USING THE APPROVED PRODUCT FOR ANY KNOWN THERAPEUTIC USE.  AND, SECOND, THERE CAN
NOT BE AN EARLIER ISSUED PROCESS PATENT, WHICH DOES NOT PRIMARILY UTILIZE
RECOMBINANT DNA AND WHICH CLAIMS A METHOD OF MANUFACTURING THE APPROVED PRODUCT.

PARAGRAPH (5)(B) PERMITS A PROCESS PATENT, WHICH PRIMARILY UTILIZES RECOMBINANT
DNA IN THE MANUFACTURE OF THE APPROVED PRODUCT, TO BE EXTENDED IF SEVERAL
CONDITIONS ARE MET.  FIRST, THE HOLDER OF THE PROCESS PATENT CAN NOT HOLD A
PRODUCT PATENT CLAIMING THE APPROVED PRODUCT OR A USE PATENT CLAIMING A METHOD OF
USING THE APPROVED PRODUCT.  SECOND, THERE CAN NOT BE AN OWNERSHIP OR CONTROL
INTEREST, EITHER DIRECTLY OR INDIRECTLY, BETWEEN THE HOLDER OF THE PROCESS PATENT
AND THE HOLDER OF ANY PRODUCT PATENT CLAIMING THE APPROVED PRODUCT OR THE HOLDER
OF ANY USE PATENT CLAIMING A METHOD OF USING THE APPROVED PRODUCT.  THIRD, THERE
CAN NOT BE ANY EARLIER ISSUED PROCESS PATENT WHICH CLAIMS A METHOD OF
MANUFACTURING THE APPROVED PRODUCT BY PRIMARILY UTILIZING RECOMBINANT DNA.

THE COMMITTEE'S BILL ESTABLISHES SEPARATE RULES FOR PROCESS PATENTS WHICH DO NOT
USE RECOMBINANT DNA BECAUSE THE DISCOVERY OF SUCH A NEW PROCESS FOR MAKING AN
EXISTING PRODUCT DOES NOT WARRANT THE SAME REWARD OF PATENT EXTENSION AS DOES THE
DISCOVERY OF A NEW PRODUCT.  AN EXTENSION FOR THE PROCESS PATENT IS APPROPRIATE
ONLY WHEN THERE ARE NO PRODUCT OR USE PATENTS.  ON THE OTHER HAND, WHEN
RECOMBINANT DNA TECHNOLOGY IS THE ESSENTIAL AND PREDOMINANT TECHNIQUE USED IN
MAKING AN IMPROVED VERSION OF AN EXISTING PRODUCT, THE COMMITTEE BELIEVES THAT
THIS NEW AND IMPORTANT INNOVATION SHOULD BE REWARDED.

SECTION 156(B)

RIGHTS TO BE EXTENDED

EXCEPT FOR THE LIMITATIONS DESCRIBED BELOW WITH RESPECT TO THE SCOPE OF THE
PATENT CLAIMS, ALL PROVISIONS OF THE PATENT LAW APPLY TO THE PATENT DURING THE
PERIOD OF EXTENSION.  THE LIMITATIONS ARE AS FOLLOWS:  (1) WHEN A PRODUCT PATENT
CLAIMING THE APPROVED PRODUCT IS EXTENDED, THE HOLDER'S RIGHTS ARE LIMITED TO ANY
USE OF THE APPROVED PRODUCT WHICH WAS APPROVED BEFORE THE EXPIRATION OF THE
EXTENDED TERM OF THE PATENT UNDER THE PROVISION OF LAW UNDER WHICH THE APPLICABLE
REGULATORY REVIEW PERIOD OCCURRED.

(2) WHEN A USE PATENT CLAIMING A METHOD OF USING THE APPROVED PRODUCT IS
EXTENDED, THE HOLDER'S RIGHTS ARE LIMITED TO ANY USE OF THE APPROVED PRODUCT
WHICH:  (1) IS CLAIMED IN THE USE PATENT, AND (B) WAS APPROVED BEFORE THE
EXPIRATION OF THE EXTENDED TERM OF THE **40 **2673 PATENT UNDER THE PROVISION OF
LAW UNDER WHICH THE APPLICABLE REGULATORY REVIEW PERIOD OCCURRED.

(3) WHEN A PROCESS PATENT CLAIMING A METHOD OF MANUFACTURING THE APPROVED

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


PRODUCT IS EXTENDED, THE HOLDER'S RIGHTS ARE LIMITED TO THE METHOD OF
MANUFACTURING WHICH:  (A) IS CLAIMED IN THE PROCESS PATENT, AND (B) IS USED TO
MAKE THE APPROVED PRODUCT.

SECTION 156(C)

PERIOD OF EXTENSION

   SECTION 156(C) SPECIFIES THE RULES BY WHICH THE LENGTH OF THE PERIOD OF
EXTENSION IS DETERMINED.  THE CALCULATION MADE UNDER THESE RULES IS FURTHER
LIMITED BY THE REQUIREMENTS OF SECTION 156(G)(4).
   UNDER SECTION 156(C), THE LENGTH OF THE EXTENSION IS BASED ON THE LENGTH OF THE
REGULATORY REVIEW PERIOD IN WHICH THE APPROVED PRODUCT WAS APPROVED. THE
DEFINITION OF THE VARIOUS REGULATORY REVIEW PERIODS IS IN SECTIONS 156(G)(1)-(3).
 ALL REGULATORY REVIEW PERIODS ARE DIVIDED INTO A TESTING PHASE AND AN AGENCY
APPROVAL PHASE.
   THE REGULATORY REVIEW PERIOD WHICH OCCURS AFTER THE PATENT TO BE EXTENDED WAS
ISSUED IS ELIGIBLE TO BE COUNTED TOWARDS EXTENSION IN ACCORDANCE WITH THE
FOLLOWING CALCULATION.  FIRST, EACH PHASE OF THE REGULATORY REVIEW PERIOD IS
REDUCED BY ANY TIME THAT THE APPLICANT FOR EXTENSION DID NOT ACT WITH DUE
DILIGENCE DURING THAT PHASE.  (THE DETERMINATION OF LACK OF DUE DILIGENCE IS MADE
UNDER SECTION 156(D).) SECOND, AFTER ANY SUCH REDUCTION, ONE-HALF OF THE TIME
REMAINING IN THE TESTING PHASE WOULD BE ADDED TO THE TIME REMAINING IN THE
APPROVAL PHASE TO COMPRISE THE TOTAL PERIOD ELIGIBLE FOR EXTENSION.  THIRD, ALL OF
THE ELIGIBLE PERIOD CAN BE COUNTED UNLESS TO DO SO WOULD RESULT IN A TOTAL
REMAINING PATENT TERM OF MORE THAN FOURTEEN YEARS.  FOR EXAMPLE, IF AN APPROVED
DRUG PRODUCT WHICH IS ELIGIBLE FOR FIVE YEARS OF EXTENSION HAD TEN YEARS OF
ORIGINAL PATENT TERM LEFT AT THE END OF ITS REGULATORY REVIEW PERIOD, THEN ONLY
FOUR OF THE FIVE YEARS COULD BE COUNTED TOWARDS EXTENSION.
   THE ADDITIONAL LIMITATION ON THE PERIOD OF EXTENSION IS FOUND IN SECTION
156(G)(4).  THAT SECTION PROVIDES DIFFERENT MAXIMUM PERIODS OF EXTENSION DEPENDING
ON WHETHER THE APPROVED PRODUCT WAS DEVELOPED BEFORE OR AFTER THE DATE OF
ENACTMENT.
   UNDER THAT SECTION, THE TOTAL PERIOD OF REGULATORY REVIEW WHICH CAN BE COUNTED
TOWARDS EXTENSION WOULD NOT EXCEED FIVE YEARS WHEN:  (1) THE PATENT TO BE EXTENDED
WAS ISSUED AFTER THE DATE OF ENACTMENT OF THIS BILL; OR (2) THE PATENT WAS ISSUED
BEFORE THE DATE OF ENACTMENT, BUT THE APPROVED PRODUCT'S REGULATORY REVIEW PERIOD
HAD NOT BEGUN ON THE DATE OF ENACTMENT.  THE TOTAL PERIOD OF ELIGIBLE REGULATORY
REVIEW WOULD NOT EXCEED TWO YEARS WHEN:  (1) THE PATENT TO BE EXTENDED WAS ISSUED
BEFORE THE DATE OF ENACTMENT; AND (2) THE APPROVED PRODUCT'S REGULATORY REVIEW
PERIOD HAD BEGUN BEFORE THE DATE OF ENACTMENT BUT THE PRODUCT HAD NOT BEEN
APPROVED BY THAT DATE.  IF ANY ACTION WAS TAKEN BEFORE THE DATE OF ENACTMENT WHICH
INITIATED THE TESTING PHASE OF THE REGULATORY REVIEW PERIOD, THEN THE APPLICANT
WOULD NOT BE ELIGIBLE FOR THE FIVE YEAR RULE BY DISCONTINUING ACTIVITY AND THEN
INITIATING A NEW REGULATORY REVIEW PERIOD AFTER THE DATE OF ENACTMENT.
   **\*41 \*\*2674** THE COMMITTEE ESTABLISHED DIFFERENT MAXIMUM PERIODS OF EXTENSION TO
PROVIDE GREATER INCENTIVE FOR FUTURE INNOVATIONS.  BY EXTENDING PATENTS FOR UP TO

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 27

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

FIVE YEARS FOR PRODUCTS DEVELOPED IN THE FUTURE, AND BY PROVIDING FOR UP TO
FOURTEEN YEARS OF MARKET EXCLUSIVITY, THE COMMITTEE EXPECTS THAT RESEARCH
INTENSIVE COMPANIES WILL HAVE THE NECESSARY INCENTIVE TO INCREASE THEIR RESEARCH
AND DEVELOPMENT ACTIVITIES.

SECTION 156(D)

APPLICATION FOR EXTENSION

   TO OBTAIN AN EXTENSION, THE PATENT OWNER OR ITS AGENT WOULD SUBMIT AN
APPLICATION TO THE COMMISSIONER OF PATENTS AND TRADEMARKS WITHIN 60 DAYS OF
APPROVAL OF THE APPROVED PRODUCT.  THE APPLICATION WOULD CONTAIN THE INFORMATION
DESCRIBED IN SUBPARAGRAPHS (A)-(G) OF SECTION 156(D)(1).  THE APPLICANT WOULD BE
SUBJECT TO ANY DISCLOSURE REQUIREMENTS PRESCRIBED BY THE COMMISSIONER.  THE
COMMITTEE EXPECTS THAT THOSE REQUIREMENTS WOULD SUBJECT THE APPLICANT TO AT LEAST
THE SAME DUTY OF DISCLOSURE, AND THE PENALTIES AND LOSS OF RIGHTS FOR VIOLATION OF
THE DUTY OF DISCLOSURE, WHICH GOVERNS ALL PATENT APPLICATION PROCEEDINGS BEFORE
THE PATENTS AND TRADEMARKS OFFICE.
   WITHIN 60 DAYS OF THE SUBMISSION OF AN APPLICATION, THE COMMISSIONER WOULD
NOTIFY THE SECRETARY OF HEALTH AND HUMAN SERVICES, OR THE SECRETARY OF
AGRICULTURE, AS APPROPRIATE, TO REVIEW THE DATES CONTAINED IN THE APPLICATION FOR
THE REGULATORY REVIEW PERIOD.  WITHIN 30 DAYS, THE APPROPRIATE SECRETARY WOULD
MAKE A DETERMINATION AS TO THOSE DATES, NOTIFY THE COMMISSIONER OF THEM, AND
PUBLISH THEM IN THE FEDERAL REGISTER.

DETERMINATION OF DUE DILIGENCE (SECTION 156(D)(2)(B))

   THE COMMITTEE'S BILL PROVIDES A DEFINITION OF DUE DILIGENCE AT SECTION 156(D)(3)
.  IT IS 'THAT DEGREE OF ATTENTION, CONTINUOUS DIRECTED EFFORT, AND TIMELINESS AS
MAY REASONABLY BE EXPECTED FROM, AND ARE ORDINARILY EXERCISED BY, A PERSON DURING
A REGULATORY REVIEW PERIOD.'
   A PETITION MAY BE SUBMITTED BY ANY INTERESTED PERSON TO THE APPROPRIATE
SECRETARY REQUESTING A DETERMINATION OF WHETHER THE APPLICANT FOR EXTENSION ACTED
WITH DUE DILIGENCE DURING THE REGULATORY REVIEW PERIOD OF THE APPROVED PRODUCT.
THE PETITION MUST BE SUBMITTED WITHIN 180 DAYS OF THE PUBLICATION BY THE SECRETARY
OF A DETERMINATION OF THE REGULATORY REVIEW PERIOD AND MUST STATE CLAIM THAT THE
APPLICANT DID NOT ACT WITH DUE DILIGENCE DURING SOME PART OF THE REGULATORY REVIEW
PERIOD.  IF THE SECRETARY CONCLUDES FROM THE INFORMATION IN THE PETITION THAT
THERE IS REASON TO BELIEVE THAT THE APPLICANT FAILED TO ACT WITH DUE DILIGENCE AT
SOME POINT IN THE REGULATORY REVIEW PERIOD, THEN THE SECRETARY WOULD MAKE, WITHIN
90 DAYS OF THE RECEIPT OF THE PETITION AND IN ACCORDANCE WITH REGULATIONS, A
DETERMINATION OF WHETHER THE APPLICANT ACTED WITH DUE DILIGENCE.  THE SECRETARY OF
HHS IS PROHIBITED FROM DELEGATING THE AUTHORITY TO MAKE THE DETERMINATION TO ANY
OFFICE BELOW THAT OF THE COMMISSIONER OF FDA.
   WHILE THE BILL PLACES THE BURDEN ON THE PETITIONER TO MAKE THE NECESSARY
SHOWING, THE COMMITTEE RECOGNIZES THAT THE INFORMATION **42 **2675 NEEDED TO MAKE A
FINAL DETERMINATION OF DUE DILIGENCE IS NOT AVAILABLE TO THE PETITIONER.  TO MEET

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                      Page 28

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

THIS BURDEN OF PROOF, THE PETITIONER NEED NOT SHOW CONCLUSIVELY THAT THERE WAS A
LACK OF DUE DILIGENCE. INSTEAD, THE PETITIONER NEED ONLY ALLEGE SUFFICIENT FACTS
TO MERIT AN INVESTIGATION BY THE SECRETARY. FOR EXAMPLE, IT WOULD BE SUFFICIENT
FOR THE PETITIONER TO DEMONSTRATE THAT HUMAN CLINICAL TRIALS DID NOT BEGIN FOR AN
UNREASONABLY LONG PERIOD OF TIME AFTER THE FDA GRANTED PERMISSION TO BEGIN THOSE
TRIALS OR THAT THE TRIALS TOOK AN UNREASONABLY LONG PERIOD OF TIME. IN THOSE
EVENTS, THE SECRETARY WOULD DETERMINE WHETHER THE DELAY WAS CAUSED BY A LACK OF
DUE DILIGENCE ON THE PART OF THE APPLICANT.
    AFTER MAKING THE DETERMINATION, THE SECRETARY WOULD NOTIFY THE COMMISSIONER OF
PATENTS AND TRADEMARKS AND PUBLISH IT IN THE FEDERAL REGISTER. ANY INTERESTED
PERSON COULD REQUEST AN INFORMAL HEARING WITHIN 60 DAYS OF PUBLICATION OF THE
DETERMINATION. IF A TIMELY REQUEST IS MADE, THE SECRETARY MUST HOLD SUCH A
HEARING WITHIN 30 DAYS, GIVE NOTICE OF THE HEARING TO THE PATENT OWNER AND ANY
INTERESTED PERSON, AND PROVIDE SUCH PERSONS WITH AN OPPORTUNITY TO PARTICIPATE.
WITHIN 30 DAYS OF THE HEARING, THE SECRETARY MUST AFFIRM OR REVISE THE
DETERMINATION, NOTIFY THE COMMISSIONER OF PATENTS, AND PUBLISH IT IN THE FEDERAL
REGISTER.
    THE COMMITTEE ESTABLISHED A SYSTEM FOR REVIEW OF DUE DILIGENCE THAT REQUIRES THE
MINIMAL AMOUNT OF FEDERAL AGENCY PERSONNEL TIME. THE GOAL OF THE SYSTEM IS TO
ASSURE THAT OBVIOUS DELAYS DURING REGULATORY REVIEW, SUCH AS A PROLONGED PERIOD
WHEN HUMAN CLINICAL TRIALS ON A DRUG PRODUCT ARE NOT BEING CONDUCTED, ARE NOT
COUNTED TOWARDS PATENT EXTENSION. THE SYSTEM IS NOT INTENDED TO CAUSE A REVIEW OF
EVERY ACTION, BUT TO IDENTIFY SIGNIFICANT PERIODS OF TIME WHEN THE LOSS OF PATENT
TERM RESULTED SOLELY FROM THE APPLICANT'S FAILURE TO PURSUE APPROVAL. DELAYS
CAUSED BY THE TEMPORARY UNAVAILABILITY OF NECESSARY TESTING FACILITIES, OR A
SCIENTIFIC DISPUTE INVOLVING TESTS REQUIRED FOR APPROVAL OR THE INTERPRETATION OF
THOSE TESTS, ARE EXAMPLES OF DELAYS WHICH CAN REASONABLY BE EXPECTED TO OCCUR AND
WOULD NOT BE A BASIS FOR FINDING A LACK OF DUE DILIGENCE.

                                SECTION 156(E)

        DETERMINATION ON PATENT EXTENSION OF THE COMMISSIONER OF PATENTS AND TRADEMARKS

    THE COMMISSIONER WOULD MAKE THE FINAL DETERMINATION THAT A PATENT IS ELIGIBLE
FOR EXTENSION UNDER SECTION 156(A), THAT THE REQUIREMENTS OF SECTION 156(D) HAVE
BEEN MET, AND THAT THE PERIOD OF EXTENSION WILL BE THE PERIOD PRESCRIBED IN
SECTION 156(C). ONCE THESE FINDINGS ARE MADE, THE COMMISSIONER WOULD BE REQUIRED
TO ISSUE A CERTIFICATE OF EXTENSION TO THE APPLICANT. THE CERTIFICATE WOULD BE
RECORDED IN THE OFFICIAL FILE OF THE PATENT AND BE CONSIDERED A PART OF THE
ORIGINAL PATENT.
    THE COMMISSIONER'S DECISION REGARDING A PATENT'S ELIGIBILITY FOR EXTENSION UNDER
THE RULES OF SECTION 156(A) MAY BE BASED SOLELY ON THE INFORMATION CONTAINED IN
THE APPLICATION. THE BURDEN IS ON THE APPLICANT TO SHOW THAT ALL PATENTS WHICH
ARE RELEVANT TO THE ELIGIBILITY DETERMINATION HAVE BEEN CONSIDERED AND DO NOT
PREVENT THE REQUESTED EXTENSION.
    **\*43 \*\*2676** WHILE THE COMMISSIONER WOULD BE RESPONSIBLE FOR EVALUATING THE
APPLICANT'S DETERMINATION REGARDING THE PATENTS LISTED IN THE APPLICATION, THE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

COMMITTEE EXPECTS THAT MOST REVIEWS WOULD BE MINISTERIAL IN NATURE.  SINCE THE
APPLICANT IS UNDER A DUTY TO DISCLOSE ALL RELEVANT INFORMATION (SEE SECTION
156(D)(4)), THE APPLICATION SHOULD BE SO WELL DOCUMENTED THAT A SUBSTANTIVE REVIEW
BY THE COMMISSIONER WOULD USUALLY NOT BE NECESSARY.

EXPIRATION OF A PATENT PENDING EXTENSION (SECTION 156(E)(2))

IT IS POSSIBLE THAT THE ORIGINAL TERM OF THE PATENT FOR WHICH EXTENSION IS
SOUGHT COULD EXPIRE BEFORE A FINAL DECISION BY THE COMMISSIONER TO ISSUE A
CERTIFICATE OF EXTENSION.  THIS MIGHT OCCUR, FOR INSTANCE, BECAUSE THE
DETERMINATION OF DUE DILIGENCE BY THE SECRETARY OF HHS OR AGRICULTURE HAS NOT BEEN
COMPLETED.

IN SUCH CIRCUMSTANCES, THE COMMISSIONER IS REQUIRED TO DETERMINE WHETHER THE
PATENT IS ELIGIBLE FOR EXTENSION UNDER SECTION 156(A), AND IF IT IS, TO ISSUE A
CERTIFICATE OF EXTENSION FOR A PERIOD OF UP TO ONE YEAR.  THE LENGTH OF THIS
INTERIM EXTENSION IS DISCRETIONARY WITH THE COMMISSIONER, BUT IS INTENDED TO
PROVIDE TIME FOR THE COMPLETION OF ANY OUTSTANDING REQUIREMENTS.  IF THE
COMMISSIONER DETERMINED THAT SUBSEQUENT INTERIM EXTENSIONS WERE NECESSARY, AND
CONSISTENT WITH THE OBJECTIVES OF SECTION 156(E)(2), THEY COULD BE GRANTED AS
WELL.  IN NO EVENT COULD THESE INTERIM EXTENSIONS BE LONGER THAN THE MAXIMUM
PERIOD OF EXTENSION TO WHICH THE APPLICANT IS THOUGHT TO BE ELIGIBLE.

SECTION 156(F)

DEFINITIONS

THE TERM 'PRODUCT' IS DEFINED IN SUBSECTION (F)(1) TO INCLUDE DRUG PRODUCTS AND
MEDICAL DEVICES, FOOD ADDITIVES AND COLOR ADDITIVES SUBJECT TO REGULATION UNDER
THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.

THE TERM 'DRUG PRODUCT' IS DEFINED IN SUBSECTION (F)(2) TO MEAN THE ACTIVE
INGREDIENT OF A NEW DRUG, ANTIBIOTIC DRUG, NEW ANIMAL DRUG, OR HUMAN OR VETERINARY
BIOLOGICAL PRODUCT (AS THOSE TERMS ARE USED IN THE FEDERAL FOOD, DRUG, AND
COSMETIC ACT, THE PUBLIC HEALTH SERVICE ACT AND THE VIRUS-SERUM-TOXIN ACT),
INCLUDING ANY SALT OR ESTER OF THE ACTIVE INGREDIENT, AS A SINGLE ENTITY OR IN
COMBINATION WITH ANOTHER ACTIVE INGREDIENT.  THE HUMAN DRUGS INCLUDED IN THIS
DEFINITION ARE BOTH PRESCRIPTION AND OVER-THE-COUNTER DRUGS.

THE TERM 'MAJOR HEALTH OR ENVIRONMENTAL EFFECTS TEST' IS DEFINED IN SUBSECTION
(F)(3) TO MEAN A TEST WHICH IS REASONABLY RELATED TO THE EVALUATION OF THE HEALTH
OR ENVIRONMENTAL EFFECTS OF A PRODUCT, WHICH REQUIRES AT LEAST SIX MONTHS TO
CONDUCT, AND THE DATA FROM WHICH IS SUBMITTED TO RECEIVE PERMISSION FOR COMMERCIAL
MARKETING OR USE. PERIODS OF ANALYSIS OR EVALUATION OF TEST RESULTS ARE NOT TO BE
INCLUDED IN DETERMINING IF THE CONDUCT OF A TEST REQUIRED AT LEAST SIX MONTHS.

THE TERM 'INFORMAL HEARING' IS DEFINED IN SUBSECTION (F)(5) TO HAVE THE SAME
MEANING AS 'PRESCRIBED FOR SUCH TERM BY SECTION 201(Y) OF THE FEDERAL FOOD, DRUG,
AND COSMETIC ACT.'

THE TERM 'PATENT' IS DEFINED IN SUBSECTION (F)(6) TO MEAN 'A PATENT ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

**\*44 \*\*2677** SECTION 156(G)

DEFINITION OF REGULATORY REVIEW PERIOD

THE 'REGULATORY REVIEW PERIOD' DIFFERS FOR EACH PRODUCT THAT CAN BE THE SUBJECT
OF PATENT EXTENSION, BUT IN ALL CASES IT IS CONSIDERED TO HAVE A TESTING PHASE AND
AN AGENCY APPROVAL PHASE.

IN SECTIONS 156(G)(1)-(3) OF THE TERM 'INITIALLY SUBMITTED' IS USED TO DESCRIBE
THE POINT IN TIME WHEN THE TESTING PHASE IS CONSIDERED TO BE COMPLETED AND THE
AGENCY APPROVAL PHASE TO HAVE BEGUN. THIS TERM IS USED INSTEAD OF THE TERM
'FILED,' BECAUSE AN APPLICATION IS OFTEN NOT CONSIDERED TO BE FILED, EVEN THOUGH
AGENCY REVIEW HAS BEGUN, UNTIL THE AGENCY HAS DETERMINED THAT NO OTHER INFORMATION
IS NEEDED AND A DECISION ON THE APPLICATION CAN BE MADE. FOR PURPOSES OF
DETERMINING THE REGULATORY REVIEW PERIOD AND ITS COMPONENT PERIODS, AN APPLICATION
FOR AGENCY REVIEW IS CONSIDERED TO BE 'INITIALLY SUBMITTED' IF THE APPLICANT HAS
MADE A DELIBERATE EFFORT TO SUBMIT AN APPLICATION CONTAINING ALL INFORMATION
NECESSARY FOR AGENCY REVIEW TO BEGIN. THE COMMITTEE RECOGNIZES THAT THE AGENCY
RECEIVING THE APPLICATION MIGHT DECIDE IT NEEDS ADDITIONAL INFORMATION OR OTHER
CHANGES IN THE APPLICATION. AS LONG AS THE APPLICATION WAS COMPLETE ENOUGH SO
THAT AGENCY ACTION COULD BE COMMENCED, IT WOULD BE CONSIDERED TO BE 'INITIALLY
SUBMITTED'.

DRUG PRODUCTS (SECTION 156(G)(1)

THE REGULATORY REVIEW PERIOD FOR DRUG PRODUCTS IS THE SUM OF THE PERIODS:  (1)
BEGINNING WHEN AN EXEMPTION UNDER 505(I), 507(D), OR 512(J) WAS GRANTED OR
AUTHORITY TO PREPARE AN EXPERIMENTAL DRUG PRODUCT UNDER THE VIRUS-SERUM-TOXIN ACT
WAS GRANTED AND ENDING WHEN WITH THE INITIAL SUBMISSION OF AN APPLICATION FOR
APPROVAL UNDER SECTION 351 OF THE PUBLIC HEALTH SERVICE ACT, 505, 507, 512 OF THE
FEDERAL FOOD, DRUG, AND COSMETIC ACT, OR THE VIRUS-SERUM-TOXIN ACT; AND (2)
BEGINNING WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED UNDER SECTION
351 OF THE PHS, 505, 507, 512 OF THE FFDCA OR THE VIRUS-SERUM-TOXIN ACT AND ENDING
WHEN THE APPLICATION WAS APPROVED.

FOOD AND COLOR ADDITIVES (SECTION 156(G)(2))

THE REGULATORY REVIEW PERIOD FOR FOOD AND COLOR ADDITIVES IS THE SUM OF THE
PERIODS:  (1) BEGINNING WHEN A MAJOR HEALTH OR ENVIRONMENTAL EFFECTS TEST FOR A
FOOD OR COLOR ADDITIVE WAS INITIATED AND ENDING WHEN A PETITION REQUESTING THE
ISSUANCE OF A REGULATION FOR USE OF THE ADDITIVE WAS INITIALLY SUBMITTED; AND (2)
BEGINNING WHEN A PETITION FOR THE ISSUANCE OF A REGULATION WAS INITIALLY SUBMITTED
AND ENDING WHEN THE REGULATION BECAME EFFECTIVE.

IF PERMISSION FOR COMMERCIAL MARKETING WAS DELAYED BECAUSE OBJECTIONS WERE FILED
TO THE REGULATION, OR IF SUCH PERMISSION WAS INITIALLY GRANTED AND LATER REVOKED
BEFORE ACTUAL MARKETING BEGAN BECAUSE OBJECTIONS WERE FILED TO THE REGULATION,
THEN THE PERIOD DESCRIBED IN (2) ABOVE WOULD END WHEN THE OBJECTIONS WERE RESOLVED
AND COMMERCIAL MARKETING WAS PERMITTED.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

## MEDICAL DEVICES (SECTION 156(G)(3))

THE REGULATORY REVIEW PERIOD FOR MEDICAL DEVICES IS THE SUM OF THE PERIODS:
(1) BEGINNING WHEN HUMAN CLINICAL INVESTIGATIONS ARE **\*45 \*\*2678** COMMENCED AND
ENDING WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED; AND (2) BEGINNING
WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED AND ENDING WHEN THE
APPLICATION WAS APPROVED, OR BEGINNING WHEN A NOTICE OF COMPLETION OF A PRODUCT
DEVELOPMENT PROTOCOL WAS INITIALLY SUBMITTED AND ENDING WHEN THE PROTOCOL WAS
DECLARED COMPLETED.

## LIMITATIONS ON THE REGULATORY REVIEW PERIOD (SECTION 156(G)(4))

A DISCUSSION OF THIS SECTION IS CONTAINED IN THE EARLIER SECTION 156(C) ENTITLED
'PERIOD OF EXTENSION'.

## SECTION 156(H)

## FEES FOR APPLICATIONS

THE COMMISSIONER OF PATENTS AND TRADEMARKS IS AUTHORIZED TO ESTABLISH SUCH FEES
AS HE DETERMINES APPROPRIATE TO COVER THE ENTIRE COST OF THE PATENTS AND
TRADEMARKS OFFICE OF RECEIVING AND ACTING UPON APPLICATIONS FOR PATENT EXTENSIONS.

## SECTION 202 OF THE BILL

SECTION 202 CREATES A NEW SECTION 271(E) IN TITLE 35 OF THE U.S.C. THE PATENT
LAW.

## PATENT INFRINGEMENT (SECTION 271(E))

SECTION 271(E)(1) PROVIDES THAT IT SHALL NOT BE AN ACT OF INFRINGEMENT TO MAKE,
USE, OR SELL A PATENTED INVENTION SOLELY FOR USES REASONABLY RELATED TO THE
DEVELOPMENT AND SUBMISSION OF INFORMATION UNDER A FEDERAL LAW WHICH REGULATES THE
APPROVAL OF DRUGS.  THIS SECTION DOES NOT PERMIT THE COMMERCIAL SALE OF A PATENTED
DRUG BY THE PARTY USING THE DRUG TO DEVELOP SUCH INFORMATION, BUT IT DOES PERMIT
THE COMMERCIAL SALE OF RESEARCH QUANTITIES OF ACTIVE INGREDIENTS TO SUCH PARTY.
THE INFORMATION WHICH CAN BE DEVELOPED UNDER THIS PROVISION IS THE TYPE WHICH IS
REQUIRED TO OBTAIN APPROVAL OF THE DRUG.  A PARTY WHICH DEVELOPS SUCH INFORMATION,
BUT DECIDES NOT TO SUBMIT AN APPLICATION FOR APPROVAL, IS PROTECTED AS LONG AS THE
DEVELOPMENT WAS DONE TO DETERMINE WHETHER OR NOT AN APPLICATION FOR APPROVAL WOULD
BE SOUGHT.
SECTION 271(E)(2) PROVIDES THAT IT SHALL BE AN ACT OF PATENT INFRINGEMENT TO
SUBMIT AN ANDA FOR A DRUG (1) WHICH IS CLAIMED IN A VALID PRODUCT PATENT, OR (2) A
USE OF WHICH IS CLAIMED IN A VALID USE PATENT, IF THE PURPOSE OF SUBMITTING THE
ANDA IS TO GET APPROVAL OF THE ANDA WITH AN EFFECTIVE DATE PRIOR TO THE EXPIRATION
OF SUCH PATENTS.
THE PURPOSE OF SECTIONS 271(E)(1) AND (2) IS TO ESTABLISH THAT EXPERIMENTATION

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

WITH A PATENTED DRUG PRODUCT, WHEN THE PURPOSE IS TO PREPARE FOR COMMERCIAL
ACTIVITY WHICH WILL BEGIN AFTER A VALID PATENT EXPIRES, IS NOT A PATENT
INFRINGEMENT.  SINCE THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT
BEGAN CONSIDERATION OF THIS BILL, THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT
HELD THAT THIS TYPE OF EXPERIMENTATION IS INFRINGEMENT.
    IN ROCHE PRODUCTS, INC. V. BOLAR PHARMACEUTICAL CO., INC.-- F.2D-- (FED. CIR.,
APRIL 23, 1984), THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT HELD THAT THE
EXPERIMENTAL USE OF A DRUG PRODUCT PRIOR TO THE **46 **2679 EXPIRATION DATE OF A
PATENT CLAIMING THAT DRUG PRODUCT CONSTITUTES PATENT INFRINGEMENT, EVEN THOUGH THE
ONLY PURPOSE OF THE EXPERIMENTS IS TO SEEK FDA APPROVAL FOR THE COMMERCIAL SALE OF
THE DRUG AFTER THE PATENT EXPIRES.  IT IS THE COMMITTEE'S VIEW THAT EXPERIMENTAL
ACTIVITY DOES NOT HAVE ANY ADVERSE ECONOMIC IMPACT ON THE PATENT OWNER'S
EXCLUSIVITY DURING THE LIFE OF A PATENT, BUT PREVENTION OF SUCH ACTIVITY WOULD
EXTEND THE PATENT OWNER'S COMMERCIAL EXCLUSIVITY BEYOND THE PATENT EXPIRATION
DATE.
    ARTICLE 1, SECTION 8, CLAUSE 8 OF THE CONSTITUTION EMPOWERS CONGRESS TO GRANT
EXCLUSIVE RIGHTS TO AN INVENTOR FOR A LIMITED TIME. THAT LIMITED TIME SHOULD BE A
DEFINITE TIME AND, THEREAFTER, IMMEDIATE COMPETITION SHOULD BE ENCOURAGED.  FOR
THAT REASON, TITLE I OF THE BILL PERMITS THE FILING OF ABBREVIATED NEW DRUG
APPLICATIONS BEFORE A PATENT EXPIRES AND CONTEMPLATES THAT THE EFFECTIVE APPROVAL
DATE WILL BE THE EXPIRATION DATE OF THE VALID PATENT COVERING THE ORIGINAL
PRODUCT. OTHER SECTIONS OF TITLE II PERMIT THE EXTENSION OF THE TERM OF A PATENT
FOR A DEFINITE TIME PROVIDED CERTAIN CONDITIONS ARE MET.  THERE SHOULD BE NO OTHER
DIRECT OR INDIRECT METHOD OF EXTENDING PATENT TERM.

            REMEDIES FOR PATENT INFRINGEMENT (SECTION 271(C)(3)-(4))

    IN AN INFRINGEMENT ACTION PURSUANT TO THIS SECTION, NO INJUNCTIVE OR OTHER
RELIEF COULD BE GRANTED TO PROHIBIT THE ACTIVITY WHICH IS PERMITTED BY SECTION
271(E)(1).
    THE COMMITTEE EXPECTS THAT INFRINGEMENT ACTIONS PURSUANT TO THIS SECTION WILL
ONLY BE BROUGHT IN THE INSTANCE DESCRIBED IN SECTION 271(E)(2), WHERE A PARTY
SUBMITTING AN ABBREVIATED NEW DRUG APPLICATION UNDER TITLE I OF THIS BILL
CERTIFIES THAT A PATENT IS INVALID OR NON-INFRINGED AND GIVES THE REQUIRED NOTICE
OF THAT CERTIFICATION TO THE PATENT OWNER.  IN THE EVENT THE PATENT IS FOUND TO BE
VALID AND INFRINGED, SO THAT THE ACT OF INFRINGEMENT DESCRIBED IN SECTION
271(E)(2) HAS OCCURRED, THE REMEDIES AVAILABLE TO THE COURT ARE THREE-FOLD.
    IF THE INFRINGING PARTY HAS NOT BEGUN COMMERCIAL MARKETING OF THE DRUG,
INJUNCTIVE RELIEF MAY BE GRANTED TO PREVENT ANY COMMERCIAL ACTIVITY WITH THE DRUG
AND THE FDA WOULD BE MANDATED TO MAKE THE EFFECTIVE DATE OF ANY APPROVED ANDA NOT
EARLIER THAN THE EXPIRATION DATE OF THE INFRINGED PATENT.  THE INJUNCTION COULD
NOT PROHIBIT THE INFRINGING PARTY FROM USING THEIR INFORMATION CONTAINED IN THE
APPLICATION TO SUPPORT THE APPROVAL OF THE APPLICATION AT THE LATER EFFECTIVE
DATE.  IN THE CASE WHERE THE ANDA HAD NOT BEEN APPROVED, THE ORDER WOULD MANDATE
THE EFFECTIVE DATE OF ANY APPROVAL TO BE NOT EARLIER THAN THE EXPIRATION DATE OF
THE INFRINGED PATENT.  IN THE CASE WHERE AN ANDA HAD BEEN APPROVED, THE ORDER
WOULD MANDATE A CHANGE IN THE EFFECTIVE DATE.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

   IF THE INFRINGING PARTY HAS BEGUN COMMERCIAL MARKETING OF THE DRUG, DAMAGES AND
OTHER MONETARY RELIEF AND INJUNCTIVE RELIEF MAY BE AWARDED FOR THE INFRINGEMENT
AND TO PREVENT FURTHER INFRINGEMENT.  IN ADDITION, THE FDA WOULD BE MANDATED TO
CHANGE THE EFFECTIVE DATE OF THE APPROVED ANDA TO THE EXPIRATION DATE OF THE
INFRINGED PATENT.

                    **\*47 \*\*2680** SECTION 203 OF THE BILL

   SECTION 203 ADDS A NEW PROVISIONS TO SECTION 282 OF TITLE 35, UNITED STATES CODE.

                DEFENSES TO PATENT INFRINGEMENT (SECTION 282)

   THE NEW PROVISION IN SECTION 282 PROVIDES THAT AN IMPROPER GRANT OF PATENT
EXTENSION, OR ANY PORTION THEREOF, BECAUSE OF A MATERIAL FAILURE BY THE APPLICANT
OR BY THE COMMISSIONER OF PATENTS AND TRADEMARKS TO COMPLY WITH THE REQUIREMENTS
OF SECTION 156, IS A DEFENSE IN ANY ACTION INVOLVING THE INFRINGEMENT OF THE
PATENT DURING THE PATENT EXTENSION. ANY FAILURE BY THE APPLICANT TO COMPLY WITH
THE REQUIREMENTS OF SECTION 156 WOULD BE CONSIDERED MATERIAL ONLY IF THE FAILURE
WOULD HAVE CHANGES THE DECISION TO GRANT THE EXTENSION OR THE LENGTH OF THE
EXTENSION. ANY FAILURE BY THE COMMISSIONER TO COMPLY WITH THE REQUIREMENTS OF
SECTION 156 WOULD BE CONSIDERED MATERIAL UNLESS THE COMMISSIONER FAILED TO MEET A
TIME DEADLINE.
   UNDER THIS PROVISION, A COURT WHICH FOUND SOME PORTION OF THE EXTENSION TO BE
IMPROPERLY GRANTED WOULD NOT INVALIDATE THE ENTIRE PATENT EXTENSION.  FOR EXAMPLE,
IF THE COMMISSIONER MADE A MATHEMATICAL ERROR THAT RESULTED IN A FIVE YEAR
EXTENSION INSTEAD OF THE FOUR YEAR EXTENSION TO WHICH THE APPLICANT WAS ENTITLED,
THE COURT WOULD INVALIDATE ONLY THAT PORTION OF THE PATENT EXTENSION IMPROPERLY
GRANTED.
   IMPLICIT IN SECTION 156 IS A DIRECTIVE TO THE COMMISSIONER TO CORRECT ANY
FAILURE ON HIS PART THAT RESULTED IN THE FUNDING OF INVALIDITY OF A PATENT
EXTENSION OR ANY PORTION OF IT.  THE NEW PROVISION DOES NOT CREATE ANY CAUSE OF
ACTION UNDER THE TORT CLAIMS ACT AGAINST THAT COMMISSIONER OR ANY PATENTS AND
TRADEMARKS OFFICE EMPLOYEE INVOLVED WITH THE EXTENSION.
   IN AN ACTION INVOLVING THIS NEW PROVISION, THE DETERMINATION REGARDING DUE
DILIGENCE MADE UNDER SECTION 156(D)(2) IS NOT SUBJECT TO REVIEW.

                                AGENCY VIEWS

   AGENCY COMMENTS WERE SUBMITTED BY THE FOOD AND DRUG ADMINISTRATION DURING THE
JULY 15, 1983, HEARING OF THE SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT.

                 *          *          *          *

               **\*71 \*\*2681** MINORITY VIEWS OF MR. BLILEY

                              INTRODUCTION

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

H.R. 3605, AS REPORTED BY THE COMMITTEE, IS A BILL DESCRIBED BY ITS PROPONENTS
AS HAVING SOMETHING FOR EVERYONE-- RESTORATION OF PATENT TERMS FOR PRODUCTS
SUBJECT TO ELABORATE PREMARKET APPROVAL REQUIREMENTS TO PROVIDE INCENTIVES FOR
PHARMACEUTICAL RESEARCH AND FACILITATION OF APPROVAL OF GENERIC DRUGS BY THE FOOD
AND DRUG ADMINISTRATION UNDER ABBREVIATED APPLICATION PROCEDURES TO INCREASE DRUG
PRICE COMPETITION. THE OBJECTIVES OF THIS LEGISLATION ARE SALUTARY AND HAVE THE
SUPPORT OF ALL INTERESTED PARTIES.  IN MY VIEW, HOWEVER, THE LEGISLATION FAILS TO
ACHIEVE A PROPER BALANCE BETWEEN THESE TWO OBJECTIVES.
  INSTEAD OF PROVIDING AN APPROPRIATE PATENT TERM FOR PHARMACEUTICALS BY RESTORING
THE TIME DEVOTED TO PERIODS OF 'REGULATORY REVIEW,' THE BILL STRICTLY LIMITS THE
TYPES OF PATENTS ELIGIBLE FOR TERM RESTORATION AND THE CONDITIONS AND LENGTH OF
THE RESTORATION PERIOD.  IN SHORT, THE PATENT TERM RESTORATION PROVISIONS OF THIS
BILL ARE LARGELY ILLUSORY. MOREOVER, THE BILL WOULD OVERRULE A DECISION OF THE
HIGHEST PATENT COURT IN THIS COUNTRY AND THEREBY ALLOW GENERIC DRUG COMPANIES TO
USE A PATENTED PRODUCT DURING THE TERM OF THE PATENT.  THIS IS A SUBSTANTIAL
DIMINUTION OF THE RIGHTS CURRENTLY HELD BY THE OWNER OF THE PATENT AND HAS SERIOUS
CONSTITUTIONAL AND POLICY IMPLICATIONS WHICH HAVE NOT BEEN CONSIDERED BY THE
COMMITTEE.  THE PATENT PROVISIONS OF THIS BILL ALSO ENCOURAGE PATENT 'JUMPING' AND
LITIGATION OVER THE VALIDITY OF PATENTS.
  THE ABBREVIATED NEW DRUG APPLICATION (ANDA) PROVISIONS OF THIS BILL ARE EQUALLY
TROUBLESOME.  FOR EXAMPLE, THE BILL HAS SUBSTANTIAL ADVERSE EFFECTS ON THE
RESOURCES AND LEGAL AUTHORITY OF THE FOOD AND DRUG ADMINISTRATION, WHICH HAS
EXPRESSED SOME OF ITS CONCERNS ABOUT THE BILL IN A DOCUMENT ENTITLED 'TECHNICAL
COMMENTS ON JUNE 2 DISCUSSION DRAFT ANDA/PATENT TERM RESTORATION LEGISLATION,'
LARGELY TO NO AVAIL.  MANY MEMBERS OF THE CONGRESS AND VARIOUS PRESTIGIOUS
ACADEMIC AND STUDY GROUPS HAVE EXPLORED RECENTLY THE NEED FOR FASTER APPROVALS OF
INNOVATIVE AND MEDICALLY NECESSARY NEW DRUGS.  THE NEED TO ACCELERATE THE APPROVAL
OF NEW DRUGS HAS BEEN ACKNOWLEDGED BY NEARLY EVERYONE, INCLUDING THE FDA.  IT IS
ASTONISHING, IN LIGHT OF THE WIDELY HELD VIEW THAT THE NEW DRUG APPROVAL PROCESS
TAKES TOO LONG, THAT THE COMMITTEE REPORTED H.R. 3605, WHICH IMPOSES SUBSTANTIAL
NEW ADMINISTRATIVE AND RESOURCE BURDENS ON THE FDA WHICH WILL ALMOST CERTAINLY
HAVE THE EFFECT OF FORCING FDA TO DIVERT RESOURCES FROM THE REVIEW AND APPROVAL OF
NEW THEREPEUTIC ENTITIES TO THE REVIEW AND APPROVAL OF COPIES OF ALREADY-AVAILABLE
DRUGS.
  I AM DEEPLY CONCERNED THAT IN ITS HASTE TO REPORT THIS LENGTHY AND COMPLEX BILL,
THE COMMITTEE HAS FAILED TO CONSIDER FULLY AND ADEQUATELY ITS EFFECTS-- INTENDED
AND UNINTENDED, DESIRABLE AND UNDESIRABLE-- IN **72** EITHER HEARINGS OR MARKUP.
H.R. 3605 IS A SIGNIFICANT PIECE OF LEGISLATION WITH IMPORTANT IMPLICATIONS FOR
CONSUMERS, RESEARCH-**2682** BASED PHARMACEUTICAL COMPANIES, GENERIC DRUG COMPANIES
AND FOR THE FDA.  IN POINT OF FACT, HOWEVER, THE COMMITTEE HAS REPORTED A HIGHLY
SIGNIFICANT AND LENGTHY BILL WITHOUT ANY HEARINGS HAVING BEEN HELD ON IT IN EITHER
THE HEALTH SUBCOMMITTEE OR IN THE FULL COMMITTEE. IT IS NO ANSWER TO SAY THAT THE
BILL IS THE RESULT OF LENGTHY NEGOTIATIONS BETWEEN THE BRANDNAME AND GENERIC DRUG
INDUSTRY TRADE ASSOCIATIONS.  MANY SIGNIFICANT INTERESTS, INCLUDING THE HIGHLY
INNOVATIVE AND RESEARCH-ORIENTED PHARMACEUTICAL FIRMS HAVE SERIOUS RESERVATIONS
ABOUT THE BILL AS REPORTED AS APPARENTLY, DOES THE FDA.
  H.R. 3605 IS AN ADMIRABLE BEGINNING TO THE PROCESS OF STRIKING AN APPROPRIATE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 35

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

BALANCE AMONG A VARIETY OF COMPETING AND IMPORTANT POLICY OBJECTIVES.  THERE IS
AMPLE TIME FOR, AND A COMPELLING NEED TO, CONSIDER, REVISE AND IMPROVE UPON THE
BILL.  IN MY VIEW, THE BILL SHOULD BE RETURNED TO THE HEALTH SUBCOMMITTEE FOR
FURTHER HEARINGS AND AMENDMENT, RATHER THAN BEING REPORTED IN HASTE BY THIS
COMMITTEE.  FURTHER, BECAUSE THIS COMMITTEE LACKS EXPERTISE IN PATENT MATTERS, THE
COMMITTEE IS NOT QUALIFIED TO EVALUATE THE PATENT PROVISIONS OF H.R. 3605.  WE DO
THIS INSTITUTION A DISSERVICE BY HASTILY REPORTING ON THE VERY DAY OF
INTRODUCTION, A COMPLEX BILL OUTSIDE THE EXPERTISE OF THE COMMITTEE AFTER A
'MARKUP' THAT LASTED BARELY THIRTY MINUTES.
   IN THE NEXT SECTIONS OF MY VIEWS, I DESCRIBE IN GREATER DETAIL THE SIGNIFICANT
AREAS IN WHICH THIS BILL IS DEFICIENT.

                 I. TITLE I-- ABBREVIATED NEW DRUG APPLICATIONS

                        A. LIMITS ON FDA AUTHORITY

   BOTH THE RESEARCH-BASED PHARMACEUTICAL COMPANIES WHICH FAVOR AMENDMENTS TO  H.R.
3605 AND THE FDA ITSELF HAVE IDENTIFIED WAYS IN WHICH THE BILL UNWISELY RESTRICTS
FDA'S AUTHORITY TO ENSURE THAT ALL DRUGS ARE DEMONSTRATED TO BE SAFE AND
EFFECTIVE.
   FIRST, THE BILL EXPRESSLY PROHIBITS FDA FROM REQUESTING DATA ON THE SAFETY OR
EFFICACY OF CERTAIN GENERIC DRUGS, EVEN WHERE SUCH DATA ARE NEEDED TO FULFILL THE
FDA'S PUBLIC HEALTH RESPONSIBILITIES.  ALTHOUGH ONE WOULD NOT ANTICIPATE THAT FDA
WOULD NEED TO RESORT TO THIS AUTHORITY VERY OFTEN, I BELIEVE IT IS A FUNDAMENTAL
MISTAKE TO DEPRIVE THE FDA OF THE AUTHORITY SIMPLY BECAUSE IT IS ASSUMED THAT IT
WILL NEED TO EXERCISE IT ONLY RARELY.
   SECOND, IT HAS BEEN THE LONGSTANDING POLICY OF FDA TO REQUIRE THAT PERSONS
SEEKING TO MARKET DRUGS COMBINING TWO OR MORE ACTIVE INGREDIENTS DEMONSTRATE THAT
THE COMBINATION ITSELF, AS OPPOSED TO THE ACTIVE INGREDIENTS INDIVIDUALLY, BE
SHOWN TO BE SAFE AND EFFECTIVE. FDA'S AUTHORITY TO REQUIRE THIS PROOF HAS BEEN
UPHELD BY THE COURTS. WITHOUT EXPLANATION OR HEARING, H.R. 3605 WOULD OVERRULE
THIS POLICY AND LIMIT FDA'S CONSIDERATION OF SAFETY AND EFFICACY TO THE INDIVIDUAL
ACTIVE INGREDIENTS OF COMBINATION DRUGS.  I DO NOT BELIEVE THAT THE CONGRESS
SHOULD PROVIDE FOR THE APPROVAL OF NEW COMBINATIONS OF DRUGS WITHOUT REQUIRING THE
APPLICANT TO DEMONSTRATE THAT THE COMBINATION IS SAFE AND EFFECTIVE.  THE PUBLIC
HEALTH SHOULD NOT BE COMPROMISED IN THIS FASHION.

                  *73 **2683 B. RESOURCE IMPLICATIONS

   THE REVIEW AND APPROVAL BY FDA OF NEW PHARMACEUTICALS-- OFTEN INNOVATIVE AND
HIGHLY DESIRABLE DEVELOPMENTS ESSENTIAL TO THE HEALTH OF OUR CITIZENS-- IS PERHAPS
THE MOST IMPORTANT FUNCTION THAT THE CONGRESS HAS GIVEN TO THE FDA. THE AMERICAN
PEOPLE AND THE MEMBERS OF THE CONGRESS RIGHTLY EXPECT THAT THIS FUNCTION BE
PERFORMED COMPETENTLY AND EXPEDITIOUSLY.  NEW DRUGS ARE OFTEN INEXPENSIVE WAYS TO
CURE LIFE-THREATENING OR DEBILITATING DISEASES. UNNECESSARY DELAY IN MAKING THESE
DRUGS AVAILABLE TO PHYSICIANS HAS BEEN A CONTINUING CONCERN TO ME, MANY OTHER
MEMBERS OF THE CONGRESS, TO THE FDA, TO THE MEDICAL COMMUNITY AND OTHERS.  THE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SO-CALLED 'DRUG LAG' AND THE NEED TO EXPEDITE DRUG APPROVALS HAS BEEN WIDELY
STUDIED AND RECOMMENDATIONS FOR IMPROVEMENTS ABOUND.  INDEED, FDA IS IN THE MIDST
OF REVISING ITS REGULATIONS AND PROCEDURES FOR NEW DRUG APPROVALS.

    ASTONISHINGLY, THEN, THE COMMITTEE HAS REPORTED A BILL WHICH IS LIKELY TO REDUCE
FDA'S ABILITY TO IMPROVE ITS NEW DRUG APPROVAL PROCEDURES AND ITS TIMELINESS IN
ACTING ON NEW DRUG APPLICATIONS.  FDA HAS EXPRESSED CONCERN IN ITS 'TECHNICAL
COMMENTS' THAT THE BILL REPORTED BY THE COMMITTEE WILL RESULT IN A 'SUBSTANTIAL
INCREASE IN WORK LOAD DURING THE FIRST FEW YEARS IMMEDIATELY FOLLOWING ENACTMENT.'
IT IS OBVIOUS THAT THIS INCREASE IN WORKLOAD WILL OBLIGATE FDA TO REALLOCATE
PERSONNEL FROM NEW DRUG REVIEW TO ANDA REVIEW. BECAUSE THE BILL ALSO CONTAINS TIME
LIMITS ON FDA'S ACTIONS ON ANDAS WHICH ARE FAR MORE RESTRICTIVE THAN THOSE FOR
NDAS, [FN21]  THIS PROBLEM WILL BE FURTHER EXACERBATED.  IT IS APPARENTLY THE
COMMITTEE'S VIEW THAT REVIEW OF ANDAS IS A MORE IMPORTANT PRIORITY FOR FDA THAN
NDAS.  I TAKE STRONG EXCEPTION TO THAT JUDGMENT.

    AS FDA HAS SUGGESTED, A PHASE-IN OF ELIGIBILITY OF ANDAS WOULD AMELIORATE MUCH
OF ITS WORKLOAD BURDEN WHILE SIMULTANEOUSLY MAKING AVAILABLE IMMEDIATELY FOR ANDA
TREATMENT SIX OF THE DRUGS THAT ARE AMONG THE TOP SELLING PRESCRIPTION DRUG
PRODUCTS.  I URGE THE MEMBERS OF THE HOUSE TO CONSIDER THIS IDEA AMONG OTHERS AS A
WAY TO GREATLY IMPROVE UPON THIS BILL.

### C. DISCLOSURE OF PROPRIETARY DATA

    THE BILL REPORTED BY THE COMMITTEE PROVIDES FOR THE PUBLIC DISCLOSURE OF ALL OF
THE EXTENSIVE AND COSTLY RESEARCH DATA GENERATED BY RESEARCH-ORIENTED
PHARMACEUTICAL COMPANIES, EVEN THOUGH THOSE SAFETY AND EFFECTIVENESS DATA MAY BE
OF SIGNIFICANT VALUE TO FOREIGN COMPETITORS OR MAY RETAIN PROPRIETARY VALUE IN THE
UNITED STATES. THESE DATA MAY WELL RETAIN COMMERCIAL VALUE, EVEN WHEN FDA NO
LONGER REQUIRES AN APPLICANT TO SUBMIT THEM FOR APPROVAL OF A DRUG (I.E., WHEN AN
ANDA MAY BE FILED WITH FDA, THE FULL DATA ARE NOT NEEDED).  THE DATA MAY STILL BE
VALUABLE, FOR EXAMPLE, BECAUSE IN MANY FOREIGN COUNTRIES ALL OR A PORTION OF THESE
DATA ARE NEEDED TO OBTAIN APPROVAL.  THESE DATA WILL BE VALUABLE PARTICULARLY IN
THOSE COUNTRIES WHICH DO NOT RECOGNIZE U.S. PATENTS. BY PROVIDING FOR THE **74
**2684 RELEASE OF THESE DATA, THE BILL HANDS TO FOREIGN COMPETITORS OF U.S. DRUG
FIRMS, FOR THE MERE PRICE OF PHOTOCOPYING CHARGES, DATA WHICH COST MANY MILLIONS
OF DOLLARS TO OBTAIN AND WHICH CAN BE USED TO OBTAIN APPROVAL TO MARKET DRUGS IN
COMPETITION WITH THE OWNER AND GENERATOR OF THE DATA.  THIS PROVISION OF H.R. 3605
IS HARDLY THE WAY TO PROTECT AND IMPROVE THE COMPETITIVENESS OF AMERICA'S
PHARMACEUTICAL INDUSTRY.

    IT SHOULD ALSO BE NOTED THAT THIS PROVISION OF H.R. 3605 HAS SIGNIFICANT
RESOURCE IMPLICATIONS FOR FDA.  UNDER THE FREEDOM OF INFORMATION ACT, FDA IS
OBLIGATED TO RESPOND TO REQUESTS FOR DOCUMENTS IN ITS FILES, INCLUDING THE
VOLUMINOUS SAFETY AND EFFECTIVENESS DATA MADE AVAILABLE BY THE BILL, ORDINARILY
WITHIN TEN DAYS.  SINCE THE ENACTMENT OF THE FOI ACT, FDA HAS CONSISTENTLY
RECEIVED MORE REQUESTS FOR DOCUMENTS THAN VIRTUALLY ANY OTHER FEDERAL AGENCY. IN
1983, FDA RECEIVED OVER 39,000 FOI REQUESTS.  ONE HUNDRED TWENTY-FIVE 'FULL TIME
EQUIVALENTS,' MANY HIGHLY TRAINED SCIENTISTS AND DOCTORS, WERE REQUIRED TO PROCESS
THESE REQUESTS.  UNDER H.R. 3605, OVER TWENTY YEARS OF SAFETY AND EFFECTIVENESS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

DATA AND INFORMATION WILL, IMMEDIATELY UPON ENACTMENT, BE AVAILABLE FOR
DISCLOSURE.  IF FDA WERE TO RECEIVE REQUESTS FOR EVEN A MODEST PART OF THOSE DATA,
THE WORKLOAD AND RESOURCE BURDENS WOULD BE STAGGERING.  I FAIL TO SEE HOW THE
PUBLIC BENEFITS BY HAVING FDA BE FORCED TO DIVERT SCARCE TECHNICAL PERSONNEL AND
RESOURCES TO PROCESSING FDA REQUESTS AND ANDAS, AT THE EXPENSE OF NEW DRUG
APPLICATIONS AND OTHER IMPORTANT PUBLIC HEALTH FUNCTIONS.

          II.  TITLE II-- PATENT TERM RESTORATION

   H.R. 3605 CONTAINS MANY SIGNIFICANT REVISIONS TO OUR PATENT LAWS. RATHER THAN
RESTORING PATENT TERMS LOST DURING EXTENSIVE REGULATORY REVIEW PERIODS, THESE
REVISIONS ELIMINATE MANY OF THE SIGNIFICANT RIGHTS WHICH CURRENTLY ACCRUE TO THE
PATENT OWNER.  MOREOVER, THE PATENT TERM RESTORATION PROVISIONS ARE SO RESTRICTIVE
THAT THEIR EFFECT MAY WELL BE LARGELY ILLUSORY.  INNOVATION IS NOT ENCOURAGED BY
THESE PATENT PROVISIONS.

          A. LOSS OF PATENT RIGHTS

   I AM ADVISED THAT IT HAS LONG BEEN ACCEPTED THAT TO USE, SELL OR MAKE A PATENTED
PRODUCT DURING THE LIFE OF THE PATENT CONSTITUTES PATENT INFRINGEMENT.  THIS
ASPECT OF THE RIGHTS ACCRUING TO THE PATENT OWNER WAS RECENTLY REAFFIRMED IN THE
CONTEXT OF GENERIC DRUGS IN THE SO-CALLED BOLAR CASE.  THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT HELD, CONSISTENT WITH PRIOR LAW, THAT A GENERIC
DRUG COMPANY MAY NOT FORMULATE AND TEST ITS VERSION OF ANOTHER COMPANY'S PATENTED
DRUG UNTIL THE PATENT TERM EXPIRES.  THE BOLAR DECISION IS SOUND LAW AND SHOULD BE
RETAINED.
   H.R. 3605, HOWEVER, WOULD OVERRULE BOLAR AND THEREBY PERMIT A GENERIC DRUG
COMPANY TO ENGAGE IN ACTS WHICH HERETOFORE WOULD HAVE CONSTITUTED PATENT
INFRINGEMENT.  IT IS EXTREMELY DOUBTFUL THAT IT IS SOUND POLICY IN A BILL DESIGNED
TO RESTORE PATENT LIFE, TO DRAMATICALLY CUT BACK ON EXISTING PATENT RIGHTS.
   I AM ALSO CONCERNED THAT THE CONSTITUTIONAL IMPLICATIONS OF THIS PROVISION OF
H.R. 3605 HAVE NOT BEEN CONSIDERED.  BY OVERRULING BOLAR, THE BILL RETROSPECTIVELY
DEPRIVES THE PATENT HOLDER OF VALUABLE **75 **2685 RIGHTS. PATENT RIGHTS REPRESENT
BOTH A CONTRACTUAL RIGHT BETWEEN THE PATENT HOLDER AND THE U.S. GOVERNMENT AND A
RECOGNIZED PROPERTY RIGHT.  THE CONSTITUTION PREVENTS THE GOVERNMENT FROM
IMPAIRING THE RIGHTS OF CONTRACT AND FROM 'TAKING' OR DEPRIVING ONE OF A PROPERTY
RIGHT WITHOUT JUST COMPENSATION.  BY OVERRULING BOLAR FOR PATENTS ALREADY ISSUED,
H.R. 3605 VIOLATES THESE IMPORTANT PROTECTIONS FOUND IN OUR CONSTITUTION.

          B. RESTRICTIONS ON PATENT TERM RESTORATION

   UNDER H.R. 3605, MOST PATENTS WILL NOT BE ELIGIBLE FOR RESTORATION, EVEN THOUGH
THEY MAY COVER PRODUCTS OR METHODS OF USE, FORMULATION OR ADMINISTRATION, OF
INNOVATIVE DRUGS WHICH REQUIRED MANY YEARS AND GREAT EXPENSE TO RESEARCH AND
DEVELOP AND EVEN THOUGH MANY YEARS MAY HAVE BEEN DEVOTED TO SECURING AN APPROVAL
TO MARKET FROM THE FDA.  THE BILL THUS FAILS TO ACHIEVE ONE OF ITS PRINCIPAL
PURPOSES:  TO ENSURE THAT SUFFICIENT INCENTIVES EXIST FOR INNOVATION.

          © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**

   A FEW EXAMPLES OF THE RESTRICTIVE APPROACH TO PATENT TERM RESTORATION WILL
DEMONSTRATE THE INADEQUACIES OF H.R. 3605.
   UNDER PRESENT LAW, A PATENT CAN BE OBTAINED CONTAINING A BROAD CLAIM (GENUS)
COVERING MANY COMPOUNDS.  IT IS DIFFICULT AND REQUIRES A LARGE INVESTMENT BY THE
INNOVATOR, BUT IS STILL POSSIBLE SUBSEQUENTLY TO OBTAIN A PATENT FOR SPECIFIC
CLAIMS (SPECIES) ON A FEW SPECIFIC COMPOUNDS ENCOMPASSED WITHIN THE GENUS.  UNDER
THE BILL, SHOULD A PATENT HOLDER OBTAIN A PATENT WITH SPECIES CLAIMS COVERED BY A
PREVIOUSLY-ISSUED GENUS PATENT, THE PATENT HOLDER COULD NOT OBTAIN RESTORATION OF
THE TERM OF THE SPECIES PATENT.
   IN ADDITION, UNDER PRESENT LAW, THE PATENT OFFICE CAN REQUIRE THAT THE CLAIMS IN
A PATENT APPLICATION BE DIVIDED AND PROSECUTED IN SEPARATE PATENTS.  UNDER THE
BILL, THE FIRST ISSUED PATENT OF THE SERIES WOULD BE THE ONLY PATENT TERM ENTITLED
TO RESTORATION, AND SUBSEQUENTLY ISSUED PATENTS OF THE SERIES WOULD BE PRECLUDED
FROM RESTORATION.  ACCORDINGLY, UNLESS AN FDA APPROVED PRODUCT IS CLAIMED WITHIN
THE FIRST ISSUED PATENT OF THE SERIES, RESTORATION OF A PATENT TERM COVERING THE
PRODUCT WOULD NOT BE AVAILABLE.  DURING THE PATENT APPLICATION PROCESS, IT IS
IMPOSSIBLE TO KNOW WHICH DRUG OR DRUGS WILL ULTIMATELY BE SUCCESSFULLY TESTED AND
MARKETED.  THEREFORE, A PATENT HOLDER IS BEING DENIED THE BENEFIT OF PATENT TERM
RESTORATION DUE TO CIRCUMSTANCES BEYOND ITS CONTROL.
   ANOTHER EXCEPTION TO PATENT TERM RESTORATION ENCOMPASSED BY H.R. 3605 WOULD
OCCUR WHERE ONE PATENT COVERS TWO FDA APPROVED DRUGS.  ANY CLAIMS IN THE PATENT
COVERING THE SECOND FDA APPROVED DRUG COULD NOT BE RESTORED. ACCORDINGLY, ONLY ONE
RESTORATION IS AVAILABLE PER PATENT EVEN THOUGH A COMPANY MAY HAVE EXPENDED
CONSIDERABLE RESOURCES IN DEVELOPING EACH FDA APPROVED PRODUCT.
   THE BILL ALSO LIMITS AVAILABILITY OF PATENT TERM RESTORATION FOR METHOD OF
MANUFACTURING PATENTS (NOT USING DNA TECHNOLOGY), INCLUDING THE LIMITATION THAT NO
OTHER TYPE OF PATENT HAS BEEN OR 'MAY BE ISSUED FOR ANY KNOWN THERAPEUTIC
PURPOSES' CLAIMING THE METHOD OF USING THE PRODUCT.
   BY EXCLUDING SO MANY PATENTS FROM ELIGIBILITY FOR TERM RESTORATION AND BY MAKING
THE ELIGIBILITY FOR RESTORATION OF SOME PATENTS TURN ON CIRCUMSTANCES BEYOND THE
CONTROL OF THE INNOVATOR, THE BILL FALLS WELL SHORT OF PROVIDING THE INCENTIVES
FOR INNOVATION THAT IT *76 **2686 PURPORTS TO ACHIEVE.  IT IS NOT NECESSARY, OR
COURSE, THAT EVERY PATENT BE ELIGIBLE FOR EXTENSION IN ORDER FOR REASONABLE
INCENTIVES TO INNOVATE TO EXIST.  RATHER, THE BILL SHOULD PROVIDE FOR PATENT TERM
RESTORATION FOR ALL SIGNIFICANT INNOVATIONS, BE THEY IN DISCOVERING NEW CHEMICAL
ENTITIES, NEW DOSAGE FORMS, NEW USES OR SPECIES OF SUBSTANCES PREVIOUSLY COVERED
BY BROAD GENUS PATENTS.  THE RESTRICTIVE ELIGIBILITY PROVISIONS OF H.R. 3605 MAKE
PATENT TERM RESTORATION A HAPHAZARD AND INFREQUENT EVENT.  INNOVATION IS NOT
ENCOURAGED WHEN THE PROSPECT OF MEANINGFUL PATENT LIFE IS LEFT TO CHANCE AND
HAPPENSTANCE AND WHEN MOST INNOVATIONS COVERED BY PATENTS WILL NOT BE ELIGIBLE FOR
TERM RESTORATION.
   H.R. 3605 ALSO MAKES OTHER SIGNIFICANT CHANGES TO OUR PATENT LAWS WHICH NEITHER
I NOR THIS COMMITTEE HAVE HAD TIME TO LEARN ABOUT OR CONSIDER.

                         III.   CONCLUSION

   IT IS DISTRESSING AND REGRETTABLE THAT THIS COMMITTEE HAS REPORTED A COMPLEX,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 39

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


LENGTHY AND HIGHLY SIGNIFICANT PIECE OF LEGISLATION WITHOUT HOLDING HEARINGS IN
EITHER THE HEALTH SUBCOMMITTEE OR IN THE FULL COMMITTEE AND AFTER WHAT CAN ONLY BE
DESCRIBED AS A PRO FORMA MARKUP. IT IS EQUALLY DISTRESSING THAT THIS COMMITTEE
REPORTED A CONTROVERSIAL BILL WHICH CHANGES SIGNIFICANTLY OUR PATENT LAWS, AN AREA
WHICH ESCAPES EVEN THE BROAD JURISDICTION OF THIS COMMITTEE.
    I SHARE WITH OTHER MEMBERS THE DESIRE TO RESTORE PATENT LIFE LOST DURING PERIODS
OF REGULATORY REVIEW AND THE DESIRE TO FACILITATE THE APPROVAL OF GENERIC DRUGS.
I OBJECT, HOWEVER, TO THE PRECIPITOUS AND SUPERFICIAL CONSIDERATION OF THE BILL BY
THE COMMITTEE AND TO ITS FAILURE TO PROVIDE FOR AND CONSIDER, THE VIEWS OF ALL
PARTIES AFFECTED BY THE LEGISLATION.
    THOMAS J. BLILEY, JR.

    FN1    21 U.S.C. 355.

    FN2    THE TERM 'LISTED DRUG' IS EXPLAINED IN PARAGRAPH (6) OF NEW SECTION 505(J)
OF THE FFDCA.  GENERALLY, A LISTED DRUG INCLUDES ANY DRUG THAT HAS BEEN APPROVED
FOR SAFETY AND EFFECTIVENESS OR THAT HAS BEEN APPROVED UNDER NEW SUBSECTION (J).

    FN3    48 FED.REG. 2751(1983).

    FN4    ID. AT 2753.

    FN5    ID. AT 2755. 21 C.F.R. 314.2(C) PROVIDES IN PART: 'A PROSPECTIVE APPLICANT
MAY SEEK A DETERMINATION OF THE SUITABILITY OF AN ABBREVIATED NEW DRUG APPLICATION
FOR A PRODUCT THAT THE APPLICANT BELIEVES SIMILAR OR RELATED TO A DRUG PRODUCT
THAT HAS BEEN DECLARED TO BE SUITABLE FOR AN ABBREVIATED NEW DRUG APPLICATION . .
. '

    FN6    ID. AT 2756.  SEE 21 CFR 314.2(F)(4), (5), (6), (7), AND (8).

    FN7    ID. AT 2755.  SEE 21 CFR 314.2(C).

    FN8    ID. AT 2752.

    FN9    ID.

    FN10    21 U.S.C. 321(P).  FOR EXAMPLE, A DRUG MARKETED PRIOR TO 1938 AND
UNCHANGED IS A 'GRANDFATHERED DRUG' AND THUS NOT WITHIN THE SCOPE OF THE
DEFINITION OF 'NEW DRUG' SET FORTH IN SECTION 201(P) OF THE FFDCA.  ANOTHER
EXAMPLE OF A DRUG OUTSIDE THE SCOPE OF SECTION 201(P) IS A PRODUCT THAT IS
GENERALLY RECOGNIZED AS SAFE AND EFFECTIVE AND THAT HAS BEEN USED TO A MATERIAL
EXTENT OR FOR A MATERIAL TIME.

    FN11    21 U.S.C. 352(E)(1)-(4).

    FN12    SEE UNTRUE STATEMENTS IN APPLICATION, 21 C.F.R. 314.12(1982).


                   © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                    Page 40

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


   FN13   THE COMMITTEE RECOGNIZES THAT, IN CERTAIN INSTANCES, THE PATENT OWNER MAY
AGREE WITH THE CERTIFICATION OF THE APPLICANT.  FOR EXAMPLE, WHEN THE APPLICANT
CERTIFIES THAT PATENT NO. 1 IS INVALID AND PATENT NO. 2 IS NOT INFRINGED, THE
PATENT OWNER MAY AGREE WITH THE CERTIFICATION REGARDING PATENT NO. 2.  THEN AN
ACTION FOR PATENT INFRINGEMENT NEED ONLY BE BROUGHT WITH RESPECT TO PATENT NO. 1.


   FN14   28 U.S.C. 1407.


   FN15   SEE DEFINITION OF BIOAVAILABILITY, 21 C.F.R. 320.1(A)(1982).


   FN16   SEE DEFINITION OF BIOEQUIVALENT DRUG PRODUCTS, 21 C.F.R. 320.1(E)(1982).


   FN17   THE COMMITTEE RECOGNIZES THAT IN CERTAIN INSTANCES, THE PATENT OWNER MAY
AGREE WITH THE CERTIFICATION OF THE APPLICANT.  FOR EXAMPLE, WHEN THE APPLICANT
CERTIFIES THAT PATENT NO. 1 IS INVALID AND PATENT NO. 2 IS NOT INFRINGED, THE
PATENT OWNER MAY AGREE WITH THE CERTIFICATION REGARDING PATENT NO. 2.  THEN AN
ACTION FOR PATENT INFRINGEMENT NEED ONLY BE BROUGHT WITH RESPECT TO PATENT NO. 1.


   FN18   SEE CONFIDENTIALITY OF DATA AND INFORMATION IN A NEW DRUG
APPLICATION  (NDA) FILE, 21 C.F.R. 314.14(F)(1)-(4)(1982).


   FN19   21 C.F.R. 314.14(F)(5) PROVIDES: '(5) A FINAL DETERMINATION HAS BEEN MADE
THAT THE DRUG MAY BE MARKETED WITHOUT SUBMISSION OF SUCH SAFETY AND/OR
EFFECTIVENESS DATA AND INFORMATION.' THE COMMITTEE WAS CONCERNED THAT THIS
PROVISION OF THE REGULATION MIGHT BE INTERPRETED AS PERMITTING THE DISCLOSURE OF
SUCH INFORMATION AND DATA UPON ENACTMENT OF THIS BILL.  THIS IS BECAUSE ALL DRUGS
APPROVED FOR SAFETY AND EFFECTIVENESS PRIOR TO ENACTMENT OF THIS BILL ARE DEEMED
LISTED AND THUS ELIGIBLE FOR CONSIDERATION IN AN ANDA UPON ENACTMENT OF THE BILL.
THE COMMITTEE WISHED TO AVOID ANY POSSIBILITY THAT LISTING OF A DRUG UNDER THIS
BILL WOULD BE DEEMED A FINAL DETERMINATION THAT THE DRUG COULD BE APPROVED WITHOUT
THE SUBMISSION OF SAFETY AND EFFECTIVENESS INFORMATION.


   FN20   THE PHRASE 'IDENTICALLY DISCLOSED OR DESCRIBED' IS USED IN 35 U.S.C. 103
TO SET FORTH THE CONDITIONS OF 35 U.S.C. 102.


   FN21   UNDER CURRENT LAW, THE 180-DAY TIME PERIOD FOR ACTING ON AN NDA DOES NOT
BEGIN UNTIL THE NDA IS 'FILED,' I.E., IS NEARLY READY TO BE APPROVED BY
FDA.  UNDER H.R. 3605 THE 180-DAY TIME PERIOD FOR ACTING ON AN ANDA BEGINS WHEN
THE ANDA IS SUBMITTED.  A SUBSTANTIAL TIME MAY PASS BETWEEN 'SUBMISSION' AND
'FILING' WHILE THE APPLICATION IS BROUGHT INTO CONFORMITY WITH FDA'S CRITERIA FOR
APPROVAL.


(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.
        2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH
USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

          © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                          Page 41

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984
U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I),  1984 U.S.C.C.A.N. 2647)**


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.